| | |
|---|---|
| IN RE:                              ) | **Chapter 11** |
|                                     ) | |
| **BUILDING MATERIALS HOLDING**      ) | **Case No. 09-12074 ( )** |
| **CORPORATION**, *et al.*,[1]       ) | |
|                          Debtors.   ) | **Joint Administration Requested** |
|                                     ) | |
|                                     ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363(c), 364(c)(1), 364(c)(2),
364(c)(3), 364(d)(1), 364(e), AND 507 AND FED. R. BANKR. P. 2002, 4001, AND 9014
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL,
(II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (III)
MODIFYING THE AUTOMATIC STAY AND (IV) SCHEDULING A FINAL HEARING**

Building Materials Holding Corporation and certain of its affiliates, as debtors

and debtors in possession (collectively, the "***Debtors***"), submit this Motion (the "***Motion***") for the

entry of an interim order substantially in the form annexed hereto as ***Exhibit A*** (the "***Interim***

***DIP Order***") and a final order (the "***Final DIP Order***" and together with the Interim DIP Order,

the "***DIP Orders***") (I) authorizing the Debtors to (A) enter into a debtor in possession financing

agreement (as amended, restated, or otherwise modified from time to time in accordance with the

terms thereof, the "***DIP Credit Agreement***"), substantially in the form annexed hereto as ***Exhibit***

***B***, with Wells Fargo Bank, National Association ("***WFB***"), as agent (the "***DIP Agent***"), and the

other lender parties from time to time party thereto as lenders (the "***DIP Lenders***"), and (B) use

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are as follows: Building Materials Holding Corporation (4269), BMC West Corporation (0454), SelectBuild Construction, Inc. (1340), SelectBuild Northern California, Inc. (7579), Illinois Framing, Inc. (4451), C Construction, Inc. (8206), TWF Construction, Inc. (3334), H.N.R. Framing Systems, Inc. (4329), SelectBuild Southern California, Inc. (9378), SelectBuild Nevada, Inc. (8912), SelectBuild Arizona, LLC (0036), and SelectBuild Illinois, LLC (0792). The mailing address for the Debtors is 720 Park Boulevard, Suite 200, Boise, Idaho 83712.

Cash Collateral (as defined herein), (II) granting priming and other liens and providing super-priority administrative expense status, (III) granting "adequate protection" to the Prepetition Lenders (as defined herein), (IV) modifying the automatic stay, and (V) prescribing the form and manner of notice and scheduling hearings with respect to the relief requested herein. In support thereof, the Debtors respectfully represent:[2]

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. sections 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. section 157(b). Venue is proper pursuant to 28 U.S.C. sections 1408 and 1409.

## RELIEF REQUESTED

2.      By this Motion, the Debtors request that the Court grant the following relief as provided in the DIP Orders:

a.      Authorizing, pursuant to sections 105(a), 362, 363(c), and 364(c), (d), and (e) of the Bankruptcy Code (as defined herein) and Rules 2002, 4001, and 9014 of the Bankruptcy Rules (as defined herein), Building Materials Holding Corporation ("***BMHC***"), in its capacity as borrower (the "***Borrower***") to enter into the DIP Credit Agreement with the DIP Agent and the DIP Lenders, to obtain postpetition loans (the "***DIP Loans***") on the terms of the DIP Credit Agreement (together with any and all documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, as may be amended hereafter from time to time, collectively, the "***DIP Loan Documents***");

b.      Providing, pursuant to Bankruptcy Code sections 364(c)(1), (2), (3), and 364(d), that the obligations of the Debtors under the DIP Loan Documents (collectively, the "***DIP Obligations***") are, as more specifically set forth in the proposed Interim DIP Order:

---

[2] A description of the Debtors' business and the reasons for filing these Chapter 11 Cases is set forth in the Declaration of Paul S. Street in Support of Chapter 11 Petitions and First Day Relief (the "***Street Declaration***"), filed contemporaneously with this Motion. This Motion is supported by the Street Declaration.

      i.      granted super-priority administrative claim status under section 364(c)(1) of the Bankruptcy Code; and

     ii.      secured by valid, enforceable, non-avoidable, and fully perfected liens pursuant to sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code, and senior priming liens pursuant to section 364(d) of the Bankruptcy Code;

c.      Authorizing the Debtors' use of Cash Collateral pursuant to the terms and conditions set forth in the DIP Orders and the DIP Credit Agreement;

d.      Authorizing the Debtors' use of the proceeds of the DIP Facility (as defined below) pursuant to the terms and conditions set forth in the DIP Orders and the DIP Credit Agreement;

e.      Modifying the automatic stay under Bankruptcy Code section 362 to the extent set forth in the DIP Credit Agreement and the DIP Orders;

f.      Approving, pursuant to Bankruptcy Code sections 361, 363, and 364, the form and manner of adequate protection set forth herein to be provided to the Prepetition Lenders (as defined herein);

g.      Finding that notice of this Motion is proper under the circumstances pursuant to Bankruptcy Rules 2002 and 4000(c)(1) and the Local Rules; and

h.      Scheduling, pursuant to Bankruptcy Rule 4001(c)(2), a hearing (the "***Final Hearing***") on the relief requested herein.

3.      The statutory bases for relief requested herein are sections 105, 361, 362, 363, 364(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"); Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"); and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

## BACKGROUND

4.      On the date hereof (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").

The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official or statutory committee has been appointed or designated.

5.      The Debtors are one of the largest providers of residential building products and construction services in the United States. The Debtors distribute building materials, manufacture building components (e.g., millwork, floor and roof trusses, and wall panels), and provide construction services to professional builders and contractors through a network of 31 distribution facilities, 43 manufacturing facilities, and five regional construction services facilities.

6.      The Debtors operate under two brand names: BMC West® and SelectBuild®.

-  Under the BMC West brand, the Debtors market and sell building products, manufacture building components, and provide construction services to professional builders and contractors. Products include structural lumber and building materials purchased from manufacturers, as well as manufactured building components such as millwork, trusses, and wall panels. Construction services include installation of various building products and framing. The Debtors currently offer these products and services in major metropolitan markets in Texas, Washington, Colorado, Idaho, Utah, Montana, North Carolina, California, and Oregon.

-  Under the SelectBuild brand, the Debtors offer integrated construction services to production homebuilders, as well as commercial and multi-family builders. Services include wood framing, concrete services, managing labor and construction schedules, and sourcing materials. The Debtors currently offer these services in major metropolitan markets in California, Arizona, Nevada and Illinois.

7.      The Debtors operate in metropolitan areas that have historically outpaced U.S. averages for residential building permit activity (largely in the Southern and Western

portions of the United States). Based on National Association of Home Builders building permit activity, the Debtors provide building products and construction services in 9 of the top 25 single-family construction markets.

8.     In addition to their strategic geographic locations, the Debtors have many other competitive strengths that enable them to attract business. For example, the Debtors' full offering of building materials, manufactured products, and construction services allows the Debtors to help professional builders and contractors reduce costs and cycle time. Similarly, the Debtors' long-term relationships with their suppliers provide the Debtors with purchasing advantages – including volume rebate programs and preferred customer status when supplies or liquidity are limited – which are passed on to the Debtors' customers in the form of reduced costs and increased on-time reliability. The Debtors have also cultivated a reputation for providing superior quality building components and construction services by employing experienced, service-oriented individuals to procure, produce, and deliver these products and services.

