**EXHIBIT 1**

$80,000,000

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

**Dated as of June 16, 2009**

**among**

**BUILDING MATERIALS HOLDING CORPORATION,**
as Borrower,

**BMC WEST CORPORATION
AND OTHER SUBSIDIARIES,**
as Guarantors,

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Administrative Agent and L/C Issuer

**and**

**THE FINANCIAL INSTITUTIONS PARTY HERETO,**
as Lenders

# TABLE OF CONTENTS

**Page**

Article I.      DEFINITIONS.................................................................................. 2
        1.01    Certain Defined Terms ....................................................... 2
        1.02    Other Interpretive Provisions............................................ 30
        1.03    Accounting Principles....................................................... 31
Article II.     THE CREDITS ............................................................................ 32
        2.01    Amounts and Terms of Commitments and Loans ........... 32
        2.02    Loan Accounts ................................................................. 32
        2.03    Procedure for Borrowing ................................................ 33
        2.04    Voluntary Termination or Reduction of Commitments...... 33
        2.05    Optional Prepayments...................................................... 33
        2.06    Mandatory Prepayments of Loans; Mandatory Commitment Reductions .......... 34
        2.07    Repayment ....................................................................... 37
        2.08    Interest............................................................................. 37
        2.09    Fees ................................................................................. 37
        2.10    Computation of Fees and Interest ................................... 39
        2.11    Payments Generally; Administrative Agent's Clawback ... 39
        2.12    Sharing of Payments, Etc................................................ 40
        2.13    Security and Guaranty...................................................... 42
        2.14    Cash Collateral ............................................................... 42
        2.15    Extension Option ............................................................ 42
Article III.    THE LETTERS OF CREDIT ..................................................... 43
        3.01    The Letter of Credit Subfacility...................................... 43
        3.02    Issuance, Amendment and Renewal of Letters of Credit ... 44
        3.03    Risk Participations, Drawings and Reimbursements........... 46
        3.04    Repayment of Participations............................................ 48
        3.05    Role of the L/C Issuer .................................................... 48
        3.06    Obligations Absolute ...................................................... 49
        3.07    Cash Collateral Pledge .................................................... 50
        3.08    Letter of Credit Fees ....................................................... 50
        3.09    Applicability of ISP98 and UCP...................................... 51

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| Article IV. | TAXES, YIELD PROTECTION AND ILLEGALITY | 52 |
| 4.01 | Taxes | 52 |
| 4.02 | Illegality. | 54 |
| 4.03 | Increased Costs | 54 |
| 4.04 | Funding Losses | 55 |
| 4.05 | Inability to Determine Rates | 56 |
| 4.06 | Certificates of Lenders | 56 |
| 4.07 | Mitigation Obligations; Replacement of Lenders | 56 |
| 4.08 | Survival | 56 |
| Article V. | CONDITIONS PRECEDENT | 57 |
| 5.01 | Conditions to Effective Date | 57 |
| 5.02 | Conditions to All Credit Extensions | 59 |
| Article VI. | REPRESENTATIONS AND WARRANTIES | 61 |
| 6.01 | Corporate Existence and Power | 61 |
| 6.02 | Corporate Authorization; No Contravention | 61 |
| 6.03 | Governmental Authorization | 62 |
| 6.04 | Binding Effect | 62 |
| 6.05 | Litigation | 62 |
| 6.06 | No Defaults | 62 |
| 6.07 | ERISA Compliance | 62 |
| 6.08 | Use of Proceeds; Margin Regulations | 63 |
| 6.09 | Title to Properties; Liens | 63 |
| 6.10 | Taxes | 63 |
| 6.11 | Financial Condition | 64 |
| 6.12 | Environmental Matters | 64 |
| 6.13 | Collateral Documents | 65 |
| 6.14 | Regulated Entities | 65 |
| 6.15 | No Burdensome Restrictions | 66 |
| 6.16 | Copyrights, Patents, Trademarks and Licenses, Etc | 66 |
| 6.17 | Subsidiaries | 66 |

| | | |
|---|---|---|
| 6.18 | Insurance | 66 |
| 6.19 | Full Disclosure | 66 |
| 6.20 | Real Property | 67 |
| 6.21 | Eligible Accounts | 67 |
| 6.22 | Eligible Fixed Assets | 67 |
| 6.23 | Eligible Inventory | 67 |
| 6.24 | Senior Secured, Super-Priority Obligations | 67 |
| Article VII. | AFFIRMATIVE COVENANTS | 68 |
| 7.01 | Financial Statements | 68 |
| 7.02 | Certificates; Other Information | 69 |
| 7.03 | Notices | 71 |
| 7.04 | Preservation of Corporate Existence, Etc | 72 |
| 7.05 | Maintenance of Property | 72 |
| 7.06 | Insurance | 73 |
| 7.07 | Payment of Obligations | 73 |
| 7.08 | Compliance with Laws | 73 |
| 7.09 | Compliance with ERISA | 74 |
| 7.10 | Inspection of Property and Books and Records | 74 |
| 7.11 | Environmental Laws | 74 |
| 7.12 | Use of Proceeds | 74 |
| 7.13 | Additional Guarantors | 75 |
| 7.14 | Additional Stock Pledges | 76 |
| 7.15 | Further Assurances | 76 |
| 7.16 | Financial Advisor | 77 |
| 7.17 | Cash Balance; Cash Sweep | 77 |
| 7.18 | Bankruptcy Cases | 78 |
| Article VIII. | NEGATIVE COVENANTS | 78 |
| 8.01 | Limitation on Liens | 78 |
| 8.02 | Disposition of Assets | 80 |
| 8.03 | Consolidations and Mergers | 81 |

| | | | |
|---|---|---|---|
| | 8.04 | Loans and Investments | 81 |
| | 8.05 | Limitation on Indebtedness | 82 |
| | 8.06 | Transactions with Affiliates | 83 |
| | 8.07 | Use of Proceeds | 83 |
| | 8.08 | Contingent Obligations | 83 |
| | 8.09 | Subsidiaries | 84 |
| | 8.10 | Lease Obligations | 84 |
| | 8.11 | Restricted Payments | 84 |
| | 8.12 | ERISA | 84 |
| | 8.13 | Sales and Leasebacks | 85 |
| | 8.14 | Change in Business | 85 |
| | 8.15 | Accounting Changes | 85 |
| | 8.16 | Financial Covenants | 85 |
| | 8.17 | No Restrictions on Subsidiary Dividends | 85 |
| | 8.18 | Capital Expenditures | 86 |
| | 8.19 | No Opt-In to Article 8 of the UCC | 86 |
| | 8.20 | Chapter 11 Claims | 86 |
| | 8.21 | The Orders | 86 |
| Article IX. | | EVENTS OF DEFAULT | 86 |
| | 9.01 | Event of Default | 86 |
| | 9.02 | Remedies | 90 |
| | 9.03 | Application of Funds | 91 |
| Article X. | | THE ADMINISTRATIVE AGENT | 91 |
| | 10.01 | Appointment and Authority | 91 |
| | 10.02 | Rights as a Lender | 92 |
| | 10.03 | Exculpatory Provisions | 92 |
| | 10.04 | Reliance by Administrative Agent | 93 |
| | 10.05 | Delegation of Duties | 93 |
| | 10.06 | Resignation of Administrative Agent | 93 |
| | 10.07 | Non-Reliance on Administrative Agent and Other Lenders | 94 |

| | | |
|---|---|---|
| 10.08 | Collateral Matters | 94 |
| 10.09 | Administrative Agent May File Proofs of Claim | 95 |
| Article XI. | MISCELLANEOUS | 96 |
| 11.01 | Amendments and Waivers | 96 |
| 11.02 | Notices; Effectiveness; Electronic Communication | 98 |
| 11.03 | No Waiver; Cumulative Remedies | 99 |
| 11.04 | Expenses; Indemnity; Damage Waiver | 99 |
| 11.05 | Marshalling; Payments Set Aside | 101 |
| 11.06 | Successors and Assigns | 101 |
| 11.07 | Treatment of Certain Information; Confidentiality | 105 |
| 11.08 | Set off | 106 |
| 11.09 | USA PATRIOT Act Notice | 107 |
| 11.10 | Guaranty | 107 |
| 11.11 | Replacement of Lenders | 113 |
| 11.12 | Notification of Addresses, Lending Offices, Etc | 114 |
| 11.13 | Counterparts; Integration; Effectiveness | 114 |
| 11.14 | Severability | 114 |
| 11.15 | No Third Parties Benefited | 115 |
| 11.16 | Governing Law; Jurisdiction, Etc | 115 |
| 11.17 | Waiver of Jury Trial | 116 |

## SCHEDULES

| | |
|---|---|
| Schedule 1.01A | Other Secured Debt |
| Schedule 1.01B | Insurance-Related Cash Collateral Accounts |
| Schedule 1.01C | Locations of Fixed Assets and Inventory |
| Schedule 1.01D | Excess Real Estate |
| Schedule 1.01E | Wind-Down Business Units |
| Schedule 6.05 | Litigation |
| Schedule 6.07 | ERISA |
| Schedule 6.11(a) | Financial Statement Exceptions |
| Schedule 6.11(a)(iii) | Permitted Liabilities |
| Schedule 6.12 | Environmental Matters |
| Schedule 6.17 | Subsidiaries and Minority Interests |
| Schedule 6.18 | Insurance Matters |
| Schedule 6.19 | Financial Statement Disclosures |
| Schedule 6.20 | Mortgaged Properties |
| Schedule 8.01 | Permitted Liens |
| Schedule 8.04(d) | Existing Loans to Non-Wholly Owned Subsidiaries |
| Schedule 8.04(e)(i) | Minority Investments |
| Schedule 8.04(e)(ii) | Put Obligations |
| Schedule 8.04(f) | Swap Obligations |
| Schedule 8.05 | Indebtedness of Non-Wholly Owned Subsidiaries |
| Schedule 8.08(g) | Stock Price Guaranties |
| Schedule 11.02 | Payment Offices; Addresses for Notices; Lending Offices |
| Schedule 11.06 | Processing Fees |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Notice of Revolving Loan Borrowing |
| Exhibit B | Form of Compliance Certificate |
| Exhibit C | Form of Legal Opinion |
| Exhibit D | Form of Assignment and Assumption |
| Exhibit E | Form of Note |
| Exhibit F | Form of Additional Guarantor Assumption Agreement |
| Exhibit G | Form of Security Agreement |
| Exhibit H | Form of Update Certificate |
| Exhibit I | Form of Borrowing Base Certificate |
| Exhibit J | Form of Interim Financing Order |

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This Senior Secured Super-Priority Debtor-in-Possession Credit Agreement ("Agreement"), dated as of June 16, 2009, is made and entered into by and among (i) BUILDING MATERIALS HOLDING CORPORATION, a Delaware corporation, as borrower ("Holdings"), (ii) BMC WEST CORPORATION, a Delaware corporation (the "Company"), and certain other subsidiaries of Holdings, as Guarantors (as defined herein), (iii) WELLS FARGO BANK, NATIONAL ASSOCIATION, as administrative agent for the Lenders (the "Administrative Agent"), and (iv) the various financial institutions from time to time party to this Agreement (individually, a "Lender" and, collectively, the "Lenders").

## RECITALS

A.    On June 16, 2009 (the "Petition Date"), Holdings and Guarantors filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") voluntary petitions for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq., and remain in possession of their assets pursuant to Sections 1107 and 1108 thereof. Each Guarantor is a subsidiary of Holdings.