9.     The Debtors' principal executive offices are located in Boise, Idaho. As of the Petition Date, the Debtors employed approximately 5,500 people. Building Materials Holding Corporation is a public company that trades on the OTC Bulletin Board under the ticker symbol BLGM. For the 12 months ended March 31, 2009, the Debtors' revenue totaled approximately $1,100,000,000. As of March 31, 2009, the book value of the Debtors' assets totaled approximately $480,000,000 and its liabilities totaled approximately $481,000,000.

## THE DEBTORS' PREPETITION SECURED INDEBTEDNESS

10.    As of the Petition Date, the Debtors' consolidated secured debt consisted of (a) a secured revolver with an outstanding principal balance of approximately $20.0 million plus obligations of approximately $112.5 million under issued and outstanding letters of credit

(including Prepetition Letters of Credit, as defined below), (b) a secured term loan with an outstanding principal balance of $268.8 million, (c) secured swap obligations with approximately $6.0 million of exposure, (d) accrued and unpaid interest on the foregoing, (e) prepetition payment-in-kind interest of approximately $6.3 on the secured term loan, (f) other obligations for fees and expenses owing under the Prepetition Credit Agreement (as defined below) and (g) other secured indebtedness of approximately $1.1 million (the "*Other Secured Debt*"). The Debtors' prepetition secured credit facilities affected by this Motion are described in summary terms below.

      11.    **The Prepetition Credit Agreement**. BMHC, as borrower, the other Debtors, as guarantors, WFB, as administrative agent (the "*Prepetition Administrative Agent*"), and the lenders party thereto (together with the Prepetition Administrative Agent, the "*Prepetition Credit Agreement Lenders*") are parties to the Second Amended and Restated Credit Agreement, dated as of November 10, 2006 (as amended, the "*Prepetition Credit Agreement*"). The Prepetition Credit Agreement provides for a $340 million term loan facility maturing November 2011 (the "*Prepetition Term Loan*") and a $200 million revolving credit facility maturing November 2011 (the "*Prepetition Revolving Credit Facility*"). The Debtors' ability to draw on the $200 million Prepetition Revolving Credit Facility is subject to certain borrowing base limitations. The Prepetition Credit Agreement is secured pursuant to that certain Third Amended and Restated Security Agreement by and among the Debtors and the Prepetition Administrative Agent, dated as of November 10, 2006 (the "*Prepetition Security Agreement*"), which grants the Prepetition Lenders a security interest in substantially all of the Debtors' assets (the "*Prepetition Collateral*").

12.     **The Letters of Credit**. The Debtors caused to be issued various letters of credit (the "***Prepetition Letters of Credit***") in favor of certain of the Debtors' creditors. The Prepetition Letters of Credit were issued primarily (a) in favor of insurers with respect to the self insured portion of automobile, general liability, and workers' compensation insurance obligations, (b) with respect to performance bonds for projects undertaken by the Debtors, and (c) with respect to obligations owed to certain of the Debtors' key material suppliers. WFB issued the Prepetition Letters of Credit under the terms of the Prepetition Credit Agreement, by which the outstanding Prepetition Letters of Credit reduce the $200 million amount available to the Debtors under the Prepetition Revolving Credit Facility. The Prepetition Letters of Credit may renew automatically on their various anniversary dates or until released by their respective beneficiaries.

13.     **The Swap Transactions**. The Debtors are party to two ISDA Master Agreements, (a) an ISDA Master agreement with BNP Paribas dated as of April 7, 2004 (along with all schedules and amendments to the same, the "***BNP Paribas Master Agreement***") and (b) an ISDA Master agreement with Suntrust Bank dated as October 10, 2006 (along with all schedules and amendments to the same, the "***Suntrust Bank Master Agreement***" and, together with the BNP Paribas Master Agreement, the "***Prepetition Master Agreements***"). The Prepetition Master Agreements govern multiple Transactions (as defined in the Prepetition Master Agreements) between the parties. Obligations arising from such Transactions, moreover, are secured by the Prepetition Collateral, and the resulting security interests are *pari passu* with that created under the Prepetition Security Agreement. Section 5(a)(vii) of each of the Prepetition Master Agreements gives BNP Paribas and Suntrust Bank the right to terminate such agreements on account of BMHC's filing for bankruptcy relief. For purposes of this Motion, the

term "***Prepetition Lenders***" shall mean the Prepetition Credit Agreement Lenders, in their capacities as lenders under the Prepetition Credit Agreement, and BNP Paribas, and Suntrust Bank, in each case, in their capacities as counterparties under the Prepetition Master Agreements.

14.     **Other Secured Debt**. The Debtors' Other Secured Debt consists of (a) certain term notes, equipment notes, and capital leases for equipment and (b) the real property set forth on Part II of Schedule 1.01A of the DIP Credit Agreement, with an aggregate outstanding balance of approximately $1 million. The interest rates on these borrowings vary and the dates of maturity are through March 2021. The collateral securing the Other Secured Debt is not sought to be included in the collateral subject to the DIP Credit Agreement (the "***DIP Collateral***").

## THE EVENTS LEADING TO THE BANKRUPTCY FILINGS

15.     As discussed above, the Debtors have approximately $310.3 million of secured funded indebtedness, including accrued but unpaid interest. Unfortunately, a series of unforeseen events placed significant strain on the Debtors' ability to continue servicing such indebtedness and ultimately led to the Debtors' filing of the Chapter 11 Cases. Those events include (a) the unprecedented downturn in the United States housing and construction market, (b) the resulting deterioration in the Debtors' financial performance, (c) the Debtors' default under the Prepetition Credit Agreement, and (d) the Debtors' unsuccessful attempts to implement an out-of-court restructuring.

## A.     The Downturn in the U.S. Housing and Construction Markets

16.     The residential building products and construction services industry is highly dependent upon demand for single-family homes. Various macroeconomic factors, including general economic conditions, interest rates, levels of unemployment, consumer

confidence, and the availability of credit influence the demand for single-family homes. Historically, the new home construction sector has been cyclical. During 2006, however, a major housing downturn began in the United States. Indeed, single-family "housing starts" fell more than 14% from approximately 1.72 million in 2005 to approximately 1.47 million in 2006.[3]

17.     The housing market downturn in the United States intensified during 2007, with single-family housing starts in 2007 falling almost 29% from the 2006 rate to approximately 1.05 million, and continued during 2008, with single-family housing starts falling over 40% from the 2007 rate to approximately 622,000. As of March 2009, single-family housing starts have fallen to an annualized rate of less than 400,000—the lowest level of single-family housing start activity since World War II.

18.     The negative effect of the housing market downturn is compounded by recent turmoil in the general economy, mortgage market, and overall credit markets, which has caused increasing levels of unemployment, a severe decline in home prices, a dramatic tightening of consumer credit, and decreased consumer confidence.

## B.     The Debtors' Financial Performance Deteriorates

19.     The adverse market conditions described above negatively affected the Debtors' financial position. Sales revenues declined from $3.0 billion in 2006 to $1.3 billion in 2008. As a result of this unanticipated and precipitous decline in sales revenues, the Debtors began experiencing losses from operations on a continuous basis in the fourth quarter of 2007.

---

[3] "Housing starts" are considered a leading indicator in the United States housing market. The United States Census Bureau and the Untied States Department of Housing and Urban Development jointly publish a monthly report on housing starts which is available at http://www.census.gov/const/www/newresconstindex.html.

For the year ending December 31, 2008, the Debtors experienced a loss of $192,456,000 from continuing operations.