B.    Holdings has requested that the Lenders make postpetition loans to Holdings pursuant to a debtor-in-possession credit facility consisting of a revolving credit facility in an aggregate principal amount not to exceed $80,000,000, including a $20,000,000 letter of credit subfacility, subject to the terms of this Agreement and, if and when entered, the Financing Orders (as defined herein).

C.    The Lenders are severally, and not jointly, willing to extend such credit to Holdings under this Agreement upon the terms and conditions set forth in this Agreement and the Financing Orders.

## AGREEMENT

NOW, THEREFORE, in consideration of the above Recitals and the mutual agreements, provisions and covenants contained herein, the parties hereto hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

1.01    Certain Defined Terms.  The following terms have the following meanings when used herein (including in the Recitals hereof):

"Account" means an account (as that term is defined in the UCC).

"Account Debtor" means any Person who is obligated on an Account.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (i) the acquisition of all or substantially all of the

assets of a Person, or of any business or division of a Person, (ii) the acquisition of in excess of 50% of the capital stock, partnership interests, membership interests or equity of any Person, or otherwise causing any Person to become a Subsidiary, or (iii) a merger or consolidation or any other combination with another Person (other than a Person that is a Subsidiary).

"Additional Guarantor Accession Date" has the meaning specified in Section 7.13.

"Additional Guarantor Assumption Agreement" has the meaning specified in Section 7.13.

"Adequate Protection" means the adequate protection ordered by the Bankruptcy Court pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, and in the case of the lenders under the Prepetition Credit Agreement, shall include (i) an administrative priority claim junior and subordinate only to the Carve-Out and the Obligations, (ii) replacement Liens on the Collateral junior and subordinate only to the Carve-Out and the Liens securing the Obligations, (iii) new Liens on previously unencumbered Collateral junior and subordinate only to the Carve-Out and the Liens securing the Obligations, (iv) payment of professional fees and expenses, including attorneys' fees and financial advisor fees, of the Prepetition Credit Agreement's administrative agent during the Bankruptcy Cases, whether incurred prepetition or postpetition, (v) to the extent of the value of the collateral securing the obligations under the Prepetition Credit Agreement, the accrual of interest under the Prepetition Credit Agreement at the default rate specified therein, and (vi) the Loan Parties' acknowledgement of the validity and amount of the obligations under the Prepetition Credit Agreement and Liens securing such obligations, subject to the right of the statutory committee of unsecured creditors' (for a limited time period) and other non-debtor Persons to challenge such obligations and Liens.

"Administrative Agent" has the meaning specified in the preamble, and any successor Administrative Agent arising under Section 10.06.

"Administrative Agent Related Persons" means Wells Fargo and any successor Administrative Agent arising under Section 10.06 and any L/C Issuer hereunder, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"Administrative Agent's Payment Office" means the address for payments set forth on Schedule 11.02 or such other address as the Administrative Agent may from time to time specify.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agency Fee" has the meaning specified in Section 2.09(a).

"Agency Fee Letter" has the meaning specified in Section 2.09(a).

"Aggregate Revolving Commitment" means the combined Revolving Commitments of the Lenders, which combined Revolving Commitments shall not exceed (i) the Interim Commitment Amount from and after the date upon which the Bankruptcy Court issues the Interim Financing Order, and (ii) the Final Commitment Amount from and after the date upon which the Bankruptcy Court issues the Final Financing Order. The Aggregate Revolving Commitment includes the L/C Commitment.

"Agreement" has the meaning specified in the preamble.

"Applicable Fee Amount" means, with respect to the Commitment Fees, 0.50%, and, with respect to the Standby Letter of Credit fees payable hereunder, 4.50%.

"Applicable Margin" means 4.50%.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06), and accepted by the Administrative Agent, in substantially the form of Exhibit D or any other form approved by the Administrative Agent.

"Attorney Costs" means and includes all fees and disbursements of any law firm or other external counsel, the allocated cost of internal legal services and all disbursements of internal counsel.

"Available Commitment" has the meaning specified in Section 2.09(b).

"Avoidance Actions" means all causes of action arising under Sections 502(d), 542, 544, 545, 547, 548, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom and property received thereby, whether by judgment, settlement or otherwise.

"Bankruptcy Cases" has the meaning specified in Recital A.

"Bankruptcy Code" means the Bankruptcy Code of the United States (11 U.S.C. §101, et seq.).

"Bankruptcy Court" has the meaning specified in Recital A.

"Base Rate" means, for any day, a fluctuating rate equal to the highest of: (i) the Prime Rate in effect on such day, (ii) a rate determined by Administrative Agent to be 1.00% above Daily One Month LIBOR in effect on such day, (iii) the Federal Funds Rate plus 1.00%, and (iv) 3.00%.

"Borrowing" means a borrowing hereunder consisting of (i) Revolving Loans made to Holdings on the same day by the Lenders under Article II, or (ii) an L/C Borrowing.

"Borrowing Base" means, as of any date of determination, the result of:

      (a)     70% of the (A) amount of Eligible Accounts less the (B) Warranty Reserve less (C) the Gift Certificate Reserve, plus

      (b)     50% of (A) the value of Eligible Inventory (other than Truss and Millwork Inventory) less (B) the Inventory Vendor Discount Reserve less (C) the Inventory Volume Rebate Reserve, plus

      (c)     25% of (A) the value of Eligible Truss and Millwork Inventory less (B) the Truss and Millwork Vendor Discount Reserve less (C) the Truss and Millwork Volume Rebate Reserve, plus

      (d)     75% of the Fixed Assets Orderly Liquidation Value, minus

      (e)     the Rent Reserve plus the aggregate amount of other reserves, if any, including with respect to the Carve-Out, established by the Administrative Agent in the exercise of its Permitted Discretion.

"Borrowing Base Certificate" means a certificate, in substantially the form of Exhibit I, by which Holdings certifies calculation of the Borrowing Base.

"Borrowing Date" means any date on which a Borrowing occurs.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City or San Francisco are authorized or required by law to close.

"Capital Expenditures" means, for any period, the aggregate of all expenditures of Holdings and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the consolidated statement of cash flows of Holdings and its Subsidiaries.

"Capital Lease" means, for any Person, any lease of property (whether real, personal or mixed) which, in accordance with GAAP, would, at the time a determination is made, be required to be recorded as a capital lease in respect of which such Person is liable as lessee.

"Carve-Out" means (i) any unpaid fees due to the U.S. Trustee pursuant to 28 U.S.C. Section 1930 of the United States Code or otherwise and any fees due to the clerk of the Bankruptcy Court, (ii) the reasonable fees and expenses approved by the Bankruptcy Court incurred by a trustee under Section 726(b) or 1104 of the Bankruptcy Code in an aggregate amount not to exceed $100,000, (iii) the reasonable expenses of members of any statutory committee appointed in the Bankruptcy Cases (excluding fees and expenses of professional persons employed by such committee members individually) in an aggregate amount not to

exceed $50,000, (iv) to the extent allowed at any time, all unpaid fees and expenses allowed by the Bankruptcy Court of professionals or professional firms retained pursuant to Section 327, 330, 363, or 1103 of the Bankruptcy Code (the "Professional Persons") that were incurred or accrued on or after the Petition Date through the date upon which Holdings receives from the Administrative Agent a notice of an Event of Default, and (v) after the date upon which Holdings receives from the Administrative Agent notice of an Event of Default, to the extent allowed at any time, the payment of the fees and expenses of Professional Persons in an aggregate amount not to exceed $500,000; provided, however, that: (1) the dollar limitations in clause (v) above on fees and expenses shall not be reduced by the amount of any compensation or reimbursement of expenses incurred by or paid to any Professional Person prior to the notifications of Holdings by the Administrative Agent of the occurrence of an Event of Default in respect of which the Carve-Out is invoked or by any fees, expenses, indemnities or other amounts paid to the Administrative Agent, the Lenders or their respective attorneys or agents under this Agreement or otherwise, and (2) to the extent the dollar limitation in clause (v) on fees and expenses is reduced by an amount as a result of payment of such fees and expenses during the continuation of an Event of Default, and such Event of Default is subsequently cured or waived, such dollar limitation shall be increased by an amount equal to the amount by which it has been so reduced.

"Cash Balance" means, at any time, the aggregate Dollar amount of all cash and cash equivalents of Holdings and its Subsidiaries held in deposit accounts, securities accounts or otherwise, as determined in accordance with GAAP, but including, without limitation, any cash or cash equivalents held in a Cash Collateral Account without regard to how the account balance is accounted for on Holdings' financial statements.

"Cash Collateral Account" means that certain deposit account with account number 4121914204 held at Wells Fargo Bank, N.A. (or such other interest-bearing deposit accounts held at Wells Fargo Bank, N.A. or its Affiliates satisfactory to the Administrative Agent) in the name of Holdings, in which cash shall from time to time be deposited pursuant to the Loan Documents as additional collateral for the Obligations, and on which the Administrative Agent shall have a first priority Lien, subject and subordinate only to the Carve-Out and Permitted Priority Liens, and over which the Administrative Agent shall have dominion and control. The Prepetition Administrative Agent shall have a second priority lien on the Cash Collateral Account, subject and subordinate only to the Liens securing the Obligations, the Carve-Out and Permitted Priority Liens.

"Cash Collateralize" means to pledge and deposit with or deliver to the Administrative Agent, as additional collateral for the L/C Obligations or the Obligations, as the case may be, pursuant to the Loan Documents, cash or deposit account balances. Derivatives of such term shall have corresponding meaning.

"Cash Management Order" means that certain order entered by the Bankruptcy Court in the Bankruptcy Cases in form and substance reasonably acceptable to the Administrative Agent and the Majority Lenders, which, among other things, authorizes the continued use of the Loan Parties' existing cash management system.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any

change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Closing Fee" has the meaning specified in Section 2.09(d).

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all of the property, assets or interests in property or assets of Holdings and each Guarantor, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created (including all property of the estate (within the meaning of the Bankruptcy Code), all accounts, deposit accounts, money, letter of credit rights, commercial tort claims, inventory, contract rights, instruments, documents, chattel paper, general intangibles, machinery and equipment, real property, leases, capital stock or other equity interests in any Subsidiary, intercompany claims, and investment property, and all other causes of action arising under the Bankruptcy Code or otherwise, and all proceeds, rents, products and profits of any of the foregoing); provided, however, that "Collateral" shall not include: (i) any agreements, contracts, permits or licenses only if and to the extent that the granting of a Lien as contemplated hereby would (A) constitute a violation of a restriction in favor of a third party on such grant, (B) give any other party to such contract, instrument, license, license agreement or other document the right to terminate its obligations thereunder, or (C) violate any law (other than (but only in respect of agreements or contracts not constituting a document evidencing a Capital Lease or purchase money obligation) to the extent that any such term described in the preceding clauses (A), (B) or (C) would be rendered ineffective pursuant to Section 9-406, 9-407 or 9-408 of the UCC (or any successor provision or provisions)) ("Excluded Contracts and Leases"); provided, further, that any agreement, contract, permit or license that does not constitute "Collateral" pursuant to this sentence shall immediately become "Collateral," and the Loan Parties, as applicable, shall be deemed to have granted a Lien therein, from and after such time as the other party to such agreement, contract, permit or license consents to the grant of a Lien in such agreement, contract, permit or license in favor of the Collateral Agent or the prohibition against granting a Lien therein otherwise ceases to be effective; and provided, further, that with respect to Excluded Contracts and Leases, Collateral shall include the proceeds from the disposition of Excluded Contracts and Leases whether now or hereafter arising, whether tangible or intangible, and wherever located; (ii) any equipment subject to certain long-term secured debt consisting of the term notes, equipment notes and capital leases set forth on Part I of Schedule 1.01A and any other equipment in which any Loan Party has rights if and for so long as the grant of a security interest therein shall constitute or result in a breach or termination pursuant to the terms of, or a default under, any capital lease or purchase money agreement entered into in connection with the acquisition or financing of such equipment; provided, however, that such security interest shall attach immediately at such time as the term restricting the attachment of a security interest in such equipment is no longer operative or the attachment of a security interest in such equipment would not constitute or result in a breach or termination pursuant to the terms of, or a default under, the capital lease or purchase money agreement governing such equipment; (iii) any trademark applications filed in the United States Patent and Trademark Office on the basis of a Loan Party's "intent-to-use" such trademark to the extent that granting a security interest in such trademark application prior to such filing would adversely affect the enforceability or validity or result in the voiding of such trademark application, unless and until

acceptable evidence of use of the Trademark has been filed with and accepted by the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. 1051, et seq.), whereupon such Trademark application will be deemed automatically included in the Collateral; (iv) any Avoidance Actions; (v) the insurance-related cash collateral accounts set forth on Schedule 1.01B, the aggregate balances of which shall not exceed $4,000,000 at any point in time without the prior written consent of the Administrative Agent; or (vi) or the real property set forth on Part II of Schedule 1.01A.