## C.    The Debtors Default Under the Prepetition Credit Agreement

20.    The Debtors' Prepetition Credit Agreement requires monthly compliance with financial covenants, including minimum liquidity and adjusted earnings before interest, taxes, depreciation, and amortization ("*EBITDA*").  Ultimately, decreased demand and corresponding sales declines caused the Debtors to fall out of compliance with certain of these financial covenants as of December 31, 2007.  As a result of these covenant defaults, the Lenders were entitled to seek immediate repayment of the amounts owed under the Prepetition Credit Agreement.  Accordingly, the Debtors engaged the Administrative Agent in discussions for a waiver of the financial covenant defaults and an amendment to the covenants in the Prepetition Credit Agreement that would enable the Debtors to meet the covenants on a going-forward basis given the depressed state of the housing market.

## D.    The Debtors' Out-of-Court Restructuring Initiatives

### I.    Operational Restructuring

21.    In response to challenging economic and industry conditions, in May 2008, the Debtors initiated a comprehensive analysis of their business operations to rationalize their operations for the current conditions of the homebuilding industry and improve cash flow and profitability.  As a result, the Debtors formulated a restructuring plan to right-size their operations, consolidate their administrative services, reorganize their operations structure, and close or consolidate their underperforming business units.

22.    To implement this restructuring plan, the Debtors have reduced overall headcount from a high of 22,824 in June 2006 to approximately 5,500 as of the Petition Date.

The Debtors have also created a shared services organization at their headquarters in Boise, Idaho to provide key administrative services such as information technology, human resources, accounting, marketing, and purchasing. Previously, some individual business locations had maintained their own administrative services. In addition, the Debtors have engaged in a comprehensive reorganization of their operations structure in order to eliminate unnecessary overhead expenditures, reduce redundancy, and enhance corporate oversight and control over the business.

23.     Finally, the Debtors have taken significant actions to close or consolidate their underperforming business units. To date, the Debtors have sold, wound down, or consolidated 78 business units.

## II.     Financial Restructuring

24.     Throughout February 2008, the Debtors continued negotiating with the Administrative Agent for a waiver of the financial covenant defaults and an amendment to the covenants in the Prepetition Credit Agreement that would enable them to meet the covenants on a going-forward basis given the depressed state of the housing market. To provide the parties with additional time to continue negotiations and avert a possible chapter 11 filing, the parties agreed to a temporary waiver of the financial covenants under the Prepetition Credit Agreement.

25.     On February 29, 2008, the Debtors were able to enter successfully into the First Amendment to the Prepetition Credit Agreement, which, among other provisions, modified the financial covenants to account for the downturn in the housing market by, among other things, lowering the Debtors' consolidated net worth requirement and the minimum EBITDA-to-interest expense ratio and setting new minimum EBITDA default-trigger thresholds. In

accordance with the First Amendment, Debtor Building Materials Holding Corporation suspended its quarterly cash dividend to shareholders.

26. Nonetheless, as the housing market continued to decline, the Debtors fell out of compliance with these new financial covenants after the fiscal period ended June 30, 2008. As a result, the Debtors engaged in further discussions with the Prepetition Administrative Agent and sought another waiver of their financial covenant and other related defaults and another amendment to the covenants in the Prepetition Credit Agreement. The Debtors were able to obtain a waiver of the existing defaults and, on September 30, 2008, were successful in entering into the Second Amendment to the Prepetition Credit Agreement which, among other things, reset the minimum EBITDA default-trigger thresholds and added minimum liquidity default-trigger thresholds.

27. Despite these extensive good-faith renegotiations of the Prepetition Credit Agreement, the unprecedented decline in the housing industry and the concomitant decline in sales of the Debtors' products and services caused the Debtors to fall out of compliance with the minimum monthly adjusted EBITDA required by the Second Amendment for the fiscal period ended February 28, 2009. As part of their continued good-faith negotiations with the Lenders, the Debtors were able to obtain a temporary waiver of this and other anticipated defaults through the earlier of (a) April 15, 2009, which was extended through June 29, 2009, and (b) the occurrence of another default.

## THE DEBTORS' MARKETING AND NEGOTIATION PROCESS FOR POSTPETITION FINANCING

28. Prior to agreeing to any proposal with respect to debtor in possession financing, the Debtors and their professionals engaged in an extensive search process. The initial stage of this search, as detailed in the Street Declaration, was the retention of Peter J. Solomon as

financial advisor. Peter J. Solomon is a well-qualified advisory firm with substantial experience in negotiating and structuring debtor in possession facilities. Together, the Debtors and Peter J. Solomon evaluated all realistic financing alternatives.

29. Prior to the Petition Date, the Debtors and Peter J. Solomon approached approximately 34 banks and other financial institutions to provide financing, with a logical focus on the Debtors' largest Prepetition Credit Agreement Lenders. In particular, Peter J. Solomon solicited these parties' interest in providing funding on either a priming or junior basis to the Prepetition Credit Agreement. Each prospective lender, moreover, was informed (a) of the Debtors' need for an expedited negotiation and closing process as a result of the Debtors' immediate financing needs and (b) that they could receive additional information upon signing a customary confidentiality agreement. Five outside parties indicated an interest in providing financing to the Debtors and were willing to sign confidentiality agreements to receive additional information. Those five parties were given access to and, in fact, took advantage of an electronic information data room established by the Debtors to facilitate potential lenders' due diligence. As a result of these efforts, the Debtors received three offers for postpetition financing in addition to a proposal by the Prepetition Credit Agreement Lenders.

30. After negotiating improved terms versus the DIP Lenders' initial proposal, the Debtors together with their advisors determined that the DIP Lenders' financing proposal provided the most advantageous terms to the Debtors and their estates under the circumstances and in light of the Debtors' immediate liquidity needs. The first aspect of the Debtors' decision making concerned pricing. Simply put, the DIP Lenders offered a lower interest rate and fewer fees than their competitors. For example, the DIP Lenders were the only bidding group which

did not request a work fee and/or a termination fee. In aggregate, the cost of borrowing from the DIP Lenders was a fraction of that from alternate sources of capital.

31.    In addition, because the DIP Lenders hold a significant portion of the Debtors' prepetition secured debt, accepting the DIP Lenders' financing proposal reduces the likelihood of a priming fight with its associated costs and operational risks. Any attempt to bring in third-party financing providers to prime all of the Prepetition Lenders risks prolonged litigation.

32.    Prior to the Petition Date, the Debtors, with the assistance of their professionals and advisors, pursued many avenues to try to maximize the value of the Debtors' business, including conducting a process to sell all or a portion of the Debtors' business. The Debtors' prepetition sale process did not, however, yield offers that reflected, in the Debtors' business judgment, the true value of the Debtors' business operations.

33.    Contemporaneously with this prepetition marketing and sale effort, the Debtors engaged in good faith, arm's-length negotiations with significant holders of the Debtors' prepetition secured indebtedness under the Prepetition Credit Agreement to develop a way to de-lever the Debtors' business, while at the same time providing the Debtors' unsecured creditor constituency with a substantial recovery. These negotiations culminated in the proposed chapter 11 plan (the "*Plan*") and accompanying disclosure statement (the "*Disclosure Statement*"), filed contemporaneously with this Motion. As set forth in greater detail in the Plan and Disclosure Statement, the Plan contemplates a restructuring of the Debtors' balance sheet and ownership structure, as well as an immediate cash distribution to unsecured creditors and an opportunity for such creditors to receive full payment from the reorganized Debtors, depending on business performance. The Plan also provides for the repayment in full in cash of the noncontingent

obligations under the DIP Facility, and the replacement of the contingent obligations, with an exit financing facility. The Debtors believe that the restructuring proposal embodied in the Plan provides the Debtors' creditors with the best means of maximizing value of the Debtors and their businesses.