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in Holdings' or its Subsidiaries' books and records, Inventory or equipment, in each case, in form and substance reasonably satisfactory to Administrative Agent.

"Collateral Documents" mean, collectively, (i) the Security Agreement, the Intellectual Property Security Agreements, the Mortgages and all other mortgages, deeds of trust, security agreements, patent and trademark assignments, lease assignments, control agreements and other similar agreements between Holdings or any Guarantor and the Lenders, or the Administrative Agent for the benefit of the Lenders and the other Secured Parties (as defined in the Security Agreement), now or hereafter delivered to the Lenders or the Administrative Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the Uniform Commercial Code or comparable law) against Holdings or any Guarantor as debtor in favor of the Lenders, or the Administrative Agent for the benefit of the Lenders and the other Secured Parties (as defined in the Security Agreement), as secured party, and (ii) any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions and extensions of any of the foregoing.

"Collected and Available Cash" means, at any time, the aggregate Dollar amount of all cash and cash equivalents constituting good and available funds of Holdings and its Subsidiaries, deposited into deposit accounts and concentrated into concentration accounts of Holdings and its Subsidiaries.

"Commercial Letter of Credit" means a commercial Letter of Credit Issued for the account of Holdings in respect of the purchase of inventory or other goods and services by Holdings or any of its Subsidiaries in the Ordinary Course of Business.

"Commitment Fees" has the meaning specified in Section 2.09(b).

"Company" has the meaning specified in the preamble.

"Compliance Certificate" means a certificate substantially in the form of Exhibit B.

"Contingent Obligation" means (without duplication), as to any Person, any direct or indirect liability of that Person, whether or not contingent, with or without recourse, (i) with respect to any Indebtedness, lease, dividend, letter of credit or other obligation (the "primary obligations") of another Person (the "primary obligor"), including any obligation of that Person

(a) to purchase, repurchase or otherwise acquire such primary obligations or any security therefor, (b) to advance or provide funds for the payment or discharge of any such primary obligation, or to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet item, level of income or financial condition of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) in connection with any synthetic lease or other similar off balance sheet lease transaction, or (e) otherwise to assure or hold harmless the holder of any such primary obligation against loss in respect thereof (each a "Guaranty Obligation"); (ii) with respect to any Surety Instrument issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or payments; (iii) to purchase any materials, supplies or other property from, or to obtain the services of, another Person if the relevant contract or other related document or obligation requires that payment for such materials, supplies or other property, or for such services, shall be made regardless of whether delivery of such materials, supplies or other property is ever made or tendered, or such services are ever performed or tendered; (iv) in respect of Earn-Out Obligations; (v) in respect of any Swap Contract; and (vi) in respect of Stock Price Guaranties. The amount of any Contingent Obligation shall, in the case of Guaranty Obligations, be deemed equal to the stated or determinable amount of the primary obligation in respect of which such Guaranty Obligation is made or, if not stated or if indeterminable, the maximum reasonably anticipated liability in respect thereof, and in the case of other Contingent Obligations other than in respect of Swap Contracts, shall be equal to the maximum reasonably anticipated liability in respect thereof and, in the case of Contingent Obligations in respect of Swap Contracts, shall be equal to the Swap Termination Value.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Costs of Goods Sold From Continuing Operations" means, for any period, costs of goods sold of Holdings and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, but exclusive of costs of goods sold attributable to the Wind-Down Business Units.

"Credit Extension" means and includes (i) the making of any Revolving Loans hereunder, and (ii) the Issuance of any Letters of Credit hereunder.

"Daily One Month LIBOR" means, for any day, the rate of interest equal to LIBOR then in effect for delivery for a one (1) month period.

"Default" means any Event of Default and any event or circumstance which, with the giving of notice, the lapse of time, or both, would constitute an Event of Default.

"Defaulting Lender" means a Lender that has failed to fund its portion of any Borrowing that it is required to fund under this Agreement and has continued in such failure for three (3) Business Days after written notice from the Administrative Agent.

"DIP Budget" has the meaning specified in Section 7.01(b).

"Disposition" means the sale, lease, conveyance or other disposition of property, including the sale, spinoff or other disposition of any division, business unit, business line, captive insurer or cell captive insurer, other than sales or other dispositions expressly permitted under Sections 8.02(a) through 8.02(e).

"Dollars," "dollars" and "$" each mean lawful money of the United States.

"Earn-out Obligations" means any obligations, whether contingent or matured, to pay additional consideration in connection with the Acquisition by Holdings or any Subsidiary of any capital stock or assets of any Person.

"EBITDAR From Continuing Operations" means, for any period, the sum of Gross Profit From Continuing Operations for such period minus Selling, General and Administrative Expenses From Continuing Operations for such period plus (to the extent deducted in determining Gross Profit From Continuing Operations pursuant to clause (b) of the definition thereof or to the extent included in Selling, General and Administrative Expenses From Continuing Operations, and without duplication) (i) depreciation expense and amortization expense for such period, (ii) restructuring charges relating to the shutdown or relocation of facilities and other like charges as may from time to time be agreed to by the Administrative Agent in its reasonable discretion, (iii) professional fees and costs attributable to the restructuring of Holdings' consolidated operations or the administration of the Bankruptcy Cases; provided, however, that such charges shall not exceed $15,000,000 per quarter, except with approval by the Administrative Agent, such approval not to be unreasonably withheld or delayed, (iv) other nonrecurring items attributable to the restructuring of Holdings' consolidated operations as may from time to time be agreed to by the Administrative Agent in its reasonable discretion, (v) non-cash impairment charges of goodwill and other intangibles, (vi) non-cash share based compensation costs; provided, however, that such costs shall not exceed $2,250,000 per quarter, (vii) severance and early retirement costs attributable to the restructuring of Holdings' consolidated operations; provided, however, that such costs shall not exceed $1,500,000 per quarter except with approval by the Administrative Agent, such approval not to be unreasonably withheld or delayed, (viii) the write-off or write-down of fixed assets attributable to the restructuring of Holdings' consolidated operations; and (ix) the write-off or write-down of operating leases attributable to the restructuring of Holdings' consolidated operations; all calculated for Holdings and its Subsidiaries on a consolidated basis for such period in accordance with GAAP.

"Effective Amount" means (i) with respect to any Revolving Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Borrowings and

prepayments or repayments of Revolving Loans occurring on such date; and (ii) with respect to any outstanding L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any Issuances of Letters of Credit occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements of outstanding unpaid drawings under any Letters of Credit or any reductions in the maximum amount available for drawing under Letters of Credit taking effect on such date; provided that for purposes of Section 2.06, the Effective Amount shall be determined without giving effect to any mandatory prepayments to be made under Section 2.06.

"Effective Date" means the date on which all conditions precedent set forth in Section 5.01 are satisfied or waived by all of the Lenders (or, in the case of Section 5.01(f), waived by the Person entitled to receive such payment).

"Eligible Accounts" means those Accounts created by Holdings or any Guarantor in the ordinary course of its business, that arise out of such Person's sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, however, that such criteria may be revised from time to time by Administrative Agent in Administrative Agent's Permitted Discretion to address the results of any audit performed by Administrative Agent from time to time after the Effective Date. Eligible Accounts shall not include the following (unless the Administrative Agent has imposed a reserve in the respect of the relevant Accounts), without duplication:

         (a)     Accounts that the Account Debtor has failed to pay within 60 days of original due date or Accounts with selling terms of more than 30 days,

         (b)     Accounts owed by an Account Debtor (or its Affiliates) where 20% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

         (c)     Accounts with respect to which the Account Debtor is owed a credit by Holdings or any Guarantor, to the extent of such credit,

         (d)     Accounts consisting of late fees or similar finance charges with respect to Accounts deemed ineligible under clause (a) above,

         (e)     Accounts subject to a contra account or with respect to which the Account Debtor is otherwise a creditor of Holdings or any Guarantor, has or has asserted a right of setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such contra account, claim, right of setoff, or dispute,

         (f)     Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which Holdings or any Guarantor has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(g)     Accounts with respect to which the Account Debtor has made a deposit or other advance payment, to the extent of such deposit or advance payment,

(h)     Accounts with respect to which the Account Debtor is owed premiums by Holdings or any Guarantor for WRAP insurance, to the extent of such premiums,

(i)     Accounts arising from services subject to a performance bond or other Surety Instrument,

(j)     Accounts with respect to which the Account Debtor is an Affiliate of Holdings or an employee or agent of Holdings or any Affiliate of Holdings,

(k)     Accounts with cash-on-delivery, cash-in-advance or similar selling terms,

(l)     Accounts with respect to which the Account Debtor is a school, school district or other similar payor,

(m)     Accounts with respect to which the Account Debtor is either (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which Holdings has complied, to the reasonable satisfaction of Administrative Agent, with the Assignment of Claims Act, 31 USC §3727), or (ii) any state of the United States,

(n)     Accounts with respect to which the Account Debtor has earned an allowance or rebate, to the extent of such allowance or rebate,

(o)     Accounts evidenced by a promissory note or other instrument,

(p)     Accounts evidencing billings in excess of costs, to the extent of such excess,

(q)     Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional,

(r)     Accounts that are not payable in Dollars,

(s)     Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States, or (ii) is not organized under the laws of the United States or any state thereof, or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (y) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Administrative Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Administrative Agent and is directly drawable by Administrative Agent, or (z) the Account is

covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Administrative Agent,

(t)     Accounts with respect to an Account Debtor whose total obligations owing to Holdings and the Guarantors exceed 20% (such percentage, as applied to a particular Account Debtor, being subject to reduction by Administrative Agent in its Permitted Discretion if the creditworthiness of such Account Debtor deteriorates) of all Eligible Accounts, to the extent of the obligations owing by such Account Debtor in excess of such percentage; provided, however, that, in each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing percentage shall be determined by Administrative Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limit,

(u)     Accounts, the collection of which Administrative Agent, in its Permitted Discretion, believes to be doubtful by reason of the Account Debtor's financial condition,

(v)     Accounts that are not subject to a valid and perfected first priority Lien in favor of the Administrative Agent,

(w)     Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor, or

(x)     Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity.