34.     The DIP Facility will be underwritten by WFB, the largest single Prepetition Lender. Participation in the DIP Facility will be open to all Prepetition Credit Agreement Lenders on a pro rata basis.

### CONCISE STATEMENT OF MATERIAL TERMS OF THE INTERIM DIP ORDER

35.     Subject to the Court's approval, the Debtors' proposed debtor in possession financing consists of a $80 million senior secured, superpriority debtor in possession revolving credit facility (the "*DIP Facility*"), including financing provided pursuant to a $20 million letter of credit subfacility (the "*Letter of Credit Subfacility*").

36.     Pursuant to the terms of the DIP Facility, the DIP Lenders have consented to the use of their Cash Collateral under the Prepetition Credit Agreement and the granting of priming liens as provided herein, subject to the terms and conditions of the DIP Facility. The Prepetition Lenders that are not DIP Lenders are adequately protected by the provision of replacement liens and superpriority administrative claims junior only to the Carve-Out and the liens and administrative claims of the DIP Lenders. In effect, the DIP Facility will be layered onto the Prepetition Credit Agreement, subject to appropriate modifications.

37.     Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and

Local Rule 4001-2(a)(ii), the material provisions of the Interim DIP Order and the location of

such provisions in the Interim DIP Order or the DIP Credit Agreement are as follows:[4]

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| Borrower | Building Materials Holding Corporation. | DIP Credit Agreement; Preamble. |
| Guarantors | Each direct or indirect United States wholly-owned subsidiary of BMHC that currently exists or is hereafter acquired or created and which is a party to a Guaranty (as defined in the DIP Credit Agreement). | DIP Credit Agreement; Article I. |
| Agent | WFB. | DIP Credit Agreement; Preamble. |
| DIP Lenders | WFB and other lenders party to the DIP Facility. | DIP Credit Agreement; Preamble. |
| Committed Facilities | Aggregate and maximum of $80 million senior secured debtor in possession revolving credit facility, as follows:<br>➢ Interim Commitment Amount: The lesser of (a) $40 million and (b) the maximum amount approved by the Bankruptcy Court in the Interim DIP Order.<br>➢ Final Commitment Amount: The lesser of (a) $80 million (subject to a borrowing base restriction, as defined in Article I of the DIP Credit Agreement, and other restrictions as set forth in the DIP Credit Agreement) and (b) the maximum amount approved by the Bankruptcy Court in the Final DIP Order. | DIP Credit Agreement; Article I. |
| Term | The earliest of (a) January 2, 2010, or, upon the effectiveness of the Extension Option (as defined in the DIP Credit Agreement), March 31, 2010; (b) the date on which the Interim DIP Order expires unless the Final DIP Order has been entered and has become effective; (c) the earlier of the effectiveness or effective date of the Plan that is confirmed pursuant to an order entered by the Court; (d) the date of the closing of a sale of all or substantially all of the Borrower's assets pursuant to section 363 of the Bankruptcy Code; (e) a dismissal of the Chapter 11 Cases or a conversion of the Chapter 11 Cases to chapter 7 cases under the Bankruptcy Code; and (f) the date of termination of the commitments under the DIP Facility in accordance with the terms of the definitive documentation. | DIP Credit Agreement; Article I. |

---

[4]   This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the Interim DIP Order. The DIP Credit Agreement will control in the event of any inconsistency between this Motion and the DIP Credit Agreement. To the extent that there is a conflict between the terms and conditions of the DIP Credit Agreement and the Interim DIP Order, the terms and conditions of the Interim Order shall govern. Each capitalized term used herein but not otherwise defined herein shall have the meaning ascribed to it in the Interim DIP Order.