"Eligible Assignee" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; and (d) any other Person (other than a natural person) approved by (i) the Administrative Agent and (ii) in the case of any assignment of a Revolving Commitment, the L/C Issuer (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include (x) Holdings or any of Holdings' Affiliates or Subsidiaries or (y) a Defaulting Lender.

"Eligible Fixed Assets" means the fixed assets (other than real estate) of Holdings and the Guarantors that comply with each of the representations and warranties respecting Eligible Fixed Assets made in the Loan Documents and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, however, that such criteria may be revised from time to time by Administrative Agent in Administrative Agent's Permitted Discretion to address the results of any audit or appraisal performed by Administrative Agent from time to time after the Effective Date.  An item of fixed assets shall not be included in Eligible Fixed Assets (unless the Administrative Agent has imposed a reserve in the respect of the relevant fixed assets), without duplication, if:

(a)     Holdings or any Guarantor does not have good, valid, and marketable title thereto,

(b)     it is not located at one of the locations in the continental United States set forth on <u>Schedule 1.01C</u>, as such Schedule may be amended from time to time (or in-transit from one such location to another such location),

(c)     it is located on real property leased by Holdings or any Guarantor or in a contract warehouse, in each case, unless either (1) it is subject to a Collateral Access Agreement executed by the lessor or warehouseman, as the case may be, and unless it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises, or (2) a Rent Reserve has been imposed in respect of the Fixed Assets located at such location, or

(d)     it is not subject to a valid and perfected first priority Lien in favor of the Administrative Agent.

"<u>Eligible Inventory</u>" means Inventory consisting of first quality finished goods held for sale in the ordinary course of Holdings' or any Guarantor's business, that complies with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; <u>provided</u>, <u>however</u>, that such criteria may be revised from time to time by Administrative Agent in Administrative Agent's Permitted Discretion to address the results of any audit or appraisal performed by Administrative Agent from time to time after the Effective Date.  In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with Holdings' historical accounting practices.  An item of Inventory shall not be included in Eligible Inventory if (unless the Administrative Agent has imposed a reserve in the respect of the relevant Inventory), without duplication:

(a)     Holdings or any Guarantor does not have good, valid, and marketable title thereto,

(b)     it is not located at one of the locations in the continental United States set forth on <u>Schedule 1.01C</u>, as such Schedule may be amended from time to time (or in-transit from one such location to another such location),

(c)     it is located on real property leased by Holdings or any Guarantor or in a contract warehouse, in each case, unless (1) it is subject to a Collateral Access Agreement executed by the lessor or warehouseman, as the case may be, and unless it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises, or (2) a Rent Reserve has been imposed in respect of the Inventory located at such location,

(d)     it is not subject to a valid and perfected first priority Lien in favor of the Administrative Agent,

(e)     it consists of goods returned or rejected by Holdings' or any Guarantor's customers,

(f)     it consists of goods that are obsolete or slow moving, restrictive or custom items, work-in-process (other than Truss and Millwork Inventory), raw materials, or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed

in Holdings' or any Guarantor's business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment,

        (g)     it consists of non-perpetual Inventory,

        (h)     it consists of special order Inventory, or

        (i)     it consists of racks and pallets Inventory.

"Eligible Truss and Millwork Inventory" means Eligible Inventory consisting of Truss and Millwork Inventory.

"Environmental Claims" means all claims, however asserted, by any Governmental Authority or other Person alleging potential liability or responsibility for violation of any Environmental Law, or for release or injury to the environment or threat to public health, personal injury (including sickness, disease or death), property damage, natural resources damage, or otherwise alleging liability or responsibility for damages (punitive or otherwise), cleanup, removal, remedial or response costs, restitution, civil or criminal penalties, injunctive relief, or other type of relief, resulting from or based upon the presence, placement, discharge, emission or release (including intentional and unintentional, negligent and non-negligent, sudden or non-sudden, accidental or non-accidental, placement, spills, leaks, discharges, emissions or releases) of any Hazardous Material at, in, or from any property, whether or not owned by Holdings or any Subsidiary.

"Environmental Laws" means all federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authorities, in each case relating to environmental, health, safety and land use matters; including the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), the Clean Air Act, the Federal Water Pollution Control Act of 1972, the Solid Waste Disposal Act, the Federal Resource Conservation and Recovery Act, the Toxic Substances Control Act, the Emergency Planning and Community Right-to-Know Act, the California Hazardous Waste Control Law, the California Solid Waste Management, Resource, Recovery and Recycling Act, the California Water Code and the California Health and Safety Code.

"Equity Securities" of any Person shall mean (a) all common stock, preferred stock, participations, shares, partnership interests, limited liability company interests or other equity interests in and of such Person (regardless of how designated and whether or not voting or non-voting) and (b) all warrants, options and other rights to acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with Holdings or the Company within the meaning of section 414(b) or (c) of the Code (and sections 414(m) and (o) of the Code for purposes of provisions relating to section 412 of the Code).

"ERISA Event" means (i) a Reportable Event with respect to a Pension Plan; (ii) a withdrawal by Holdings, the Company or any ERISA Affiliate from a Pension Plan subject to section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in section 4001(a)(2) of ERISA) or a cessation of operations which is treated as such a withdrawal under section 4062(e) of ERISA; (iii) a complete or partial withdrawal by Holdings, the Company or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (iv) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (v) an event or condition which might reasonably be expected to constitute grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (vi) the imposition of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under section 4007 of ERISA, upon Holdings, the Company or any ERISA Affiliate.

"Event of Default" means any of the events or circumstances specified in Section 9.01.

"Event of Loss" means, with respect to any property, any of the following: (i) any loss, destruction or damage of such property; (ii) any pending or threatened institution of any proceedings for the condemnation or seizure of such property or for the exercise of any right of eminent domain; or (iii) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such property, or confiscation of such property or the requisition of the use of such property.

"Excess Real Estate" means the real property assets set forth on Schedule 1.01D.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of Holdings hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which Holdings is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by Holdings under Section 4.07), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 4.01(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from Holdings with respect to such withholding tax pursuant to Section 4.01(a).

"Extension Option" has the meaning specified in Section 2.15.

"Fair Market Value" means, in respect of any asset, the price at which the asset would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers for the immediately preceding day, as published by the Federal Reserve Bank of New York; provided that if no such rate is so published on any day, then the Federal Funds Rate for such day shall be the rate most recently published.

"Final Commitment Amount" means the lesser of (i) $80,000,000 and (ii) the maximum amount approved by the Bankruptcy Court in the Final Financing Order to be made available to Holdings pursuant to this Agreement.

"Final Financing Order" means the final order of the Bankruptcy Court substantially in the form of the Interim Financing Order (except as may otherwise be agreed by the Administrative Agent and the Majority Lenders in writing or on the record at the final hearing with respect to such order in the Bankruptcy Cases) entered in the Bankruptcy Cases after notice and any hearing pursuant to the Bankruptcy Rules and applicable local rules which, among other matters, authorizes the transactions contemplated by this Agreement (including Liens securing the Obligations) and provides for the superpriority of the Administrative Agent's and the Lenders' claims; which order shall be in full force and effect and not vacated, modified, amended, renewed, overturned, subject to a pending appeal or stayed in any respect (except in each case with the written consent of the Administrative Agent or as otherwise permitted under Section 8.21); and, in the event such order is the subject of a pending appeal, the performance of any Obligation of any Loan Party shall not be stayed during such appeal.

"Financing Orders" means the Interim Financing Order and the Final Financing Order.

"First Day Orders" means the Cash Management Order, the Interim Financing Order and all other orders entered by the Bankruptcy Court on the Petition Date or within five Business Days of the Petition Date or based on motions filed by Holdings or any Guarantor on the Petition Date.

"Fixed Assets Orderly Liquidation Value" means the Dollar amount that is estimated to be recoverable in an orderly liquidation of the Eligible Fixed Assets net of all associated costs and expenses of such liquidation, such Dollar amount to be as determined from time to time by an appraisal company selected by the Administrative Agent.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which Holdings is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"FRB" means the Board of Governors of the Federal Reserve System, and any Governmental Authority succeeding to any of its principal functions.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination, subject to Section 1.03.

"Gift Certificate Reserve" means, as of any date of determination, a Dollar amount equal to Holdings' and its Subsidiaries' accrued liabilities for outstanding gift certificates as of such date.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Gross Profit From Continuing Operations" means, for any period, (a) Total Sales From Continuing Operations for such period minus (b) Costs of Goods Sold From Continuing Operations for such period.

"Guarantor" means each direct or indirect U.S. Wholly-Owned Subsidiary of Holdings that currently exists or is hereafter acquired or created and which is a party to a Guaranty in its capacity as a guarantor of any of the Obligations, and shall include the Company and each U.S. Wholly-Owned Subsidiary of Holdings party hereto; provided, however, that in no event shall any Guarantor be released of its obligations under any Guaranty in the event such Guarantor ceases to be a U.S. Wholly-Owned Subsidiary, by operation of any disposition of the equity thereof or otherwise, except as permitted under this Agreement.

"Guaranty" means the guaranty of each Guarantor made pursuant to Section 11.10 and any other guaranty under any separate agreement executed by any Guarantor pursuant to which it guarantees any of the Obligations.

"Guaranty Obligation" has the meaning specified in the definition of "Contingent Obligation."

"Hazardous Materials" means all those substances that are regulated by, or which may form the basis of liability under, any Environmental Law, including any substance identified under any Environmental Law as a pollutant, contaminant, hazardous waste, hazardous constituent, special waste, hazardous substance, hazardous material, or toxic substance, or petroleum or petroleum derived substance or waste.

"Holdings" has the meaning specified in the preamble.

"Honor Date" has the meaning specified in Section 3.03(b).

"Indebtedness" of any Person means, without duplication, (i) all indebtedness for borrowed money; (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services (other than trade payables entered into in the Ordinary Course of Business on ordinary terms and (x) not past due for more than 120 days or (y) if past due for more than 120 days, are being contested in good faith with any reserves as may be required by GAAP made therefor, but including all non-contingent Earn-Out Obligations); (iii) all reimbursement or payment obligations with respect to Surety Instruments (contingent or otherwise); (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses; (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by the Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (vi) all obligations with respect to Capital Leases; (vii) all indebtedness referred to in clauses (i) through (vi) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness; (viii) all Guaranty Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above; and (ix) all Stock Price Guaranties. For all purposes of this Agreement, the Indebtedness of any Person shall include all recourse Indebtedness of any partnership or joint venture or limited liability company in which such Person is a general partner or a joint venturer or a member.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Insolvency Proceeding" means, with respect to any Person, (i) any case, action or proceeding with respect to such Person before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (ii) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in either case undertaken under U.S. Federal, state or foreign law, including the Bankruptcy Code.

"Intellectual Property Security Agreement" has the meaning specified in the Security Agreement.

"Interest Payment Date" means the last Business Day of each calendar month and the Revolving Loan Maturity Date.

"Interim Commitment Amount" means the lesser of (i) $40,000,000 and (ii) the maximum amount approved by the Bankruptcy Court in the Interim Financing Order to be made available to Holdings prior to the issuance of the Final Financing Order pursuant to this Agreement.

"Interim Financing Order" means that certain order issued by the Bankruptcy Court in substantially the form of Exhibit J, as the same may be amended, modified or supplemented from time to time with the express written consent of Holdings, the Administrative Agent and the Majority Lenders or as otherwise permitted under Section 8.21.