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| Interest | Base Rate *plus* 4.50%.<br><br>Base Rate, for any day, is a fluctuating rate equal to the highest of (a) the Prime Rate in effect on such day, (b) 1.00% above the Daily One Month LIBOR in effect on such day, (c) the Federal Funds Rate plus 1.00%, and (d) 3.00%. | DIP Credit Agreement; Article I. |
| Default Rate of Interest | The applicable interest rate plus 4% per annum payable upon demand. | DIP Credit Agreement; Section 2.08(c). |
| Fees | ➢ <u>Agency Fee</u>. The greater of (i) $50,000 and (ii) $10,000 per DIP Lender, per annum, under the fee specified in that certain letter agreement between BHMC and WFB dated on or about June 16, 2009.<br><br>➢ <u>Underwriting Fee</u>: $1,000,000 under that certain letter agreement between BHMC and WFB dated on or about June 16, 2009.<br><br>➢ <u>Commitment Fees</u>. With respect to the revolver, 0.50%, and, with respect to the letter of credit fees, 4.50%.<br><br>➢ <u>Servicing Fee</u>. $2,500 per month.<br><br>➢ <u>Closing Fee</u>. 2.00% of the Maximum Commitment Amount (as defined in the DIP Credit Agreement).<br><br>➢ <u>Audit, Appraisal and Examination Fees</u>. (i) $1,000 per day, per auditor, plus reasonable out-of-pocket expenses for each financial audit of BHMC or any guarantor performed by personnel, employed by the Agent, (ii) if implemented, a fee equal to $1,000 per day, per applicable individual, plus reasonable out-of-pocket expenses for the establishment of electronic collateral reporting, and (iii) the actual charges paid or incurred by the Agent if it elects to employ the services of one or more third persons to perform financial audits or quality of the earnings analyses of BHMC or any guarantor, to establish electronic collateral reporting systems, to appraise the DIP Collateral, or any portion thereof, or to assess BHMC or any guarantor's business valuation. | DIP Credit Agreement; Section 2.09(a)-(e). |
| Use | The proceeds of the DIP Facility shall be used to:<br><br>➢ Pay fees, interest, and expenses associated with the DIP Facility;<br><br>➢ Fund the Carve-Out;<br><br>➢ Provide ongoing working capital and satisfy capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases and for the purposes set forth in the DIP Budget (as defined below), including, without limitation, the payment of fees and expenses of Professional Persons (as defined below) approved by the Bankruptcy Court during the pendency of the Chapter 11 Cases;<br><br>➢ Provide for other general corporate purposes of the Debtors during the pendency of the Chapter 11 Cases and for the purposes set forth in the DIP Budget; and<br><br>➢ Repay $4.0 million of the $20 million owed under the Prepetition Revolving Credit Facility.<br><br>For avoidance of doubt, no DIP Facility proceeds or any Cash Collateral shall be available for any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings, or other | DIP Credit Agreement; Section 7.12. Interim DIP Order ¶ 15(j). |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | litigation against (i) the DIP Agent or the DIP Lenders or (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the DIP Liens (as defined herein), claims, interests and adequate protection of the DIP Agent and the DIP Lenders or the Prepetition Administrative Agent and Prepetition Credit Agreement Lenders under the Prepetition Credit Agreement as of the Petition Date; provided up to $50,000 in the aggregate may be used by any statutory committee appointed in the Chapter 11 Cases for purposes of investigating the Prepetition Liens (as defined herein), claims and interests under the Prepetition Credit Agreement. | |
| Incremental Availability | Subject to approval by the Court, the full amounts available under the DIP Facility will be available upon entry of the Final DIP Order. | DIP Credit Agreement; Article I. |
| DIP Budget | A rolling 13-week consolidated operating budget (the "*DIP Budget*") attached hereto as *Exhibit C*, updated monthly, for BMHC and its subsidiaries. | DIP Credit Agreement; Section 7.01(b). |
| Superpriority Claims | Claims arising from the DIP Facility will be entitled to superpriority administrative expense claim status in the Chapter 11 Cases, subject and subordinate to the Carve-Out. | DIP Credit Agreement; Section 6.24(c). |
| DIP Facility Priority and Liens | Pursuant to section 364(c)(2) of the Bankruptcy Code,<br><br>First priority liens on all DIP Collateral (including, without limitation, all real property) that is not subject to valid and perfected liens existing on the Petition Date, pursuant to section 364(c)(2) of the Bankruptcy Code, subject and junior to the Carve Out.<br><br>Pursuant to section 364(d)(1) of the Bankruptcy Code,<br><br>First priority, senior "priming" liens on all DIP Collateral that is subject to valid and perfected liens existing on the Petition Date in favor of the Prepetition Administrative Agent or under the Prepetition Master Agreements pursuant to Section 364(d)(1) of the Bankruptcy Code, subject and junior to the Carve Out and the Permitted Priority Liens (as defined in the DIP Credit Agreement). | DIP Credit Agreement; Section 6.24(b). Interim DIP Order ¶ 5. |
| Parties with Interest in the Collateral | Prepetition Lenders. | Interim DIP Order ¶ H. |
| Adequate Protection | The Debtors will provide the Prepetition Lenders with the following adequate protection, only to the extent of diminution of value in their Prepetition Collateral:<br><br>    ➢  replacement liens, junior and subordinate to (i) the Permitted Priority Liens, (ii) the Carve-Out, (iii) the liens securing the DIP Facility (the "*DIP Liens*") and (iv) the Prepetition Liens on the Prepetition Collateral;<br><br>    ➢  administrative priority claims junior and subordinate to the Superpriority Claim and the Carve-Out;<br><br>    ➢  payment of professional fees and expenses, including attorneys' fees, financial advisor fees and other professionals and consultants (to the extent such other professionals and consultants are provided for under the Prepetition Credit Agreement), of the Prepetition Administrative Agent | Interim DIP Order ¶ 7. |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | during the Chapter 11 Cases, whether incurred before or after the Petition Date;<br><br>   ➢  to the extent allowable under section 506(b) of the Bankruptcy Code, the accrual of interest under the Prepetition Credit Agreement at the default rate specified therein;<br><br>   ➢  the Debtors' acknowledgement of the validity and amount of the obligations under the Prepetition Credit Agreement and the Prepetition Liens. | |
| Carve-Out | The "*Carve-Out*" shall be (a) any unpaid fees due to the United States Trustee pursuant to 28 U.S.C. Section 1930 of the United States Code or otherwise and any fees due to the clerk of the Bankruptcy Court, (b) the reasonable fees and expenses approved by the Bankruptcy Court incurred by a trustee under Section 726(b) or 1104 of the Bankruptcy Code is an aggregate amount not to exceed $100,000, (c) the reasonable expenses of members of any statutory committee appointed in the Bankruptcy Cases in an amount not to exceed $50,000, (d) to the extent allowed at any time, all unpaid fees and expenses allowed by the Bankruptcy Court of professionals or professional firms retained pursuant to section 327, 330, 363, or 1103 of the Bankruptcy Code (the "*Professional Persons*") that were incurred or accrued through the date upon which BMHC receives from the Agent a notice of an Event of Default, and (e) after the date upon which BMHC receives from such notice, to the extent allowed at any time, the payment of the fees and expenses of Professional Persons in an aggregate amount not to exceed $500,000. | DIP Credit Agreement; Article I. |
| Conditions Precedent | The obligations of each DIP Lender under the DIP Credit Agreement shall be subject to conditions precedent consistent with a debtor in possession loan facility of this nature, including the execution of the DIP Credit Agreement and the payment of all related fees. | DIP Credit Agreement; Article V. |
| Representation, Warranties, and Covenants | The DIP Credit Agreement includes customary representations and warranties, affirmative covenants, and negative covenants consistent with a debtor in possession loan facility of this nature and the Prepetition Credit Agreement, including, without limitation, a quarterly minimum EBITDAR and capital expenditures covenants. | DIP Credit Agreement; Articles VI, VII and VIII. |
| Events of Default | The DIP Credit Agreement includes customary events of default consistent with a debtor in possession loan facility of this nature and the Prepetition Credit Agreement, including, without limitation, events of default relating to events in the Chapter 11 Cases (including, without limitation, dismissal of the Chapter 11 Cases, appointment of a trustee or an examiner with expanded powers, and conversion of the Chapter 11 Cases to chapter 7 cases) and a cross-default, in part, concerning the occurrence of an event of default or early termination date under any Swap Contract (as defined in the DIP Credit Agreement) entered into after the Petition Date. | DIP Credit Agreement Section 9.01. |
| Remedies | Upon the occurrence and continuation of an event of default under the DIP Facility, the DIP Agent may or shall, upon instructions from the Majority Lenders (as defined in the DIP Credit Agreement), by written notice to BMHC, terminate all commitments under the DIP Facility, require BMHC to cash collateralize amounts outstanding under the Letter of Credit Subfacility, declare all obligations due and payable and, upon three (3) business days' written notice to BMHC, the United States Trustee and any statutory committee, exercise all rights and remedies under the DIP Loan Documents and applicable law. | DIP Credit Agreement Section 9.02. |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| The Debtors' Stipulations | As of the Petition Date, (i)the aggregate unpaid principal amount of the Prepetition Lender Debt is approximately $310.3 million; and (ii) all of the Prepetition Lender Debt under the Prepetition Credit Agreement is unconditionally due and owing by the Debtors to the Prepetition Credit Agreement Lenders.<br><br>Additional stipulations include:<br><br>&#10148; as of the Petition Date, the Prepetition Credit Agreement Lenders held security interests in and liens on, among other things, substantially all of the Debtors' assets; and<br><br>&#10148; stipulations regarding the perfection, priority, and seniority of liens arising under the Prepetition Credit Agreement. | Interim DIP Order ¶ I. |
| Waivers | The Debtors waive their right to challenge the DIP Liens or the Prepetition Liens under the Prepetition Credit Agreement and to bring avoidance actions against the DIP Agent, the DIP Lenders, the Prepetition Credit Agreement Lenders, and the Prepetition Administrative Agent. | Interim DIP Order ¶ I. |
| Challenge Period | Any statutory committee and any other non-Debtor party have ninety days from the Petition Date (the "*Challenge Period Deadline*") to bring claims and actions against the Prepetition Credit Agreement Lenders and the Prepetition Administrative Agent. | Interim DIP Order ¶ 6. |
| Expense Repayment | The Debtors shall use proceeds of the DIP Facility to repay $4.0 million of the amount owing under the Prepetition Revolving Credit Facility | DIP Credit Agreement Section 7.12. |
| Automatic Stay | The automatic stay under section 362 of the Bankruptcy Code is modified to effectuate all terms and provisions of the Interim DIP Order upon three (3) business day's written notice to BMHC, the U.S. Trustee and any statutory committee appointed in these Chapter 11 Cases. | Interim DIP Order ¶ 15(b). |
| Section 506 | Each of the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent, and the Prepetition Lenders shall be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code | Interim DIP Order ¶ 15(e). |
| Section 552 | Each of the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent, and the Prepetition Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, the Prepetition Administrative Agent, and the Prepetition Lenders with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral. | Interim DIP Order ¶ 15(f). |

## PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

38.     Local Rule 4001-2 requires the Debtors to highlight certain provisions included in the DIP Credit Agreement and DIP Orders.  The provisions identified by Local Rule 4001-2 included in the DIP Orders and the DIP Credit Agreement are as follows:

39. **Repayment of Prepetition Debt (Local Rule 4001-2(a)(i)(E)).** Local Rule 4001-2(a)(i)(E) requires a description of provisions which contemplate the use of postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt. *See* Del. Bankr. L. R. 4001-2(a)(i)(E). The Debtors propose to borrow or obtain cash advances under the DIP Loan Documents to repay a limited portion, $4.0 million, of the amount owing under the Prepetition Revolving Credit Facility (the "*Expense Repayment*"). The Expense Repayment relates to funds advanced under the Prepetition Revolving Credit Facility prior to the Petition Date to pay restructuring and bankruptcy planning and preparation fees, costs, and expenses (including the funding of retainers) incurred by the Debtors prior to the Petition Date. *See* Interim DIP Order ¶ 15(j).

40. The Debtors submit that the Expense Repayment is justified because (a) it truly represents the reimbursement of costs associated with the Chapter 11 Cases which, to prepare for the Chapter 11 Cases, had to be incurred before the Petition Date and (b) the Debtors would not have been able to secure the postpetition financing on such advantageous terms without the Expense Repayment. All of the Debtors' assets are encumbered by the liens and security interests (the "*Prepetition Liens*") securing the obligations under the Prepetition Credit Agreement. No potential postpetition lender was willing to extend credit on a junior priority basis or on a senior basis with as generous terms as the DIP Lenders. Thus, without Expense Repayment, the Debtors would have been forced to pursue alternate, more expensive postpetition financing and engage in expensive, time-consuming, and uncertain litigation.

41. The Final DIP Order provides that the approval of the DIP Facility is without prejudice to the right of any statutory committee, or other party-in-interest, to contest or challenge the validity of debt under the Prepetition Credit Agreement, the Prepetition Master

Agreements, or the Prepetition Liens until the Challenge Period Deadline. *See* Interim DIP Order ¶ 6. For the foregoing reasons, the Expense Repayment under the Interim DIP Order, as an initial advance by the DIP Agent and DIP Lenders under the DIP Facility, is justified in light of the circumstances of these Chapter 11 Cases.[5]

42. **506(c) Waiver (Local Rule 4001-2(a)(i)(C)):** Pursuant to Local Rule 4001-2(a)(i)(c), a movant must describe any provision which constitutes a waiver by the Debtors of the provisions of section 506(c) of the Bankruptcy Code. *See, e.g.*, Interim DIP Order ¶ 15(e). This provision is justified because it was a condition to receiving the financing provided by the DIP Facility and the Debtors' use of Cash Collateral, which liquidity is essential for the Debtors to continue operations in the ordinary course of business and avoid immediate and irreparable harm to their estates. Nor will the proposed 506(c) waiver take effect until entry of the Final DIP Order, thereby providing parties-in-interest an opportunity to object and be heard on matters with respect thereto.

43. **Priming Liens (Local Rule 4001-2(a)(i)(G)).** Pursuant to Local Rule 4001-2(a)(i)(G), a movant must describe provisions of the proposed debtor in possession facility which contemplate a priming of any secured lien without the consent of that lienor. *See* Del. Bankr. L.R. 4001-2(a)(i)(G).

44. The DIP Facility is a "priming" facility inasmuch as the DIP Liens will be senior to the Prepetition Liens of the Prepetition Lenders on the Prepetition Collateral, subject to

---

5  Courts have approved debtor-in-possession financing facilities that provided for the immediate repayment in full of prepetition indebtedness owed pursuant to secured prepetition credit facilities. *See e.g., In re Radnor Holdings Corp.*, Case No 06-10894 (PJW) (Bankr. D. Del. September 22, 2006); *In re Ultimate Electronics, Inc.*, Case No. 05-10104 (PJW) (Bankr. D. Del. Feb. 14, 2005); *In re Comdial Corp.*, Case No. 05-11492 (MFW) (Bankr. D. Del. June 29, 2005); *In re Hoop Holdings*, Case No. 08-10544 (BLJ) (Bankr. D. Del. April 16, 2008); *In re Linen 'n Things*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 28, 2008).

the terms and conditions of the Interim DIP Order and the DIP Loan Documents. *See, e.g.*, Interim DIP Order ¶ 5(a). The DIP Lenders have consented to the terms of the DIP Facility, including the priming of the Prepetition Liens securing any remaining obligations to them under the Prepetition Credit Agreement, subject to the terms and conditions of the Interim DIP Order and the DIP Loan Documents. Any Prepetition Lenders who choose not to participate in the DIP Facility, moreover, will receive adequate protection, among other things, in the form of replacement liens and super-priority administrative expense claims that are junior only to the Carve-Out and the liens and administrative claims of the DIP Lenders. Any equipment or other collateral subject to the Other Secured Debt is not included in the DIP Collateral.

45.     The aforementioned circumstances demonstrate that the above-described provisions are justified and should be authorized as necessary and appropriate.

### BASIS FOR EXPEDITED RELIEF

46.     The Debtors bring this Motion on an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtors' estates if the Debtors cannot enter into the DIP Loans and use Cash Collateral needed to sustain their businesses as a going concern. The Debtors have an immediate need to obtain the financing under the DIP Facility and use Cash Collateral to permit them to, among other things, continue (a) to operate their businesses, (b) to maintain business relationships with vendors, suppliers, and customers, (c) to pay employee wages in the ordinary course of business, (d) to make necessary capital expenditures, and (e) to satisfy other working capital and operational needs, all of which are necessary to preserve the Debtors' going-concern value.

47.     Without access to the DIP Facility and the use of Cash Collateral as provided herein, the Debtors may have to curtail or eventually terminate their business

operations, to the material detriment of creditors, employees, and other parties-in-interest, and the Debtors' ability to implement any pre-packaged plan of reorganization could be materially delayed or entirely disrupted. The Debtors must ensure that working capital is available now, and the Debtors anticipate accessing the DIP Facility almost immediately. The Debtors must demonstrate to their customers, suppliers, and vendors that they have sufficient capital to ensure ongoing operations in the ordinary course during the prosecution of these Chapter 11 Cases. Important estate stakeholders must believe that they Debtors will maintain "business as usual" during their hopefully brief stay in bankruptcy.

## BASIS FOR RELIEF REQUESTED

**A.    The Debtors Should Be Authorized to Use the Cash Collateral on an Interim Basis**

48.    The Debtors' use of property of their estate is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

49.    Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use Cash Collateral as long as the applicable secured creditor consents or is adequately protected. *See In re McCormick*, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use the Cash Collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to the bankruptcy court that the secured creditor's interest in the Cash Collateral is adequately protected). *"Cash Collateral"* is defined as "cash, negotiable

instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

50.     The Debtors have an urgent need for the immediate use of the Cash Collateral pending the final hearing on this Motion and seek to use all Cash Collateral existing on or after the Petition Date. The Debtors require the use of the Cash Collateral to, among other things, pay present operating expenses, including payroll and vendors, and ensure a continued supply of goods and services essential to the Debtors' continued viability. Without the use of the Cash Collateral, the Debtors will not be able to meet their cash requirements for working capital needs. The DIP Lenders do not object to the Debtors' use of the Cash Collateral, subject to the terms and conditions set forth in the Interim DIP Order and the DIP Loan Documents.