"Inventory" means inventory (as that term is defined in the UCC).

"Inventory Vendor Discount Reserve" means, as of any date of determination, (i) 100% minus the Truss and Millwork Inventory Percentage multiplied by (ii) the amount of reserves that Holdings has recorded in its books as of such date, in accordance with GAAP, in respect of vendor discounts earned on Holdings' and its Subsidiaries' Inventory.

"Inventory Volume Rebate Reserve" means, as of any date of determination, (i) 100% minus the Truss and Millwork Inventory Percentage multiplied by (ii) the amount of reserves that Holdings has recorded in its books as of such date, in accordance with GAAP, in respect of rebates earned by vendors relating to volume purchases of Holdings' and its Subsidiaries' Inventory.

"Investment" has the meaning specified in Section 8.04.

"IRS" means the Internal Revenue Service, and any Governmental Authority succeeding to any of its principal functions under the Code.

"Issuance Date" has the meaning specified in Section 3.01(a).

"Issue" means, with respect to any Letter of Credit, to issue or to extend the expiry of, or to renew or increase the amount of or otherwise amend, such Letter of Credit; and the terms "Issued," "Issuing" and "Issuance" have corresponding meanings.

"L/C Advance" means each Lender's participation in any L/C Borrowing in accordance with its Proportionate Share.

"L/C Amendment Application" means an application form for amendment of outstanding Standby or Commercial Letters of Credit as shall at any time be in use at the L/C Issuer, as the L/C Issuer shall request.

"L/C Application" means an application form for issuances of Standby or Commercial Letters of Credit as shall at any time be in use at the L/C Issuer, as the L/C Issuer shall request.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which shall not have been reimbursed on the date when made nor converted into a Borrowing of Revolving Loans under Section 3.03(c).

"L/C Cash Collateral Account" means that certain deposit account with account number 4121914212 held at Wells Fargo Bank, N.A. (or such other interest-bearing deposit accounts held at Wells Fargo Bank, N.A. or its Affiliates satisfactory to the Administrative Agent) in the name of Holdings, in which cash shall from time to time be deposited pursuant to

the Loan Documents as additional collateral for the L/C Obligations, and on which the Administrative Agent shall have a first priority Lien, subject and subordinate only to the Carve-Out and Permitted Priority Liens, and over which the Administrative Agent shall have dominion and control. The Prepetition Administrative Agent shall have a second priority lien on the L/C Cash Collateral Account, subject and subordinate only to the Liens securing the Obligations, the Carve-Out and Permitted Priority Liens.

"L/C Commitment" means the commitment of the L/C Issuer to Issue, and the commitment of the Lenders severally to participate in, Letters of Credit from time to time Issued or outstanding under Article III, in an aggregate amount not to exceed on any date the amount of $20,000,000, as the same shall be reduced as a result of a reduction in the L/C Commitment pursuant to Section 2.04 or Section 2.06; provided that the L/C Commitment is a part of the Aggregate Revolving Commitment rather than a separate, independent commitment; and provided further that if as a result of any Revolving Commitment reductions hereunder the L/C Commitment shall exceed the Aggregate Revolving Commitment, the L/C Commitment shall automatically reduce by the amount of such excess.

"L/C Issuer" means Wells Fargo in its capacity as issuer of one or more Letters of Credit hereunder, together with any replacement letter of credit issuer arising under Section 10.06 or Section 11.06.

"L/C Obligations" means at any time the sum of (i) the aggregate undrawn amount of all Letters of Credit then outstanding, plus (ii) the amount of all unreimbursed drawings under all Letters of Credit, including all outstanding L/C Borrowings.

"L/C-Related Documents" means the Letters of Credit, the L/C Applications, the L/C Amendment Applications and any other documents relating to any Letter of Credit, including any of the L/C Issuer's standard form documents for letter of credit issuances.

"Lender" has the meaning specified in the preamble. References to the "Lenders" shall include Wells Fargo, including in its capacity as L/C Issuer; for purposes of clarification only, to the extent that Wells Fargo may have any rights or obligations in addition to those of the Lenders due to its status as L/C Issuer, its status as such will be specifically referenced.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify Holdings and the Administrative Agent.

"Letters of Credit" means any letters of credit Issued by the L/C Issuer pursuant to Article III (which may be Commercial Letters of Credit or Standby Letters of Credit).

"LIBOR" means the rate per annum (rounded upward, if necessary, to the nearest whole 1/8 of 1%) and determined pursuant to the following formula:

$$\text{LIBOR} = \frac{\text{Base LIBOR}}{100\% - \text{LIBOR Reserve Percentage}}$$

"Base LIBOR" means the rate per annum for United States dollar deposits quoted by Wells Fargo, for the purpose of calculating effective rates of interest for loans making reference to the Daily One Month LIBOR Rate, as the Inter-Bank Market Offered Rate in effect from time to time for delivery of funds for one (1) month in amounts approximately equal to the principal amount of such loans. Holdings understands and agrees that Wells Fargo may base its quotation of the Inter-Bank Market Offered Rate upon such offers or other market indicators of the Inter-Bank Market as Wells Fargo in its discretion deems appropriate including, but not limited to, the rate offered for U.S. dollar deposits on the London Inter-Bank Market.

"LIBOR Reserve Percentage" means the reserve percentage prescribed by the FRB (or any successor) for "Eurocurrency Liabilities" (as defined in Regulation D of the Federal Reserve Board, as amended), adjusted by Wells Fargo for expected changes in such reserve percentage during the applicable term of this Agreement.

"Lien" means any security interest, mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or other) or preferential arrangement of any kind or nature whatsoever in respect of any property (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing, or the authorized filing of any financing statement naming the owner of the asset to which such lien relates as debtor, under the Uniform Commercial Code or any comparable law) and any contingent or other agreement to provide any of the foregoing.

"Loan" means an extension of credit by a Lender to Holdings (i) under Article II, in the form of a Revolving Loan, or (ii) under Article III in the form of an L/C Advance.

"Loan Documents" means this Agreement, the Notes, each Guaranty, the Collateral Documents, the Agency Fee Letter, the L/C Related Documents and all other documents delivered to the Administrative Agent or any Lender in connection herewith.

"Loan Party" means Holdings, the Company and each other Guarantor.

"Majority Lenders" means two or more Lenders (or if there is only one Lender, such Lender) whose Revolving Commitments (or, if all Revolving Commitments have been terminated, whose outstanding Revolving Loans plus Proportionate Share, if any, of the Effective Amount of all L/C Obligations) exceed 50% of the Aggregate Revolving Commitment (or, if all Revolving Commitments have been terminated, the Effective Amount of all Revolving Loans plus the Effective Amount of all L/C Obligations); provided, however, that at any time any Lender is a Defaulting Lender, all Defaulting Lenders shall be excluded in determining "Majority Lenders" and such Defaulting Lenders' Revolving Commitments (or Revolving Loans and Proportionate Share of L/C Obligations, as the case may be) shall be excluded in such determination, and "Majority Lenders" shall mean two or more non-Defaulting Lenders (or if

there is only one non-Defaulting Lender, such Lender) otherwise meeting the criteria set forth in this definition.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the FRB.

"Material Adverse Effect" means (i) a material adverse change in, or a material adverse effect upon, the operations, business, properties or condition (financial or otherwise) of Holdings or Holdings and its Subsidiaries taken as a whole; (ii) a material impairment of the ability of the Loan Parties to perform under the Loan Documents; or (iii) a material adverse effect upon (a) the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document or (b) the perfection or priority of any Lien granted under the Collateral Documents; provided, however, that the filing of the Bankruptcy Cases and/or the events leading thereto or resulting therefrom shall not constitute a Material Adverse Effect.

"Maximum Commitment Amount" means $80,000,000.

"Minimum Amount" means (i) in respect of any Borrowing of Loans, (a) in the case of Revolving Loans, an aggregate minimum amount of $250,000 or any integral multiple of $100,000 in excess thereof, (ii) in the case of any reduction of the Revolving Commitments under Section 2.04, $250,000 or any multiple of $100,000 in excess thereof, and (iii) in the case of any optional prepayment of Loans under Section 2.05, $250,000 or any multiple of $100,000 in excess thereof.

"Minority Investment" means the direct or indirect Investment by Holdings in the equity interests of any Person, provided in each case that such Person is not a Subsidiary at the time of such Investment and after giving effect thereto.

"Mortgage" means any deed of trust, mortgage, assignment of rents or other document, in each case as amended, creating a Lien on real property or any interest in real property owned by any Loan Party.

"Mortgaged Property" means all real property set forth on Schedule 6.20 hereto, as such Schedule may be amended from time to time in accordance with Section 7.15.

"Multiemployer Plan" means a "multiemployer plan," within the meaning of section 4001(a)(3) of ERISA, to which Holdings, the Company or any ERISA Affiliate makes, is making, or is obligated to make contributions or, during the preceding three calendar years, has made, or been obligated to make, contributions.

"Net Issuance Proceeds" means, as to any issuance of debt or equity by any Person, cash proceeds received or receivable by such Person in connection therewith, net of costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of such Person.

"Net Proceeds" means, as to any Disposition by a Person, proceeds in cash, checks or other cash equivalent financial instruments as and when received by such Person, net of: (i) the direct costs relating to such Disposition excluding amounts payable to such Person or

any Affiliate of such Person, (ii) sale, use or other transaction taxes and capital gains taxes paid or payable by such Person as a direct result thereof, and (iii) amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Indebtedness secured by a purchase money security interest on any asset which is the subject of such Disposition. "Net Proceeds" shall also include proceeds paid on account of any Event of Loss, net of (a) all money actually applied to repair or reconstruct the damaged property or property affected by the condemnation or taking, (b) all of the direct costs and expenses incurred in connection with the collection of such proceeds, award or other payments, and (c) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments.

"Non-Wholly-Owned Subsidiaries" means all direct and indirect Subsidiaries of Holdings which are not Wholly-Owned Subsidiaries.

"Note" means a promissory note executed by Holdings in favor of a Lender pursuant to Section 2.02(b), in substantially the form of Exhibit E.

"Notice of Revolving Loan Borrowing" means a notice in substantially the form of Exhibit A.

"Obligations" means all advances to, and debts and liabilities of, any Loan Party arising under any Loan Document, or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Operating Lease" means, for any Person, any lease of property (whether real, personal or mixed) which, in accordance with GAAP, would, at the time a determination is made, be required to be recorded as an operating lease in respect of which such Person is liable as lessee.

"Ordinary Course of Business" means, in respect of any transaction involving a Loan Party, the ordinary course of such Loan Party's business, and undertaken by such Loan Party in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Participant" has the meaning specified in Section 11.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation, or any Governmental Authority succeeding to any of its principal functions under ERISA.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means a pension plan (as defined in section 3(2) of ERISA) subject to Title IV of ERISA which Holdings or the Company sponsors, maintains, or to which it makes, is making, or is obligated to make contributions, or in the case of a multiple employer plan (as described in section 4064(a) of ERISA) has made contributions at any time during the immediately preceding five (5) plan years.

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"Permitted Liens" has the meaning specified in Section 8.01.

"Permitted Prepetition Claim Payment" means a payment on account of any claim arising or deemed to have arisen prior to the Petition Date, the payment of which is approved pursuant to the First Day Orders or otherwise authorized by the Bankruptcy Court; provided, however, that no such payment shall be made after the occurrence and during the continuance of an Event of Default.