51.     To the extent any Prepetition Lender does not consent to the Debtors' use of Case Collateral, such lender will be adequate protected. What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y.). By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993); *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Adequate protection is not expressly defined by the Bankruptcy Code except through examples provided by section 361 of the Bankruptcy Code. The flexibility provided by section 361(3), in particular, provides the Court with discretion in fashioning the protection provided to a secured party. *See In re Swedeland Dev.*

*Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994). Thus, adequate protection can come in various forms, including replacement liens and priority claims.

52.     To the extent of any diminution in value of the Prepetition Lenders' Prepetition Collateral, the Prepetition Lenders are entitled to adequate protection of their interests in the Collateral pursuant to Bankruptcy Code sections 361, 363(e), and 364(d)(1). As adequate protection, the Interim DIP Order contemplates the following:

a.      the Prepetition Lenders will receive replacement liens, junior to (i) the Permitted Priority Liens, (ii) the Carve-Out, (iii) the DIP Liens and (iv) the Prepetition Liens on the Prepetition Collateral;

b.      the Prepetition Lenders will receive administrative priority claims junior to the Carve-Out and the Superpriority Claim;

c.      payment of professional fees and expenses, including attorneys' fees, financial advisor fees and other professionals and consultants (to the extent such other professionals and consultants are provided for in the Prepetition Credit Agreement), of the Prepetition Administrative Agent during the Chapter 11 Cases, whether incurred before or after the Petition Date;

d.      to the extent allowable under section 506(b) of the Bankruptcy Code, the accrual of interest under the Prepetition Credit Agreement at the default rate specified therein; and

e.      the Debtors' acknowledgement of the validity and amount of the obligations under the Prepetition Credit Agreement and Prepetition Liens securing such obligations, subject to right of any statutory committee (for a limited time period) and other non-debtor Persons to challenge such obligations and liens.

53.     By virtue of their participation in the DIP Facility, the DIP Lenders have consented that the adequate protection provided by the DIP Orders is sufficient under the facts and circumstances of the Chapter 11 Cases. And, although other Prepetition Lenders have not so expressly consented to the use of Cash Collateral or the financing provided herein, the notice and adequate protection provided to such parties is sufficient under the facts and circumstances of the Chapter 11 Cases.

54.     Thus, the Debtors seek authority to provide the Prepetition Lenders with replacement liens junior to the DIP Facility to the extent of any diminution in the value of their Prepetition Collateral. These liens will be junior to the DIP Liens. The Debtors have also provided all Prepetition Lenders with notice of this Motion. Moreover, the Debtors respectfully submit that their continued performance in the ordinary course of business with respect to the obligations owed to the Prepetition Lenders will allow those parties to hold at least as favorable a position as existed prior to the Petition Date. *See Swedeland Dev. Group*, 16 F.3d at 564 (noting that adequate protection exists where "the proposal . . . provide[s] the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing"). In fact, however, the Prepetition Lenders' position is actually substantially enhanced by approval of the DIP Facility. Absent the DIP Facility, the Debtors would have insufficient cash to operate and no alternative to a liquidation. In such liquidation, the Prepetition Lenders would receive only approximately 23.2% to 33.6% of the amount owed to them (the "***Liquidation Distribution***"). With the DIP Facility, the Debtors are able to finance their business operations until the Plan can be confirmed. The distribution to the Prepetition Lenders under the Plan, even after taking into consideration the full repayment of the DIP Facility, far exceeds the Liquidation Distribution.

55.     Accordingly, the Debtors believe that the adequate protection described above is sufficient to protect against any diminution in the value of any party's interest in the Prepetition Collateral during the brief period such collateral is used by the Debtors during these Chapter 11 Cases.

56.     Courts in this district have granted similar relief in other recent chapter 11 cases.[6]
*See, e.g., In re Sharper Image Corp.*, No. 08-10322 (KG) (Bankr. D. Del. March 7, 2008); *In re Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008); *In re Pope & Talbot, Inc.*, No. 07-11738 (CSS) (Bankr. D. Del. Dec. 7, 2007); *In re HomeBanc Mortgage Corp.*, No. 07-11079 (KJC) (Bankr. D. Del. Sept. 13, 2007).

**B.      The Debtors Should Be Authorized To Enter into the DIP Facility on the Terms Provided Herein**

57.     As set forth above, the Debtors' ability to maximize the value of their estates hinges upon being able to access postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c), if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property. 11 U.S.C. § 364(c); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to section 364(b)).

---

[6]  The Debtors have not annexed copies of the unreported orders cited herein because of their size. Copies of these orders, however, are available upon request of the Debtors' counsel, including at the hearing to consider the Motion.

58.     The Court is also permitted to authorize the incurrence of debt secured by a senior or equal lien on all property of the estate where the Debtors cannot otherwise obtain credit and there is adequate protection for junior or equal lienholders. *See* 11 U.S.C. § 364(d); *see also In re Phoenix Steel Corp.*, 39 B.R. 218, 222 n.9 (D. Del. 1984) (noting that debtor must show "it is unable to obtain credit otherwise" in order to obtain debt secured by liens provided under section 364(d) of the Bankruptcy Code).

59.     Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

60.     Despite the foregoing, a debtor seeking financing under section 364(c) or (d) of the Bankruptcy Code is not required to seek credit from every possible source. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re*

*Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

61.    The focus of a bankruptcy court's approval of a financing agreement pursuant to section 364 should be whether the transaction would enhance the value of the debtor's assets. Courts advocate using a "holistic approach" to evaluate super-priority postpetition financing agreements that focuses on the transaction as a whole, not just on the priming of liens. *See In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere").

62.    In furtherance of this approach, courts consider a number of factors, including, without limitation: (a) whether alternative financing is available on any other basis (*e.g.*, whether any better offers, bids, or timely proposals are before the court); (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business; (c) whether the terms of the

proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); (d) whether the proposed financing agreement adequately protects prepetition secured creditors; and (e) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors. *See Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003). Each of these considerations has been met here.

*i.     The DIP Facility Represents the Best Financing Available*

63.     As set forth above, the Debtors selected the financing proposal provided by the DIP Lenders only after approaching approximately 34 potential sources of financing. Peter J. Solomon, on the Debtors' behalf, made numerous inquiries regarding potential lenders' level of interest and willingness to enter into a confidentiality agreement with the Debtors. In the end, the DIP Lenders' proposal offered the greatest economic benefits and allowed the Debtors to potentially avoid the expensive and time-consuming process of pressing for the approval of the DIP Credit Agreement over the objections of a majority of the Prepetition Lenders.

64.     The Debtors believe it is imperative that they obtain postpetition financing with the consent of a majority of their Prepetition Lenders. A contested proceeding to use Cash Collateral or obtain a priming debtor-in-possession loan at the inception of the Chapter 11 Cases where the objecting parties include a majority of the Debtors' Prepetition Lenders could delay the Debtors' restructuring, incur significant costs, and erode the confidence of employees, vendors, and other creditor constituencies, endangering the long-term viability of the Debtors, regardless of the trial outcome. Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of section 364 of the Bankruptcy Code.

> ii.     The DIP Facility Is Necessary to Preserve the Assets of the
>         Debtors' Estates

65.     As debtors in possession, the Debtors have a fiduciary duty to protect and

maximize the estate's assets. *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir.