"Permitted Priority Liens" means any Permitted Liens described in clauses (iii) [taxes], (iv) [carriers, warehouseman], (v) [ordinary course liens], and (viii) [ordinary course real estate liens] of Section 8.01(a), but only to the extent such Liens were perfected, non-avoidable, first priority Liens by operation of law prior to the Petition Date.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in Recital A.

"Plan" means an employee benefit plan (as defined in section 3(3) of ERISA) which Holdings or the Company sponsors or maintains or to which Holdings or the Company makes, is making, or is obligated to make contributions and includes any Pension Plan.

"Plan of Reorganization" means any Chapter 11 plan or plans for Holdings and each Guarantor to be filed with the Bankruptcy Court in the Bankruptcy Cases; provided, however, that notwithstanding anything to the contrary set forth herein, the Plan of Reorganization (or any amendments or modifications thereto) shall provide for the payment in full in cash of all outstanding Loans and other non-contingent obligations hereunder and the

replacement, cancellation, cash collateralization or satisfactory rollover of all Letters of Credit on the effective date of the Plan of Reorganization.

"Pledged Collateral" means the "Pledged Collateral" as defined in the Security Agreement and shall include all products and Proceeds (as defined in the Security Agreement) of the Pledged Collateral.

"Postpetition Liabilities" means any liabilities or other obligations of Holdings or any Subsidiary incurred or assumed after the Petition Date.

"Prepetition Administrative Agent" means Wells Fargo in its capacity as "Administrative Agent" under the Prepetition Credit Agreement, and its successors and assigns in such capacity.

"Prepetition Credit Agreement" means the Second Amended and Restated Credit Agreement dated as of November 10, 2006, by and among Holdings, the Guarantors, the lenders party thereto and Wells Fargo, as administrative agent, as amended by that certain First Amendment to Second Amended and Restated Credit Agreement dated as of February 29, 2008 and that certain Second Amendment to Second Amended and Restated Credit Agreement dated as of September 30, 2008.

"Prime Rate" means at any time the rate of interest most recently announced within Wells Fargo at its principal office as its Prime Rate, with the understanding that the Prime Rate is one of Wells Fargo's base rates and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto, and is evidenced by the recording thereof after its announcement in such internal publication or publications as Wells Fargo may designate.

"Professional Persons" has the meaning specified in the definition of "Carve-Out" herein.

"Proportionate Share" means, as to any Lender at any time, the percentage equivalent (expressed as a decimal, rounded to the ninth decimal place) at such time of such Lender's Revolving Commitment divided by the Aggregate Revolving Commitment (or, if all Revolving Commitments have been terminated, (i) the sum of (A) the Effective Amount of such Lender's Revolving Loans and (B) such Lender's pro rata share, if any, of the Effective Amount of all L/C Obligations, divided by (ii) the sum of (A) the Effective Amount of all Revolving Loans and (B) the Effective Amount of all L/C Obligations).

"Put Obligations" mean obligations of Holdings either directly or indirectly to purchase from any Person such Person's equity interest in Non-Wholly-Owned Subsidiaries or such Person's equity interest in Persons in which Holdings has a Minority Investment.

"Reimbursement Date" has the meaning specified in Section 3.03(b).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Rent Reserve" means, as of any date of determination and without duplication for multiple classes of eligible assets held at any particular location, a Dollar amount equal to (i) three <u>multiplied by</u> (ii) the aggregate monthly rent payable by Holdings and its Subsidiaries in respect of all real property leased by Holdings and its Subsidiaries and all contract warehouses, in each case, where Eligible Inventory or Eligible Fixed Assets are located, but only to the extent that the underlying real property lease or contract has been assumed by a Loan Party in the Bankruptcy Cases.

"Reportable Event" means any of the events set forth in section 4043(c) of ERISA or the regulations thereunder, other than any such event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the PBGC.

"Requirement of Law" means, as to any Person, any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon the Person or any of its property or to which the Person or any of its property is subject.

"Requisite Priority" means the following with respect to Holdings and each Guarantor in the Bankruptcy Cases, subject and subordinate only to the Carve-Out (<u>provided</u> that such exceptions set forth in the definition of "Carve-Out" shall only apply upon the actual accrual of such amounts in accordance therewith and, at all times prior to such accruals, such amounts shall be subject to clauses (i) and (ii) below) and Permitted Priority Liens:

(i)     pursuant to Bankruptcy Code Section 364(c)(2), a first priority, perfected Lien upon each Loan Party's right, title and interest in, to and under the Collateral that is not otherwise encumbered by a valid perfected security interest or Lien on the Petition Date; and

(ii)    pursuant to Bankruptcy Code Section 364(d)(1), a first priority, senior, priming, perfected Lien upon all of each Loan Party's right, title and interest in, to and under all other Collateral, including the collateral under the Prepetition Credit Agreement.

"Responsible Officer" means as to any Person, the chief executive officer or the president of such Person, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants, the chief financial officer or the treasurer of such Person, or any other officer having substantially the same authority and responsibility.

"Revolving Commitment" means, as to each Lender, its obligation to (a) make Revolving Loans to Holdings pursuant to <u>Section 2.01(a)</u> and (b) purchase participations in L/C Obligations, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on <u>Schedule 2.01(a)</u> or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Loan" has the meaning specified in <u>Section 2.01(a)</u>.

"Revolving Loan Maturity Date" means the earliest to occur of (a) January 2, 2010 or, upon the effectiveness of the Extension Option, March 31, 2010; (b) the date upon which the Interim Financing Order expires unless the Final Financing Order has been entered and has become effective; (c) the earlier of the effectiveness or effective date of the Plan of Reorganization; (d) the date of the closing of a sale of all or substantially all of Holdings' assets pursuant to Section 363 of the Bankruptcy Code; (e) a dismissal of the Bankruptcy Cases or a conversion of the Bankruptcy Cases to Chapter 7 cases under the Bankruptcy Code; and (f) the date of termination of the Revolving Commitments in accordance with the provisions of this Agreement.

"Sale Cash Collateral Excess Proceeds Account" means that certain deposit account with account number 4121914295 held at Wells Fargo Bank, N.A. (or such other interest-bearing deposit accounts held at Wells Fargo Bank, N.A. or its Affiliates satisfactory to the Administrative Agent) in the name of Holdings, in which cash shall from time to time be deposited as provided in Sections 2.06(a)(iii) and 2.06(a)(vii) as additional collateral for the Indebtedness under the Prepetition Credit Agreement, and on which the Administrative Agent shall have a first priority Lien, subject and subordinate only to the Carve-Out and Permitted Priority Liens, and over which the Administrative Agent shall have dominion and control, which account shall be treated in accordance with the Plan of Reorganization. The Prepetition Administrative Agent shall have a second priority lien on the Sale Cash Collateral Excess Proceeds Account, subject and subordinate only to the Liens securing the Obligations, the Carve-Out and Permitted Priority Liens.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, (d) a Person resident in or determined to be resident in a country, in each case, that is subject to a country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals maintained by OFAC.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means that certain Security Agreement, dated as of the Effective Date, among Holdings, the Guarantors and the Administrative Agent for the benefit of the Lenders and the other Secured Parties (as defined in the Security Agreement) in substantially the form of Exhibit G.

"Selling, General and Administrative Expenses From Continuing Operations" means, for any period, selling, general and administrative expenses of Holdings and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, but exclusive of selling, general and administrative expenses of the Wind-Down Business Units.

"Servicing Fee" has the meaning specified in Section 2.09(c).

"Solvent" means, with respect to any Person on a particular date, that, at fair valuations, the sum of such Person's assets is greater than all of such Person's debts.

"Standby Letter of Credit" means a standby Letter of Credit issued for the account of Holdings to support obligations of Holdings or any Subsidiary, contingent or otherwise (and excluding all Commercial Letters of Credit).

"Stock Price Guaranty" means a guaranty that (i) is issued by Holdings or an Affiliate of Holdings in connection with the Acquisition of another Person, and (ii) is for the payment of cash or issuance of Holdings' common stock if the common stock issued by Holdings in connection with such an Acquisition is sold for less than the price provided for in the guaranty during its term, provided that for purposes of determining the amount of any Stock Price Guaranty at any time, the amount of such guaranty shall be equal to (a) the guaranteed stock price multiplied by the number of shares covered by the guaranty, minus (b) the current fair market value of one share of Holdings' common stock (which fair market value shall be equal to the five day trailing average closing price for Holdings' common stock as reported by the Nasdaq National Stock Market) multiplied by the number of shares covered by the guaranty, provided further, that for purposes of determining the amount of any Stock Price Guaranty which is payable solely in common stock of Holdings, the amount of such Stock Price Guaranty shall equal zero.

"Subsidiary" of a Person means any corporation, association, partnership, limited liability company, joint venture or other business entity of which more than 50% of the voting stock, membership interests or other equity interests, is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof. Unless the context otherwise clearly requires, references herein to a "Subsidiary" refer to a Subsidiary of Holdings.

"Superpriority Status" has the meaning specified in Section 6.24(c).

"Surety Instruments" means all letters of credit (including standby and commercial), banker's acceptances, bank guaranties, shipside bonds, surety bonds and similar instruments.

"Swap Contract" means any agreement, whether or not in writing, relating to any transaction that is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap or option, bond, note or bill option, interest rate option, forward foreign exchange transaction, cap, collar or floor transaction, currency swap, cross-currency rate swap, swaption, currency option or any other, similar transaction (including any option to enter into any of the foregoing) or any combination of the foregoing, and, unless the context otherwise clearly requires, any master agreement relating to or governing any or all of the foregoing.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (i) for any date on or after the date such Swap Contracts have been closed out

and termination value(s) determined in accordance therewith, such termination value(s), and (ii) for any date prior to the date referenced in clause (i) the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined by Holdings based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include any Lender).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Total Sales From Continuing Operations" means, for any period, total sales of Holdings and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, but exclusive of total sales of the Wind-Down Business Units.

"Truss and Millwork Inventory" means Inventory consisting of trusses and millwork.

"Truss and Millwork Inventory Percentage" means, as of any date of determination, the percentage of Holdings' and its Subsidiaries' total Inventory consisting of Truss and Millwork Inventory as of such date.

"Truss and Millwork Vendor Discount Reserve" means, as of any date of determination, (i) the Truss and Millwork Inventory Percentage multiplied by (ii) the amount of reserves that Holdings has recorded in its books as of such date, in accordance with GAAP, in respect of vendor discounts earned on Holdings' and its Subsidiaries' Inventory.

"Truss and Millwork Volume Rebate Reserve" means, as of any date of determination, (i) the Truss and Millwork Inventory Percentage multiplied by (ii) the amount of reserves that Holdings has recorded in its books as of such date, in accordance with GAAP, in respect of rebates earned by vendors relating to volume purchases of Holdings' and its Subsidiaries' Inventory.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of California.

"Unfunded Pension Liability" means the excess of a Plan's benefit liabilities under section 4001(a)(16) of ERISA, over the current value of that Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to section 412 of the Code for the applicable plan year.

"United States" and "U.S." each means the United States of America.

"Update Certificate" means a certificate in substantially the form of Exhibit H.

"U.S. Subsidiary" and "U.S. Wholly-Owned Subsidiary" means a Subsidiary or Wholly-Owned Subsidiary, as the case may be, that is located in and a resident of the United States.

"U.S. Trustee" means the U.S. Trustee for the District of Delaware.

"Warranty Reserve" means, as of any date of determination, the amount of reserves that Holdings has recorded in its books as of such date, in accordance with GAAP, in respect of actual or estimated warranty claims relating to products or services provided by Holdings and its Subsidiaries.

"Wells Fargo" has the meaning specified in the preamble, or any successor by merger thereto.

"Wholly-Owned Subsidiary" means any Person in which (other than directors' qualifying shares required by law) 100% of the capital stock or similar equity interest of each class having ordinary voting power, and 100% of the capital stock or similar equity interest of every other class, in each case, at the time as of which any determination is being made, is owned, beneficially and of record, by Holdings, or by one or more of the other Wholly-Owned Subsidiaries, or both.

"Wind-Down Business Units" means the business units identified on Schedule 1.01E, together with such other business units as Holdings may designate and that are approved by the Administrative Agent and the Majority Lenders, such approval not to be unreasonably withheld or delayed.

"Wind-Down of Non-Core Operations" means the termination or transfer of all employees and the cessation of business operations (within the meaning of Section 165 of the Code) of the Wind-Down Business Units.

1.02    Other Interpretive Provisions.

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) the

words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, and (vii) the term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

(c)     The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(d)     This Agreement and other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.  Unless otherwise expressly provided, any reference to any action of the Administrative Agent or the Lenders by way of consent, approval or waiver shall be deemed modified by the phrase "in its/their sole discretion."

(e)     This Agreement and the other Loan Documents are the result of negotiations among the Administrative Agent, Holdings, the Company and the other parties, have been reviewed by counsel to the Administrative Agent, Holdings, the Company and such other parties, and are the products of all parties.  Accordingly, they shall not be construed against the Lenders or the Administrative Agent merely because of the Administrative Agent's or Lenders' involvement in their preparation.

1.03     Accounting Principles.

(a)     Unless the context otherwise clearly requires, all accounting terms not expressly defined herein shall be construed, and all financial computations required under this Agreement shall be made, in accordance with GAAP, consistently applied; provided, however, that if GAAP shall have been modified after the Effective Date and the application of such modified GAAP shall have a material effect on such financial computations (including the computations required for the purpose of determining compliance with the covenants set forth in Article VIII), then such computations shall be made and such financial statements, certificates and reports shall be prepared, and all accounting terms not otherwise defined herein shall be construed, in accordance with GAAP as in effect prior to such modification, unless and until the Majority Lenders and Holdings shall have agreed upon the terms of the application of such modified GAAP.

(b)     References herein to "fiscal year", "fiscal quarter" and "fiscal month" refer to such fiscal periods of Holdings.

## ARTICLE II.

## THE CREDITS

2.01     Amounts and Terms of Commitments and Loans.

(a)     The Revolving Credit.  On the terms and subject to the conditions of this Agreement, each Lender severally agrees to advance to Holdings from time to time during the period beginning on the Effective Date and ending on the Revolving Loan Maturity Date such loans (each such loan, a "Revolving Loan") in Dollars as Holdings may request under this Section 2.01(a); provided, however, that (i) after giving effect to any Borrowing of Revolving Loans, (A) the Effective Amount of all Revolving Loans and the Effective Amount of all L/C Obligations shall not exceed the Aggregate Revolving Commitment, (B) the Effective Amount of the Revolving Loans of any Lender plus the participation of such Lender in the Effective Amount of all L/C Obligations shall not at any time exceed such Lender's Revolving Commitment and (C) the Effective Amount of all Revolving Loans and L/C Obligations shall not exceed the Borrowing Base then in effect.  Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, Holdings may borrow under this Section 2.01(a), prepay under Section 2.05 and reborrow under this Section 2.01(a).

2.02    Loan Accounts.

(a)     The Loans made by each Lender and the Letters of Credit Issued by the L/C Issuer shall be evidenced by one or more accounts or records maintained by such Lender or L/C Issuer, as the case may be, in the ordinary course of business.  The accounts or records maintained by the Administrative Agent, the L/C Issuer and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to Holdings and the Letters of Credit Issued for the account of Holdings, and the interest and payments thereon.  Any failure so to record or any error in doing so shall not, however, limit or otherwise affect the obligation of Holdings hereunder to pay any amount owing with respect to the Loans or any Letter of Credit.

(b)     Upon the request of any Lender made through the Administrative Agent, the Loans made by such Lender may be evidenced by one or more Notes, instead of or in addition to loan accounts.  Each such Lender shall endorse on the schedules annexed to its Note(s) the date, amount and maturity of each Loan made by it and the amount of each payment of principal made by Holdings with respect thereto.  Each such Lender is irrevocably authorized by Holdings to endorse its Note(s), and each Lender's record shall be conclusive absent manifest error; provided, however, that the failure of a Lender to make, or an error in making, a notation thereon with respect to any Loan shall not limit or otherwise affect the obligations of Holdings hereunder or under any such Note to such Lender.

2.03    Procedure for Borrowing.

(a)     Each Borrowing of Revolving Loans shall be made upon Holdings' irrevocable written notice delivered to the Administrative Agent in the form of a Notice of Revolving Borrowing, which notice must be received by the Administrative Agent prior to 9:00 a.m. (San Francisco time) on the requested Borrowing Date, specifying:

(i)     the amount of the Borrowing, which shall be in a Minimum Amount; and

(ii)     the requested Borrowing Date, which shall be a Business Day.

(b)     The Administrative Agent will promptly notify each Lender of its receipt of any Notice of Revolving Borrowing and of the amount of such Lender's Proportionate Share of that Borrowing.

(c)     Each Lender will make the amount of its Proportionate Share of each Borrowing available to the Administrative Agent for the account of Holdings at the Administrative Agent's Payment Office by 11:00 a.m. (San Francisco time) on the Borrowing Date requested by Holdings in funds immediately available to the Administrative Agent. The proceeds of each such Borrowing will then be made available to Holdings by the Administrative Agent at such office by crediting the account of Holdings on the books of Wells Fargo with the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent, or if requested by Holdings, by wire transfer in accordance with written instructions provided to the Administrative Agent by Holdings of such funds as received by the Administrative Agent, unless on the date of the Borrowing all or any portion of the proceeds thereof shall then be required to be applied to the repayment of any outstanding Loans or L/C Obligations, in which case such proceeds or portion thereof shall be applied to the payment of such Loans or L/C Obligations.

2.04     Voluntary Termination or Reduction of Commitments. Holdings may, upon not less than three (3) Business Days' prior written notice to the Administrative Agent, terminate the Revolving Commitments, or permanently reduce the Revolving Commitments, provided that the aggregate amount of any partial reduction is in a Minimum Amount; unless, after giving effect thereto and to any prepayments of any Loans made on the effective date thereof, (i) the Effective Amount of all Revolving Loans and L/C Obligations together would exceed the Aggregate Revolving Commitment then in effect, or (ii) the Effective Amount of all L/C Obligations would exceed the L/C Commitment then in effect. Once reduced in accordance with this Section 2.04, the Revolving Commitments may not be increased. Any reduction of the Revolving Commitments shall be applied to each Lender according to its Proportionate Share. If and to the extent specified by Holdings in the notice to the Administrative Agent, some or all of the reduction in the Revolving Commitments shall be applied to reduce the L/C Commitment. All accrued commitment and letter of credit fees to, but not including, the effective date of any reduction or termination of Revolving Commitments, shall be paid on the effective date of such reduction or termination.

2.05     Optional Prepayments. Subject to Section 4.04, Holdings may, at any time or from time to time, upon irrevocable written notice to the Administrative Agent provided prior to 9:00 a.m. (San Francisco time) on the day of such prepayment (provided that, if such prepayment is received by the Administrative Agent on or prior to 11:00 a.m. (San Francisco time) on any Business Day, such payment shall be applied against the outstanding Loans on the same Business Day), ratably prepay Loans in whole or in part, in Minimum Amounts without penalty; provided, however, that such notice may state that it is conditioned upon the consummation of a refinancing or other transaction, in which case such notice may be revoked by Holdings (by written notice to the Administrative Agent on or prior to the specified prepayment date), subject to Section 4.04, if such condition is not satisfied. Such notice of

prepayment shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify the Lenders of its receipt of any such notice and of such prepayment. If such notice is given by Holdings, Holdings shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein, together with (in the case of Loans based on LIBOR) accrued interest to each such date on the amount prepaid and any amounts required pursuant to Section 4.04.

    2.06   Mandatory Prepayments of Loans; Mandatory Commitment Reductions.

    (a)   Mandatory Prepayments of Loans.

    (i)   Over L/C Commitment. If at any time the Effective Amount of all L/C Obligations exceeds the L/C Commitment, Holdings shall Cash Collateralize on such date the outstanding Letters of Credit in an amount equal to the excess of the maximum amount then available to be drawn under the Letters of Credit over the L/C Commitment.

    (ii)   Over Aggregate Revolving Commitment. If at any time the Effective Amount of all Revolving Loans plus the Effective Amount of all L/C Obligations exceeds the Aggregate Revolving Commitment, Holdings shall immediately, and without notice or demand, pay an amount equal to the applicable excess in the following order of priority: first, Holdings shall prepay any L/C Borrowings then outstanding up to an amount equal to any remaining excess; and second, Holdings shall prepay the Revolving Loans then outstanding up to an amount equal to any remaining excess.

    (iii)   Dispositions of Property other than Excess Real Estate. If Holdings, the Company or any other Subsidiary shall at any time make or agree to make a Disposition of assets other than Excess Real Estate, then (A) Holdings shall promptly notify the Administrative Agent and the Prepetition Administrative Agent of such Disposition (including notice of the amount of the estimated Net Proceeds to be received by Holdings, the Company or such other Subsidiary in respect thereof), and (B) promptly upon, and in no event later than one (1) Business Day after, receipt by Holdings, the Company or such other Subsidiary of the Net Proceeds of such Disposition, Holdings shall pay an amount equal to 100% of such Net Proceeds in the following order of priority: first, Holdings shall prepay the outstanding amount of any L/C Borrowings; second, with any remaining excess, Holdings shall prepay the outstanding amount of any Revolving Loans; third, with any remaining excess, Holdings shall Cash Collateralize the L/C Obligations in accordance with Section 3.07; and fourth, to the extent that Holdings and its Subsidiaries have received such Net Proceeds exceeding $25,000,000 in the aggregate, and provided no Default then exists, Holdings shall pay any remaining excess to the Prepetition Administrative Agent as cash collateral for the Indebtedness under the Prepetition Credit Agreement, which excess would be deposited in the Sale Cash Collateral Excess Proceeds Account and be treated in accordance with the Plan of Reorganization; provided, however, that with respect to any Non-Wholly-Owned Subsidiary, Holdings shall only be required to make the payments provided above in an amount equal to the ratable portion of the Net Proceeds received by such Non-Wholly-Owned Subsidiary based on Holdings' direct or indirect interest in such Non-Wholly-Owned Subsidiary; and provided, further, however, that if the Net Proceeds of any Disposition are less than $100,000, then Holdings may delay the payments required under this

Section 2.06(a)(iii) until such time as aggregate Net Proceeds from Dispositions in respect of which a payment under this Section 2.06(a)(iii) has not been made exceed $100,000.

(iv) New Debt. If Holdings, the Company or any other Subsidiary shall at any time or from time to time issue any debt securities or otherwise borrow money (other than any Loans and other Indebtedness permitted under Section 8.05), then (i) Holdings shall promptly notify the Administrative Agent in advance of the estimated Net Issuance Proceeds of such issuance or borrowing, and (ii) promptly upon, and in no event later than one (1) Business Day after, receipt by Holdings, the Company or such other Subsidiary of the Net Issuance Proceeds of such issuance or borrowing, Holdings shall pay an amount equal to 100% of such Net Issuance Proceeds in the following order of priority: first, Holdings shall prepay the outstanding amount of any L/C Borrowings; second, with any remaining excess, Holdings shall prepay the outstanding amount of any Revolving Loans; third, with any remaining excess, Holdings shall Cash Collateralize the outstanding amount of any L/C Obligations in accordance with Section 3.07; and fourth, with any remaining excess, Holdings shall fund the Cash Collateral Account; provided, however, that with respect to any Non-Wholly-Owned Subsidiary, Holdings shall only be required to make the payments provided above in an amount equal to the ratable portion of the Net Issuance Proceeds received by such Non-Wholly-Owned Subsidiary in respect of such issuance or borrowing based on Holdings' direct or indirect interest in such Non-Wholly-Owned Subsidiary.

(v) Over Borrowing Base. If at any time the Effective Amount of all Revolving Loans plus the Effective Amount of all L/C Obligations exceeds the Borrowing Base then in effect, Holdings shall immediately, and without notice or demand, pay an amount equal to the applicable excess in the following order of priority: first, Holdings shall prepay any L/C Borrowings then outstanding up to an amount equal to the applicable excess; second, Holdings shall prepay the Revolving Loans then outstanding up to an amount equal to any remaining excess; and third, Holdings shall Cash Collateralize the L/C Obligations then outstanding up to an amount equal to any remaining excess in accordance with Section 3.07.

(vi) New Equity. Unless waived by the Majority Lenders in each instance, upon the receipt of Net Issuance Proceeds in respect of the issuance and sale of any Equity Securities by Holdings or any Subsidiary, Holdings shall, within one (1) Business Day of Holdings' or such Subsidiary's receipt of such Net Issuance Proceeds, pay an amount equal to 100% of such Net Issuance Proceeds in the following priority: first, Holdings shall prepay the outstanding amount of any L/C Borrowings; second, with any remaining excess, Holdings shall prepay the outstanding amount of any Revolving Loans; third, with any remaining excess, Holdings shall Cash Collateralize the outstanding amount of any L/C Obligations in accordance with Section 3.07; and fourth, with any remaining excess, Holdings shall fund the Cash Collateral Account.

(vii) Dispositions of Excess Real Estate. If Holdings, the Company or any other Subsidiary shall at any time make or agree to make a Disposition of Excess Real Estate, then (A) Holdings shall promptly notify the Administrative Agent and the Prepetition Administrative Agent of such Disposition (including notice of the amount of the estimated Net Proceeds to be received by Holdings, the Company or such other Subsidiary in respect thereof), and (B) provided no Default then exists, then promptly upon, and in no event

later than one (1) Business Day after, receipt by Holdings, the Company or such other Subsidiary of the Net Proceeds of such Disposition, Holdings shall pay an amount equal to 100% of such Net Proceeds to the Prepetition Administrative Agent as cash collateral for the Indebtedness under the Prepetition Credit Agreement, which excess would be deposited in the Sale Cash Collateral Excess Proceeds Account and be treated in accordance with the Plan of Reorganization; provided, however, that with respect to any Non-Wholly-Owned Subsidiary, Holdings shall only be required to make the payments provided above in an amount equal to the ratable portion of the Net Proceeds received by such Non-Wholly-Owned Subsidiary based on Holdings' direct or indirect interest in such Non-Wholly-Owned Subsidiary.

(viii)     Extraordinary Payments. If Holdings, the Company or any other Subsidiary shall at any time or from time to time receive extraordinary payments (*i.e.*, payments received outside of the Ordinary Course of Business) of cash, checks or other cash equivalent financial instruments, including payments from any Governmental Authority in respect of any federal, state or local tax refunds, then promptly upon, and in no event later than one (1) Business Day after, receipt by Holdings, the Company or such other Subsidiary of such extraordinary payments, Holdings shall pay an amount equal to 100% of such extraordinary payments in the following order of priority: first, Holdings shall prepay the outstanding amount of any L/C Borrowings; second, with any remaining excess, Holdings shall prepay the outstanding amount of any Revolving Loans; third, with any remaining excess, Holdings shall Cash Collateralize the outstanding amount of any L/C Obligations in accordance with Section 3.07; and fourth, with any remaining excess, Holdings shall fund the Cash Collateral Account; provided, however, that if the Net Proceeds of any extraordinary payment are less than $100,000, then Holdings may delay the payments required under this Section 2.06(a)(viii) until such time as aggregate Net Proceeds from extraordinary payments in respect of which a payment under this Section 2.06(a)(viii) has not been made exceed $100,000.

(ix)     Cash Collateral Account Balance. If as of the close of business on any Business Day the balance in the Cash Collateral Account on such day exceeds $1,000,000, then Holdings shall within one (1) Business Day, and without notice or demand, pay an amount equal to the applicable excess in the following order of priority: first, Holdings shall prepay any L/C Borrowings then outstanding up to an amount equal to any remaining excess; second, Holdings shall prepay the Revolving Loans then outstanding up to an amount equal to any remaining excess; and third, Holdings shall Cash Collateralize the L/C Obligations then outstanding up to an amount equal to any remaining excess in accordance with Section 3.07.

(x)     Holdings shall pay, together with each prepayment under this Section 2.06, accrued interest on the amount of any Loans prepaid and any amounts required pursuant to Section 4.04.

(b)     Mandatory Commitment Reductions. The Aggregate Revolving Commitment shall be automatically and permanently reduced to $0 on the Revolving Loan Maturity Date.

2.07     Repayment.

(a)    The Revolving Loans.  Holdings shall repay to the Administrative Agent for the account of the Lenders on the Revolving Loan Maturity Date the aggregate principal amount of Revolving Loans outstanding on such date.

2.08    Interest.

(a)    Subject to Section 2.08(c) below, each Revolving Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing Date at a rate per annum equal to the Base Rate plus the Applicable Margin.

(b)    Interest on each Revolving Loan shall be paid in arrears on each Interest Payment Date.  Interest shall also be paid on the date of any prepayment of the Loans under Section 2.05 or Section 2.06 for the portion of such Loans so prepaid and upon payment (including prepayment) in full thereof, and on the Revolving Loan Maturity Date.  During the existence of any Event of Default, interest shall be paid on demand of the Administrative Agent at the request or with the consent of the Majority Lenders.

(c)    Notwithstanding Section 2.08(a), while any Event of Default exists or after acceleration, Holdings shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the principal amount of all outstanding Loans and other Obligations of Holdings, at a rate per annum which is determined by adding 4% per annum to the Applicable Margin and, in the case of Obligations not subject to the Applicable Margin, at a rate per annum equal to the Base Rate plus the Applicable Margin plus 4% per annum.

(d)    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to Holdings.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

2.09    Fees.  In addition to certain fees described in Section 3.08:

(a)    Agency Fee.  On the Effective Date, Holdings shall pay the fee specified in that certain letter agreement between Holdings and Wells Fargo dated June 16, 2009 (the "Agency Fee Letter", and such fee, the "Agency Fee").  The Agency Fee is fully earned when due and, once paid, is non-refundable.

(b)    Commitment Fees.  Holdings shall pay to the Administrative Agent for the account of each Lender a commitment fee on the actual daily unused portion of such Lender's Proportionate Share of the then effective Aggregate Revolving Commitment (the "Available Commitment"), computed on a monthly basis in arrears on the last Business Day of each calendar month based upon the daily utilization for that month as calculated by the

Administrative Agent at a rate per annum equal to the Applicable Fee Amount (such fees, the "Commitment Fees"). For purposes of calculating the Available Commitment under this Section 2.09, the Revolving Commitments shall be deemed used to the extent of the Effective Amount of Revolving Loans then outstanding plus the Effective Amount of L/C Obligations then outstanding (other than L/C Obligations consisting of the aggregate undrawn amount of all Commercial Letters of Credit then outstanding). Such Commitment Fees shall accrue from the Effective Date to the Revolving Loan Maturity Date and shall be due and payable monthly in arrears on the last Business Day of each calendar month, commencing on June 30, 2009, to the Revolving Loan Maturity Date, with the final payment to be made on the Revolving Loan Maturity Date; provided that in connection with any termination of Revolving Commitments hereunder, the accrued Commitment Fees calculated for the period ending on such date shall also be paid on the date of termination. The Commitment Fees provided in this Section 2.09(b) shall accrue at all times after the Effective Date, including at any time during which one or more conditions in Article V are not met. The Commitment Fees are fully earned when due and, once paid, are non-refundable.

(c)     Servicing Fee. Holdings shall pay to the Administrative Agent, for the Administrative Agent's sole account, a servicing fee equal to $2,500 per month for each month (or a pro-rata share thereof, if in respect of a portion of a month) from and after the Effective Date up to the Revolving Loan Maturity Date (the "Servicing Fee"), which shall be due and payable monthly in arrears on the last Business Day of each calendar month, commencing on June 30, 2009, to the Revolving Loan Maturity Date, with the final payment to be made on the Revolving Loan Maturity Date. The Servicing Fee is fully earned when due and, once paid, is non-refundable.

(d)     Closing Fee. On the Effective Date, Holdings shall pay to the Administrative Agent for the account of each of the Lenders in accordance with its respective Proportionate Share a closing fee equal to 2.00% of the Maximum Commitment Amount (such fee, the "Closing Fee"). The Closing Fee is fully earned when due and, once paid, is non-refundable.

(e)     Audit, Appraisal and Examination Fees. Holdings shall pay to the Administrative Agent, for the Administrative Agent's sole account, (i) a fee equal to $1,000 per day, per auditor, plus reasonable out-of-pocket expenses for each financial audit of Holdings or any Guarantor performed by personnel, employed by the Administrative Agent, (ii) if implemented, a fee equal to $1,000 per day, per applicable individual, plus reasonable out-of-pocket expenses for the establishment of electronic collateral reporting, and (iii) the actual charges paid or incurred by the Administrative Agent if it elects to employ the services of one or more third persons to perform financial audits or quality of the earnings analyses of Holdings or any Guarantor, to establish electronic collateral reporting systems, to appraise the Collateral, or any portion thereof, or to assess Holdings' or any Guarantor's business valuation.

2.10    Computation of Fees and Interest.

(a)     All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b)     Each determination of an interest rate by the Administrative Agent shall be conclusive and binding on Holdings and the Lenders in the absence of manifest error. The Administrative Agent will, at the request of Holdings or any Lender, deliver to Holdings or the Lender, as the case may be, a statement showing the quotations used by the Administrative Agent in determining any interest rate and the resulting interest rate.

2.11    Payments Generally; Administrative Agent's Clawback.

(a)     General.  All payments to be made by Holdings shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by Holdings hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Payment Office in Dollars and in immediately available funds not later than 11:00 a.m. (San Francisco time) on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Proportionate Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 11:00 a.m. (San Francisco time) shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by Holdings shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)     (i)     Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing (or prior to the time of any Borrowing, in the case of any same day advance of Revolving Loans) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.03 and may, in reliance upon such assumption, make available to Holdings a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and Holdings severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to Holdings to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (B) in the case of a payment to be made by Holdings, the interest rate applicable to Revolving Loans.  If Holdings and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to Holdings the amount of such interest paid by Holdings for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by Holdings shall be without prejudice to any claim Holdings may have against a Lender that shall have failed to make such payment to the Administrative Agent.