2004); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548,

573 (3d Cir. 2003). The DIP Facility, if approved, will first be used to complete the Expense

Repayment and will thereafter provide essential working capital, allowing the Debtors to

continue funding their day-to-day operations until the Plan is confirmed. Without the DIP

Facility, the Debtors will be unable to preserve the going-concern value of their estates, thereby

endangering the success of these Chapter 11 Cases.

66.     The initial success of the Chapter 11 Cases and the stabilization of the

Debtors' operations at the outset thereof depend on the confidence of the Debtors' employees,

vendors, service providers, and customers, which in turn depends upon the Debtors' ability to

minimize the disruption inherent to any bankruptcy filing. The Debtors are suffering severe

liquidity constraints and cannot continue to operate without additional financing. If the relief

sought in this Motion is delayed or denied, an immediate liquidation could ensue or, at the very

least, the resulting business disruption could severely damage the Debtors' ability to reorganize.

In contrast, approval of the DIP Facility will assure the Debtors' continued operations and

smooth transition into bankruptcy, allowing the Debtors to preserve the going concern value of

their estates.

> iii.    The Terms of the DIP Credit Agreement Are Reasonable and
>         Adequate Under the Circumstances

67.     The DIP Credit Agreement was negotiated in good faith and at arm's

length among the parties, culminating in a carefully crafted agreement designed to maintain the

Debtors' business as a going concern and preserve value for all parties-in-interest. Given the

urgent needs of the Debtors to obtain financial and operational stability for the benefit of all parties in interest, the terms of the proposed DIP Credit Agreement are the best available. Indeed, when viewed in their totality, the DIP Credit Agreement reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and supported by fair consideration.

>           *iv.    The Debtor's Proposed Adequate Protection Is Appropriate*

68.     The proposed adequate protection is comprised of the "customary package" of the payment of fees and expenses of the Prepetition Administrative Agent's professionals, and the granting of liens and super-priority claims in respect of any diminution in value during the Chapter 11 Cases. This adequate protection, subject to the other terms and conditions set forth in the Interim DIP Order, has been consented to by the DIP Lenders.

>           *v.    The Debtors Have Exercised their Business Judgment in Entering into the DIP Credit Agreement*

69.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

70. Bankruptcy courts generally will defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility, and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor-in-possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the [Bankruptcy] Code." *Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

71. As described above, the Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Credit Agreement. The DIP Credit Agreement contains terms that are the best available under the circumstances.

72. The funds provided by the DIP Facility are essential to enable the Debtors to retain the confidence of vendors and customers and ensure the continued supply of goods and services they need to sustain their operations and maintain a competitive position in the marketplace through the pendency of these Chapter 11 Cases. Indeed, failure to obtain approval of the DIP Facility will irreparably harm the going-concern value of the Debtors' business which, in turn, will adversely affect the value ultimately received by their stakeholders.

73. Accordingly, pursuant to sections 364(c) and (d), the Debtors respectfully submit that they should be granted authority to enter into the DIP Credit Agreement and obtain funds from the DIP Lenders on the secured and administrative super-priority basis described herein.

###### vi.      *Modification of the Automatic Stay is Warranted*

74.      The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified to allow the DIP Agent and the DIP Lenders to, among other things, upon an event of default under the DIP Loan Documents or the proposed Interim DIP Order, and subject to three (3) business days prior written notice to the Borrower, its counsel, and the U.S. Trustee, exercise all rights and remedies provided for in the DIP Loan Documents, the Interim DIP Order or under other applicable bankruptcy and non-bankruptcy law. *See* Interim DIP Order, ¶ 15(b).

75.      Stay modification provisions of this sort are ordinary and usual features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Credit Agreement and the DIP Orders.

## INTERIM APPROVAL OF THE DIP FACILITY SHOULD BE GRANTED

76.      The Debtors respectfully submit that interim approval of their use of the DIP Facility as provided by the Interim DIP Order is appropriate under the circumstances of these Chapter 11 Cases. As set forth above, Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2).

77.      A key element of the Debtors' prosecution of these Chapter 11 Cases and performance under any pre-packaged plan of reorganization requires the Debtors to continue operations in the ordinary course of business. Accordingly, and given the immediate and irreparable harm to be suffered by the Debtors absent interim relief, the Debtors respectfully

request that the Court schedule and conduct a preliminary hearing on this Motion and authorize the Debtors, from the entry of the Interim DIP Order until the final hearing, to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral. The interim authority will allow the Debtors to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending a final hearing on the DIP Facility. The Debtors believe $40 million is absolutely necessary on an interim basis. The Debtors are dependent on suppliers and builder customers that make business decisions to transact with the Debtors based, in part, on the financial ability of the Debtors to perform.

- Customers depend on the Debtors to supply materials and services over a period of time. For example, a customer may obtain a quote from the Debtors and then issue purchase orders for different phases in a subdivision. If the full $40 million is not approved on an interim basis, the customers may doubt if the Debtors can meet their commitment to perform in the future and either use another supplier or split the job with another supplier.

- Vendors track the Debtors' credit status carefully. Accordingly, interim advances under DIP Facility of less than $40 million could result in shortened payment terms and risk adjusted pricing.

## REQUEST FOR WAIVER OF STAY

78.     To implement the foregoing, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), any order authorizing the use, sale, or lease of property other than Cash Collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise. As set forth above, the DIP Credit Agreement and use of Cash Collateral are essential to prevent potentially irreparable damage to the Debtors' operations. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 10-day stay imposed by Bankruptcy Rule 6004(h).

# NOTICE

79. No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. The Debtors have provided notice of filing of the Motion either by electronic mail or facsimile and/or by overnight mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) the 50 largest unsecured creditors of the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; and (c) counsel to WFB, as agent for both of the Prepetition Lenders and DIP Lenders (collectively, the "***Notice Parties***"). As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the nature of the relief requested, the Debtors respectfully submit that no further notice of the hearing on interim financing is required.

80. The Debtors further respectfully request that the Court schedule the Final Hearing and authorize them to mail copies of the signed Interim DIP Order, which fixes the time, date, and manner for the filing of objections, to the Notice Parties and (a) any party that has filed prior to such date a request for notices with this Court; and (b) counsel for any official committee(s). The Debtors request that the Court consider such notice of the Final Hearing, including without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under Bankruptcy Code Section 506(c) to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[7]

---

[7] Local Rule 2002-1(b) provides that "[i]n chapter 11 cases, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices under Bankruptcy Rule 2002 and all parties whose rights are affected by the motion. If an official unsecured creditors' committee has not been appointed, service shall be made on the twenty (20) largest unsecured creditors in the case in lieu of the creditors' committee."

## NO PRIOR REQUEST

81.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
       June 16, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sean M. Beach (No. 4070)
Donald J. Bowman, Jr. (No. 4383)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West St., 17th Floor
Wilmington, DE 19801
Telephone:    302.571.6600
Facsimile:    302.571.1253

---- and ----

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (*pro hac vice* pending)
Matthew K. Kelsey (*pro hac vice* pending)
Saee M. Muzumdar (*pro hac vice* pending)
200 Park Ave, 47th Floor
New York, NY 10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

Aaron G. York (*pro hac vice* pending)
Jeremy L. Graves (*pro hac vice* pending)
2100 McKinney Ave, Suite 1100
Dallas, TX 75201-6911
Telephone:    214.698.3100
Facsimile:    214.571.2900

PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION