# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| BUILDING MATERIALS HOLDING | ) Case No. 09-12074 (KJC) |
| CORPORATION, *et al.*,[1] | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |

### DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION FOR THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
### AMENDED OCTOBER 21, 2009

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

---

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Matthew K. Kelsey (admitted *pro hac vice*)
Aaron G. York (admitted *pro hac vice*)
200 Park Avenue
47th Floor
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4053
Email: *mrosenthal@gibsondunn.com*
*mkelsey@gibsondunn.com*
*ayork@gibsondunn.com*

**ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Sean Beach (No. 4070)
Donald J. Bowman, Jr. (4383)
Robert F. Poppiti, Jr. (5052)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: *sbeach@ycst.com*
*dbowman@ycst.com*
*rpoppiti@ycst.com*

Dated: Wilmington, Delaware
October 21, 2009

---

1     The Debtors, along with the last four digits of each Debtor's tax identification number, are as follows: Building Materials Holding Corporation (4269), BMC West Corporation (0454), SelectBuild Construction, Inc. (1340), SelectBuild Northern California, Inc. (7579), Illinois Framing, Inc. (4451), C Construction, Inc. (8206), TWF Construction, Inc. (3334), H.N.R. Framing Systems, Inc. (4329), SelectBuild Southern California, Inc. (9378), SelectBuild Nevada, Inc. (8912), SelectBuild Arizona, LLC (0036), and SelectBuild Illinois, LLC (0792). The mailing address for the Debtors is 720 Park Boulevard, Suite 200, Boise, Idaho 83712.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4 P.M. PREVAILING EASTERN TIME ON NOVEMBER _____, 2009 UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE. **AFTER EXPLORING SEVERAL ALTERNATIVES, THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE DEBTORS' CREDITORS. THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THIS "DISCLOSURE STATEMENT")[2] IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT PLAN OF REORGANIZATION OF BUILDING MATERIALS HOLDING CORPORATION AND ITS SUBSIDIARY DEBTORS (AS IT MAY BE AMENDED, THE "PLAN") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ONCE APPROVED, THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS, THE VALUE OF THEIR ASSETS OR THE VALUES OF THE EQUITY SECURITIES DESCRIBED HEREIN TO BE ISSUED OR BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS AND/OR INTERESTS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. THE DEBTORS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION CONTAINED HEREIN. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF, OR INTERESTS IN, THE

---

[2]     Capitalized terms not defined herein shall have the meanings ascribed to them in the Uniform Glossary of Defined Terms for Plan Documents, attached hereto as Exhibit A.

DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, BUILDING MATERIALS HOLDING CORPORATION ("BMHC") OR ANY OF ITS SUBSIDIARY DEBTORS (COLLECTIVELY WITH BMHC, THE "COMPANY"). EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

THE COMPANY'S BOARDS OF DIRECTORS HAVE APPROVED THE PLAN AND RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL IMPAIRED CLASSES ENTITLED TO VOTE (CLASSES 2(A)-(L), 3(A)-(L), 6(A)-(L) AND 8(A)-(L)) VOTE TO ACCEPT IT.

THE COMPANY PRESENTLY INTENDS TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE ARTICLE XIII, "CONDITIONS PRECEDENT TO CONSUMMATION." THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN ARE DESCRIBED UNDER "PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS."

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

**ACCEPTANCE OF THE PLAN BY HOLDERS OF CLAIMS WILL BE DEEMED TO CONSTITUTE APPROVAL OF THE LONG TERM INCENTIVE PLAN FOR PURPOSES OF SECTIONS 162(M) AND 422 OF THE INTERNAL REVENUE CODE OF 1986 AS AMENDED.**

IF THE PLAN IS NOT CONFIRMED AND CONSUMMATED, THE COMPANY BELIEVES THAT THERE IS SUBSTANTIAL DOUBT ABOUT ITS ABILITY TO CONTINUE AS A GOING CONCERN WITHOUT AN ALTERNATIVE FINANCIAL RESTRUCTURING UNDER THE PROVISIONS OF CHAPTER 11 OF THE BANKRUPTCY CODE. WITHOUT THE RESTRUCTURING OF INDEBTEDNESS CONTEMPLATED BY THE PLAN, THERE CAN BE NO ASSURANCE THAT THE COMPANY WILL BE ABLE TO EFFECTUATE SUCH AN ALTERNATIVE FINANCIAL RESTRUCTURING OR SUCCESSFULLY EMERGE FROM A CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND THE COMPANY MAY BE FORCED INTO A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. THE COMPANY BELIEVES THAT IF IT IS LIQUIDATED UNDER CHAPTER 7, THE VALUE OF THE ASSETS AVAILABLE FOR PAYMENT OF CREDITORS WOULD BE SIGNIFICANTLY LOWER THAN THE VALUE OF THE DISTRIBUTIONS CONTEMPLATED BY AND UNDER THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE REORGANIZED BMHC EQUITY INTERESTS TO BE ISSUED UNDER THE PLAN WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE REORGANIZED DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. THE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE THE PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN. SEE ARTICLE XVIII, "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN." CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN WHICH, THEREFORE, ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE REORGANIZED DEBTORS AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE COMPANY, ITS ADVISORS, OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED. NEITHER THE COMPANY'S INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS AND THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY, AND ASSUME NO RESPONSIBILITY FOR, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS OR LIQUIDATION ANALYSIS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. THE PROJECTIONS ARE QUALIFIED IN THEIR ENTIRETY BY THE DESCRIPTION THEREOF CONTAINED IN THIS DISCLOSURE STATEMENT. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS WILL PROVE CORRECT OR THAT THE REORGANIZED DEBTORS' ACTUAL RESULTS WILL NOT DIFFER FROM THE INFORMATION CONTAINED WITHIN THIS DISCLOSURE STATEMENT. THE COMPANY AND ITS PROFESSIONALS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE ANY INFORMATION DISCLOSED HEREIN TO REFLECT ANY CHANGES ARISING AFTER THE DATE HEREOF OR TO REFLECT FUTURE EVENTS, EVEN IF ANY ASSUMPTIONS CONTAINED HEREIN ARE SHOWN TO BE IN ERROR. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN, INCLUDING THE CONSUMMATION AND IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, COMMODITY PRICE FLUCTUATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL

DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS AND OTHER MARKET AND COMPETITIVE CONDITIONS.

HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.

SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT; MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

IN THIS DISCLOSURE STATEMENT, THE COMPANY RELIES ON AND REFERS TO INFORMATION AND STATISTICS REGARDING ITS INDUSTRY. THE COMPANY OBTAINED THIS MARKET DATA FROM INDEPENDENT INDUSTRY PUBLICATIONS OR OTHER PUBLICLY AVAILABLE INFORMATION. ALTHOUGH THE COMPANY BELIEVES THAT THESE SOURCES ARE RELIABLE, THE COMPANY HAS NOT INDEPENDENTLY VERIFIED AND DOES NOT GUARANTEE THE ACCURACY AND COMPLETENESS OF THIS INFORMATION.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND SUMMARY OF THE PLAN ..................................................... 1

    A.  OVERVIEW OF CHAPTER 11 ...................................................................... 3

    B.  PURPOSE AND EFFECT OF THE PLAN TRANSACTIONS ....................................... 3

        1.  Overview of Restructuring Transactions .......................................... 4

        2.  Exit Credit Facilities .............................................................. 4

        3.  Term Loan Credit Agreement and Prepetition Letters of Credit ........................ 5

        4.  Unsecured Cash Fund ............................................................. 6

        5.  Reorganized BMHC Equity Interests .............................................. 6

    C.  SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ............. 7

II.  VOTING AND CONFIRMATION PROCEDURES ..................................................... 18

    A.  PERSONS ENTITLED TO VOTE ON THE PLAN ................................................. 18

        1.  Classes 1(a)-(l): Other Priority Claims. ............................................ 18

        2.  Classes 2(a)-(l): Funded Lender Claims. ........................................... 20

        3.  Classes 3(a)-(l): L/C Lender Claims. ............................................. 20

        4.  Classes 4(a)-(l): Other Secured Claims. ........................................... 21

        5.  Classes 5(a)-(l): L/C General Unsecured Claims .................................... 22

        6.  Classes 6(a)-(l): General Unsecured Claims. ....................................... 23

        7.  Classes 7(a)-(l): Intercompany Claims. ........................................... 23

        8.  Classes 8(a)-(l): Small Unsecured Claims. ......................................... 24

        9.  Classes 9(a)-(l): Interests. ....................................................... 25

        10.  Class 10(a)-(l): Section 510(b) Claims. ........................................... 26

    B.  ACCEPTANCE OR REJECTION OF THE PLAN ................................................. 27

    C.  VOTING PROCEDURES ......................................................................... 27

    D.  CONFIRMATION HEARING ..................................................................... 27

        1.  Confirmation Hearing Date ....................................................... 28

    2.     Plan Objection Deadline ................................................................... 28

III.   GENERAL INFORMATION ........................................................................... 28

    A.   THE COMPANY'S BUSINESS OPERATIONS ..................................... 28

    B.   THE COMPANY'S ORGANIZATION STRUCTURE ........................... 29

IV.   SUMMARY OF PREPETITION INDEBTEDNESS AND FINANCING ........................ 30

    A.   THE COMPANY'S PREPETITION CREDIT AGREEMENT ................ 30

    B.   THE COMPANY'S OTHER DEBT ........................................................ 31

    C.   PENDING LITIGATION ........................................................................ 33

        1.    Class Action Lawsuits ................................................................... 33

            a.    Pedro Alvarado et al. v. Building Materials Holding Corporation et al.; In the Superior Court of the State of California for the County of Los Angeles; Case No. BC391029 ........................ 33

            b.    Eduardo Acevedo et al. v. Building Materials Holding Corporation et al.; In the United States District Court for the Central District of California; CV 08-06227 SJO (Cwx) ........................ 34

V.   EVENTS LEADING TO THE CHAPTER 11 CASES ........................................... 34

    A.   THE DOWNTURN IN THE U.S. HOUSING AND CONSTRUCTION MARKETS ................. 34

    B.   THE DEBTORS' FINANCIAL PERFORMANCE DETERIORATES ............... 35

    C.   THE DEBTORS DEFAULT UNDER THE PREPETITION CREDIT AGREEMENT ............... 36

    D.   THE DEBTORS' OUT-OF-COURT RESTRUCTURING INITIATIVES ............... 36

        1.    Operational Restructuring ................................................................... 36

        2.    Financial Restructuring ................................................................... 37

        3.    Development of Plan ................................................................... 38

VI.   ADMINISTRATION OF THE CHAPTER 11 CASES ........................................... 38

    A.   RELIEF SOUGHT AT OR NEAR THE OUTSET OF THESE CHAPTER 11 CASES ............... 38

        1.    Stabilizing Operations ................................................................... 39

            a.    Critical Vendors and 503(b)(9) Claimants ........................ 39

            b.    Outstanding Orders, Goods in Transit, Warehousemen, and Mechanic's/Materialman's Lien Claimants ........................ 39

            c.    Employee Compensation ................................................................... 40

DB02:8855143.1

068301.1001

|   |   | d. | Taxes | 40 |
|---|---|---|---|---|
|   |   | e. | Insurance Coverage | 40 |
|   |   | f. | Cash Management System | 40 |
|   |   | g. | Utilities | 41 |
|   |   | h. | Customer Programs | 41 |
|   |   | i. | Foreign Vendors | 41 |
|   |   | j. | Lease Rejections | 41 |
|   | 2. | | The Debtor in Possession Financing and Use of Cash Collateral | 42 |
|   | 3. | | Employment and Compensation of Advisors | 42 |
|   | 4. | | The Plan, Disclosure Statement and Balloting and Solicitation Procedures | 42 |
| B. | | | UNSECURED CREDITORS | 42 |
|   | 1. | | Appointment of the Creditors' Committee | 42 |
|   | 2. | | Meeting of Creditors | 43 |
| C. | | | SCHEDULES | 43 |
| D. | | | CLAIMS BAR DATE | 43 |
| E. | | | POST-FILING THIRD PARTY MARKETING EFFORTS | 43 |
| VII. | | | SUMMARY OF THE PLAN | 44 |
| A. | | | ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND PROFESSIONAL COMPENSATION CLAIM | 44 |
|   | 1. | | Administrative Expense Claims. | 44 |
|   | 2. | | Professional Compensation Claims. | 44 |
|   | 3. | | Priority Tax Claims. | 44 |
|   | 4. | | DIP Facility. | 44 |
|   | 5. | | U.S. Trustee Fees | 45 |
| B. | | | CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY SECURITIES | 45 |
|   | 1. | | Summary | 45 |
|   | 2. | | Summary of Classification and Treatment of Classified Claims and Interests | 45 |
|   | 3. | | Effect of Non-Voting; Modifications. | 55 |

|   |   | 4. | Classification and Treatment of Claims and Interests | 55 |
|   |   |   | a. Treatment of Classes 1(a)-(l) – Other Priority Claims. | 55 |
|   |   |   | b. Treatment of Classes 2(a)-(l) – Funded Lender Claims. | 55 |
|   |   |   | c. Treatment of Classes 3(a)-(l) – L/C Lender Claims. | 56 |
|   |   |   | d. Treatment of Classes 4(a)-(l) – Other Secured Claims. | 57 |
|   |   |   | e. Treatment of Classes 5(a)-(l) –L/C General Unsecured Claims. | 57 |
|   |   |   | f. Treatment of Classes 6(a)-(l): General Unsecured Claims. | 57 |
|   |   |   | g. Treatment of Classes 7(a)-(l) – Intercompany Claims. | 60 |
|   |   |   | h. Treatment of Classes 8(a)-(l) – Small Unsecured Claims. | 61 |
|   |   |   | i. Treatment of Class 9(a) – Interests in BMHC. | 61 |
|   |   |   | j. Treatment of Classes 9(b)-(l) – Other Interests. | 61 |
|   |   |   | k. Treatment of Classes 10(a)-(l) – Section 510(b) Claims. | 61 |
|   | C. | DISCLAIMER GOVERNING UNIMPAIRED CLAIMS | | 61 |
|   | D. | ACCEPTANCE OR REJECTION OF THE PLAN | | 62 |
|   |   | 1. | Voting Classes | 62 |
|   |   | 2. | Presumed Acceptance of the Plan | 62 |
|   |   | 3. | Presumed Rejection of the Plan | 62 |
|   | E. | CONFIRMATION PURSUANT TO SECTIONS 1129(A)(8) AND/OR (10) AND 1129(B) OF THE BANKRUPTCY CODE | | 62 |
|   | F. | NON-CONFIRMABILITY | | 62 |
|   | G. | CONTROVERSY CONCERNING IMPAIRMENT | | 63 |
| VIII. | MEANS FOR IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF REORGANIZED DEBTORS | | | 63 |
|   | A. | GENERAL SETTLEMENT OF CLAIMS | | 63 |
|   | B. | SOURCES OF CONSIDERATION FOR PLAN DISTRIBUTIONS. | | 63 |
|   |   | 1. | The Exit Credit Facilities. | 63 |
|   |   | 2. | The Term Loan Credit Agreement. | 63 |
|   |   | 3. | Issuance of Reorganized BMHC Equity Interests. | 64 |
|   |   | 4. | Avoidance Actions. | 64 |

DB02:8855143.1

068301.1001

        5.       Unsecured Cash Fund. ........................................................................ 64

C.    RULE 2004 EXAMINATIONS. ...................................................................... 64

D.    CONTINUED CORPORATE EXISTENCE. .................................................. 65

E.    REVESTING OF ASSETS. ............................................................................... 65

F.    MERGER. ............................................................................................................ 65

G.    CANCELLATION OF SECURITIES AND AGREEMENTS. ........................ 65

H.    REORGANIZED BMHC. .................................................................................. 65

I.    POST EFFECTIVE DATE MANAGEMENT. ................................................. 66

J.    DIRECTORS AND OFFICERS OF THE REORGANIZED DEBTORS. ...................................... 66

K.    NEW CERTIFICATES OF INCORPORATION AND NEW BYLAWS OF THE REORGANIZED DEBTORS. ........................................................................ 66

L.    NEW EMPLOYMENT, RETIREMENT, INDEMNIFICATION, AND OTHER RELATED AGREEMENTS. ........................................................................... 66

M.    EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS. ................. 66

N.    CORPORATE ACTION. .................................................................................. 66

O.    SECTION 1146 EXEMPTION. ......................................................................... 67

P.    PRESERVATION OF CAUSES OF ACTION. ............................................... 67

Q.    INSURANCE POLICIES AND AGREEMENTS. ........................................... 67

R.    COLLECTIVE BARGAINING AGREEMENTS. ........................................... 68

S.    NON-OCCURRENCE OF EFFECTIVE DATE. ............................................. 68

IX.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................... 68

A.    ASSUMPTION AND REJECTION OF CONTRACTS AND UNEXPIRED LEASES. ............... 68

B.    CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES. ................................................................................. 69

C.    CURE OF DEFAULTS. .................................................................................... 69

D.    CONTRACTS AND LEASES ENTERED INTO AFTER THE PETITION DATE. ................... 69

E.    MODIFICATIONS, AMENDMENTS, SUPPLEMENTS, RESTATEMENTS, OR OTHER AGREEMENTS. ........................................................................ 70

F.    RESERVATION OF RIGHTS. ......................................................................... 70

X.  PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS ....................................................................... 70

    A.    DISBURSING AGENT. .......................................................................... 70

    B.    DISTRIBUTION RECORD DATE. ........................................................ 70

    C.    CASH PAYMENTS. ............................................................................. 70

    D.    DELIVERY OF DISTRIBUTIONS. ...................................................... 70

    E.    MINIMUM CASH DISTRIBUTIONS. ................................................. 71

    F.    WITHHOLDING TAXES. ...................................................................... 71

    G.    UNCLAIMED PROPERTY. ................................................................. 71

    H.    RESERVE FOR DISPUTED GENERAL UNSECURED CLAIMS. ............................................. 71

    I.    DISPUTED CLAIMS. .......................................................................... 71

    J.    OBJECTIONS TO CLAIMS. ................................................................ 72

    K.    COMPROMISES AND SETTLEMENTS. ............................................ 72

    L.    NO DISTRIBUTIONS PENDING ALLOWANCE. .............................. 72

    M.    NO POSTPETITION INTEREST ON CLAIMS. ................................. 72

    N.    CLAIMS PAID OR PAYABLE BY THIRD PARTIES. ......................... 72

        1.    Claims Paid by Third Parties. ................................................. 72

        2.    Claims Payable by Third Parties. ........................................... 72

        3.    Applicability of Insurance Policies and Agreements. .............. 73

XI.  SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ................................. 73

    A.    DISCHARGE. ....................................................................................... 73

        1.    Discharge of Claims Against the Debtors and the Reorganized Debtors. ......................... 73

        2.    Injunction Related to the Discharge. ....................................... 73

    B.    RELEASES. .......................................................................................... 74

        1.    Releases by the Debtors. ......................................................... 74

        2.    Certain Waivers. ...................................................................... 74

        3.    Releases by Holders of Claims and Interests. .......................... 74

        4.    Exculpation. ............................................................................ 75

DB02:8855143.1

068301.1001

| | | 5. | Injunction Related to Releases. ....................................................... | 75 |
| | C. | NO SUCCESSOR LIABILITY. .................................................................. | 76 |
| | D. | RELEASE OF LIENS. ................................................................................ | 76 |
| | E. | TERM OF INJUNCTIONS. ........................................................................ | 76 |
| | F. | BINDING EFFECT. ................................................................................... | 76 |
| XII. | ALLOWANCE AND PAYMENT OF PROFESSIONAL COMPENSATION CLAIMS ......................... | | 76 |
| | A. | FINAL FEE APPLICATIONS. ................................................................... | 76 |
| | B. | POST-CONFIRMATION DATE FEES AND EXPENSES. .......................... | 77 |
| XIII. | CONDITIONS PRECEDENT TO CONSUMMATION ....................................... | | 77 |
| | A. | CONDITIONS PRECEDENT ..................................................................... | 77 |
| | | 1. | Conditions to Confirmation. ............................................................... | 77 |
| | | 2. | Conditions to Effective Date. .............................................................. | 77 |
| | B. | EFFECT OF FAILURE OF CONDITIONS. ............................................... | 78 |
| XIV. | RETENTION OF JURISDICTION ................................................................... | | 78 |
| XV. | MISCELLANEOUS PROVISIONS .................................................................... | | 80 |
| | A. | PLAN SUPPLEMENT. ............................................................................... | 80 |
| | B. | EXEMPTION FOR REGISTRATION REQUIREMENTS. ......................... | 80 |
| | C. | STATUTORY FEES. ................................................................................... | 80 |
| | D. | THIRD PARTY AGREEMENTS. ............................................................... | 80 |
| | E. | AMENDMENT OR MODIFICATION OF PLAN. ...................................... | 80 |
| | F. | SEVERABILITY. ........................................................................................ | 80 |
| | G. | REVOCATION OR WITHDRAWAL OF PLAN. ....................................... | 81 |
| | H. | RULES GOVERNING CONFLICTS BETWEEN DOCUMENTS. ............... | 81 |
| | I. | GOVERNING LAW. ................................................................................... | 81 |
| | J. | NOTICES. ................................................................................................... | 81 |
| | K. | INTEREST AND ATTORNEYS' FEES. ..................................................... | 82 |
| | L. | BINDING EFFECT. ................................................................................... | 82 |
| | M. | NO ADMISSIONS. ..................................................................................... | 82 |

DB02:8855143.1

068301.1001

|  | N. | EXHIBITS. | 82 |

| XVI. | | SOLICITATION AND VOTING PROCEDURES | 82 |
| | A. | THE SOLICITATION PACKAGE. | 82 |
| | B. | VOTING INSTRUCTIONS. | 83 |
| | C. | VOTING TABULATION. | 84 |

| XVII. | | CONFIRMATION PROCEDURES | 85 |
| | A. | CONFIRMATION HEARING | 85 |
| | B. | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. | 85 |
| | | 1. Best Interests of Creditors Test/Liquidation Analysis | 86 |
| | | 2. Feasibility | 88 |
| | | 3. Acceptance by Impaired Classes | 89 |
| | | 4. Confirmation Without Acceptance by All Impaired Classes | 89 |
| | | a. No Unfair Discrimination | 89 |
| | | b. Fair and Equitable Test | 90 |

| XVIII. | | PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 90 |
| | A. | RISKS RELATED TO CONFIRMATION, EFFECTIVENESS AND IMPLEMENTATION | 90 |
| | | 1. Parties in Interest May Object to the Company's Classification of Claims and Interests | 90 |
| | | 2. Failure to Satisfy Vote Requirement | 91 |
| | | 3. The Company May Not Be Able to Secure Confirmation of the Plan | 91 |
| | | 4. Nonconsensual Confirmation | 91 |
| | | 5. A Party in Interest May Object to the Amount or Classification of a Claim | 92 |
| | | 6. Risk of Non-Occurrence of the Effective Date | 92 |
| | | 7. Risk Related to IRS Claim | 92 |
| | | 8. Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan | 92 |
| | B. | RISK FACTORS RELATED TO THE BUSINESS OF THE REORGANIZED DEBTORS. | 92 |

1.  The Company's business is dependent on demand for and supply of single-family homes that are influenced by changes in the overall condition of the U.S. economy, including interest rates, consumer confidence, job formation, availability of credit and other important factors............................................................. 92

2.  The Company's ability to maintain adequate liquidity, reduce operating costs and increase market share in an industry experiencing a 55% reduction in average annual housing starts may not be fully realized or may take longer to realize than expected. ........................................................................................ 93

3.  The Company's liquidity is dependent on operating performance, an efficient cash conversion cycle and compliance with financial covenants. ................................... 93

4.  An inability to implement and maintain cost structures that align with sales trends may have an adverse impact on the Company's operating results or the anticipated benefits of restructuring may not be fully realized or may take longer to realize than expected. ............................................................................................. 94

5.  Loss of customers as well as changes in the business models of customers may have an adverse impact on the Company's operating results. ......................................... 94

6.  Due to the continuing downturn in the housing industry, the Company may incur additional impairment charges and costs to close or consolidate additional business units in underperforming markets. ................................................................. 94

7.  The Company's business is subject to intense competition. ............................................. 94

8.  The Company's success is dependent upon the availability of and its ability to attract, train and retain qualified individuals. ................................................................ 95

9.  The Company's operating results are affected by fluctuations in its costs and the availability of sourcing channels for commodity wood products, concrete, steel and other building products. ............................................................................................. 95

10. Weather conditions, including natural catastrophic events, may cause the Company's operating results to fluctuate each quarter. ..................................................... 95

11. The nature of the business exposes the Company to product liability and construction defect claims as well as other legal proceedings. ........................................ 96

12. The Company may be adversely affected by disruptions in its information systems. .............................................................................................................................. 96

13. Actual and perceived vulnerabilities as a result of widespread credit and liquidity concerns, terrorist activities and armed conflict may adversely impact consumer confidence and the Company's business. ........................................................... 96

14. Federal, state and other regulations could impose substantial costs and/or restrictions on our business. .............................................................................................. 96

15. Numerous other matters of a local and regional scale, including those of a political, economic, business, competitive or regulatory nature may have an adverse impact on the Company's business. .................................................................... 97

C.   RISK FACTORS ASSOCIATED WITH FORWARD LOOKING STATEMENTS..................... 97

| | 1. | Financial information is based on the Company's books and records and, unless otherwise stated, no audit was performed. | 97 |
| | 2. | Financial projections and other forward looking statements are not assured, are subject to inherent uncertainty due to the numerous assumptions upon which they are based and, as a result, actual results may vary. | 97 |
| D. | | RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN. | 97 |
| | 1. | The Reorganized Debtors may not be able to achieve projected financial results or meet post-reorganization debt obligations and finance all operating expenses, working capital needs and capital expenditures. | 97 |
| | 2. | The Reorganized BMHC Equity Interests are speculative. | 98 |
| | 3. | The consideration being provided for the Funded Lender Claims and the L/C Lender Claims in the Plan does not reflect any independent valuation of such Claims. | 98 |
| | 4. | The Reorganized BMHC Equity Interests are a new issue of securities for which there is no prior market and the trading market for the Reorganized BMHC Equity Interests may be limited. | 98 |
| E. | | DISCLOSURE STATEMENT DISCLAIMER. | 98 |
| | 1. | Information Contained Herein Is for Soliciting Votes. | 98 |
| | 2. | No Legal or Tax Advice Is Provided to You by this Disclosure Statement. | 98 |
| | 3. | No Admissions Made. | 99 |
| | 4. | Failure to Identify Litigation Claims or Projected Objections. | 99 |
| | 5. | Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Recover Transfers and Assets. | 99 |
| | 6. | Information Was Provided by the Company and Was Relied Upon by the Company's Professionals. | 99 |
| | 7. | Potential Exists for Inaccuracies, and the Company Has No Duty to Update. | 99 |
| | 8. | No Representations Outside this Disclosure Statement Are Authorized. | 99 |
| F. | | LIQUIDATION UNDER CHAPTER 7. | 100 |
| XIX. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES | 100 |
| A. | | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS. | 101 |
| | 1. | Cancellation of Debt Income and Reduction of Tax Attributes. | 101 |
| | 2. | Accrued Interest. | 102 |

DB02:8855143.1                                    068301.1001

3.    NOL Carryback. ................................................................................ 102

4.    Limitation on NOL Carryforwards and Other Tax Attributes. ...................... 102

5.    Special Bankruptcy Exceptions. ................................................................ 103

6.    Alternative Minimum Tax. ........................................................................ 104

7.    Certain Consequences of Section 5.5.2 of the Plan. ...................................... 104

B.    U.S. HOLDERS. .............................................................................................. 104

1.    Certain U.S. Federal Income Tax Consequences to the Exit Revolver Lenders............ 104

2.    Certain U.S. Federal Income Tax Consequences to the Exit Term Lenders.................. 105

3.    Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Allowed Claims that are Paid Solely in Cash.................................................................... 106

4.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims that are Paid Using Consideration other than Solely Cash. .............................. 106

     a.    In General................................................................................ 107

     b.    Consequences to U.S. Holders of Funded Lender Claims and L/C Lender Claims against BMHC upon Exchange.................................... 107

     c.    Consequences to U.S. Holders of Funded Lender Claims and L/C Lender Claims against Debtors other than BMHC upon Exchange ................ 108

     d.    Consequences to Ownership of Term Notes ...................................... 108

5.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Interests in BMHC. ........................................................................................................ 109

6.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Other Secured Claims, L/C General Unsecured Claims, Intercompany Claims and Intercompany Interests. ................................................................................ 109

7.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Section 510(b) Claims. ............................................................................................ 109

8.    Market Discount. ...................................................................................... 109

9.    Certain U.S. Federal Income Tax Consequences of Ownership by U.S. Holders of Reorganized BMHC Equity Interests Issued Pursuant to the Plan........................... 110

     a.    Distributions........................................................................... 110

     b.    Sale or Exchange of Reorganized BMHC Equity Interests.............................. 110

10.    Backup Withholding Tax and Information Reporting Requirements. ........................... 110

C.    NON-U.S. HOLDERS. ...................................................................................... 110

DB02:8855143.1

068301.1001

| | 1. | Exchange and Subsequent Dispositions. | 111 |
| | 2. | Interest on the Exit Revolver, Exit Term Loan and Term Notes. | 111 |
| | 3. | Dividends. | 112 |
| | 4. | Withholding, Backup Withholding and Information Reporting. | 112 |
| XX. | | CONCLUSION AND RECOMMENDATION | 113 |

DB02:8855143.1
068301.1001

## I.  INTRODUCTION AND SUMMARY OF THE PLAN

Building Materials Holding Corporation, BMC West Corporation, SelectBuild Construction, Inc., SelectBuild Northern California, Inc., Illinois Framing, Inc., C Construction, Inc., TWF Construction, Inc., H.N.R. Framing Systems, Inc., SelectBuild Southern California, Inc., SelectBuild Nevada, Inc., SelectBuild Arizona, LLC, and SelectBuild Illinois, LLC, as debtors and debtors in possession (collectively, the "Debtors"), submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims in connection with: (a) the solicitation of votes to accept or reject the *Joint Plan of Reorganization for the Debtors under Chapter 11 of the Bankruptcy Code Amended October 21, 2009* (as the same may be amended from time to time, the "Plan"), which was filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and (b) the confirmation hearing (the "Confirmation Hearing"), which is scheduled for December _____, 2009 at ___ ___.m. (Prevailing Eastern Time) (as the same may be adjourned or continued from time to time, the "Confirmation Hearing Date"). The Plan constitutes a separate chapter 11 subplan for each of the Debtors. Each Debtor's separate chapter 11 subplan is designated by a letter (from (a) to (l)). A Uniform Glossary of Defined Terms for Plan Documents, including this Disclosure Statement, is attached hereto as Exhibit A and incorporated herein by reference.

On June 16, 2009 (the "Petition Date"), BMHC and all of its subsidiaries (collectively, the "Subsidiary Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court (these "Chapter 11 Cases"). BMHC and the Subsidiary Debtors are operating their businesses and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases. On June 26, 2009, the United States Trustee for the District of Delaware (the "U.S. Trustee") convened an organizational meeting and appointed a consolidated official committee of unsecured creditors for the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "Committee," as may be reconstituted from time to time).

Attached as exhibits to this Disclosure Statement are copies of the following documents: (a) the Uniform Glossary of Defined Terms for Plan Documents (Exhibit A); (b) the Plan (Exhibit B); (c) [intentionally omitted]; (d) the Disclosure Statement Approval Order (Exhibit D), which, among other things, approves this Disclosure Statement and establishes certain procedures with respect to solicitation and tabulation of votes to accept or reject the Plan; (e) the Liquidation Analysis (Exhibit E), which sets forth estimated recoveries in a chapter 7 liquidation of the Debtors, considered separately and in the aggregate, as compared to estimated recoveries under the Plan; (f) the Feasibility Analysis (Exhibit F), which sets forth the analysis, and related financial projections, showing that the Company can fund its ongoing operations and service its debt obligations under the Plan going forward, (g) the Company's latest 10K (Exhibit G); (h) the backstop premium letter by and between Wells Fargo Bank, National Association and BMHC with respect to fees that BMHC agrees to pay in connection with the Exit Credit Facilities (Exhibit H); (i) the term sheet with respect to the Term Loan Credit Agreement (Exhibit I); and (j) the Commitment Letter and term sheet with respect to the Exit Credit Facilities, and Addendum to Commitment Letter (Exhibit J). In addition, for those holders of Claims entitled to vote under the Plan, a Ballot (together with voting instructions) for the acceptance or rejection of the Plan is separately enclosed.

The Plan represents a compromise and settlement of various significant Claims against the Debtors. The Plan seeks to preserve the value of the Debtors for their Creditors while recognizing and balancing the fact that the Debtors' secured prepetition lenders have direct claims against the Debtors that would result in the Debtors' other creditors receiving no value for their Claims. Each particular Debtors' General Unsecured Creditors are grouped in Classes 6(a) through (l) under the Plan.

Each Holder of an Allowed General Unsecured Claim (whether or not that particular holder itself voted to accept or reject the Plan) will receive their pro rata share (*i.e.*, a percentage share based on the ratio of the holder's claim to the total allowed claims in the class) of distributions from the Unsecured Cash Fund that shall be funded on the Effective Date in the amount of $2 million. Funding the Unsecured Cash Fund with $2 million is appropriate based on the Liquidation Analysis which shows that Holders of General Unsecured Claims would receive no distribution in a hypothetical chapter 7 liquidation of the Debtors. The Unsecured Cash Fund shall be held in a segregated Unsecured Cash Distribution Account. Initial payments to holders of Allowed General Unsecured

Claims shall be made by the Reorganized Debtors from available, unreserved cash in the Unsecured Cash Distribution Account as soon as practicable after the Effective Date of the Plan, which Effective Date the Debtors estimate will be approximately ten days after confirmation of the Plan. The Debtors project that each Holder of an Allowed General Unsecured Claim in an accepting Class shall receive Distributions with a value of approximately 4.4% of each Holder's Allowed Claim.[3]

The Feasibility Analysis and Projections indicate that the Reorganized Debtors will have sufficient cash to pay all expenses to exit from chapter 11 and sufficient future cash flow to service their debt obligations and to fund operations. Under the Plan, the Reorganized Debtors will emerge from chapter 11 with $188.5 million of total debt and $60.3 million of unrestricted cash which when combined result in a net debt ("Net Debt") position of $128.2 million ($188.5 million of total debt less $60.3 million of unrestricted cash). Over the three year forecast period, the Reorganized Debtors will reduce their total debt position to $186.6 million and increase their unrestricted cash to $127.5 million or approximately $59.1 million of Net Debt. The reduction of Net Debt by December 2012 is achieved primarily through increases in cash flow from operations and from cash raised by selling excess real estate assets. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Debtors' management continues to actively monitor business activity levels and will make appropriate adjustments to the business plan where necessary or appropriate to meet business goals.

The ballots sent to holders of General Unsecured Claims in Classes 6(a) through 6(l) will contain boxes where holders of such claims can make the "Small Unsecured Claims Class Election." This election is completely voluntary. By making this election, the claim holder will be voting to accept the Plan and agreeing to reduce the aggregate amount of the holder's claims against all Debtors to the lesser of $5,000 or the aggregate amount of the holder's claims. All allowed General Unsecured Claims less than $5,000 are placed in Class 8 (Small Unsecured Claims). Holders of Small Unsecured Claims (including those who agreed to reduce the aggregate amount of their claims against all Debtors to less than $5,000 by making the Small Unsecured Claims Election), shall receive Cash equal to the lesser of (a) 25% of the Allowed Amount of all Allowed General Unsecured Claims held by such Holder against all Debtors (excluding interest) or (b) $1,250; provided, however, that the aggregate payments to Holders of Allowed Small Unsecured Claims shall not exceed $700,000 and payment to each Holder of an Allowed Small Unsecured Claim shall be reduced proportionately to the extent aggregate payments would otherwise exceed $700,000. The amounts paid to Small Unsecured Claims will not come from the Unsecured Cash Fund and will not impact distributions to holders of General Unsecured Claims.

Holders of Unsecured Claims that are the beneficiaries of Prepetition Letters of Credit, or that have claims against the Debtors that are covered by insurance or performance bonds that would entitle an insurer or surety to draw under a Prepetition Letter of Credit if the claim was not paid, are grouped in Classes 5(a)-(l). These claims shall be paid in full by the applicable Reorganized Debtors to avoid draws on the Prepetition Letters of Credit.

The Holders of the Prepetition Funded Lender Claims in Classes 2(a)-(l), which are claims under the Debtors' prepetition secured credit agreements in the amount of approximately $302 million, shall receive a pro rata share of notes under a term loan credit agreement in the aggregate principal amount of $135 million, less amounts such Holders receive from the sale of certain excess real estate.[4] On the Effective Date, Reorganized BMHC will

---

[3]      The version of the Disclosure Statement filed on the Petition Date projected present value percentage recoveries with respect to General Unsecured Claims of approximately 55%. Since that time, the Debtors have finalized their exit financing. The terms of such financing are significantly more expensive than contemplated in the Plan filed on the Petition Date and will leave the Reorganized Debtors with less financial flexibility upon their exit from bankruptcy. Moreover, approval of the Plan by the Exit Credit Facilities Lenders and acceptance of the Plan by the Prepetition Lenders is essential for the Plan to be confirmed. Both of these considerations, among other factors, lead the Debtors to reduce the consideration offered to General Unsecured Creditors under the Plan.

[4]      The Debtors own a large portfolio of real estate assets and have identified approximately $50 million of excess real estate that is no longer required to support the business. The Debtors are engaged in efforts to

[Footnote continued on next page]

DB02:8855143.1                                                                                                                068301.1001

emerge from chapter 11 as a private company and 100% of the Reorganized BMHC Equity Interests shall be owned by the Holders of Prepetition Funded Lender Claims. This ownership interest is subject to dilution by up to 10% in connection with the Long Term Incentive Plan, which Long Term Incentive Plan shall provide, as an incentive mechanism, for the allocation to management of the Reorganized Debtors of restricted stock units, stock options, and/or stock appreciation rights, and by the Reorganized BMHC Equity Interests, if any, issued to the Holders of liquidated Allowed L/C Lender Claims (i.e., holders of any prepetition letters of credit that are drawn in the future).

The classification and treatment of other Claims and Interests is described below.

**AFTER EXPLORING SEVERAL ALTERNATIVES, THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE DEBTORS' CREDITORS. THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

## A.      OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the debtor's legal and equitable interests in property as of the commencement of the chapter 11 case. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, any holder of a claim against or equity interest in a debtor and all other persons as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan and discharges a debtor from its prepetition obligations.

After a plan of reorganization has been filed, certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. The purpose of this Disclosure Statement, submitted in accordance with the requirements of section 1125 of the Bankruptcy Code, is to provide such information.

## B.      PURPOSE AND EFFECT OF THE PLAN TRANSACTIONS

The Debtors believe that the transactions contemplated by the Plan will (a) significantly de-leverage their balance sheet as of the Effective Date by reducing total debt from approximately $302 million to approximately

---

[Footnote continued from previous page]
sell such excess real estate. Under the DIP Facility, any proceeds from sales of excess real estate during the Chapter 11 Cases are placed into a "Sale Cash Collateral Excess Proceeds Account" as additional collateral for the Debtors' secured lenders. Amounts in the Sale Cash Collateral Excess Proceeds Account, less amounts required to repay the shall be paid to the DIP Facility and to fund $6,000,000 for use by the Debtors as operating cash, shall be paid on the Effective Date to the holders of Prepetition Funded Lender Claims. The Debtors anticipate that, on the Effective Date, no amount will be available in the Sale Cash Collateral Excess Proceeds Account to pay the holders of Prepetition Funded Lender Claims.

DB02:8855143.1                                        068301.1001

$190 million, (b) improve cash flows by significantly reducing ongoing interest expense and (c) provide sufficient working capital through an Exit Credit Facility in the amount of $103.5 million to (i) fund the Company's emergence from chapter 11, (ii) appropriately capitalize the Reorganized Debtors and (iii) facilitate the implementation of the Debtors' business plan. The Debtors believe that any alternative to Confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, would result in significant delays, litigation and additional costs and, ultimately, would substantially lower, and in many cases eliminate, the recoveries for Holders of Allowed Claims.

### 1. Overview of Restructuring Transactions

The Plan contemplates the reorganization of the Company upon consummation of the Plan and the resolution of the outstanding Claims against and Interests in BMHC and the Subsidiary Debtors pursuant to sections 1123, 1129 and 1141 of the Bankruptcy Code.

### 2. Exit Credit Facilities

The Debtors engaged in a process to obtain exit financing on the most favorable terms available. In connection with this process, the Debtors solicited financing proposals from major financial entities, including, among others, the Prepetition Lenders. Given the current status of the credit markets, this search proved extremely difficult. After substantial negotiation, an agreement was reached with certain of the Prepetition Lenders to provide the required exit financing (the "Exit Credit Facilities"). The exit financing terms reflect market conditions and are the result of arms-length negotiations with the subset of the Prepetition Lenders that is providing such financing.

The terms of the Exit Credit Facilities are set forth in the Commitment Letter, and the Addendum to Commitment Letter, attached as Exhibit J. Pursuant to the Commitment Letter, the Reorganized Debtors will obtain exit financing in the amount of $103.5 million. A precondition to the obligation of the exit lenders under the Commitment Letter is court approval of the provisions of, and payments required under, the Commitment Letter and the Fee Letter (described below).

The Reorganized Debtors shall obtain exit financing in the amount of up to $103.5 million. The exit facility is necessary to fund near term operating losses, provide for seasonal variances in working capital, allow for the issuance of letters of credit and liquidity should the business not perform as projected over the forecast period. A significant component of the size of the required exit financing is the Debtors' insurance programs which, as currently structured, require the Debtors to either post letters of credit or cash equivalents to support policy deductibles. Under the current structure, the letters of credit issued under the Exit Revolver would reach approximately $49.5 million in 2012. Any required letters of credit would reduce the availability under the Exit Revolver. During the projection period, Total Liquidity, defined as balance sheet cash plus revolver availability would reach its lowest point of approximately $57 million in July 2010. This liquidity cushion will provide added confidence to the Debtors' customers and vendors that the Debtors will be able to meet all of its financial obligations.

The Exit Credit Facilities shall consist of (i) the Exit Revolver in an amount of up to $50 million, with availability to issue letters of credit (up to the total amount of the exit revolver) for the replacement or rollover of standby letters of credit issued under the DIP Facility and issuance of new standby letters of credit; and (ii) the Exit Term Loan, a non-amortizing term loan in the original principal amount of up to $53.5 million. The 2.5% closing fee for the Exit Term loan will be paid as an original issue discount ("OID") such that the cash proceeds of the Exit Term Loan are anticipated to be up to $52.3 million. The aggregate cost of the Exit Credit Facilities, including fees, cash interest and payment-in-kind interest, is projected to be $42.9 million.

All obligations of the Reorganized Debtors under the Exit Credit Facilities shall be secured by a perfected, first priority lien on and security interest in all or substantially all of the assets of the Reorganized Debtors. The proceeds of the Exit Credit Facilities, together with other cash available to the Debtors and Reorganized Debtors, will be used to (i) pay in full in cash all non-contingent obligations under the Senior Secured Super-Priority Debtor-in-Possession Financing Credit Agreement (the "DIP Facility"), expected to be approximately $8 million, (ii) to fund exit costs, including, without limitation, the funding of (a) the Cash Claims Reserve, (b) the Allowed Professional Compensation Claims, and (c) the Unsecured Cash Fund, and (iii) fund general working capital

requirements of the Reorganized Debtors. The Company projects that upon giving effect to all cash transaction costs necessary to emerge from bankruptcy that upon emergence there will be $60.3 million of cash on the balance sheet and the Exit Revolver will be undrawn and no letters of credit outstanding. The outstanding amount of the Exit Credit Facilities shall be due and payable in full on the third anniversary of its effective date.

Set forth below is a table of Sources and Uses of Cash on the Effective Date:

**BMHC Estimated Sources and Uses (Mid June Filing; Exit at December 31, 2009)**

*(Dollars in Millions)*

| Sources | | Uses | |
|---|---|---|---|
| Exit Revolver Facility | $0.0 | DIP Revolver Balance (12/31/09) | $8.4 |
| Funded Term Loan at Exit | 52.3 | Loan Costs at Exit | 1.3 |
| SERP Funds (Cash Surrender Value) | 16.3 | Excess Cash Remaining on Books | 54.3 |
| Deferred Comp Asset | 1.3 | Total General Unsecured Claims | 2.0 |
| Professional Fee Retainer Returned to BMHC | 1.6 | Payment of Bankruptcy Professional Fees Accrued for December | 3.1 |
| Prepaid Utility Expenses Returned to BMHC | 0.3 | Transaction Fees | 2.0 |
| | | Convenience Claims | 0.6 |
| **Total Sources** | **$71.8** | **Total Uses** | **$71.8** |

WFB has executed a Commitment Letter describing the general terms and conditions of the Exit Credit Facilities and setting forth WFB's and certain other lenders' commitment to provide the $50 million Exit Revolver upon the terms and subject to the conditions set forth in the Commitment Letter. In addition, WFB has received commitments from certain banks, financial institutions and other entities to provide the Exit Term Loan upon the terms and subject to the conditions set forth in the Commitment Letter and Addendum to Commitment Letter.

A copy of the Commitment Letter and Addendum to Commitment Letter, and the term sheet with respect to the Exit Credit Facilities is attached hereto as Exhibit J.

In consideration of the Commitment Letter, BMHC has executed a fee letter (the "Fee Letter") confirming the fees, premiums and discounts that it has agreed to pay to WFB for its account and for the account of the other lenders in connection with the Exit Credit Facilities. In particular, BMHC agrees to pay WFB a backstop premium in an amount equal to $5,175,000, due and payable upon on the second business day following the later to occur of (i) the date upon which the Bankruptcy Court unconditionally approves BMHC's immediate payment of such backstop premium and (ii) the date upon which BMHC receives written acknowledgement from WFB and the other lenders (collectively having an aggregate commitment under the Exit Credit Facilities of at least $103,500,000) that the Plan Approval Condition has been satisfied (i.e., essentially that the lenders are satisfied with the terms and conditions of the Plan and form of Confirmation Order). BMHC also agrees to pay to WFB, for the account of all the lenders, a fee, denominated as a closing discount in the Fee Letter, in an amount equal to 2.5% of the sum of the aggregate committed principal amount of the Exit Revolver (on the closing of the Exit Revolver) plus the original principal amount of the Exit Term Loan. The closing discount will be $2,587,500 which is 2.5% of $103,500,000. Finally, BMHC agrees to pay to WFB an administrative agency fee in an amount equal to $100,000 per annum, payable in advance on the closing date and on each anniversary thereof until the earlier of (i) the final maturity of the Exit Credit Facilities and payment of all amounts due thereunder and (ii) early termination of the Exit Credit Facilities and payment of all amounts due thereunder. The Debtors filed a motion requesting the Bankruptcy Court to approve the Commitment Letter and related Fee Letter on October 10, 2009 [Docket No. 684], and the Bankruptcy Court will consider such motion on October 22, 2009.

A copy of the Backstop Premium Letter is attached hereto as Exhibit H.

3.    **Term Loan Credit Agreement and Prepetition Letters of Credit**

The Reorganized Debtors shall also enter into the Term Loan Credit Agreement. The Term Loan Credit Agreement shall be secured by a second priority lien and security interest on all or substantially all of the assets of the Reorganized Debtors.

In addition to receiving Reorganized BMHC Equity Interests as described below, the Holders of Prepetition Funded Lender Claims (i.e., approximately $302 million[5] in claims under the Debtor's Second Amended and Restated Credit Agreement (as amended, the "Prepetition Credit Agreement")), which on the Petition Date were secured by a first priority security interest on all or substantially all of the assets of the Debtors, shall receive a pro rata share of notes under the Term Loan Credit Agreement in the aggregate principal amount of $135 million, less amounts received from the Sale Cash Collateral Excess Proceeds Account established under the DIP Facility. All persons receiving notes under the Term Loan Credit Agreement pursuant to the Plan are, by their acceptance of such notes, deemed to be parties to and bound by the Term Loan Credit Agreement and all documents related thereto, including but not limited to the Intercreditor Agreement.

As of the bankruptcy Petition Date, the Debtors had open, but undrawn Prepetition Letters of Credit under the Prepetition Credit Agreement. The Debtors do not expect that there will be any draws on the Prepetition Letters of Credit during these Chapter 11 Cases or after the Effective Date. Even so, the Reorganized Debtors shall have certain obligations related to the Prepetition Letters of Credit which will remain outstanding after the Effective Date of the Plan. While the Reorganized Debtors will not be liable to reimburse the Prepetition L/C Lenders if any amounts are drawn under the Prepetition Letters of Credit, the Reorganized Debtors will be responsible to pay certain fees associated with the continuation of these Prepetition Letters of Credit; namely, a standby letter of credit fee equal to 2.5% per annum of the outstanding amount of Prepetition Letters of Credit. Further, while not expected, if and to the extent that draws are made under the Prepetition Letters of Credit after the Petition Date, the Prepetition L/C Lenders that fund such draws shall, like the Holders of Prepetition Funded Lender Claims, be entitled to receive Reorganized BMHC Equity Interests and notes under the Term Loan Credit Agreement.

More specifically, if the Prepetition L/C Lender funds a draw under a Prepetition Letter of Credit on or after the Petition Date, the Prepetition L/C Lender shall have an L/C Lender Claim. Each Holder of an L/C Lender Claim shall receive term notes issued under the Term Loan Credit Agreement based on a formula set forth in the Plan. If there are draws on the Prepetition Letters of Credit, this formula is designed to give the Prepetition L/C Lenders a distribution of term notes that is equivalent to the distribution that the Holders of Prepetition Funded Lender Claims receive on account of their claims. The formula is complex and takes into consideration a number of factors. Basically, the maximum amount of term notes that could be issued on account of L/C Lender Claims is approximately $51 to $52 million and the percentage, if any, of these term notes that are actually issued would be equal to the ratio between Prepetition Letters of Credit that are drawn and all Prepetition Letters of Credit. Accordingly, for example, if 10% of the Prepetition Letters of Credit are drawn, roughly $5.1 to $5.2 million of additional term notes will be issued under the Term Loan Credit Agreement.

A copy of a term sheet with respect to the Term Loan Credit Agreement is attached hereto as Exhibit I.

4.      **Unsecured Cash Fund**

Creditors with Allowed General Unsecured Claims in Classes 6(a)-(l) will receive their Pro Rata share of distributions from the Unsecured Cash Fund. The Unsecured Cash Fund shall be $2,000,000. Funding the Unsecured Cash Fund with $2,000,000 is justified by the fact that the Liquidation Analysis demonstrates that in a chapter 7 liquidation, holders of General Unsecured Claims would receive no distribution, even from unencumbered assets, as a result of payment of higher priority claims (including Administrative and Priority Claims) from the proceeds generated by the liquidation of the Debtors' assets.

5.      **Reorganized BMHC Equity Interests**

On the Effective Date, Reorganized BMHC will emerge from chapter 11 as a private company and 100% of the Reorganized BMHC Equity Interests shall be owned by the Holders of Prepetition Funded Lender Claims.

---

5       Such claims consist of approximately $269 million under the Prepetition Term Loan, $16 million under the Prepetition Revolving Credit Facility, accrued interest of $11 million, and long-term swap liability of $6 million.

This ownership interest is subject to dilution by up to 10% in connection with the Long Term Incentive Plan and by the Reorganized BMHC Equity Interests, if any, issued to the Holders of liquidated Allowed L/C Lender Claims.

Allowed L/C Lender Claims liquidated as of the Effective Date of the Plan will receive their ratable share of the Reorganized BMHC Equity Interests L/C Lender Issuance, subject to dilution by the shares of stock issued in connection with the Long Term Incentive Plan and shares of stock issued on account of L/C Lender Claims liquidated after the Effective Date of the Plan. The Reorganized BMHC Equity Interests L/C Lender Issuance is equal to the Reorganized BMHC Equity Interests Effective Date Issuance, multiplied by the ratio (expressed as a percentage) that the Allowed L/C Lender Claims liquidated from the Petition Date to the Effective Date bears to the sum of the aggregate Allowed Funded Lender Claims and the aggregate Allowed L/C Lender Claims.

For Allowed L/C Lender Claims liquidated after the Effective Date, the Plan provides for a distribution of stock in Reorganized BMHC equal to the liquidated amount of such Claims multiplied by the L/C Lender Claim Equity Conversion Ratio. The L/C Lender Claim Equity Conversion Ratio is the Reorganized BMHC Equity Interests Effective Date Issuance divided by the sum of (a) the aggregate amount of Allowed Funded Lender Claims and the aggregate amount of Allowed L/C Lender Claims liquidated from and after the Petition Date through the Effective Date.

## C. SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND THE PROJECTED RECOVERIES UNDER THE PLAN. THE PROJECTED RECOVERIES SET FORTH BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS.

### SUMMARY OF TREATMENT AND PROJECTED RECOVERIES

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| Unclassified | Administrative Expense Claims, including Claims under DIP Facility | These Claims are Unimpaired. The Plan provides for payment of Allowed Administrative Expense Claims in full in Cash. | 100% |
| Unclassified | Professional Compensation Claims | These Claims are Unimpaired. The Plan provides for payment of each Allowed Professional Compensation Claim in full in Cash. | 100% |
| Unclassified | Priority Tax Claims | These Claims are Unimpaired. The Plan provides that each Holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | 100% |
| 1(a)-(l) | Other Priority Claims | Claims in these Classes are Unimpaired. The Plan provides for payment of each Allowed Other Priority Claim in full in Cash. | 100% |

DB02:8855143.1

068301.1001

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 2(a)-(l) | Funded Lender Claims | Claims in these Classes are Impaired. Each Holder of an Allowed Funded Lender Claim shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive (i) the Funded Lender's Share of Sale Cash Collateral Excess Proceeds Account Effective Date Amount as to such Claim, (ii) a Term Note issued by Reorganized BMHC under the Term Loan Credit Agreement in an original principal amount equal to the Maximum Funded Lenders Term Note Cap multiplied by such Holder's Pro Rata share of all Allowed Funded Lender Claims, and (iii) its Pro Rata share of the Reorganized BMHC Equity Interest Funded Lender Issuance, subject to dilution by (a) any Reorganized BMHC Equity Interests issued on the Effective Date and from time to time thereafter to the Holders of Allowed L/C Lender Claims and (b) any Reorganized BMHC Equity Interests issued after the Effective Date in respect of the Long Term Incentive Plan. In the event that section 5.5.2 of the Plan is applicable, each Holder of an Allowed Funded Lender Claim shall be deemed to be distributed its Pro Rata Share of the Reorganized Subsidiary Equity Interests, and to have contributed such Reorganized Subsidiary Equity Interests to the applicable Holders of Equity Interests in Classes 9(b)-9(l) as provided in such section 5.5.2. | 73.6%[6] |
| 3(a)-(l) | L/C Lender Claims | Claims in these Classes are Impaired. Allowed L/C Lender Claims shall be treated as follows: From and after the Effective Date, obligations of the Prepetition L/C Lenders (whether Wells Fargo Bank, N.A. ("WFB"), as the letter of credit issuer under the Prepetition Credit Agreement, or the Prepetition Revolving Lenders in respect of their several reimbursement obligations to WFB arising under the Prepetition Credit Agreement) shall continue to be governed by the lender reimbursement provisions of the Prepetition Credit Agreement. Reorganized BMHC shall have no obligations whatsoever in respect of the letter of credit reimbursement obligations arising in respect of the Prepetition Letters of Credit, except (a) the Holders of Allowed L/C Lender Claims shall be entitled to the L/C Lender Fee and (b) as expressly set forth in Section 4.3.2.2 of the Plan. All Liens with respect to the Prepetition Credit Agreement shall be released, discharged and extinguished.

To the extent any Allowed L/C Lender Claim is liquidated on or after the Petition Date, each Holder of an Allowed L/C Lender Claim shall, in full satisfaction, release, and discharge of and in exchange for the Liquidated L/C | NA |

---

[6]     Assumes, as is consistent with the Debtors' projections, no draws on Prepetition Letters of Credit.

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|------------------------------|-----------------------------------|
| | | Amount of such Claim, receive the following on the Effective Date and thereafter from time to time if, as and when Allowed L/C Lender Claims are liquidated:<br><br>(A) a Term Note issued by Reorganized BMHC under the Term Loan Credit Agreement in an original principal amount equal to the Maximum L/C Lenders Term Note Cap multiplied by the ratio (expressed as a percentage) that such Liquidated L/C Amount of such Claim bears to the aggregate amount of all Allowed L/C Lender Claims; and<br><br>(B) with respect to any Allowed L/C Lender Claim liquidated from and after the Petition Date through the Effective Date, its Pro Rata share of the Reorganized BMHC Equity Interest L/C Lender Issuance, subject to dilution by (a) the Reorganized BMHC Equity Interests issued on the Effective Date to the Holders of Allowed Funded Lender Claims, (b) any Reorganized BMHC Equity Interests issued from time to time after the Effective Date to the Holders of Allowed L/C Lender Claims and (c) any BMHC Equity Interests issued after the Effective Date in respect of the Long Term Incentive Plan; and<br><br>(C) with respect to any Allowed L/C Lender Claims liquidated after the Effective Date, an amount of the Reorganized BMHC Equity Interests, rounded to the nearest whole number, equal to the Liquidated L/C Amount of such Claim multiplied by the L/C Lender Claim Equity Conversion Ratio, subject to dilution by any Reorganized BMHC Equity Interests issued after the Effective Date in respect of the Long Term Incentive Plan; and<br><br>(D) On the Effective Date only, the L/C Lender's Share of the Sale Cash Collateral Excess Proceeds Account Effective Date Amount as to such Liquidated L/C Amount of such Claim on the Effective Date.<br><br>If, and only to the extent, a Prepetition L/C Lender fails to reimburse in full WFB in respect of its reimbursement obligation to WFB arising under the Prepetition Credit Agreement, WFB shall be entitled to receive the distribution described above which would otherwise be payable to such defaulting Prepetition L/C Lender.<br><br>Prepetition Letters of Credit shall not be used by the Reorganized Debtors to collateralize obligations that do not exist as of the Effective Date; *provided, however,* that notwithstanding the foregoing, Prepetition Letters of Credit shall continue to collateralize all obligations under Insurance Policies and Agreements and/or performance bonds (and any agreements, documents or instruments relating thereto) | |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|------------------------------|----------------------------------|
| | | secured by such Prepetition Letters of Credit, whether such obligations exist as of the Effective Date or arise thereafter; and such Prepetition Letters of Credit and obligations shall survive the Effective Date unaffected and unaltered by the Plan. No issuer of Prepetition Letters of Credit shall have any obligation to renew a Prepetition Letter of Credit for a period beyond the Maturity Date under the Term Loan Credit Agreement (as such term is defined therein); provided that this sentence shall not impair or affect the rights of any beneficiary under any Prepetition Letter of Credit. Allowed L/C Lender Claims or any portion thereof that are not liquidated prior to the occurrence of the Maturity Date of the Term Loan Credit Agreement shall be extinguished, and any outstanding Prepetition Letters of Credit at that time shall be cancelled and replaced by the Reorganized Debtors as and to the extent necessary in accordance with their business judgment. | |
| 4(a)-(l) | Other Secured Claims | Claims in these Classes are Unimpaired. Each Allowed Other Secured Claim, including secured tax claims, shall be reinstated or otherwise rendered unimpaired as of the Effective Date, and Liens related thereto shall remain in effect. Allowed secured tax claims may be treated in accordance with the terms set forth in section 1129(a)(9)(D) of the Bankruptcy Code, with the Effective Date as the commencement date of the five year period, and any interest required to be paid on Allowed secured tax claims will be paid in accordance with section 511 of the Bankruptcy Code. If the Reorganized Debtors substantially default on the payment of a tax due to the Internal Revenue Service under the Plan, the entire tax debt owed to the Internal Revenue Service shall become due and payable immediately, and the Internal Revenue Service may collect these unpaid tax liabilities through the administrative collection provisions of the Internal Revenue Code. If the Reorganized Debtors substantially default on the payment of a tax due to state or local taxing authorities under the Plan, the entire tax debt owed to such taxing authority shall become due and payable immediately, and the taxing authority may collect these unpaid tax liabilities in accordance with applicable state law remedies. | 100% |
| 5(a)-(l) | L/C General Unsecured Claims | Claims in these Class are Unimpaired. Except to the extent that a Holder of an L/C General Unsecured Claim agrees to a less favorable treatment, each L/C General Unsecured Claim shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the L/C General Unsecured Claim, whether no existing or hereafter arising. | 100% |
| 6(a) | General Unsecured Claims against | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim | 4.4% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | BMHC | against BMHC shall receive its Pro Rata share of the BMHC Unsecured Distribution. The BMHC Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against BMHC bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against BMHC shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(b) | General Unsecured Claims against BMC West | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against BMC West shall receive its Pro Rata share of the BMC West Unsecured Distribution. The BMC West Unsecured Distribution means a distribution from the available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against BMC West bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against BMC West shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder | 4.4% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(c) | General Unsecured Claims against SelectBuild Construction | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Construction shall receive its Pro Rata share of the SelectBuild Construction Unsecured Distribution. The SelectBuild Construction Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Construction bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Construction shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 6(d) | General Unsecured Claims against SelectBuild Northern California | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Northern California shall receive its Pro Rata share of the SelectBuild Northern California Unsecured Distribution. The SelectBuild Northern California Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Northern California bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Northern California shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder | 4.4% |

DB02:8855143.1

068301.1001

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(e) | General Unsecured Claims against Illinois Framing | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against Illinois Framing shall receive its Pro Rata share of the Illinois Framing Unsecured Distribution. The Illinois Framing Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against Illinois Faming bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against Illinois Framing shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 6(f) | General Unsecured Claims against C Construction | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against C Construction shall receive its Pro Rata share of the C Construction Unsecured Distribution. The C Construction Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against C Construction bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against C Construction shall be entitled, by exercise of the election set forth on the | 4.4% |

DB02:8855143.1

068301.1001

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(g) | General Unsecured Claims against TWF Construction | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against TWF Construction shall receive its Pro Rata share of the TWF Construction Unsecured Distribution. The TWF Construction Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against TWF Construction bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against TWF Construction shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 6(h) | General Unsecured Claims against SelectBuild H.N.R. Framing Systems | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against H.N.R. Framing Systems shall receive its Pro Rata share of the H.N.R. Framing Systems Unsecured Distribution. The H.N.R. Framing Systems Unsecured Distribution means a distribution from available, unreserved | 4.4% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against H.N.R. Framing Systems bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against H.N.R. Framing Systems shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(i) | General Unsecured Claims against SelectBuild Southern California | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Southern California shall receive its Pro Rata share of the SelectBuild Southern California Unsecured Distribution. The SelectBuild Southern California Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Southern California bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Southern California shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim | 4.4% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | and receive the treatment specified in section 4.8 of the Plan. | |
| 6(j) | General Unsecured Claims against SelectBuild Nevada | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Nevada shall receive its Pro Rata share of the SelectBuild Nevada Unsecured Distribution. The SelectBuild Nevada Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Nevada bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Nevada shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 6(k) | General Unsecured Claims against SelectBuild Arizona | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Arizona shall receive its Pro Rata share of the SelectBuild Arizona Unsecured Distribution. The SelectBuild Arizona Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Arizona bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Arizona shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount | 4.4% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(l) | General Unsecured Claims against SelectBuild Illinois | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Illinois shall receive its Pro Rata share of the SelectBuild Illinois Unsecured Distribution. The SelectBuild Illinois Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Illinois bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Illinois shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 7(a)-(l) | Intercompany Claims | Except as provided in section 5.5.2 of the Plan, Claims in these Classes are Unimpaired. Except as provided in section 5.5.2 of the Plan, to preserve the Debtors' corporate structure, Intercompany Claims may be reinstated as of the Effective Date or, at the Debtors' or Reorganized Debtors' option, be cancelled, and no distributions shall be made on account of such Claims. | 100% |
| 8(a)-(l) | Small Unsecured Claims | Claims in these Classes are Impaired. On the Distribution Date, each Holder of a Small Unsecured Claim shall receive, in full satisfaction, release and discharge of and in exchange for all Allowed General Unsecured claims held by such Holder against all Debtors, Cash equal to the lesser of (i) 25% of the Allowed Amount of all Allowed General Unsecured Claims held by such Holder against all Debtors (excluding any interest) or (ii) $1,250; *provided, however,* | 25% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | that the Small Unsecured Claims Class Election shall only be effective upon the Confirmation Order and the occurrence of the Effective Date; *provided, further*, however, that the aggregate payments to Holders of Allowed Small Unsecured Claims shall not exceed $700,000 and payment to each Holder of an Allowed Small Unsecured Claim shall be reduced proportionately to the extent aggregate payments would otherwise exceed $700,000. | |
| 9(a) | Interests in BMHC | Interests in this Class are Impaired. All Interests in BMHC shall be cancelled without further distribution. | NA |
| 9(b)-(l) | Other Interests | Except as provided in section 5.5.2 of the Plan, Interests in these Classes are Unimpaired. Except as provided in section 5.5.2 of the Plan, Intercompany Interests in each of BMC West, SelectBuild Construction, SelectBuild Northern California, Illinois Framing, C Construction, TWF Construction, H.N.R. Framing Systems, SelectBuild Southern California, SelectBuild Nevada, SelectBuild Arizona and SelectBuild Illinois shall be reinstated for the benefit of the Holders thereof. | NA |
| 10(a)-(l) | Section 510(b) Claims | Claims in these Classes are Impaired. All Section 510(b) Claims shall be cancelled and discharged without further distribution. | 0% |

## II.  VOTING AND CONFIRMATION PROCEDURES

### A.  PERSONS ENTITLED TO VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. Holders of Claims or Interests that are not Impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan. Holders of Claims or Interests that will not receive a distribution or retain any property under the Plan are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtor. A Claim or Interest is placed in a particular Class for purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

### 1.  Classes 1(a)-(l): Other Priority Claims.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1(a) | Other Priority Claims against BMHC | Unimpaired | Not entitled to vote (Deemed to accept) |

| | | | |
|---|---|---|---|
| Class 1(b) | Other Priority Claims against BMC West | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 1(c) | Other Priority Claims against SelectBuild Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 1(d) | Other Priority Claims against SelectBuild Northern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 1(e) | Other Priority Claims against Illinois Framing | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 1(f) | Other Priority Claims against C Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 1(g) | Other Priority Claims against TWF Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 1(h) | Other Priority Claims against H.N.R. Framing Systems | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 1(i) | Other Priority Claims against SelectBuild Southern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 1(k) | Other Priority Claims against SelectBuild Arizona | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 1(l) | Other Priority Claims against SelectBuild Illinois | Unimpaired | Not entitled to vote (Deemed to accept) |

DB02:8855143.1

068301.1001

2. **Classes 2(a)-(l): Funded Lender Claims.**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 2(a) | Funded Lender Claims against BMHC | Impaired | Entitled to vote |
| Class 2(b) | Funded Lender Claims against BMC West | Impaired | Entitled to vote |
| Class 2(c) | Funded Lender Claims against SelectBuild Construction | Impaired | Entitled to vote |
| Class 2(d) | Funded Lender Claims against SelectBuild Northern California | Impaired | Entitled to vote |
| Class 2(e) | Funded Lender Claims against Illinois Framing | Impaired | Entitled to vote |
| Class 2(f) | Funded Lender Claims against C Construction | Impaired | Entitled to vote |
| Class 2(g) | Funded Lender Claims against TWF Construction | Impaired | Entitled to vote |
| Class 2(h) | Funded Lender Claims against H.N.R. Framing Systems | Impaired | Entitled to vote |
| Class 2(i) | Funded Lender Claims against SelectBuild Southern California | Impaired | Entitled to vote |
| Class 2(j) | Funded Lender Claims against SelectBuild Nevada | Impaired | Entitled to vote |
| Class 2(k) | Funded Lender Claims against SelectBuild Arizona | Impaired | Entitled to vote |
| Class 2(l) | Funded Lender Claims against SelectBuild Illinois | Impaired | Entitled to vote |

3. **Classes 3(a)-(l): L/C Lender Claims.**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 3(a) | L/C Lender Claims against BMHC | Impaired | Entitled to vote |
| Class 3(b) | L/C Lender Claims against BMC West | Impaired | Entitled to vote |
| Class 3(c) | L/C Lender Claims against SelectBuild Construction | Impaired | Entitled to vote |
| Class 3(d) | L/C Lender Claims against SelectBuild Northern California | Impaired | Entitled to vote |
| Class 3(e) | L/C Lender Claims against Illinois Framing | Impaired | Entitled to vote |
| Class 3(f) | L/C Lender Claims against C Construction | Impaired | Entitled to vote |
| Class 3(g) | L/C Lender Claims against TWF | Impaired | Entitled to vote |

| | | | |
|---|---|---|---|
| | Construction | | |
| Class 3(h) | L/C Lender Claims against H.N.R. Framing Systems | Impaired | Entitled to vote |
| Class 3(i) | L/C Lender Claims against SelectBuild Southern California | Impaired | Entitled to vote |
| Class 3(j) | L/C Lender Claims against SelectBuild Nevada | Impaired | Entitled to vote |
| Class 3(k) | L/C Lender Claims against SelectBuild Arizona | Impaired | Entitled to vote |
| Class 3(l) | L/C Lender Claims against SelectBuild Illinois | Impaired | Entitled to vote |

4.     **Classes 4(a)-(l): Other Secured Claims.**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 4(a) | Other Secured Claims against BMHC | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(b) | Other Secured Claims against BMC West | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(c) | Other Secured Claims against SelectBuild Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(d) | Other Secured Claims against SelectBuild Northern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(e) | Other Secured Claims against Illinois Framing | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(f) | Other Secured Claims against C Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(g) | Other Secured Claims against TWF Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(h) | Other Secured Claims against H.N.R. Framing Systems | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(i) | Other Secured Claims against SelectBuild Southern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(j) | Other Secured Claims against | Unimpaired | Not entitled to vote |

DB02:8855143.1

068301.1001

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| | SelectBuild Nevada | | (Deemed to accept) |
| Class 4(k) | Other Secured Claims against SelectBuild Arizona | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 4(l) | Other Secured Claims against SelectBuild Illinois | Unimpaired | Not entitled to vote (Deemed to accept) |

5.    **Classes 5(a)-(l): L/C General Unsecured Claims.**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 5(a) | L/C General Unsecured Claims against BMHC | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(b) | L/C General Unsecured Claims against BMC West | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(c) | L/C General Unsecured Claims against SelectBuild Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(d) | L/C General Unsecured Claims against SelectBuild Northern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(e) | L/C General Unsecured Claims against Illinois Framing | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(f) | L/C General Unsecured Claims against C Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(g) | L/C General Unsecured Claims against TWF Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(h) | L/C General Unsecured Claims against H.N.R. Framing Systems | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(i) | L/C General Unsecured Claims against SelectBuild Southern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(j) | L/C General Unsecured Claims against SelectBuild Nevada | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 5(k) | L/C General Unsecured Claims against SelectBuild Arizona | Unimpaired | Not entitled to vote (Deemed to accept) |

DB02:8855143.1

068301.1001

| | | | |
|---|---|---|---|
| Class 5(l) | L/C General Unsecured Claims against SelectBuild Illinois | Unimpaired | Not entitled to vote (Deemed to accept) |

6. **Classes 6(a)-(l): General Unsecured Claims.**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 6(a) | General Unsecured Claims against BMHC | Impaired | Entitled to vote |
| Class 6(b) | General Unsecured against BMC West | Impaired | Entitled to vote |
| Class 6(c) | General Unsecured Claims against SelectBuild Construction | Impaired | Entitled to vote |
| Class 6(d) | General Unsecured Claims against SelectBuild Northern California | Impaired | Entitled to vote |
| Class 6(e) | General Unsecured Claims against Illinois Framing | Impaired | Entitled to vote |
| Class 6(f) | General Unsecured Claims against C Construction | Impaired | Entitled to vote |
| Class 6(g) | General Unsecured Claims against TWF Construction | Impaired | Entitled to vote |
| Class 6(h) | General Unsecured Claims against H.N.R. Framing Systems | Impaired | Entitled to vote |
| Class 6(i) | General Unsecured Claims against SelectBuild Southern California | Impaired | Entitled to vote |
| Class 6(j) | General Unsecured Claims against SelectBuild Nevada | Impaired | Entitled to vote |
| Class 6(k) | General Unsecured Claims against SelectBuild Arizona | Impaired | Entitled to vote |
| Class 6(l) | General Unsecured Claims against SelectBuild Illinois | Impaired | Entitled to vote |

7. **Classes 7(a)-(l): Intercompany Claims.**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 7(a) | Intercompany Claims against BMHC | Unimpaired[7] | Not entitled to vote (Deemed to accept) |
| Class 7(b) | Intercompany Claims against BMC West | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 7(c) | Intercompany Claims against | Unimpaired | Not entitled to vote |

---

[7]     Subject to impairment if section 5.5.2 of the Plan becomes operative.

DB02:8855143.1      068301.1001

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| | SelectBuild Construction | | (Deemed to accept) |
| Class 7(d) | Intercompany Claims against SelectBuild Northern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 7(e) | Intercompany Claims against Illinois Framing | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 7(f) | Intercompany against C Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 7(g) | Intercompany Claims against TWF Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 7(h) | Intercompany Claims against H.N.R. Framing Systems | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 7(i) | Intercompany Claims against SelectBuild Southern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 7(j) | Intercompany Claims against SelectBuild Nevada | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 7(k) | Intercompany Claims against SelectBuild Arizona | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 7(l) | Intercompany Claims against SelectBuild Illinois | Unimpaired | Not entitled to vote (Deemed to accept) |

8. **Classes 8(a)-(l): Small Unsecured Claims.**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 8(a) | Small Unsecured Claims against BMHC | Impaired | Entitled to vote |
| Class 8(b) | Small Unsecured against BMC West | Impaired | Entitled to vote |
| Class 8(c) | Small Unsecured Claims against SelectBuild Construction | Impaired | Entitled to vote |
| Class 8(d) | Small Unsecured Claims against SelectBuild Northern California | Impaired | Entitled to vote |
| Class 8(e) | Small Unsecured Claims against Illinois Framing | Impaired | Entitled to vote |
| Class 8(f) | Small Unsecured Claims against C Construction | Impaired | Entitled to vote |
| Class 8(g) | Small Unsecured Claims against TWF Construction | Impaired | Entitled to vote |
| Class 8(h) | Small Unsecured Claims against H.N.R. Framing Systems | Impaired | Entitled to vote |
| Class 8(i) | Small Unsecured Claims against SelectBuild Southern California | Impaired | Entitled to vote |
| Class 8(j) | Small Unsecured Claims against SelectBuild Nevada | Impaired | Entitled to vote |
| Class 8(k) | Small Unsecured Claims against | Impaired | Entitled to vote |

DB02:8855143.1 068301.1001

| | SelectBuild Arizona | | |
|---|---|---|---|
| Class 8(l) | Small Unsecured Claims against SelectBuild Illinois | Impaired | Entitled to vote |

9.      **Classes 9(a)-(l): Interests.**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 9(a) | Interests in BMHC | Impaired | Not entitled to vote (Deemed to reject) |
| Class 9(b) | Interests in BMC West | Unimpaired[8] | Not entitled to vote (Deemed to accept) |
| Class 9(c) | Interests in SelectBuild Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 9(d) | Interests in SelectBuild Northern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 9(e) | Interests in Illinois Framing | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 9(f) | Interests in C Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 9(g) | Interests in TWF Construction | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 9(h) | Interests in H.N.R. Framing Systems | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 9(i) | Interests in SelectBuild Southern California | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 9(j) | Interests in SelectBuild Nevada | Unimpaired | Not entitled to vote (Deemed to accept) |
| Class 9(k) | Interests in SelectBuild Arizona | Unimpaired | Not entitled to vote (Deemed to accept) |

---

[8]      Subject to impairment if section 5.5.2 of the Plan becomes operative.

DB02:8855143.1      068301.1001

| Class 9(l) | Interests in SelectBuild Illinois | Unimpaired | Not entitled to vote (Deemed to accept) |
| --- | --- | --- | --- |

10. **Class 10(a)-(l): Section 510(b) Claims.**

| Class | Claims and Interests | Status | Voting Rights |
| --- | --- | --- | --- |
| Class 10(a) | Section 510(b) Claims against BMHC | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(b) | Section 510(b) Claims against BMC West | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(c) | Section 510(b) Claims against SelectBuild Construction | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(d) | Section 510(b) Claims against SelectBuild Northern California | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(e) | Section 510(b) Claims against Illinois Framing | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(f) | Section 510(b) Claims against C Construction | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(g) | Section 510(b) Claims against TWF Construction | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(h) | Section 510(b) Claims against H.N.R. Framing Systems | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(i) | Section 510(b) Claims against SelectBuild Southern California | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(j) | Section 510(b) Claims against SelectBuild Nevada | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(k) | Section 510(b) Claims against SelectBuild Arizona | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(l) | Section 510(b) Claims against SelectBuild Illinois | Impaired | Not entitled to vote (Deemed to reject) |

DB02:8855143.1

068301.1001

For a detailed description of the Classes of Claims and the Classes of Interests, as well as their respective treatment under the Plan, see Article IV of the Plan.

## B.    ACCEPTANCE OR REJECTION OF THE PLAN

The Bankruptcy Code defines "acceptance" of a plan by a class of claims or interests as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims or Interests in that class that cast ballots for acceptance or rejection of the plan. Assuming that at least one Impaired Class with respect to each Debtor votes to accept the Plan, the Debtors will seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, which permits the confirmation of a plan notwithstanding the non-acceptance by one or more Impaired classes of Claims or Interests. Under section 1129(b) of the Bankruptcy Code, a plan may be confirmed if (a) the plan has been accepted by at least one Impaired class of Claims and (b) the Bankruptcy Court determines that the plan does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting classes. A more detailed discussion of these requirements is provided in Article XVII of this Disclosure Statement.

## C.    VOTING PROCEDURES

To determine whether you are entitled to vote on the Plan, refer to section II(A) above. If you are entitled to vote, you should carefully review this Disclosure Statement, including the attached exhibits and the instructions accompanying the Ballot. Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot and return the Ballot in the postage-paid envelope provided. If you are a creditor of more than one of the Debtors, you may cast one vote with respect to the plans for each of these Debtors which are contained in the Plan, or you may vote separately with respect to the plans for each of the Debtors which are contained in the Plan. Please refer to Exhibit D, the Disclosure Statement/Voting Procedures Approval Order, for more information.

**To be sure your Ballot is counted, your Ballot must be received by The Garden City Group, Inc. (the "Balloting and Claims Agent"), as instructed in your Ballot, no later than 4:00 p.m. Prevailing Eastern Time on November _____, 2009 (the "Voting Deadline"). Your Ballot will not be counted if received after the Voting Deadline.**

If you must return your Ballot to your bank, broker, agent, or nominee, then you must return your Ballot to such bank, broker, agent or nominee in sufficient time for them to process your Ballot and return it to the Debtors' Balloting and Claims Agent before the Voting Deadline. Your Ballot will not be counted if received after the Voting Deadline.

DO NOT RETURN SECURITIES OR ANY OTHER DOCUMENTS WITH YOUR BALLOT.

It is important that Creditors exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by it if it is accepted by the requisite holders of Claims. The amount and number of votes required for confirmation of the Plan are computed on the basis of the total amount and number of Claims actually voting.

**AFTER EXPLORING SEVERAL ALTERNATIVES, THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE DEBTORS' CREDITORS. THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

## D.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

1.    **Confirmation Hearing Date**

The Confirmation Hearing will commence on December [____, 2009, at _____.m.] (Prevailing Eastern Time), before The Honorable Kevin J. Carey, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 5th Floor, Courtroom #2, 824 Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Persons specified in Bankruptcy Rule 2002, all Persons who have requested notice in these Chapter 11 Cases, and the Persons who have filed objections to the Plan ("Plan Objections"), without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

2.    **Plan Objection Deadline**

The Plan Objection Deadline is 4:00 p.m. (Prevailing Eastern Time) on November [____], 2009. All Plan Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the notice of confirmation hearing attached as Exhibit B to the Disclosure Statement Approval Order (the "Confirmation Hearing Notice") on or before the Plan Objection Deadline. The Debtors believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

**THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED BY THE PLAN OBJECTION DEADLINE IN COMPLIANCE WITH THE DISCLOSURE STATEMENT/VOTING PROCEDURES APPROVAL ORDER.**

## III.    GENERAL INFORMATION

A.    **THE COMPANY'S BUSINESS OPERATIONS**

The Debtors are one of the largest providers of residential building products and construction services in the United States. The Debtors distribute building materials, manufacture building components (e.g., millwork, floor and roof trusses, and wall panels), and provide construction services to professional builders and contractors through a network of 31 distribution facilities, 43 manufacturing facilities, and 5 regional construction services facilities.

The Debtors operate under two brand names: BMC West® and SelectBuild®.

Under the BMC West brand, the Debtors market and sell building products, manufacture building components, and provide construction services to professional builders and contractors. Products include structural lumber and building materials purchased from manufacturers, as well as manufactured building components such as millwork, trusses, and wall panels. Construction services include installation of various building products and framing. The Debtors currently offer these products and services in major metropolitan markets in Texas, Washington, Colorado, Idaho, Utah, Montana, North Carolina, California, and Oregon. The BMC West brand also includes the services provided by the Debtor Illinois Framing, Inc.

Under the SelectBuild brand, the Debtors offer integrated construction services to production homebuilders, as well as commercial and multi-family builders. Services include wood framing, concrete services, managing labor and construction schedules, and sourcing materials. The Debtors currently offer these services in major metropolitan markets in California, Arizona, Nevada and Illinois.

The Debtors operate in metropolitan areas that have historically outpaced U.S. averages for residential building permit activity (largely in the Southern and Western portions of the United States). Based on National Association of Home Builders building permit activity, the Debtors provide building products and construction services in 9 of the top 25 single-family construction markets.

In addition to their strategic geographic locations, the Debtors have many other competitive strengths that enable them to attract business. For example, the Debtors' full offering of building materials, manufactured products, and construction services allows the Debtors to help professional builders and contractors reduce costs and cycle time. Similarly, the Debtors' long-term relationships with their suppliers provide the Debtors with purchasing advantages—including volume rebate programs and preferred customer status when supplies or liquidity are limited—which are passed on to the Debtors' customers in the form of reduced costs and increased on-time reliability. The Debtors have also cultivated a reputation for providing superior quality building components and construction services by employing experienced, service-oriented individuals to procure, produce, and deliver these products and services.

The Debtors' principal executive offices are located in Boise, Idaho. As of the Petition Date, the Debtors employed approximately 5,000 people. Debtor Building Materials Holding Corporation is a public company that trades in the pink sheets under the ticker symbol BLGM. For the twelve months ended August 31, 2009, the Debtors' revenue totaled approximately $842 million. As of August 31, 2009 the book value of the Debtors' assets totaled approximately $406 million and its liabilities totaled approximately $459 million.

### Figure 1 – Debtors' Sales Revenue by Product Type



**B.     THE COMPANY'S ORGANIZATION STRUCTURE**

The following chart generally depicts the Debtors' prepetition organizational structure just prior to a merger that took effect on or about June 10, 2009 pursuant to which the Company merged its dormant subsidiaries, SelectBuild Distribution, Inc., SelectBuild L.P., SelectBuild Mid-Atlantic, LLC, SelectBuild Florida, LLC, SelectBuild Mechanical, LLC, SelectBuild Trim, LLC, KBI Stucco, Inc, KBI Windows, Inc. and A-1 Building Components, LLC, with and into SelectBuild Southern California, Inc.:

Figure 2 – Debtors' Prepetition/Pre-Merger Organizational Structure

Building Materials Holding Corporation (Delaware)
— 1% — SelectBuild, L.P. (California)
— 100% — BMC West Corporation (Delaware) — 100% — Illinois Framing, Inc. (Delaware)
— 100% — SelectBuild Construction, Inc. (Delaware) — 99%

SelectBuild Construction, Inc.:
- SelectBuild Northern California, Inc. (Delaware) — 100%
- SelectBuild Distribution, Inc. (Delaware) — 100%
- C Construction, Inc. (Delaware) — 100%
- TWF Construction, Inc. (Delaware) — 100%
- H.N.R. Framing Systems Inc. (California) — 100%
- SelectBuild Illinois, LLC (Delaware) — 100%
- SelectBuild Southern California, Inc. (Delaware) — 100% — SelectBuild Trim, LLC (Delaware)
- SelectBuild Mid-Atlantic, LLC (Delaware) — 100% — SelectBuild Mechanical, LLC (Delaware)
- SelectBuild Nevada, Inc. (Delaware) — 100% — KBI Stucco, Inc. (Delaware)
- SelectBuild Arizona, LLC (Delaware) — 100% — KBI Windows, Inc. (Delaware)
- SelectBuild Florida, LLC (Delaware) — 100% — A-1 Building Components, LLC (Delaware)

## IV. SUMMARY OF PREPETITION INDEBTEDNESS AND FINANCING

### A. THE COMPANY'S PREPETITION CREDIT AGREEMENT

The Debtors' prepetition credit facility consists of a $340 million secured term loan maturing in November 2011 (the "Prepetition Term Loan") and a $200 million secured revolving line of credit, with a letter of credit sublimit (the "Prepetition Revolving Credit Facility"). In addition, the Debtors have entered into interest rate swap agreements (the "Swap Agreements") with various parties and owe prepetition payment-in-kind interest of approximately $6 million under the Prepetition Term Loan, which constitutes additional debt, which arose when the Company was unable to pay interest currently prepetition. All of these obligations are secured by a pari passu first priority, perfected security interest in substantially all of the assets of the Debtors, other than BMHC.

As of the Petition Date, there were approximately $20 million in borrowings outstanding under the Prepetition Revolving Credit Facility, approximately $269 million in principal was outstanding under the Prepetition Term Loan and approximately $11 million in accrued interest. In addition, as of the Petition Date, there were open, but undrawn, letters of credit (collectively, the "Prepetition Letters of Credit") issued under the Prepetition Revolving Credit Facility in the amount of approximately $113 million. As of the Petition Date, the Debtors believe that the termination obligations under the Swap Agreements were approximately $6 million. Pursuant to the DIP Facility, the Debtors rolled-up $4 million of the approximately $20 million outstanding amount of the Prepetition Revolving Credit Facility into the DIP Facility.

**The Prepetition Term Loan and Revolving Credit Facility.** Debtor Building Materials Holding Corporation, as the borrower, the other Debtors, as guarantors, Wells Fargo Bank, as administrative agent ("WFB" or the "Administrative Agent"), and the lenders party thereto (together with the Administrative Agent, the "Prepetition Lenders") are parties to that certain Second Amended and Restated Credit Agreement, dated as of November 10, 2006 (the "Prepetition Credit Agreement"), as amended by that certain First Amendment to Second Amended and Restated Credit Agreement and Waiver, dated as of February 29, 2008 (the "First Amendment") and that certain Second Amendment to Second Amended and Restated Credit Agreement and Waiver, dated as of September 30, 2008 (the "Second Amendment"). The Prepetition Credit Agreement provides for the $200 million Prepetition Revolving Credit Facility and the $340 million Prepetition Term Loan, which is scheduled to mature on November 10, 2011. The Debtors' ability to draw on the $200 million Prepetition Revolving Credit Facility is subject to certain borrowing base limitations. The Prepetition Credit Agreement is secured pursuant to that certain Third Amended and Restated Security Agreement by and among the Debtors and the Administrative Agent (the

"Prepetition Security Agreement"), dated as of November 10, 2006, which grants the Lenders a security interest in substantially all of the Debtors' assets. As of the Petition Date, there were approximately $20 million in borrowings outstanding under the Prepetition Revolving Credit Facility and approximately $269 million in principal was outstanding under the Prepetition Term Loan. Pursuant to the DIP Facility, the Debtors rolled-up $4 million of the approximately $20 million outstanding amount of the Prepetition Revolving Credit Facility into the DIP Facility.

      **The Letters of Credit**. The Debtors caused to be issued various Prepetition Letters of Credit in favor of certain of the Debtors' creditors. The Prepetition Letters of Credit were issued primarily in favor of the Debtors' insurers for the deductible portion of automobile, general liability, and workers' compensation claims, with respect to performance bonds for projects undertaken by the Debtors and with respect to obligations owed to certain of the Debtor's key material suppliers.. Wells Fargo Bank issued the Prepetition Letters of Credit under the terms of the Prepetition Credit Agreement, by which the outstanding Letters of Credit reduce the $200 million amount available to the Debtors under the Prepetition Revolving Credit Facility. These Prepetition Letters of Credit renew automatically on their various anniversary dates or until released by their respective beneficiaries. As of the Petition Date, there were open, but undrawn, Letters of Credit in the amount of approximately $113 million.

      **Swap Agreements.** The Debtors are party to two ISDA Master Agreements, (a) an ISDA Agreement with BNP Paribas dated as of April 7, 2004 (along with all schedules and amendments to same, the "BNP Paribas Master Agreement") and (b) an ISDA Agreement with Suntrust Bank dated as of October 10, 2006 (along with all schedules and amendments to same, the "Suntrust Bank Master Agreement" and, together with the BNP Paribas Master Agreement, the "Prepetition Master Agreements"). The Prepetition Master Agreements govern multiple Transactions (as defined in the Prepetition Master Agreements) between the parties. Obligations arising from such Transactions, moreover, are secured by the Collateral (as defined in the Prepetition Master Agreements), and the resulting security interests are pari passu with that created under the Prepetition Security Agreement. Section 5(a)(vii) of each of the Prepetition Master Agreements gives BNP Paribas and Suntrust Bank the right to terminate such agreements on account of these Chapter 11 Cases. As of the Petition Date, the Debtors believe that the termination obligations under the Swap Agreements were approximately $6 million.

## B.      THE COMPANY'S OTHER DEBT

      **Other Secured Borrowings**. The Debtors have a limited amount of other long-term secured debt. Such other debt consists of (a) an obligation owed to various parties from whom BMC West purchased real property in 2006, which obligation is secured by the real property that was purchased (the "Mitchell Obligation") and (b) certain equipment sale contracts/capital leases. The outstanding liability with respect to Mitchell Obligation is approximately $950,000 and the obligation under the equipment sale contracts/leases is approximately $70,000. The interest rate on the Mitchell Obligation is 7%, payments are monthly and the maturity date is March 2021.

      **Trade Credit/Expense Accrual**. The Debtors also receive unsecured credit from most vendors and suppliers, though the Debtors do have two trade suppliers whose rights to payment are secured by Prepetition Letters of Credit. The Debtors estimate that, as of the Petition Date, they owe approximately $9 million to their unsecured trade creditors that will not be paid during the Chapter 11 Cases pursuant to Bankruptcy Court orders.

      **SERP Claims/Other Deferred Compensation Claims/Executive Bonus**. In 1993, BMHC developed a Supplemental Employee Retirement Plan (the "SERP") to help meet retirement and retention objectives for key Company employees. There are currently two programs, the 1994 "Old Plan," which was frozen in order to preserve less restrictive Internal Revenue Service rules, and the 2005 "New Plan," which has more restrictive election and distribution procedures. Both plans are non-qualified deferred compensation plans. The cost of the program was offset by reductions in BMHC's cash profit-sharing program. The plan was funded by purchasing Life Insurance Policies with 5.5% of BMHC earnings after tax. The SERP was frozen by BMHC's compensation committee in November 2008 due to market conditions and the Company's financial performance. As of the Petition Date, BMHC owed approximately $21 million to SERP claimants. Of this amount, approximately $13.7 relates to active employees, approximately $4.3 million relates to inactive employees (i.e., employees on some type of leave) and approximately $2.9 million relates to former employees.

      Benefits under the SERP are paid out upon retirement as elected by the participant, either in a lump sum or monthly installment payments. The assets that fund the SERP are the Life Insurance Policies held by BMHC in a

"rabbi" trust. The Life Insurance Policies have a cash surrender value of approximately $16.3 million. While the Agent on behalf of the Prepetition Lenders has asserted a security interest in the rabbi trust, the Company believes that, under applicable law, the assets of the rabbi trust are available to pay all BMHC creditors. The Debtors could realize the value of the Life Insurance Policies by tendering the Life Insurance Policies to the relevant insurers in exchange for a payment equal to the cash surrender value. However, the Debtors believe that, through a sale of the Life Insurance Policies to a third party investor, the Debtors may receive greater value from the Life Insurance Policies. The cash surrender value shall be used by the Reorganized Debtors for operations and to fund their obligations under the Plan.[9]

In addition, BMHC has another deferred compensation plan, separate from SERP, that benefits nine former employees. As of the Petition Date, those employees were owed approximately $1.3 million under the plan. In addition, as of the Petition Date, approximately $835,000 had accrued that was unpaid to three executives with respect to the 2008 Annual Incentive Program.

**Liability under Leases**. Prior to the Petition Date, the Debtors were parties to numerous unexpired real and personal property leases which the Debtors utilized to operate their businesses. As of the Petition Date, the Debtors no longer needed certain of these leases due to the Debtor's restructuring efforts whereby the Debtors discontinued operations in many locations and closed several business units. As a result, the Debtors were maintaining leases for unoccupied parcels of real property as well as trucks, tractors and trailers, vans, heavy equipment and office equipment that were not being used in the course of the Debtors' businesses. The Debtors have moved to reject such leases, and expect the resulting rejection damages claims to be approximately $6 million.

**Employment Related Claims**. Prior to the Petition Date, the Debtors entered into a number of employment agreements with their employees and former employees. Certain of the employment agreements with former employees required the Debtors to make payments to these former employees even though the former employees were no longer providing any benefits to the Debtors. The Debtors expect to reject certain employment agreements. In addition to claims under rejected employment agreements, the Debtors expect certain other employee related claims, including vacation claims (see section IX.B below). The Debtors' estimate that the aggregate liability for non-priority, employment related claims will be approximately $4.5 million. The precise amount of employment related claims will depend, in substantial part, on which employment agreements are assumed, rejected or renegotiated.

**Ordinary Course Employee Liabilities**. The Debtors employ approximately 5,500 employees, of which 80 are part-time and approximately 300 are represented by unions. The Debtors paid all of their undisputed prepetition wage obligations to their employees. However, in the ordinary course of business, each month the Debtors incur approximately $18,343,000 in employee wage obligations. In addition the Debtors employ approximately 10 independent contractors to whom the Debtors pay an average of $100,000 per month. The Debtors reimburse employees and directors for certain business-related expenses such as travel, meals, parking and similar expenses. On average, the Debtors reimburse approximately $250,000 in business related expenses per month. The Debtors provide company-leased vehicles or a base allowance plus adjustable fuel allowance for employees who travel in excess of 12,000 miles per year on account of business. The Debtors incur approximately $355,000 per month on account of these automobile expenses.

The Debtors offer their employees a variety of benefits including: health insurance, dental insurance, vision care, vacation time, leaves of absence, 401(k) plans, retirement benefits with respect to union-sponsored pension plans provided by certain of the unions that represent the Debtors' employees, life and accidental death and dismemberment insurance, short and long term disability benefits, flexible benefit plans, relocation program, tuition reimbursement, severance pay, and retiree medical benefits. The Debtors paid all of their undisputed obligations on account of these benefits. On account of these benefits, the Debtors incur an average of $2,300,000 per month.

---

[9] These obligations include, without limitation, obligations due on the Effective Date to fund the distributions required to be made on account of General Unsecured Claims. See, e.g., the table of Sources and Uses at section I.B.2. for a summary of the sources and uses of Cash as of the Effective Date.

The Debtors intend to pay these employee related expenses on a going-forward basis in the ordinary course of business. In addition, the Debtors intend to assume all of their Collective Bargaining Agreements.

**Intercompany Claims**. The Debtors maintain business relationships among themselves. As a result, there are intercompany transactions and transfers (collectively, the "Intercompany Transactions") that give rise to intercompany claims (the "Intercompany Claims") including, without limitation, the following types of transactions:

1.      Intercompany Sales. In the ordinary course of business, the Debtors sell and purchase goods from various Debtor affiliates.

2.      Central Receipts and Disbursements. In the ordinary course of business, BMHC pays for inventory and supplies and, in some cases, collects receivables on behalf of its affiliates.

3.      Centrally-Billed Expenses. In the ordinary course of business, the Debtors incur centrally-billed expenses, including insurance premiums, workers' compensation obligations, advertising expenses, shipping and transportation charges, and other expenses necessary to operate the business. BMHC typically pays these expenses and then allocates them to the appropriate affiliate.

The net position of the Debtors' Intercompany Claims as of the Petition Date is listed on each Debtor's respective Schedule B. Specifically, BMC West owes Intercompany Claims totaling $631,319.18. C Construction is owed Debtor Intercompany Accounts Receivable of $70,893.88, TWF Construction is owed Debtor Intercompany Accounts Receivable of $204,522.64, SelectBuild Nevada is owed Debtor Intercompany Accounts Receivable of $369,333.71 and SelectBuild Arizona is owed Debtor Intercompany Accounts Receivable of $112,720.70.

## C.      PENDING LITIGATION

### 1.      Class Action Lawsuits

The Debtors are parties to two pending class action lawsuits:

**a.      Pedro Alvarado et al. v. Building Materials Holding Corporation et al.; In the Superior Court of the State of California for the County of Los Angeles; Case No. BC391029**

This is a class action lawsuit filed in a California state court by a former employee of Debtor HNR Framing Systems, Inc. It alleges that the plaintiff and all similarly situated employees were not paid overtime, given break times or lunch periods as required by California law. The lawsuit seeks to be certified as a class action, but no motion to certify has been filed yet.

The Company denies the allegation that the former employee and all similarly situated employees were not paid properly. The Company believes that the class certification would be inappropriate given the individualized nature of the claims, the variability in the circumstances of the putative class members and the ability of individual employees, each of whom will be given notice of the Chapter 11 Cases, to file their own claims for any alleged violations of wage and hour requirements.

On August 31, 2009, Pedro Alvarado filed a motion in the Bankruptcy Court requesting authority to file a class proof of claim. The Debtors, the Committee and WFB objected to this motion. The Bankruptcy Court denied Pedro Alvarado's motion to file a class proof of claim by order entered on October 13, 2009 [Docket No. 741].

**b. Eduardo Acevedo et al. v. Building Materials Holding Corporation et al.; In the United States District Court for the Central District of California; CV 08-06227 SJO (Cwx)**

This is a class action lawsuit filed in a federal court in California, but plaintiffs are former employees of Subsidiary Debtors operating in Nevada, California, and Arizona. The lawsuit alleges that all similarly situated employees have not been properly paid for all of their compensable time. The plaintiffs are seeking certification of a class action under the Fair Labor Standards Act ("FLSA") based on alleged violations of the FLSA, including alleged failure to pay overtime, failure to compensate for time spent waiting for materials or work, time spend traveling to and from work sites and other "off the clock" wage claims. Plaintiffs have filed a motion seeking class certification.

The Company denies the allegation that the former employees and all similarly situated employees were not paid in accordance with law. The Company believes that the class certification would be inappropriate given the individualized nature of the claims and the variability in the circumstances (including the applicability of labor laws in three different states) of the putative class members, and the ability of individual employees, each of whom will be given notice of the Chapter 11 Cases, to file their own claims for any alleged violations of wage and hour requirements.

On August 21, 2009, the Debtors filed their Motion for an Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, Authorizing and Approving the Settlement With the Acevedo Plaintiffs [Docket No. 517]. The proposed settlement agreement would settle the claims of the named plaintiffs for $244,343.57, and provides for payment of $230,505.48 with respect to the Acevedo plaintiff's attorneys' fees and costs. On September 18, 2009, the Bankruptcy Court entered an order approving the settlement [Docket No. 635].

## V. EVENTS LEADING TO THE CHAPTER 11 CASES

A series of unforeseen and, unfortunately, unavoidable events placed significant strain on the Debtors' ability to continue servicing its indebtedness and ultimately led to the Debtors' filing of the Chapter 11 Cases. Those events include (A) the unprecedented downturn in the U.S. housing and construction market, (B) the resulting deterioration in the Debtors' financial performance, (C) the Debtors' default under the Prepetition Credit Agreement, and (D) the Debtors' unsuccessful attempts to implement an out-of-court restructuring.

## A. THE DOWNTURN IN THE U.S. HOUSING AND CONSTRUCTION MARKETS

The residential building products and construction services industry is highly dependent upon demand for single-family homes. Various macroeconomic factors, including general economic conditions, interest rates, levels of unemployment, consumer confidence, and the availability of credit influence the demand for single-family homes. Historically, the new home construction sector has been cyclical. During 2006, however, a major housing downturn began in the United States. Indeed, single-family "housing starts" fell more than 14% from approximately 1.72 million in 2005 to approximately 1.47 million in 2006.[10]

The housing market downturn in the United States intensified during 2007, with single-family housing starts in 2007 falling almost 29% from the 2006 rate to approximately 1.05 million, and continued during 2008, with single-family housing starts falling over 40% from the 2007 rate to approximately 622,000. As of March 2009, single-family housing starts have fallen to an annualized rate of less than 400,000 – the lowest level of single-family housing start activity since World War II.

---

[10] "Housing starts" are considered a leading indicator in the United States housing market. The United States Census Bureau and the Untied States Department of Housing and Urban Development jointly publish a monthly report on housing starts which is available at http://www.census.gov/const/www/newresconstindex.html.



Figure 3 – U.S. Single-Family Housing Start History 1959-2009

The negative effect of the housing market downturn is compounded by recent turmoil in the general economy, mortgage market, and overall credit markets, which has caused increasing levels of unemployment, a severe decline in home prices, a dramatic tightening of consumer credit, and decreased consumer confidence.

**B. THE DEBTORS' FINANCIAL PERFORMANCE DETERIORATES**

The adverse market conditions described above negatively affected the Debtors' financial position. Sales revenues declined from $3.0 billion in 2006 to $1.3 billion in 2008.

DB02:8855143.1

068301.1001

Figure 4 – Debtors' Unaudited Quarterly Sales Revenue (2005-Q1 2009)



As a result of this unanticipated and precipitous decline in sales revenues, the Debtors began experiencing losses from operations on a continuous basis in the fourth quarter of 2007. For the year ending December 31, 2008, the Debtors experienced a loss of $192,456,000 from continuing operations.

## C.    THE DEBTORS DEFAULT UNDER THE PREPETITION CREDIT AGREEMENT

The Debtors' Prepetition Credit Agreement requires monthly compliance with financial covenants, including minimum liquidity and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Ultimately, decreased demand and corresponding sales declines caused the Debtors to fall out of compliance with certain of these financial covenants as of December 31, 2007. As a result of these non-monetary covenant defaults, the Prepetition Lenders were entitled to seek immediate repayment of $345,625,000 under the Prepetition Credit Agreement. Accordingly, the Debtors engaged WFB, the Administrative Agent, in discussions for a waiver of the financial covenant defaults and an amendment to the covenants in the Prepetition Credit Agreement that would enable the Debtors to meet the covenants on a going-forward basis given the depressed state of the housing market. A description of the initiatives undertaken by the Debtors to address the default under the Prepetition Credit Agreement and the depressed state of the housing market is set forth below.

## D.    THE DEBTORS' OUT-OF-COURT RESTRUCTURING INITIATIVES

### 1.    Operational Restructuring

In response to the above-described challenging economic and industry conditions, in May 2008 the Debtors initiated a comprehensive analysis of their business operations to rationalize their operations for the current conditions of the homebuilding industry and improve cash flow and profitability. To assist in this analysis, the Debtors engaged Alvarez & Marsal ("A&M"), one of the pre-eminent restructuring turnaround firms in the world. With the assistance of A&M, the Debtors formulated a restructuring plan to right-size their operations, consolidate

their administrative services, reorganize their operations structure, and close or consolidate their underperforming business units.

To implement this restructuring plan, the Debtors have reduced overall headcount from a high of 22,824 in June 2006 to approximately 5,000 as of the Petition Date. The Debtors have also created a shared services organization at their headquarters in Boise, Idaho to provide key administrative services such as information technology, human resources, accounting, marketing, and purchasing. Previously, some individual business locations had provided their own administrative services. In addition, the Debtors have engaged in a comprehensive reorganization of their operations structure in order to eliminate unnecessary overhead expenditures, reduce redundancy, and enhance corporate oversight and control over the business.

<u>Figure 5 – Debtors' Business Operations Reorganization</u>



Finally, the Debtors have taken significant actions to close or consolidate their underperforming business units. To date, the Debtors have sold, wound down or consolidated 78 business units.

### 2. Financial Restructuring

Throughout February 2008, the Debtors continued negotiating with the Administrative Agent for a waiver of the financial covenant defaults and an amendment to the covenants in the Prepetition Credit Agreement that would enable them to meet the covenants on a going-forward basis given the depressed state of the housing market. To provide the parties with additional time to continue negotiations and avert a possible chapter 11 filing, the parties agreed to a temporary waiver of the financial covenants under the Prepetition Credit Agreement.

On February 29, 2008, the Debtors were able to enter successfully into the First Amendment to the Prepetition Credit Agreement, which, among other provisions, modified the financial covenants to account for the downturn in the housing market by, among other things, lowering the Debtors' consolidated net worth requirement and the minimum EBITDA-to-interest expense ratio and setting new minimum EBITDA default-trigger thresholds. In accordance with the First Amendment, Debtor Building Materials Holding Corporation suspended its quarterly cash dividend to shareholders. The First Amendment also brought forward the term loan maturity dated to November 2011 and reduced the revolving loan limit to $200 million, which was also subject, however, to a borrowing base limitation calculated on certain accounts receivable minus 50% of outstanding surety bonds multiplied by 50%.

Nonetheless, as the housing market continued to decline, the Debtors fell out of compliance with these new financial covenants after the fiscal period ended June 30, 2008. As a result, the Debtors engaged in further discussions with the Administrative Agent and sought another waiver of their financial covenant and other related

defaults and another amendment to the covenants in the Prepetition Credit Agreement. The Debtors were able to obtain a waiver of the existing defaults and, on September 30, 2008, were successful in entering into the Second Amendment to the Prepetition Credit Agreement which, among other things, reset the minimum EBITDA default-trigger thresholds and added minimum liquidity default-trigger thresholds. The Second Amendment also increased interest rates for the revolver and term note to LIBOR plus 5.25% or Prime plus 3.25%, and added a payment-in-kind feature to the term note of an additional 2.75%. Subsequent to the Second Amendment, the amended credit facility continued to provide for a $200 million revolver subject to borrowing base limitations and a $340 million term loan maturing November 2011.

Despite these extensive good-faith renegotiations of the Prepetition Credit Agreement, the unprecedented decline in the housing industry and the concomitant decline in sales of the Debtors' products and services caused the Debtors to fall out of compliance with the minimum adjusted EBITDA required by the Second Amendment for the fiscal period ended February 28, 2009. As part of their continued good-faith negotiations with the Prepetition Lenders, the Debtors were able to obtain a temporary waiver of this and other anticipated defaults through the earlier of (i) April 15, 2009, which was extended through June 1, 2009 and again through June 29, 2009 and (ii) the occurrence of another default.

### 3. Development of Plan

Prior to the Petition Date, the Debtors, with the assistance of their Professionals and advisors, engaged in extensive efforts to maximize the value of the Debtors' assets. Specifically, the Debtors conducted a broad marketing effort to explore a possible sale of their business. This marketing effort, however, did not yield indications of interest that were consistent with the Debtors' view, in their business judgment, of the best way to maximize the value of their business.

Additionally, the Debtors explored ways in which to refinance some or all of their outstanding prepetition indebtedness. Notwithstanding this effort, due to liquidity restraints in the capital markets, coupled with the severe and well-reported downturn in the U.S. housing markets, the Debtors were unable to obtain interest in a refinancing that could be implemented under the current economic conditions outside of bankruptcy.

Accordingly, the Debtors engaged in good faith, arm's-length negotiations with their prepetition senior secured lenders, among many other potential funding sources, to develop a proposed restructuring that would significantly de-lever the Debtors' balance sheet, while at the same time provide a meaningful recovery to the Debtors' unsecured creditors in relation to the amount that they would receive in a liquidation. After months of negotiations and the consideration of four separate funding proposals, the Debtors and certain of the prepetition senior secured lenders were able to agree to a restructuring proposal.

The Debtors filed a draft proposed plan of reorganization with respect to the restructuring proposal on the Petition Date. The Debtors filed an amended version of the plan on July 27, 2009, October 1, 2009 and October 6, 2009. Since that time, the Debtors have been engaged in discussions with various plan bidders to explore alternative plan proposals. Those discussions have not resulted in an alternative that the Debtors view as more favorable to their Estates than the current version of the Plan filed on October 21, 2009.

## VI. ADMINISTRATION OF THE CHAPTER 11 CASES

### A. RELIEF SOUGHT AT OR NEAR THE OUTSET OF THESE CHAPTER 11 CASES

On or shortly after the Petition Date, the Company filed several motions and applications seeking the entry of certain interim orders (collectively, the "First Day Orders") and/or final orders (collectively, the "Final Orders"), intended to facilitate the transition between the Company's prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

Recognizing that any interruption of the Company's business, even for a brief period, would negatively impact operations, customer relationships, revenue and profits, the Company filed a number of motions to ensure a

stabilization of operations. Thereafter, the Bankruptcy Court entered a number of First Day and Final Orders granting the Company the authority to, among other things, pay certain prepetition claims and obligations and continue certain existing programs.

1.    **Stabilizing Operations**

a.    **Critical Vendors and 503(b)(9) Claimants**

The Company relies on certain critical suppliers of goods and services, with whom the Company intends to continue to do business and whose goods and services are essential for the continuation of the Company's operations. The Company believed that the ability to honor prepetition claims of these critical suppliers could be utilized to secure favorable trade terms from these suppliers and in many cases was necessary to continue the Company's operations, minimize disruption of its delivery schedules to the Company's customers, preserve enterprise value, and emerge successfully from these Chapter 11 Cases.

Many of these critical suppliers and certain other suppliers delivered goods to the Debtors in the ordinary course of business during the 20-day period prior to the Petition Date. Pursuant to section 503(b)(9) of the Bankruptcy Code, creditors have an administrative priority claim to the extent of "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." The Company believed that the ability to pay these suppliers at the outset of these Chapter 11 Cases would increase the likelihood that such suppliers would continue to supply the goods and services necessary to operate the Company's business on favorable credit terms.

Accordingly, the Bankruptcy Court entered a Final Order authorizing the Company to pay certain prepetition claims of critical vendors up to $6 million in the aggregate and to pay certain claims entitled to administrative priority pursuant to section 503(b)(9) up to $9 million in the aggregate [Docket No. 64]. All allowed section 503(b)(9) claims will be paid in full on the Effective Date of the Plan.

b.    **Outstanding Orders, Goods in Transit, Warehousemen, and Mechanic's/Materialman's Lien Claimants**

Prior to the Petition Date, and in the ordinary course of business, the Company ordered goods for which delivery would not occur until after the Petition Date. The Company believed that the suppliers of these goods might refuse to ship or transport such goods (or recall such shipments) unless the Company issued substitute purchase orders postpetition or obtained an order of the Bankruptcy Court: (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all of the Company's undisputed obligations arising from the acceptance of goods ordered prior to the Petition Date and (b) authorizing the Company to satisfy such obligations in the ordinary course of business.

In addition, in the period immediately prior to the Petition Date, certain of the Company's goods were in transit or were stored in third-party warehouses. The Company believed that, unless it was authorized to pay certain shippers and warehousemen, it would have been highly unlikely that the Company would have recovered possession of these goods. The Company was concerned that the shippers and warehousemen possessed lien rights or the ability to exercise "self-help" remedies to secure payment of their claims, and, as such, any failure by the Company to satisfy outstanding shipping charges and warehousing charges could have had a material adverse impact on the Company's business.

The Company also does business with a number of third parties who could potentially assert liens against the Company and its property or its customers' property for amounts the Company owes to those third parties, including mechanic's liens and materialman's liens. The Company was concerned that if it was unable to satisfy the prepetition claims of those third parties, they could have either prevented the Company from retrieving its tooling or other equipment or could have prevented the Company from receiving payment from its customers, who often require lien releases from these third parties before they will pay the Company.

DB02:8855143.1

068301.1001

Accordingly, the Bankruptcy Court entered a Final Order authorizing, among other things, the Company to pay for goods ordered prior to the Petition Date in the ordinary course of business, to pay certain prepetition claims of shippers, warehousemen, and materialmen's lien holders up to $1,133,000 in the aggregate, and to satisfy joint check claims [Docket No. 66]. Upon a supplemental request, the Bankruptcy Court entered a Final Order increasing this amount to $2,225,000. [Docket No. 243]. As a result of these orders, the Debtors are not aware that any material mechanics liens have been asserted against their property.

### c. Employee Compensation

The Company relies on its employees for its day-to-day business operation. The Company believed that absent the ability to honor prepetition wages, salaries, benefits and the like, its employees might have sought alternative employment opportunities, perhaps with the Company's competitors, thereby depleting the Company's workforce, hindering the Company's ability to meet its customer obligations and likely diminishing confidence in the Company's ability to successfully reorganize. The loss of valuable employees would have been distracting at a critical time when the Company was focused on stabilizing its operations. Accordingly, the Bankruptcy Court entered a First Day Order authorizing the Company to pay up to $12,900,000 in the aggregate with respect to prepetition claims and obligations for, among other things, (1) wages, salaries and other compensation, (2) reimbursable employee expenses and (3) employee medical and similar benefits (other than severance pay and retention pay) [Docket No. 55]. On July 16, 2009, the Bankruptcy Court entered a Final Order authorizing the relief granted in the First Day Order on a final basis and authorizing the Company to pay, in the ordinary course of business, severance pay (other than with respect to insiders or employees party to an executive severance plan) and any "cash out" vacation or paid off time obligations upon termination [Docket No. 236].

### d. Taxes

The Company believed that, in some cases, certain authorities had the ability to exercise rights that would be detrimental to the Company's restructuring if the Company failed to meet the obligations imposed upon it to remit certain taxes and fees. Therefore, the Company felt that it was in its best interests to eliminate the possibility of any unnecessary distractions. Accordingly, the Company sought, and the Bankruptcy Court entered, a Final Order authorizing the Company to pay up to $4,500,000 with respect to taxes and fees, including sales, income, use, and franchise taxes as well as business license fees and certain other governmental charges as necessary or appropriate to avoid harm to the Company's business operations, and, upon following certain procedures, to pay upward audit adjustments necessitated by subsequent audits [Docket No. 62]. As of October 21, 2009, the Debtors have been audited through 2008.

### e. Insurance Coverage

The Company felt that the maintenance of its prepetition insurance policies and premium financing agreements was critical to the preservation of the value of the Company's estate, and that payment of any unpaid prepetition amounts owed in connection with its insurance policies was necessary to continue operating in certain states, prevent its insurers from drawing on letters of credit, keep its insurance policies in current effect and/or ensure that there was no inadvertent lapses in coverage. Accordingly, the Bankruptcy Court entered a First Day Order authorizing the Company to (1) continue prepetition insurance policies and programs and to pay any obligations relating thereto and (2) maintain prepetition premium financing agreements [Docket No. 58]. On July 16, 2009, the Bankruptcy Court entered a Final Order authorizing the relief granted in the First Day Order on a final basis [Docket No. 237].

### f. Cash Management System

As part of a smooth transition into these Chapter 11 Cases and in an effort to avoid administrative inefficiencies, maintaining the Company's cash management system was of critical importance. Thus, the Company sought and the Bankruptcy Court entered a Final Order authorizing the Company to continue using its existing cash management system, bank accounts and business forms and authorizing the Company to open new bank accounts. Further, the Court deemed the Company's bank accounts the debtor-in-possession accounts and authorized the Company to maintain and continue using these accounts in the same manner and with the same account numbers and document forms as those employed prior to the Petition Date. In addition, the Bankruptcy Court authorized the

Company to continue to perform intercompany transactions in the ordinary course of business and to continue its prepetition investment practices [Docket No. 54].

### g. Utilities

Section 366 of the Bankruptcy Code protects the Company from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the Company will pay for postpetition services. The Company agreed to provide the utilities with a deposit equal to the approximate value of two weeks of utility services (which amount was reduced by certain deposits held by utility providers) as the adequate assurance required by the Bankruptcy Code. Consequently, pending further order, the Bankruptcy Court entered a First Day Order prohibiting utilities from altering, refusing or discontinuing service on account of any unpaid prepetition charges or the commencement of the Chapter 11 Cases and approving procedures under which utilities could request additional assurance [Docket No. 61]. On July 16, 2009, the Bankruptcy Court entered a Final Order authorizing the relief granted in the First Day Order on a final basis, other than with respect to certain identified parties [Docket No. 238]. The Debtors have deposited approximately $290,000 in utility deposits in an escrow account at WFB under the Final Order, and have posted approximately $20,000 in additional post-petition deposits with certain other utilities as a result of specific agreements. The Debtors expect such amounts to be returned to them on the Effective Date.

### h. Customer Programs

Prior to the Petition Date, the Company enacted certain customer programs such as warranty, rebate and similar programs designed to develop customer loyalty, encourage new purchases, sustain goodwill, enhance customer satisfaction and ensure that the Company remains competitive. The Company believed that these customer programs assisted, and continue to assist, it in retaining current customers, attracting new ones and, ultimately, increasing revenue. The continuation of these customer programs and retention of core customers is a critical element of the Company's successful reorganization.

On June 17, 2009, the Bankruptcy Court entered a Final Order authorizing the Company to continue its customer programs and to honor prepetition commitments owed to customers [Docket No. 63].

### i. Foreign Vendors

The Company relies on certain foreign vendors to supply products that the Company sells to its customers or that are necessary to the Company's production of manufactured building components. The Company believed that continued delivery of the goods supplied by the foreign vendors was necessary to avoid disruptions to its business operations. The Company believed that it was necessary to honor the prepetition obligations to these foreign vendors because foreign vendors are unfamiliar with U.S. bankruptcy laws and the Company's failure to pay even a single invoice would have posed a significant risk that the foreign vendors would take precipitous action against the Company. Therefore, the Bankruptcy Court entered a Final Order authorizing the Debtors to pay certain prepetition claims of foreign vendors up to $1,250,000 in the aggregate on a final basis [Docket No. 65]. The Debtors believe that they have paid all such foreign vendors.

### j. Lease Rejections

Prior to the Petition Date, the Company was party to unexpired leases for the use and occupancy of certain nonresidential real property which it no longer needed as a result of pre and postpetition restructuring efforts. The Company believed that these leases posed a significant drain on its assets with no corresponding benefit because the relevant properties were not being occupied. Accordingly, the Bankruptcy Court entered Final Orders authorizing the Debtors to reject certain real property leases [Docket Nos. 199, 242].

The Company was also party to unexpired leases for the use of certain trucks, trailers, heavy equipment and office equipment which it no longer needed as a result of pre and postpetition restructuring efforts and downsizing. The Company believed that these leases posed a significant drain on its assets with no corresponding benefit because

the relevant personal property was no longer being used. Accordingly, the Bankruptcy Court entered Final Orders authorizing the Debtors to reject certain personal property leases [Docket Nos. 202, 203 and 205].

  2.  **The Debtor in Possession Financing and Use of Cash Collateral**

On June 16, 2009, the Company sought approval to enter into the DIP Facility which consists of an $80 million revolving credit facility, with a $20 million letter of credit sublimit, extended by the DIP Lenders. The administrative agent under the DIP Facility is WFB (or in such capacity, the "DIP Administrative Agent"), which also is the prepetition Administrative Agent under the Prepetition Credit Agreement. WFB and various other Prepetition Lenders under the Prepetition Credit Agreement are the DIP Lenders. The DIP Facility provides for repayment of $4.0 million of the prepetition amounts outstanding under the Prepetition Credit Agreement's revolver (the "Roll-Up Debt").

On June 17, 2009, the Bankruptcy Court entered a First Day Order (the "Interim DIP Order") authorizing the Company to borrow up to $40 million on an interim basis under the DIP Facility [Docket No. 56]. In addition to approving the interim financing, the Bankruptcy Court authorized the Company to use cash collateral in which the DIP Lenders and/or the Prepetition Lenders may have an interest, pursuant to the term and conditions set forth in the Interim DIP Order.

On July 1, 2009, the Bankruptcy Court entered a Final Order (the "Final DIP Order") approving, on a final basis, among other things, (i) the DIP Facility and the Company's access to the full commitment thereunder; (ii) the cash collateral provisions and related adequate protection package for the Prepetition Lenders; and (iii) the repayment of the Roll-Up Debt [Docket No. 132].

  3.  **Employment and Compensation of Advisors**

To assist the Company in carrying out its duties as Debtors-in-possession and to otherwise represent the Company's interests in the Chapter 11 Cases, the Bankruptcy Court entered orders authorizing the Company to retain and employ the following advisors: Gibson, Dunn & Crutcher, LLP [Docket No. 246]; Young Conaway Stargatt & Taylor, LLP [Docket No. 200]; Alvarez & Marsal [Docket No. 241]; Peter J. Solomon Company [Docket No. 240]; PricewaterhouseCoopers, LLP [Docket No. 245], and KPMG [Docket No. 326]. On July 16, 2009, the Bankruptcy Court entered an order approving certain procedures for the interim compensation and reimbursement of Professionals in the Chapter 11 Cases [Docket No. 201]. The Bankruptcy Court also entered an order authorizing the Company to continue to employ and pay certain other professionals in the ordinary course of business [Docket No. 244].

  4.  **The Plan, Disclosure Statement and Balloting and Solicitation Procedures**

On the Petition Date, the Company filed an original version of the Plan and of this Disclosure Statement to implement the restructuring. On July 13, 2009, the Company filed a Motion seeking approval of the Disclosure Statement and balloting and solicitation procedures applicable to the Plan. The Company filed amended versions of the Plan and Disclosure Statement on July 27, 2009, further amended versions on October 1, 2009 and October 6, 2009. Lastly, the Company filed the current version of the Plan and Disclosure Statement on October 21, 2009. The Disclosure Statement hearing was conducted on October 22, 2009, and the Bankruptcy Court entered the Disclosure Statement Approval Order [Docket No. _____] [on _____, 2009.]

**B.**  **UNSECURED CREDITORS**

  1.  **Appointment of the Creditors' Committee**

On June 26, 2009, the U.S. Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code. The members of the Committee are: Robert Garcia, Space Center Mira Loma, Inc. and Atrium Companies, Inc.

The Committee retained Arent Fox as its legal counsel. The Committee also has retained Executive Sounding Board as its financial advisor. The Bankruptcy Court entered a Final Order approving the retention of Arent Fox [Docket Nos. 414] on August 10, 2009 and entered a Final Order approving the retention of Executive Sounding Board [Docket No. 581] on September 10, 2009.

### 2. Meeting of Creditors

The meeting of creditors pursuant to section 341 of the Bankruptcy Code took place on July 17, 2009 at the J. Caleb Boggs Federal Building, 844 King Street, 2nd Floor, Room 2112, Wilmington, Delaware 19801. In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Company appear at such meeting of creditors for the purpose of being examined under oath by a representative of the U.S. Trustee and by any attending parties in interest), a representative of the Company, as well as counsel to the Company, attended the meeting and answered questions posed by the U.S. Trustee and other parties in interest present at the meeting.

### C. SCHEDULES

The Company filed its Schedules of Assets and Liabilities and Statement of Financial Affairs on July 15, 2009. The Company filed amended Schedules on July 21, 2009.

### D. CLAIMS BAR DATE

On July 16, 2009, the Bankruptcy Court approved August 31, 2009 at 5:00 p.m. (Prevailing Eastern Time) as the general Claims Bar Date[11] and approved the form and manner of the notice of the Claims Bar Date [Docket No. 248]. In addition to mailing the notice of Claims Bar Date to creditors, between July 29, 2009 and August 1, 2009, the Debtors published English versions of the notice of the Claims Bar Date in The Wall Street Journal, the Los Angeles Times, the Las Vegas Review-Journal, The Arizona Republic, the Sun Sentinel and The Miami Herald, and published Spanish versions of the notice of the Claims Bar Date in Impacto USA (California), El Tiempo (Nevada), and Presna Hispana (Arizona). [See Docket Nos. 366, 367, 368, 411, 498, 499, 500, 501, and 524]. The Debtors are in the process of reviewing the claims that were timely filed as of the Claims Bar Date.

### E. POST-FILING THIRD PARTY MARKETING EFFORTS

Throughout the course of the Chapter 11 Cases, the Debtors, through their financial advisor, Peter J. Solomon, engaged in an extensive process to market the Debtors' business to third party investors and/or acquirors. In connection with this process, the Debtors contacted 66 parties, signed confidentiality agreements with 21 potential bidders and engaged in substantive discussions with at least 11 parties. A total of 31 bidders and their agents were provided access to a complete virtual data room with the key documents and financial information related to the Debtors. In addition, management of the Debtors spent countless hours in question and answer and document diligence sessions with these parties. These discussions continued in earnest over the past several months during which the Debtors initiated a formal process to solicit best and final offers. Sale process letters were distributed to interested investors, along with drafts of key documents. Bidders were instructed to submit their bids, without (among other things) any financing contingencies, by August 28, 2009, together with mark-ups of the relevant documents and any other documents necessary to implement their proposed transaction. On or about August 28, 2009, the Debtors received offers from three different bidders. After reviewing and evaluating these offers, including further discussions with each of the bidders, the Debtors, in consultation with the Prepetition Lenders, determined that no agreement more favorable than that embodied in the Plan could be reached with the bidders. As a result, the Debtors finalized the Exit Credit Facilities with the Prepetition Lenders and filed the current version of the Plan on October 21, 2009. To this day, several of the bidders continue to engage in discussions with the Debtors and the Prepetition Lenders but no agreements with any of these bidders have been reached, and the Debtors are focusing their efforts on confirmation of the Plan.

---

[11]  The bar date for governmental units is December 16, 2009 at 5:00 p.m. (Prevailing Eastern Time).

DB02:8855143.1

068301.1001

# VII.  SUMMARY OF THE PLAN

## A.  ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND PROFESSIONAL COMPENSATION CLAIM

1.  **Administrative Expense Claims.**  On the later of (i) the Effective Date or (ii) if the Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which an Administrative Expense Claim becomes Allowed, the Debtors or Reorganized Debtors shall either (x) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (y) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtors or Reorganized Debtors and such Holder shall have agreed upon; *provided, however,* that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (x).  Other than with respect to Professional Compensation Claims and Cure Claims, notwithstanding anything in the Plan to the contrary (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release), (a) if an Administrative Expense Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business during the Postpetition Period or (ii) pursuant to an Executory Contract (including, but not limited to, the Debtors' Insurance Policies and Agreements that are treated as Executory Contracts under the Plan), the Holder of such Administrative Expense Claim shall be paid in Cash by the applicable Debtor (or after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreements giving rise to such Administrative Expense Claim without the need or requirement for the Holder of such Administrative Expense Claim to file a motion, application, claim or request for allowance or payment of an Administrative Expense Claim with the Bankruptcy Court and (b) such Administrative Expense Claims shall be Allowed Claims; provided, however, that nothing limits the ability of any applicable Debtor or Reorganized Debtor to dispute (or the Holder of such Administrative Expense Claim to assert and/or defend) the validity or amount of any such Administrative Expense Claim and/or to bring an action in the appropriate forum.

2.  **Professional Compensation Claims.**  Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims, any Person asserting a Professional Compensation Claim shall, no later than 30 days after the Confirmation Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date.  To the extent that such an award is granted by the Bankruptcy Court, the requesting Person shall receive: (i) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases, such payment to be made within the later of (a) the Effective Date or (b) three (3) business days after the Order granting such Person's final fee application becomes a Final Order; (ii) payment on such other terms as may be mutually agreed upon by the Holder of the Professional Compensation Claim and BMHC or Reorganized BMHC, as applicable (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court); or (iii) payment in accordance with the terms of any applicable administrative procedures orders entered by the Bankruptcy Court, including the Interim Compensation Order, dated July 16, 2009.  All Professional Compensation Claims for services rendered after the Confirmation Date, including those relating to the prosecution of Causes of Action preserved hereunder, shall be paid by Reorganized BMHC upon receipt of an invoice therefor, or on such other terms as Reorganized BMHC (or the Debtors prior to the Effective Date) and the Professional may agree, without the requirement of a further Bankruptcy Court order.

3.  **Priority Tax Claims.**  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  If the Reorganized Debtors substantially default on the payment of a tax due to the Internal Revenue Service under the Plan, the entire tax debt owed to the Internal Revenue Service shall become due and payable immediately, and the Internal Revenue Service may collect these unpaid tax liabilities through the administrative collection provisions of the Internal Revenue Code.

4.  **DIP Facility.**  Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims, Administrative Expense Claims arising under the DIP Facility shall be Allowed Administrative Expense Claims on the Effective Date and shall be paid in full in Cash on the Effective Date, and all excess Cash in the Cash Collateral Account shall remain with Reorganized BMHC.

### 5. U.S. Trustee Fees

U.S. Trustee Fees incurred by the U.S. Trustee prior to the Effective Date shall be paid on the Distribution Date in accordance with the applicable schedule for payment of such fees. Until each of the Chapter 11 Cases is closed by entry of a final decree of the Bankruptcy Court, the Reorganized Debtors shall pay additional U.S. Trustee Fees incurred in accordance with the applicable schedule for the payment of such fees.

## B. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY SECURITIES

### 1. Summary

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn, or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8), respectively, of the Bankruptcy Code have not been classified and their treatment is set forth in Article II of the Plan and described above.

The Plan constitutes a separate chapter 11 subplan for each of the Debtors. Pursuant to section 1122 of the Bankruptcy Code, set forth below is a summary of Classes of Claims against and Interests in the Debtors.

### 2. Summary of Classification and Treatment of Classified Claims and Interests

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|------------------------------|-----------------------------------|
| 1(a)-(l) | Other Priority | Claims in these Classes are Unimpaired. The Plan provides for | 100% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|------------------------------|------------------------------------|
| | Claims | payment of each Allowed Other Priority Claim in full in Cash. | |
| 2(a)-(l) | Funded Lender Claims | Claims in these Classes are Impaired. Each Holder of an Allowed Funded Lender Claim shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive (i) the Funded Lender's Share of Sale Cash Collateral Excess Proceeds Account Effective Date Amount as to such Claim, (ii) a Term Note issued by Reorganized BMHC under the Term Loan Credit Agreement in an original principal amount equal to the Maximum Funded Lenders Term Note Cap multiplied by such Holder's Pro Rata share of all Allowed Funded Lender Claims, and (iii) its Pro Rata share of the Reorganized BMHC Equity Interest Funded Lender Issuance, subject to dilution by (a) any Reorganized BMHC Equity Interests issued on the Effective Date and from time to time thereafter to the Holders of Allowed L/C Lender Claims and (b) any Reorganized BMHC Equity Interests issued after the Effective Date in respect of the Long Term Incentive Plan. In the event that section 5.5.2 of the Plan is applicable, each Holder of an Allowed Funded Lender Claim shall be deemed to be distributed its Pro Rata Share of the Reorganized Subsidiary Equity Interests, and to have contributed such Reorganized Subsidiary Equity Interests to the applicable Holders of Equity Interests in Classes 9(b)-9(l) as provided in such section 5.5.2. | 73.6%[12] |
| 3(a)-(l) | L/C Lender Claims | Claims in these Classes are Impaired. Allowed L/C Lender Claims shall be treated as follows: From and after the Effective Date, obligations of the Prepetition L/C Lenders (whether Wells Fargo Bank, N.A. ("WFB"), as the letter of credit issuer under the Prepetition Credit Agreement, or the Prepetition Revolving Lenders in respect of their several reimbursement obligations to WFB arising under the Prepetition Credit Agreement) shall continue to be governed by the lender reimbursement provisions of the Prepetition Credit Agreement. Reorganized BMHC shall have no obligations whatsoever in respect of the letter of credit reimbursement obligations arising in respect of the Prepetition Letters of Credit, except (a) the Holders of Allowed L/C Lender Claims shall be entitled to the L/C Lender Fee and (b) as expressly set forth in Section 4.3.2.2 of the Plan. All Liens with respect to the Prepetition Credit Agreement shall be released, discharged and extinguished.<br><br>To the extent any Allowed L/C Lender Claim is liquidated on or after the Petition Date, each Holder of an Allowed L/C Lender Claim shall, in full satisfaction, release, and discharge of and in exchange for the Liquidated L/C Amount of such Claim, receive the following on the Effective Date and thereafter from time to time if, as and when Allowed L/C Lender Claims are liquidated: | NA |

---

[12]    Assumes, as is consistent with the Debtors' projections, no draws on Prepetition Letters of Credit.

DB02:8855143.1

068301.1001

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|------------------------------|----------------------------------|
| | | (A)  a Term Note issued by Reorganized BMHC under the Term Loan Credit Agreement in an original principal amount equal to the Maximum L/C Lenders Term Note Cap multiplied by the ratio (expressed as a percentage) that such Liquidated L/C Amount of such Claim bears to the aggregate amount of all Allowed L/C Lender Claims; and<br><br>(B)  with respect to any Allowed L/C Lender Claim liquidated from and after the Petition Date through the Effective Date, its Pro Rata share of the Reorganized BMHC Equity Interest L/C Lender Issuance, subject to dilution by (a) the Reorganized BMHC Equity Interests issued on the Effective Date to the Holders of Allowed Funded Lender Claims, (b) any Reorganized BMHC Equity Interests issued from time to time after the Effective Date to the Holders of Allowed L/C Lender Claims and (c) any BMHC Equity Interests issued after the Effective Date in respect of the Long Term Incentive Plan; and<br><br>(C)  with respect to any Allowed L/C Lender Claims liquidated after the Effective Date, an amount of the Reorganized BMHC Equity Interests, rounded to the nearest whole number, equal to the Liquidated L/C Amount of such Claim multiplied by the L/C Lender Claim Equity Conversion Ratio, subject to dilution by any Reorganized BMHC Equity Interests issued after the Effective Date in respect of the Long Term Incentive Plan; and<br><br>(D)  On the Effective Date only, the L/C Lender's Share of the Sale Cash Collateral Excess Proceeds Account Effective Date Amount as to such Liquidated L/C Amount of such Claim on the Effective Date.<br><br>If, and only to the extent, a Prepetition L/C Lender fails to reimburse in full WFB in respect of its reimbursement obligation to WFB arising under the Prepetition Credit Agreement, WFB shall be entitled to receive the distribution described above which would otherwise be payable to such defaulting Prepetition L/C Lender.<br><br>Prepetition Letters of Credit shall not be used by the Reorganized Debtors to collateralize obligations that do not exist as of the Effective Date; *provided, however*, that notwithstanding the foregoing, Prepetition Letters of Credit shall continue to collateralize all obligations under Insurance Policies and Agreements and/or performance bonds and surety bonds (and any agreements, documents or instruments relating thereto) secured by such Prepetition Letters of Credit, whether such obligations exist as of the Effective Date or arise thereafter; and such Prepetition Letters of Credit and obligations shall survive the Effective Date unaffected and unaltered by the Plan. No issuer of Prepetition Letters of Credit shall have any obligation to renew a Prepetition Letter of Credit for a period beyond the Maturity Date under the | |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | Term Loan Credit Agreement (as such term is defined therein); provided that this sentence shall not impair or affect the rights of any beneficiary under any Prepetition Letter of Credit. | |
| | | Allowed L/C Lender Claims or any portion thereof that are not liquidated prior to the occurrence of the Maturity Date of the Term Loan Credit Agreement shall be extinguished, and any outstanding Prepetition Letters of Credit at that time shall be cancelled and replaced by the Reorganized Debtors as and to the extent necessary in accordance with their business judgment. | |
| 4(a)-(l) | Other Secured Claims | Claims in these Classes are Unimpaired. Each Allowed Other Secured Claim, including secured tax claims, shall be reinstated or otherwise rendered unimpaired as of the Effective Date, and Liens related thereto shall remain in effect. Allowed secured tax claims may be treated in accordance with the terms set forth in section 1129(a)(9)(D) of the Bankruptcy Code, with the Effective Date as the commencement date of the five year period, and any interest required to be paid on Allowed secured tax claims will be paid in accordance with section 511 of the Bankruptcy Code. If the Reorganized Debtors substantially default on the payment of a tax due to the Internal Revenue Service under the Plan, the entire tax debt owed to the Internal Revenue Service shall become due and payable immediately, and the Internal Revenue Service may collect these unpaid tax liabilities through the administrative collection provisions of the Internal Revenue Code. If the Reorganized Debtors substantially default on the payment of a tax due to state or local taxing authorities under the Plan, the entire tax debt owed to such taxing authority shall become due and payable immediately, and the taxing authority may collect these unpaid tax liabilities in accordance with applicable state law remedies. | 100% |
| 5(a)-(l) | L/C General Unsecured Claims | Claims in these Class are Unimpaired. Except to the extent that a Holder of an L/C General Unsecured Claim agrees to a less favorable treatment, each L/C General Unsecured Claim shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the L/C General Unsecured Claim, whether no existing or hereafter arising. | 100% |
| 6(a) | General Unsecured Claims against BMHC | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against BMHC shall receive its Pro Rata share of the BMHC Unsecured Distribution. The BMHC Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against BMHC bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against BMHC shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small | 4.4% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(b) | General Unsecured Claims against BMC West | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against BMC West shall receive its Pro Rata share of the BMC West Unsecured Distribution. The BMC West Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against BMC West bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against BMC West shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 6(c) | General Unsecured Claims against SelectBuild Construction | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Construction shall receive its Pro Rata share of the SelectBuild Construction Unsecured Distribution. The SelectBuild Construction Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Construction bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Construction shall be entitled, by exercise of | 4.4% |

DB02:8855143.1

068301.1001

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(d) | General Unsecured Claims against SelectBuild Northern California | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Northern California shall receive its Pro Rata share of the SelectBuild Northern California Unsecured Distribution. The SelectBuild Northern California Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Northern California bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Northern California shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 6(e) | General Unsecured Claims against Illinois Framing | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against Illinois Framing shall receive its Pro Rata share of the Illinois Framing Unsecured Distribution. The Illinois Framing Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against Illinois Faming bears to the aggregate amount of | 4.4% |

DB02:8855143.1

068301.1001

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against Illinois Framing shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(f) | General Unsecured Claims against C Construction | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against C Construction shall receive its Pro Rata share of the C Construction Unsecured Distribution. The C Construction Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against C Construction bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against C Construction shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 6(g) | General Unsecured Claims against TWF Construction | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against TWF Construction shall receive its Pro Rata share of the TWF Construction Unsecured Distribution. The TWF Construction Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio | 4.4% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | (expressed as a percentage) that the amount of Allowed General Unsecured Claims against TWF Construction bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against TWF Construction shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan.. | |
| 6(h) | General Unsecured Claims against SelectBuild H.N.R. Framing Systems | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against H.N.R. Framing Systems shall receive its Pro Rata share of the H.N.R. Framing Systems Unsecured Distribution. The H.N.R. Framing Systems Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against H.N.R. Framing Systems bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against H.N.R. Framing Systems shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 6(i) | General Unsecured Claims against SelectBuild Southern | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Southern California shall receive its Pro Rata share of the SelectBuild Southern California Unsecured Distribution. The | 4.4% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|-----------------------------|----------------------------------|
| | California | SelectBuild Southern California Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Southern California bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Southern California shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | |
| 6(j) | General Unsecured Claims against SelectBuild Nevada | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Nevada shall receive its Pro Rata share of the SelectBuild Nevada Unsecured Distribution. The SelectBuild Nevada Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Nevada bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Nevada shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |
| 6(k) | General Unsecured | Claims in this Class are Impaired. On the Distribution Date, each | 4.4% |

DB02:8855143.1

068301.1001

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|----------------------------|----------------------------------|
|  | Claims against SelectBuild Arizona | Holder of an Allowed General Unsecured Claim against SelectBuild Arizona shall receive its Pro Rata share of the SelectBuild Arizona Unsecured Distribution. The SelectBuild Arizona Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Arizona bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Arizona shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. |  |
| 6(l) | General Unsecured Claims against SelectBuild Illinois | Claims in this Class are Impaired. On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Illinois shall receive its Pro Rata share of the SelectBuild Illinois Unsecured Distribution. The SelectBuild Illinois Unsecured Distribution means a distribution from available, unreserved cash in the Unsecured Cash Fund equal to the ratio (expressed as a percentage) that the amount of Allowed General Unsecured Claims against SelectBuild Illinois bears to the aggregate amount of all Allowed General Unsecured Claims. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Illinois shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Claim and receive the treatment specified in section 4.8 of the Plan. | 4.4% |

DB02:8855143.1

068301.1001

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 7(a)-(l) | Intercompany Claims | Except as provided in section 5.5.2 of the Plan, Claims in these Classes are Unimpaired. Except as provided in section 5.5.2 of the Plan, to preserve the Debtors' corporate structure, Intercompany Claims may be reinstated as of the Effective Date or, at the Debtors' or Reorganized Debtors' option, be cancelled, and no distributions shall be made on account of such Claims. | 100% |
| 8(a)-(l) | Small Unsecured Claims | Claims in these Classes are Impaired. On the Distribution Date, each Holder of a Small Unsecured Claim shall receive, in full satisfaction, release and discharge of and in exchange for all Allowed General Unsecured claims held by such Holder against all Debtors, Cash equal to the lesser of (i) 25% of the Allowed Amount of all Allowed General Unsecured Claims held by such Holder against all Debtors (excluding any interest) or (ii) $1,250; *provided, however*, that the Small Unsecured Claims Class Election shall only be effective upon the Confirmation Order and the occurrence of the Effective Date; provided, further, however, that the aggregate payments to Holders of Allowed Small Unsecured Claims shall not exceed $700,000 and payment to each Holder of an Allowed Small Unsecured Claim shall be reduced proportionately to the extent aggregate payments would otherwise exceed $700,000. | 25% |
| 9(a) | Interests in BMHC | Interests in this Class are Impaired. All Interests in BMHC shall be cancelled without further distribution. | NA |
| 9(b)-(l) | Other Interests | Except as provided in section 5.5.2 of the Plan, Interests in these Classes are Unimpaired. Except as provided in section 5.5.2 of the Plan, Intercompany Interests in each of BMC West, SelectBuild Construction, SelectBuild Northern California, Illinois Framing, C Construction, TWF Construction, H.N.R. Framing Systems, SelectBuild Southern California, SelectBuild Nevada, SelectBuild Arizona and SelectBuild Illinois shall be reinstated for the benefit of the Holders thereof. | NA |
| 10(a)-(l) | Section 510(b) Claims | Claims in these Classes are Impaired. All Section 510(b) Claims shall be cancelled and discharged without further distribution. | 0% |

3.      **Effect of Non-Voting; Modifications.**

At the Confirmation Hearing, the Debtors will seek a ruling that if no Holder of a Claim or Interest eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan will be deemed accepted by the Holders of such Claims or Interests in such Class for the purposes of section 1129(b) of the Bankruptcy Code. Subject to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to modify the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, provided such modifications are consistent with Section 12.5 of the Plan.

4.      **Classification and Treatment of Claims and Interests**

To the extent a Class contains Allowed Claims or Allowed Interests with respect to the Debtors, the treatment provided to each Class for distribution purposes is specified below:

a.      **Treatment of Classes 1(a)-(l) – Other Priority Claims.**

*Impairment and Voting.* Classes 1(a)-(l) are Unimpaired by the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Treatment.* On the Distribution Date, each Holder of an Allowed Other Priority Claim shall receive in full satisfaction, release, and discharge of and in exchange for such Claim: (i) payment of Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim, or (ii) such other treatment that the Debtors and such Holder shall have agreed upon in writing; *provided, however,* that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (i).

b.      **Treatment of Classes 2(a)-(l) – Funded Lender Claims.**

*Impairment and Voting.* Classes 2(a)-(l) are Impaired by the Plan. Each Holder of an Allowed Funded Lender Claim as of the Record Date is entitled to vote to accept or reject the Plan.

*Treatment.* Each Holder of an Allowed Funded Lender Claim shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive (i) the Funded Lender's Share of Sale Cash Collateral Excess Proceeds Account Effective Date Amount as to such Claim, (ii) a Term Note issued by Reorganized BMHC under the Term Loan Credit Agreement in an original principal amount equal to the Maximum Funded Lenders Term Note Cap multiplied by such Holder's Pro Rata share of all Allowed Funded Lender Claims, and (iii) its Pro Rata share of the Reorganized BMHC Equity Interest Funded Lender Issuance, subject to dilution by (a) any Reorganized BMHC Equity Interests issued on the Effective Date and from time to time thereafter to the Holders of Allowed L/C Lender Claims and (b) any Reorganized BMHC Equity Interests issued after the Effective Date in respect of the Long Term Incentive Plan. In the event that section 5.5.2 of the Plan is applicable, each Holder of an Allowed Funded Lender Claim shall be deemed to be distributed its Pro Rata Share of the Reorganized Subsidiary Equity Interests, and to have contributed such Reorganized Subsidiary Equity Interests to the applicable Holders of Equity Interests in Classes 9(b)-9(l) as provided in such section 5.5.2.

c.      **Treatment of Classes 3(a)-(l) – L/C Lender Claims.**

*Impairment and Voting.* Classes 3(a)-(l) are Impaired by the Plan. Each Holder of an Allowed L/C Lender Claim as of the Record Date is entitled to vote to accept or reject the Plan.

*Treatment.* Allowed L/C Lender Claims shall be treated as follows:

1.      From and after the Effective Date, obligations of the Prepetition L/C Lenders (whether WFB, as the letter of credit issuer under the Prepetition Credit Agreement, or the Prepetition Revolving Lenders in respect of their several reimbursement obligations to WFB arising under the Prepetition Credit Agreement) shall continue to be governed by the lender reimbursement provisions of the Prepetition Credit Agreement. Reorganized BMHC shall have no obligations whatsoever in respect of the letter of credit reimbursement obligations arising in respect of the Prepetition Letters of Credit, except (a) the Holders of Allowed L/C Lender Claims shall be entitled to the L/C Lender Fee and (b) as expressly set forth in Section 4.3.2.2 of the Plan. All Liens with respect to the Prepetition Credit Agreement shall be released, discharged and extinguished.

2.      To the extent any Allowed L/C Lender Claim is liquidated on or after the Petition Date, each Holder of an Allowed L/C Lender Claim shall, in full satisfaction, release, and discharge of and in exchange for the Liquidated L/C Amount of such Claim, receive the following on the Effective Date and thereafter from time to time if, as and when Allowed L/C Lender Claims are liquidated:

(A)      a Term Note issued by Reorganized BMHC under the Term Loan Credit Agreement in an original principal amount equal to the Maximum L/C Lenders Term Note Cap multiplied by the ratio (expressed as a percentage) that such Liquidated L/C Amount of such Claim bears to the aggregate amount of all Allowed L/C Lender Claims; and

(B)      with respect to any Allowed L/C Lender Claim liquidated from and after the Petition Date through the Effective Date, its Pro Rata Share of the Reorganized BMHC Equity Interest L/C Lender Issuance, subject to dilution by (a) the Reorganized BMHC Equity Interests issued on the Effective Date to the Holders of Allowed Funded Lender Claims, (b) any Reorganized BMHC Equity Interests issued from time to time after the Effective Date to the Holders of Allowed L/C Lender Claims and (c) any Reorganized BMHC Equity Interests issued after the Effective Date in respect of the Long Term Incentive Plan; and

(C)      with respect to any Allowed L/C Lender Claim liquidated after the Effective Date, an amount of the Reorganized BMHC Equity Interests, rounded to the nearest whole number, equal to the Liquidated L/C Amount of such Claim multiplied by the L/C Lender Claim Equity Conversion Ratio, subject to dilution by any Reorganized BMHC Equity Interests issued after the Effective Date in respect of the Long Term Incentive Plan; and

(D)      On the Effective Date only, the L/C Lender's Share of the Sale Cash Collateral Excess Proceeds Account Effective Date Amount as to such Liquidated L/C Amount of such Claim on the Effective Date.

3.      *WFB Reimbursement Rights*.  If, and only to the extent, a Prepetition L/C Lender fails to reimburse in full WFB in respect of its reimbursement obligation to WFB arising under the Prepetition Credit Agreement, WFB shall be entitled to receive the distribution described in Section 4.3.2.2 of the Plan which would otherwise be payable to such defaulting Prepetition L/C Lender.

4.      *Prepetition Letters of Credit*.  Prepetition Letters of Credit shall not be used by the Reorganized Debtors to collateralize obligations that do not exist as of the Effective Date; *provided, however,* that notwithstanding the foregoing, Prepetition Letters of Credit shall continue to collateralize all obligations under Insurance Policies and Agreements and/or performance bonds (and any agreements, documents or instruments relating thereto) secured by such Prepetition Letters of Credit, whether such obligations exist as of the Effective Date or arise thereafter; and such Prepetition Letters of Credit and obligations shall survive the Effective Date unaffected and unaltered by the Plan.  No issuer of Prepetition Letters of Credit shall have any obligation to renew a Prepetition Letter of Credit for a period beyond the Maturity Date under the Term Loan Credit Agreement (as such term is defined therein); provided that this sentence shall not impair or affect the rights of any beneficiary under any Prepetition Letter of Credit.

5.      *L/C Lender Claims Not Liquidated Prior to Maturity Date of the Term Loan Credit Agreement*.  Allowed L/C Lender Claims or any portion thereof that are not liquidated prior to the occurrence of the Maturity Date of the Term Loan Credit Agreement shall be extinguished, and any outstanding Prepetition Letters of Credit at that time shall be cancelled and replaced by the Reorganized Debtors as and to the extent necessary in accordance with their business judgment.

d.      **Treatment of Classes 4(a)-(l) – Other Secured Claims.**

*Impairment and Voting.*  Classes 4(a)-(l) are Unimpaired by the Plan.  Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Treatment.*  Except to the extent that a Holder of an Other Secured Claim, including a secured tax claim, agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of and in exchange for each Other Secured Claim, each Allowed Other Secured Claim shall be reinstated or otherwise rendered Unimpaired, and Liens related thereto shall remain in effect.  Allowed secured tax claims may be treated in accordance with the terms set forth in section 1129(a)(9)(D) of the Bankruptcy Code, with the Effective Date as the commencement date of the five year period, and any interest required to be paid on allowed secured tax claims will be paid in accordance with section 511 of the Bankruptcy Code.  If the Reorganized Debtors substantially default on the payment of a tax due to the Internal Revenue Service under the Plan, the entire tax debt owed to the Internal Revenue Service shall become due and payable immediately, and the Internal Revenue Service may collect these unpaid tax liabilities through the administrative collection provisions of the Internal Revenue Code.  If the Reorganized Debtors substantially default on the payment of a tax due to state or local taxing authorities under the Plan, the entire tax debt owed to such taxing authority shall become due and payable immediately, and the taxing authority may collect these unpaid tax liabilities in accordance with applicable state law remedies.

e.    **Treatment of Classes 5(a)-(l) –L/C General Unsecured Claims.**

*Impairment and Voting.*  Classes 5(a)-(l) are Unimpaired by the Plan.  Each Holder of an Allowed L/C General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Treatment.*  Except to the extent that a Holder of an L/C General Unsecured Claim agrees to a less favorable treatment, each L/C General Unsecured Claim shall be reinstated, paid in full or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the L/C General Unsecured Claim, whether now existing or hereafter arising.

f.    **Treatment of Classes 6(a)-(l): General Unsecured Claims.**

*Impairment and Voting.*  Classes 6(a)-(l) are Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim as of the Record Date is entitled to vote to accept or reject the Plan.

*Treatment.*

*Class 6(a).*  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against BMHC shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the BMHC Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against BMHC shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(b).*  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against BMC West shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the BMC West Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against BMC West shall be entitled, by exercise of the election set forth on the Ballot with respect to such Allowed General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claims against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(c).*  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Construction shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the SelectBuild Construction Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Construction shall be entitled, by exercise of the election set forth on the Ballot with respect to such Allowed General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement

to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(d)*.  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Northern California shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the SelectBuild Northern California Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Northern California shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(e)*.  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against Illinois Framing shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the Illinois Framing Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against Illinois Framing shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(f)*.  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against C Construction shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the C Construction Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against C Construction shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(g)*.  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against TWF Construction shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the TWF Construction Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against TWF Construction shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(h)*.  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against H.N.R. Framing Systems shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the H.N.R. Framing Systems Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against H.N.R. Framing Systems shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(i)*.  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Southern California shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the SelectBuild Southern California Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Southern California shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(j)*.  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Nevada shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the SelectBuild Nevada Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Nevada shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

*Class 6(k)*.  On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Arizona shall, in full satisfaction, release, and discharge of and in exchange for such Claim, receive its Pro Rata share of the SelectBuild Arizona Unsecured Distribution.  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Arizona shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election.  Making the Small Unsecured Claims Class Election is Voluntary.  By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000.  Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

***Class 6(l).*** On the Distribution Date, each Holder of an Allowed General Unsecured Claim against SelectBuild Illinois shall, in full satisfaction, release, and discharge of such Claim, receive its Pro Rata share of the SelectBuild Illinois Unsecured Distribution. Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim against SelectBuild Illinois shall be entitled, by exercise of the election set forth on the Ballot with respect to such General Unsecured Claim, to make the Small Unsecured Claims Class Election. Making the Small Unsecured Claims Class Election is Voluntary. By making the Small Unsecured Claims Class Election for any Allowed General Unsecured Claim against any Debtor, such Holder will be deemed to have made such Election with respect to all Allowed General Unsecured Claims held by such Holder against all Debtors and to have agreed to reduce the amount of its aggregate General Unsecured Claims against all Debtors to the lesser of (a) the amount of such aggregate claims or (b) $5,000. Making the Small Unsecured Claims Class Election shall constitute an acceptance of the Plan and will indicate the Holder's agreement to waive Class 6 treatment; instead, such Holder shall have a Class 8 Small Unsecured Claim and receive the treatment specified in section 4.8 of the Plan.

g. **Treatment of Classes 7(a)-(l) – Intercompany Claims.**

*Impairment and Voting.* Except as provided in section 5.5.2 of the Plan, Classes 7(a)-(l) are Unimpaired by the Plan. Each Holder of an Allowed Intercompany Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Treatment.* Except as provided in section 5.5.2 of the Plan, to preserve the Debtor's corporate structure, Intercompany Claims may be reinstated as of the Effective Date or, at the Debtors' or Reorganized Debtors' option, be cancelled and no distributions shall be made on account of such Claims.

h. **Treatment of Classes 8(a)-(l) – Small Unsecured Claims.**

*Impairment and Voting.* Classes 8(a)-(l) are Impaired by the Plan. Each Holder of a Small Unsecured Claim as of the Record Date is entitled to vote to accept or reject the Plan.

*Treatment.* On the Distribution Date, each Holder of a Small Unsecured Claim shall receive, in full satisfaction, release, and discharge of and in exchange for all Allowed General Unsecured Claims held by such Holder against all Debtors, Cash equal to the lesser of (i) 25% of the Allowed Amount of all Allowed General Unsecured Claims held by such Holder against all Debtors (excluding any interest) or (ii) $1,250; *provided, however,* that the Small Unsecured Claims Class Election shall only be effective upon entry of the Confirmation Order and the occurrence of the Effective Date; provided, further, however, that the aggregate payments to Holders of Allowed Small Unsecured Claims shall not exceed $700,000 and payment to each Holder of an Allowed Small Unsecured Claim shall be reduced proportionately to the extent aggregate payments would otherwise exceed $700,000.

i. **Treatment of Class 9(a) – Interests in BMHC.**

*Impairment and Voting.* Class 9(a) is Impaired by the Plan. Each Holder of an Interest in BMHC is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

*Treatment.* On the Effective Date, all Interests in BMHC shall be cancelled without further distribution.

j. **Treatment of Classes 9(b)-(l) – Other Interests.**

*Impairment and Voting.* Except as provided in section 5.5.2 of the Plan, Classes 9(b)-(l) are Unimpaired by the Plan. Each Holder of an Intercompany Interest in any BMC West, SelectBuild Construction, SelectBuild Northern California, Illinois Framing, C Construction, TWF Construction, H.N.R. Framing Systems, SelectBuild Southern California, SelectBuild Nevada, SelectBuild Arizona and/or SelectBuild Illinois is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Treatment.* Except as provided in section 5.5.2 of the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Intercompany Interest, Intercompany Interests in each of BMC West, SelectBuild Construction, SelectBuild Northern California, Illinois Framing, C Construction, TWF Construction, H.N.R. Framing Systems, SelectBuild Southern California, SelectBuild Nevada, SelectBuild Arizona and SelectBuild Illinois shall be reinstated for the benefit of the Holders thereof.

### k. Treatment of Classes 10(a)-(l) – Section 510(b) Claims.

*Impairment and Voting.* Classes 10(a)-(l) are Impaired by the Plan. Each Holder of a Section 510(b) claim is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

*Treatment.* On the Effective Date, all Section 510(b) Claims shall be cancelled and discharged without any distribution.

## C. DISCLAIMER GOVERNING UNIMPAIRED CLAIMS

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Company's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## D. ACCEPTANCE OR REJECTION OF THE PLAN

### 1. Voting Classes

Classes 2(a)-(l), 3(a)-(l), 6(a)-(l), and 8(a)-(l) are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 2. Presumed Acceptance of the Plan

Classes 1(a)-(l), 4(a)-(l), 5(a)-(l), 7(a)-(l) and 9(b)-(l) are Unimpaired under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code the Holders of Claims and Interests in such Classes are conclusively presumed to have accepted the Plan and are therefore not entitled to vote to accept or reject the Plan.

### 3. Presumed Rejection of the Plan

Classes 7(a)-(l), 9(a) and 10(a)-(l) are Impaired under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code the Holders of Claims and Interests in such Classes are deemed not to have accepted the Plan and are therefore not entitled to vote to accept or reject the Plan.

## E. CONFIRMATION PURSUANT TO SECTIONS 1129(A)(8) AND/OR (10) AND 1129(B) OF THE BANKRUPTCY CODE

The Debtors shall tabulate all votes on the Plan on a non-consolidated basis for purposes of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code. If no Impaired Classes accept the Plan with respect to each Debtor, the Debtors may modify the Plan to appropriately address the rights of the Holders of Allowed Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

## F. NON-CONFIRMABILITY

If the Plan has not been accepted by the requisite majorities and the Debtors determine that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code, or if the Bankruptcy Court, upon consideration, declines to approve Confirmation of the Plan, the Debtors may in their sole discretion seek to either (i) propose a

new plan or plans of reorganization, (ii) seek to amend the current Plan to satisfy all objections, if any, or (iii) seek to convert or dismiss the Chapter 11 Cases.

Section 5.5.2 of the Plan provides that, notwithstanding the generality of the foregoing, in the event that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code because the Plan proposes that the Holders of Equity Interests in Classes 9(b)-9(l) are unimpaired, the Plan shall, automatically and without the need for further solicitation from any Class, be amended to eliminate any distributions on account of such Equity Interests, such Equity Interests shall be cancelled and the Reorganized Subsidiary Equity Interests shall be issued and deemed to be distributed to the Holders of Class 2(b)-2(l) Claims, as may be applicable, which Holders shall be deemed to contribute such Reorganized Subsidiary Equity Interests to the Holders of Equity Interests in Classes 9(b)-9(l), as may be applicable, subject to the Restructuring Transactions described in the Restructuring Transactions Memorandum. Section 5.5.2 of the Plan further provides that in the event that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code because the Plan proposes that Holders of Intercompany Claims in Classes 7(a)-7(l) are unimpaired, the Plan shall, automatically and without the need for further solicitation from any Class, be amended to eliminate any distributions on account of such Intercompany Claims and such Intercompany Claims shall be cancelled and discharged without any distribution.

### G.  CONTROVERSY CONCERNING IMPAIRMENT

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## VIII.  MEANS FOR IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF REORGANIZED DEBTORS

### A.  GENERAL SETTLEMENT OF CLAIMS Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. Subject to Article VIII of the Plan, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

### B.  SOURCES OF CONSIDERATION FOR PLAN DISTRIBUTIONS.

#### 1.  The Exit Credit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Credit Facilities consisting of the Exit Revolver and the Exit Term Loan. Confirmation shall be deemed approval of the Exit Revolver and the Exit Term Loan (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith) and authorization for the Reorganized Debtors to enter into and execute (i) the Exit Revolver documents, subject to such modifications as the Reorganized Debtors and the Exit Revolver Lenders may deem to be reasonably necessary to consummate such Exit Revolver; and (ii) the Exit Term Loan Documents, subject to such modifications as the Reorganized Debtors and the Exit Term Loan Lenders may deem to be reasonably necessary to consummate such Exit Term Loan. Proceeds from the Exit Credit Facilities shall be used by the Reorganized Debtors to (i) pay in full in Cash all non-contingent obligations under the DIP Facility, (ii) fund exit costs, including, without limitation, the funding of (a) the Cash Claims Reserve, (b) the Allowed Professional Compensation Claims, and (c) the cash component of the Unsecured Cash Fund, and (iii) fund general working capital requirements of the Reorganized Debtors. Additionally, the Exit Revolver may be used for the issuance of letters of credit and the replacement of the then outstanding letters of credit issued under the DIP Facility.

The Exit Credit Facilities shall mature on the third anniversary of its effective date. The Exit Credit Facilities shall be secured by a first priority lien on all or substantially all assets of the Reorganized Debtors.

A copy of a term sheet with respect to the Exit Credit Facilities is attached hereto as Exhibit J.

2. **The Term Loan Credit Agreement.**

On the Effective Date, the Reorganized Debtors shall enter into the Term Loan Credit Agreement. Confirmation shall be deemed approval of the Term Loan Credit Agreement (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith) and authorization for the Reorganized Debtors to enter into and execute the Term Loan Credit Agreement documents, subject to such modifications as the Reorganized Debtors and the Term Loan Lenders may deem to be reasonably necessary to consummate such Term Loan Credit Agreement. The Term Notes shall be issued to the Holders of Allowed Funded Lender Claims and L/C Lender Claims as provided in Sections 4.2 and 4.3 of the Plan.

Holders of the Term Notes shall be entitled to receive, among other things, an amount equal to 100% of the Excess Cash Flow, determined on an annual basis upon delivery of audited financial statements by Reorganized BMHC. All persons receiving Term Notes pursuant to the Plan are, by their acceptance of such Notes, deemed to be parties to and bound by the Term Loan Credit Agreement and all documents related thereto, including but not limited to the Intercreditor Agreement.

A copy of a term sheet with respect to the Term Loan Credit Agreement is attached hereto as Exhibit I.

3. **Issuance of Reorganized BMHC Equity Interests.**

On the Effective Date, Reorganized BMHC will emerge from chapter 11 as a private company and 100% of the Reorganized BMHC Equity Interests shall be owned by the Holders of Prepetition Funded Lender Claims. The ownership interest is subject to dilution in connection with the Long Term Incentive Plan and to the extent that Prepetition Letters of Credit are drawn after the Petition Date. The issuance of the Reorganized BMHC Equity Interests, including Reorganized BMHC Equity Interests issuable in respect of the L/C Lender Equity Reserve and for options, or other equity awards, if any, in respect of the Long Term Incentive Plan, by Reorganized BMHC shall be authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. An unlimited number of common shares shall be authorized under the New Certificate of Incorporation of Reorganized BMHC. The Reorganized BMHC Equity Interests, less reserves for the L/C Lender Equity Reserve and for options, or other equity reserves, if any, in respect of the Long Term Incentive Plan, will be issued (i) to Holders of Allowed Funded Lender Claims on the Effective Date and (ii), if applicable, and as and to the extent provided in Section 4.3 of the Plan, to Holders of Allowed L/C Lender Claims on the Effective Date and from time to time thereafter.

All of the shares of Reorganized BMHC Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person receiving such distributions or issuance.

The Reorganized BMHC Equity Interest Effective Date Issuance shall be subject to adjustment in the reasonable discretion of Reorganized BMHC to effectuate the terms of the Plan. Shares of Reorganized BMHC Equity Interests issuable to Holders of Allowed L/C Lender Claims from time to time after the Effective Date pursuant to Section 4.3.2.2 of the Plan shall be subject to adjustment from time to time for any stock splits, stock dividends, reverse stock splits, reclassifications and the like occurring after the Effective Date in respect of the Reorganized BMHC Equity Interests occurring after the Effective Date.

Upon the Effective Date, in the event that Reorganized BMHC determines that a Shareholder Agreement is advisable, then Reorganized BMHC shall enter into such agreement with each Person that is to be a counter-party thereto and such agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms. All persons receiving Reorganized BMHC Equity Interests pursuant to the Plan are, by their acceptance of such BMHC Equity Interests, deemed to be parties to and bound by the Shareholder Agreement and all documents related thereto.

**4.      Avoidance Actions.**

Avoidance Actions are expressly preserved and shall vest in the applicable Reorganized Debtor on the Effective Date. For business reasons, at this time the Debtors do not believe it would be prudent to pursue such avoidance actions as the target of such actions would necessarily include the Debtors' trade vendors and/or customers.

**5.      Unsecured Cash Fund.**

On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Debtors shall transfer, from the proceeds of the Exit Credit Facility, or from other cash available to the Debtors and the Reorganized Debtors, $2,000,000 to fund the Unsecured Cash Fund in a separate account.

**C.      RULE 2004 EXAMINATIONS.**

The power of the Debtors to conduct examinations pursuant to Bankruptcy Rule 2004 shall be expressly preserved following the Effective Date.

**D.      CONTINUED CORPORATE EXISTENCE.**

Except as provided in the Plan, each Debtor will continue to exist on or after the Effective Date as a separate corporate entity, with all the powers of a corporation or limited liability company, as the case may be, under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution, or otherwise) under applicable law.

**E.      REVESTING OF ASSETS.**

Except as expressly provided in the Plan, the Assets of each Debtor's Estate shall revest with the respective Reorganized Debtor on the Effective Date. The Bankruptcy Court shall retain jurisdiction to determine disputes as to property interests created or vested by the Plan. From and after the Effective Date, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, except as provided in the Plan. As of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims and Interests, except as, and to the extent, provided in the Plan.

**F.      MERGER.**

On the Effective Date, the Reorganized Debtors may: (i) effectuate the transactions described in the Restructuring Transactions Memorandum, if any; (ii) merge, dissolve, transfer assets, or otherwise consolidate any of the Debtors in furtherance of the Plan or (iii) engage in any other transaction in furtherance of the Plan. Any such transaction may be effected on or subsequent to the Effective Date without any further action by Holders of Interests or the directors of any of the Debtors.

**G.      CANCELLATION OF SECURITIES AND AGREEMENTS.**

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under the Prepetition Credit Agreement, DIP Facility, and any other Certificate, Equity Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Security (except such Certificates, notes, or other instruments or document evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and their affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such

agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided, however*, that notwithstanding Confirmation or consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; *provided, further, however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors; and *provided, further, however*, that the foregoing shall not effect the cancellation of the Reorganized BMHC Equity Interests issued pursuant to the Plan in Reorganized BMHC, nor any other shares held by one Debtor in another Debtor, except in connection with any Restructuring Transactions implemented by the Reorganized Debtors.

**H.    REORGANIZED BMHC.**

On the Effective Date, the New Board of Reorganized BMHC shall be established and Reorganized BMHC shall adopt its New Bylaws. As soon after the Effective Date as reasonably practicable, Reorganized BMHC shall adopt the Long Term Incentive Plan. Reorganized BMHC shall be authorized to adopt any other agreements, documents, and instruments and to take any other action contemplated by the Plan as necessary and desirable to consummate the Plan.

**I.    POST EFFECTIVE DATE MANAGEMENT.**

Except as expressly provided in the Plan and the Debtors' certificate of incorporation and the New Certificates of Incorporation, which may be amended from time to time, the operation, management, and control of the Reorganized Debtors shall be the general responsibility of its board of directors or managers and senior officers, which shall thereafter have the responsibility for the management, control, and operation of the Reorganized Debtors. Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtors from the Petition Date through and until the Effective Date.

**J.    DIRECTORS AND OFFICERS OF THE REORGANIZED DEBTORS.**

On and after the Effective Date, the business and affairs of the Reorganized Debtors will be managed by the new boards and the officers, directors or managers identified in the Plan Supplement. Biographical information regarding these proposed officers, directors, and managers will be set forth in the Plan Supplement. A schedule of the annual compensation to be paid to persons serving as executives, officers, and directors or managers as of the Effective Date will be set forth in the Plan Supplement.

**K.    NEW CERTIFICATES OF INCORPORATION AND NEW BYLAWS OF THE REORGANIZED DEBTORS.**

As of the Effective Date, the New Certificates of Incorporation and the New Bylaws will be substantially in the forms included in the Plan Supplement, with such changes as may be necessary to conform to the applicable laws of the state of incorporation. The New Certificates of Incorporation and New Bylaws, among other things, shall prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their New Certificates of Incorporation and New Bylaws, as permitted under applicable state laws, subject to the terms and conditions of such documents.

**L.    NEW EMPLOYMENT, RETIREMENT, INDEMNIFICATION, AND OTHER RELATED AGREEMENTS.**

As of the Effective Date, the Reorganized Debtors shall have the authority, as determined by its governing Persons, to: (i) maintain, amend, or revise existing employment, retirement, welfare, incentive, severance, indemnification, and other agreements with its active and retired directors or managers, officers, and employees, subject to the terms and conditions of any such agreement and applicable law; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification, and other agreements for active and retired employees.

## M.    EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS.

On and after the Effective Date, Reorganized BMHC and the other Reorganized Debtors, and the officers and members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of Reorganized BMHC and the other Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**N.     CORPORATE ACTION.** Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (i) the adoption or assumption, as applicable, of the agreements with existing management; (ii) the selection of the directors and officers for the Reorganized Debtors; (iii) the distribution of the Reorganized BMHC Equity Interests in accordance with the Plan; (iv) the execution and entry into the Exit Revolver, the Exit Term Loan and the Term Loan Credit Agreement; (v) the establishment of the Long Term Incentive Plan and the issuance of any Reorganized BMHC Equity Interests thereunder; and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Revolver, the Exit Term Loan and the Term Loan Credit Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated herein shall be effective notwithstanding any requirements under non-bankruptcy law. The issuance of the Reorganized BMHC Equity Interests shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of securities by an officer or director (or a director deputized for purposes thereof) as of the new Effective Date.

**O.     SECTION 1146 EXEMPTION.** Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**P.     PRESERVATION OF CAUSES OF ACTION.** In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against any Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

DB02:8855143.1

068301.1001

**Q.      INSURANCE POLICIES AND AGREEMENTS.** Notwithstanding anything in the Plan to the contrary (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release), Insurance Policies and Agreements are treated as Executory Contracts under the Plan; and all references to Executory Contracts shall include the Insurance Policies and Agreements.  On the Effective Date, the applicable Debtors that are parties to such Insurance Policies and Agreements and the applicable Reorganized Debtors shall be deemed to have assumed in accordance with section 365 of the Bankruptcy Code all such Insurance Policies and Agreements, and the applicable Reorganized Debtors shall remain liable for all obligations under the Insurance Policies and Agreements, whether now existing or hereafter arising, and shall pay such obligations in the ordinary course of business.  The applicable insurers shall be deemed to have consented to such assumption.  Nothing in the Plan:  (a) precludes or limits the rights of insurers to contest or litigate with any party, including, without limitation, the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy; (b) permits any holder of an Insured Claim to recover the same amounts from an insurer and any other party including, but not limited to, the Debtors (or after the Effective Date, the Reorganized Debtors); (c) alters an insurer's rights and obligations under its Insurance Policies and Agreements or modifies the coverage provided thereunder; (d) alters the rights and obligations of the Debtors (or after the Effective Date, the Reorganized Debtors) or insurers under the Insurance Policies and Agreements including, without limitation, any duty of the Debtors' to defend, at their own expense, against claims asserted under the Insurance Policies and Agreements; (e) discharges, releases or relieves the Debtors or Reorganized Debtors, after the Effective Date, from any debt or other liability under the Insurance Policies and Agreements; or (f) limits, diminishes, or otherwise alters or impairs the Debtors', Reorganized Debtors' and/or an insurer's defenses, claims, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Insurance Policies and Agreements.  If an insurer objects to the proposed assumption of its Insurance Policies and Agreements, or any of them, or the proposed Cure Claim related thereto, the insurer must comply with the objection procedure specified in section 6.4 of the Plan and the Disclosure Statement Approval Order.  The Debtors do not expect there to be any material Cure Claims related to Insurance Policies and Agreements.

**R.      COLLECTIVE BARGAINING AGREEMENTS.**

All of the Debtors' Collective Bargaining Agreements are treated as Executory Contracts under the Plan. On the Effective Date, the applicable Debtors shall be deemed to have assumed all Collective Bargaining Agreements.

**S.      NON-OCCURRENCE OF EFFECTIVE DATE.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## IX.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      ASSUMPTION AND REJECTION OF CONTRACTS AND UNEXPIRED LEASES.** Except as otherwise provided in the Plan or pursuant to the Confirmation Order, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Person, including, but not limited to, all Intercompany Contracts, shall be assumed pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date, except for any such contract or lease (i) that has been assumed or rejected, or renegotiated and either assumed or rejected on renegotiated terms, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) that has been entered into by the Debtors during the pendency of the Chapter 11 Cases in the ordinary course of business or pursuant to an order of the Bankruptcy Court, (iii) that is the subject of a motion to reject, or a motion to approve renegotiated terms and to assume or reject on such renegotiated terms, that has been filed and served prior to the Effective Date, or (iv) that is identified on the Rejected Executory Contract and Unexpired Lease List; provided, however, that the applicable Debtors shall assume the Collective Bargaining Agreements on the Effective Date.  Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption of Executory Contracts and Unexpired Leases provided for herein.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court

authorizing and providing for its assumption under applicable federal law. All agreements that are rejected pursuant to the Rejected Executory Contract and Unexpired Lease List shall be rejected effective as of the date specified therein.

Notwithstanding anything in the Plan to the contrary, the applicable Debtors shall assume and adopt that certain BMHC-BMC West Vacation Policy 2009, which was in effect as of the Petition Date (the "Vacation Policy") and shall perform under the Vacation Policy in the ordinary course of business. All other agreements, plans or policies relating to vacation or personal time off, including agreements, plans or policies of Subsidiary Debtors that have been in effect from time to time and any contractual commitments or accepted offers of employment that contain more favorable vacation or personal time off terms than the Vacation Policy, shall be rejected effective as of the Confirmation Date.

**B.      CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED**

**LEASES.** All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, including with respect to rejected vacation and/or paid time off programs or agreements, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with the Plan.

**C.      CURE OF DEFAULTS.**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (i) the Cure Claim, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the payments required by section 365(b)(1) of the Bankruptcy Code in respect of Cure Claims shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 20 days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed Cure Claims to be sent to applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed and served in accordance with, and otherwise comply with, the provisions of the Disclosure Statement/Voting Procedures Approval Order related to assumption of Executory Contracts and Unexpired Leases. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption and Cure Claim. If an objection to a proposed Cure Claim is sustained by the Bankruptcy Court, the Reorganized Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**D.      CONTRACTS AND LEASES ENTERED INTO AFTER THE PETITION DATE.**

Contracts and leases entered into during the Postpetition Period by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor

liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## E. MODIFICATIONS, AMENDMENTS, SUPPLEMENTS, RESTATEMENTS, OR OTHER AGREEMENTS.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to any prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## F. RESERVATION OF RIGHTS.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## X. PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS

## A. DISBURSING AGENT.

The Debtors shall act as the Disbursing Agent under the Plan with respect to distributions of Cash made on the Effective Date and the Reorganized Debtors shall act as the Disbursing Agent after the Effective Date. The Debtors and the Reorganized Debtors shall not be required to give any bond, surety or other security for the performance of duties as Disbursing Agent.

## B. DISTRIBUTION RECORD DATE.

For purposes of the Plan, as of the close of business on the Distribution Record Date, the records of ownership of Claims against the Debtors (including the claims register in the Chapter 11 Cases) will be closed. For purposes of the Plan, the Debtors, the Estates, and the Reorganized Debtors shall have no obligation to recognize the transfer of any of the Claims against the Debtors occurring after the Distribution Record Date, and shall be entitled for all purposes relating to the Plan to recognize and deal only with those Holders of record as of the close of business on the Distribution Record Date.

## C. CASH PAYMENTS.

Any Cash payments made pursuant to the Plan will be made in U.S. dollars. Cash payments made pursuant to the Plan in the form of a check shall be null and void if not cashed within 180 days of the date of issuance thereof.

## D.   DELIVERY OF DISTRIBUTIONS.

If the Distribution to any Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of such Holder. Undeliverable Distributions shall be held, subject, subject to Section 8.7 of the Plan.

## E.   MINIMUM CASH DISTRIBUTIONS.

No Cash payment less than fifty dollars shall be made to any Holder of a Claim unless a request therefor is made in writing to the Debtors.

## F.   WITHHOLDING TAXES.

The Disbursing Agent shall comply with all withholding, reporting, certification, and information requirements imposed by any federal, state, local, or foreign taxing authority and all distributions under the Plan shall, to the extent applicable, be subject to any such withholding, reporting, certification, and information requirements.

Persons entitled to receive distributions under the Plan shall, as a condition to receiving such distributions, provide such information and take such steps as the Disbursing Agent may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable the Disbursing Agent to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

Any Person that does not provide the Disbursing Agent with requisite information after the Disbursing Agent has made at least three attempts (by written notice or request for such information, including on the ballots in these Chapter 11 Cases) to obtain such information, may be deemed to have forfeited such Person's right to such distributions, which shall be treated as unclaimed property under Section 8.8 of the Plan.

## G.   UNCLAIMED PROPERTY.

Any Person that fails to claim any Distribution to be distributed under the Plan within one year from the initial date for such distribution shall forfeit all rights to any such distributions under the Plan. Upon such forfeiture of Cash or other property, such Cash or property shall be the property of the applicable Disbursing Agent. Nothing in the Plan shall require the Disbursing Agent to attempt to locate or notify any Person with respect to any forfeited property. Persons that fail to claim Cash or other property to be distributed under the Plan within such one-year period shall forfeit their rights thereto and shall have no claim whatsoever with respect thereto against the Debtors, their Estates, the Disbursing Agent, or any Holder of an Allowed Claim to which distributions are made.

## H.   RESERVE FOR DISPUTED GENERAL UNSECURED CLAIMS.

On the Effective Date, the Disbursing Agent shall establish, and maintain thereafter, a reserve from the Unsecured Cash Fund for the benefit of Holders of Disputed General Unsecured Claims. Such reserve shall consist of an amount of Cash equal to the amount that would be distributable to all Holders of such Disputed General Unsecured Claims, in respect of all distributions made to that date, if those Claims were Allowed in the Maximum Amount. In the event any such Disputed General Unsecured Claim becomes an Allowed Claim, the amount of such Allowed Claim shall never exceed the Maximum Amount of such Disputed General Unsecured Claim, and the Disbursing Agent shall distribute to the Holder of such Allowed Claim from the reserve the aggregate amount of Cash that such Holder would have received as of the date of such distribution in respect of such Allowed Claim had such Claim been an Allowed Claim as of the Effective Date. If a Disputed General Unsecured Claim is disallowed, the Cash reserved for such claim shall be distributed, on the next anniversary of the Effective Date (or as soon as practicable thereafter), to Holders of Allowed Claims in the applicable class.

## I. DISPUTED CLAIMS.

If the Debtors or any other party in interest disputes any Claim against the Debtors, such dispute shall be determined, resolved, or adjudicated, as the case may be, under applicable law by the Bankruptcy Court. Among other things, (i) the Debtors (on or before the Effective Date) and (ii) the Reorganized Debtors (after the Effective Date) may each elect, at their respective sole option, to object to or seek estimation under section 502 of the Bankruptcy Code with respect to any Proof of Claim filed by or on behalf of a Holder of a Claim against the Debtors.

## J. OBJECTIONS TO CLAIMS.

Unless a later or different time is set by Final Order or otherwise established by other provisions of the Plan, all objections to Claims must be filed by the Claims Objection Bar Date; provided, however, that no such objection may be filed against any Claim after the Bankruptcy Court has determined by entry of a Final Order that such Claim is an Allowed Claim. The failure by any party in interest, including the Debtors and the Committee, to object to any Claim, whether or not unpaid, for purposes of voting shall not be deemed a waiver of such party's or the Disbursing Agent's rights to object to, or re-examine, any such Claim in whole or in part. After the Effective Date, no party in interest shall have the right to object to Claims against the Debtors or their Estates other than the Reorganized Debtors.

## K. COMPROMISES AND SETTLEMENTS.

From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtors may compromise and settle Claims.

Prior to the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or other claims they may have against other Persons.

## L. NO DISTRIBUTIONS PENDING ALLOWANCE.

If a Claim or any portion of a Claim is disputed, no payment or Distribution will be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such Disputed Claim or portion thereof becomes an Allowed Claim.

## M. NO POSTPETITION INTEREST ON CLAIMS.

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

## N. CLAIMS PAID OR PAYABLE BY THIRD PARTIES.

### 1. Claims Paid by Third Parties.

The Debtors or the Disbursing Agent, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Disbursing Agent. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Disbursing Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Disbursing Agent, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall

result in the Holder owing the applicable Disbursing Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

### 2. Claims Payable by Third Parties.

Except with respect to payment of Insured Claims within the applicable deductible or self-insured retention under Insurance Policies and Agreements that are secured by Prepetition Letters of Credit, no Distributions under the Plan shall be made on account of an Insured Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such an Insured Claim has received proceeds, if any, of any applicable Insurance Policies and Agreements. To the extent that one or more of the Debtors' insurers agrees to settle or pay, in full or in part, an Insured Claim, then immediately upon such insurers' payment, the applicable portion of the Claim may be expunged without a Claims objection having to be Filed and without further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Applicability of Insurance Policies and Agreements.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims that are covered by the Debtors' Insurance Policies and Agreements shall be in accordance with the provisions of any applicable Insurance Policy and Agreement. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Person may hold against any other Person, including insurers under any Insurance Policies and Agreements, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights, claims or defenses, including coverage defenses, held by such insurers.

## XI. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A. DISCHARGE.

#### 1. Discharge of Claims Against the Debtors and the Reorganized Debtors.

Except as otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation of the Plan shall, as of the Effective Date: (i) discharge the Debtors, the Reorganized Debtors or any of its or their Assets from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code or (c) the Holder of a Claim based on such debt has accepted the Plan; and (ii) preclude all Persons from asserting against the Debtors, the Reorganized Debtors, or any of its or their Assets, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in the Plan shall void any judgment obtained against any of the Debtors at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

#### 2. Injunction Related to the Discharge.

Except as otherwise provided in the Plan or the Confirmation Order, all entities that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtors, or an Interest or other right of an Equity Security Holder in any or all of the Debtors, that are discharged pursuant to the terms of the Plan, are permanently enjoined, on and after the Effective Date, from taking any of the following actions on account of any such Claims, debts, liabilities or Interests or rights: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest, or right, other than to enforce any right to a Distribution pursuant to the Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or any of its or their Assets on account of any such Claim, debt, liability, Interest, or right; (iii) creating, perfecting, or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors, or any of its or their Assets on account of any such Claim, debt, liability, Interest or right; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability,

or obligation due to the Debtors, the Reorganized Debtors, or any of its or their Assets on account of any such Claim, debt, liability, Interest, or right; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction shall extend to any successor of the Debtors, the Reorganized Debtors, or any of its or their Assets. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

## B.    RELEASES.

### 1.    Releases by the Debtors.

As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, the Debtors in their individual capacity and as debtors in possession will be deemed to release and forever waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time up to immediately prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 2.    Certain Waivers.

Although the Debtors do not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, each Debtor hereby understands and waives the effect of Section 1542 of the California Civil Code to the extent that such section is applicable to the Debtors. Section 1542 of the California Civil Code provides:

§1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

EACH DEBTOR AGREES TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THE PLAN AND EACH DEBTOR HEREBY WAIVES AND RELEASES ALL RIGHTS AND BENEFITS WHICH IT MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS. TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, EACH DEBTOR WAIVES AND RELEASES ANY BENEFIT, RIGHT OR DEFENSE WHICH IT MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD

DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.

3.      Releases by Holders of Claims and Interests.

Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date of the Plan, each Holder of a Claim or an Interest, shall be deemed to have released and forever waived and discharged all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiations, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time up to immediately prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations (except Cure Claims that have not been filed timely) of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any obligation under any assumed contract or lease or any Prepetition Letter of Credit.

4.      Exculpation.

On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action, or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Debtors, the Estates, the Committee, WFB, the Prepetition Lenders, the DIP Lenders, and their respective officers, directors, employees, members, attorneys, crisis managers, financial advisors, and professionals, shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. No provision of the Plan, the Disclosure Statement, or the Confirmation Order shall be deemed to act upon or release any claims, Causes of Action or liabilities that the Debtors, the Estates, or any party in interest may have against or to any Person for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases, nor shall any provision of the Plan or the Confirmation Order be deemed to act to release any Avoidance Actions.

5.      Injunction Related to Releases.

To the fullest extent allowed by law, and except as otherwise provided in the Plan or the Confirmation Order, all Persons that have held, currently hold, or may hold claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities that are released or exculpated pursuant to Section 9.2.1, 9.2.2, 9.2.3, and 9.2.4 of the Plan shall be permanently enjoined, on and after the

Effective Date, from taking any of the following actions on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities: (i) commencing or continuing in any manner any action or other proceeding of any kind against a Released Party or Exculpated Party with respect to any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (iii) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction shall extend to any successor of any Released Party or any Exculpated Party or any of its or their assets. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

**C.      NO SUCCESSOR LIABILITY.**

Except as otherwise expressly provided in the Plan, none of the Released Parties shall be determined to be successors to any of the Debtors or to any Person for which the Debtors may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character. The Released Parties do not agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or the Reorganized Debtors, whether arising before, on, or after the Confirmation Date, except as otherwise expressly provided in the Plan.

**D.      RELEASE OF LIENS.**

Except as otherwise expressly provided in the Plan or in any contract, instrument, indenture, or other agreement or document expressly incorporated by reference in the Plan, the Confirmation Order will release any and all prepetition Liens against the Debtors, the Reorganized Debtors or any of their Assets.

**E.      TERM OF INJUNCTIONS.**

All injunctions or stays provided in, or in connection with, the Chapter 11 Cases, whether pursuant to section 105, section 362, or any other provision of the Bankruptcy Code, other applicable law or court order, in effect immediately prior to Confirmation will remain in full force and effect until such injunctions or stays become effective and shall remain in full force and effect thereafter if so provided in the Plan, the Confirmation Order or by their own terms. In addition, on and after Confirmation Date, the Debtors may seek further orders to preserve the status quo during the time between the Confirmation Date and the Effective Date.

**F.      BINDING EFFECT.**

The Plan shall be binding upon, and inure to the benefit of, the Debtors and all Holders of Claims and Interests, and their respective successors and assigns, whether or not the Claims and Interests of such Holders are Impaired under the Plan and whether or not such Holders have accepted the Plan.

**XII.   ALLOWANCE AND PAYMENT OF PROFESSIONAL COMPENSATION CLAIMS**

**A.      FINAL FEE APPLICATIONS.**

Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims, any Person asserting a Professional Compensation Claim shall, no later than 30 days after the Confirmation Date, file a final

application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date. To the extent that such an award is granted by the Bankruptcy Court, the requesting Person shall receive: (i) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases, such payment to be made within the later of (a) the Effective Date or (b) three (3) business days after the Order granting such Person's final fee application becoming a Final Order; (ii) payment on such other terms as may be mutually agreed upon by the Holder of the Professional Compensation Claim and BMHC or Reorganized BMHC, as applicable (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court); or (iii) payment in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court, including the Interim Compensation Order.

## B.      POST-CONFIRMATION DATE FEES AND EXPENSES

After the Confirmation Date, any requirement that Professionals employed by the Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate Professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

All Professional Compensation Claims for services rendered after the Confirmation Date, including those relating to prosecution of Causes of Action preserved under the Plan, shall be paid by Reorganized BMHC (or the Debtors prior to the Effective Date) upon receipt of an invoice therefor, or on such other terms as Reorganized BMHC (or the Debtors prior to the Effective Date) and the Professional shall agree to, without the requirement of a further Bankruptcy Court order.

## XIII.  CONDITIONS PRECEDENT TO CONSUMMATION

## A.      CONDITIONS PRECEDENT.

The Plan shall not become effective unless and until the following conditions have been satisfied:

**1.      Conditions to Confirmation.**

a.       Disclosure Statement. The Bankruptcy Court shall have approved this Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

b.       Plan Supplement. The Plan Documents to be provided in the Plan Supplement are in a form that is reasonably satisfactory to the Debtors and WFB as agent under the Exit Credit Facilities.

c.       Confirmation Order. The Confirmation Order must be in form and substance reasonably acceptable to the Debtors, and WFB as agent under the Exit Credit Facilities, and must provide for the confirmation of the Plan with respect to each Debtor.

**2.      Conditions to Effective Date.**

a.       Confirmation Order. At least 10 days shall have passed after the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and WFB as agent under the Exit Credit Facilities.

b.       No Stay of Confirmation. There shall not be in force any order, decree, or ruling of any court or governmental body having jurisdiction, restraining, enjoining, or staying the consummation of, or rendering illegal the transactions contemplated by, the Plan.

c.　　Receipt of Required Governmental Authorization.　All governmental authorizations, consents, and regulatory approvals (if any) necessary to effectuate the Plan shall have been obtained.

d.　　Exit Revolver.　The documents evidencing the Exit Revolver shall be in form and substance reasonably acceptable to the Debtors and the Exit Revolving Lenders, shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of such document shall have been satisfied or waived.

e.　　Term Loan Credit Agreement.　The documents evidencing the Term Loan Credit Agreement shall be in form and substance reasonably acceptable to the Debtors and the Exit Term Loan Lenders, shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived.

f.　　Plan Supplement.　All documents to be contained in the Plan Supplement shall be completed and in final form and, to the extent necessary, shall have been executed and delivered by the respective parties thereto.

g.　　Required Transactions.　All transactions required by the Plan have been completed to the reasonable satisfaction of the Debtors and WFB as agent under the Exit Credit Facilities.

h.　　IRS Tax Refund Claim.　The Internal Revenue Service's proofs of claim filed in the Chapter 11 Cases with respect to the Form 1139 Carryback Refunds that were received in 2009 shall either be withdrawn or disallowed.

i.　　Restructuring Transactions.　At the discretion of the Debtors and with the consent of WFB as agent under the Exit Credit Facilities (which consent shall not be unreasonably withheld), the Restructuring Transactions described in the Restructuring Transactions Memorandum have been completed to the reasonable satisfaction of the Debtors and WFB as agent under the Exit Credit Facilities.

j.　　Waiver.　Any of the conditions set forth in Sections 10.1.1 and 10.1.2 of the Plan may be waived by the party benefiting from such condition to the extent that such waiver does not affect the distributions hereunder.

**B.　EFFECT OF FAILURE OF CONDITIONS.**

In the event that the conditions specified in Section 10.1 of the Plan have not been satisfied or waived on or before 120 days after the Confirmation Date, then the Debtors may seek an order from the Bankruptcy Court vacating the Confirmation Order.　Such request shall be served upon counsel for the administrative agent under the Prepetition Credit Agreement, the administrative agent under the DIP Facility, the proposed administrative agent under the Revolving Credit Agreement, the Committee, and the U.S. Trustee. If the Confirmation Order is vacated, (i) the Plan shall be null and void in all respects; (ii) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (iii) the time within which the Debtors may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of 60 days after the date the Confirmation Order is vacated.

## XIV.　RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

1.　　allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of

any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

2.      hear and rule upon all Causes of Action retained by the Debtors and commenced and/or pursued by the Debtors or the Reorganized Debtors;

3.      resolve any matters related to the rejection, assumption, or assumption and assignment of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

4.      ensure that Distributions on account of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested, or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

7.      resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Person's rights arising from or obligations incurred in connection with the Plan or such documents;

8.      approve any modification of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

9.      hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 363, 503(b), 1103, and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtors, or the Reorganized Debtors, as applicable, only upon allowance thereof pursuant to the order of the Bankruptcy Court; provided, however, that the fees and expenses of the Debtors incurred after the Confirmation Date, including attorneys' fees, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation of the Plan, implementation, or enforcement of the Plan or the Confirmation Order;

11.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

12.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or if Distributions pursuant to the Plan are enjoined or stayed;

13.     determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement, or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

DB02:8855143.1                                                                      068301.1001

14.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

15.     hear and determine all matters related to (i) the property of the Debtors and the Estates from and after the Confirmation Date and (ii) the activities of the Debtors or the Reorganized Debtors; and

16.     hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code.

## XV.     MISCELLANEOUS PROVISIONS

### A.     PLAN SUPPLEMENT.

No later than 10 days prior to the Voting Deadline, the Debtors shall File with the Bankruptcy Court the Plan Supplement, which shall contain such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Debtors' counsel.

### B.     EXEMPTION FOR REGISTRATION REQUIREMENTS.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance and Distribution of any securities contemplated by the Plan shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution or sale of securities.  In addition, any securities contemplated by the Plan will be tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code; and (ii) the restrictions, if any, on the transferability of such securities and instruments.

### C.     STATUTORY FEES.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

### D.     THIRD PARTY AGREEMENTS.

The Distributions to the various Classes of Claims and Interests under the Plan shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise.  All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Plan.  Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.

### E.     AMENDMENT OR MODIFICATION OF PLAN.

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before Confirmation, *provided* that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Debtors may modify the Plan at any time after Confirmation and before consummation of the Plan, *provided* that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

DB02:8855143.1     068301.1001

## F. SEVERABILITY.

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, the Reorganized Debtors may, at their option, (a) treat such provision as invalid, void or unenforceable with respect to the Holder or Holders of such Claims or Interests that the provision is determined to be invalid, void or unenforceable, in which case such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan, or (b) alter, amend, revoke, or withdraw the Plan.

## G. REVOCATION OR WITHDRAWAL OF PLAN.

The Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing at any time prior to the occurrence of the Effective Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation does not occur, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall (A) constitute a waiver or release of any Claims by or against, or Interests in, such Debtors or any other Person, (B) prejudice in any manner the rights of such Debtors or any other Person, or (C) constitute an admission of any sort by the Debtors or any other Person.

For the avoidance of doubt, if the Confirmation Hearing is adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

## H. RULES GOVERNING CONFLICTS BETWEEN DOCUMENTS.

In the event of a conflict between the terms or provisions of the Plan and the Plan Documents, the terms of the Plan shall control over the Plan Documents. In the event of a conflict between the terms of the Plan or the Plan Documents, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order shall control. In the event of a conflict between the information contained in the Disclosure Statement and the Plan or any other Plan Document, the Plan or other Plan Document (as the case may be) will control.

## I. GOVERNING LAW.

Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its conflicts of law principles.

## J. NOTICES.

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid. If to the Debtors, any such notice shall be directed to the following at the addresses set forth below:

> Building Materials Holding Corporation
> 720 Park Boulevard, Suite 200
> Boise, Idaho 83712
> Attention: Paul Street

> -- with copies to --

> Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, New York 10166-0193
Attention: Michael A. Rosenthal and Matthew K. Kelsey

-- and --

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street
17th Floor
Wilmington, Delaware 19801
Attention: Sean M. Beach and Robert F. Poppiti

## K.  INTEREST AND ATTORNEYS' FEES.

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law. No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in the Plan or as ordered by the Bankruptcy Court.

## L.  BINDING EFFECT.

The Plan shall be binding upon the Debtors, the Reorganized Debtors, the Holders of all Claims and Interests, parties in interest, Persons, and Governmental Units and their respective successors and assigns. To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

## M.  NO ADMISSIONS.

As to contested matters, adversary proceedings and other Causes of Action or threatened Causes of Action, nothing in the Plan, the Plan Supplement, the Disclosure Statement, or other Plan Documents shall constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations. The Plan shall not be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtors or any of their subsidiaries and affiliates, as debtors and debtors in possession in the Chapter 11 Cases.

## N.  EXHIBITS.

All Exhibits and Schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

## XVI.  SOLICITATION AND VOTING PROCEDURES

The following briefly summarizes procedures to accept and confirm the Plan:

## A.  THE SOLICITATION PACKAGE.

The following materials constitute the Solicitation Package:

- written notice in the form approved by the bankruptcy court of (i) approval of the Disclosure Statement, (ii) the deadline for voting on the Plan, (iii) the date of the Confirmation Hearing, (iv) the deadline and procedures for filing objections to the confirmation of the Plan;

- the Plan (either by paper copy or in "pdf" format on a CD-Rom, at the Debtors' discretion);

- this Disclosure Statement (either by paper copy or in "pdf" format on a CD-Rom, at the Debtors' discretion), with attached Disclosure Statement Approval Order; and

- the appropriate ballot and ballot return envelope; and

- such other information as the bankruptcy court may direct or approve.

The Classes entitled to vote to accept or reject the Plan shall be served the Solicitation Package. The Debtors shall send to each impaired creditor entitled to vote on the Plan (a) only the Solicitation Package appropriate for the class applicable to such creditor, and (b) only one Solicitation Package even if such creditor has Claims against more than one of the Debtors. The Solicitation Package (except Ballots) can be obtained by: (a) accessing the Debtors' website at http://www.bmhcrestructuring.com; or (b) requesting a copy from the Debtors' Balloting and Claims Agent by writing to The Garden City Group, Inc., Attn.: Building Materials Holding Corporation, P.O. Box 9393, Dublin, OH 43017-4293; or (c) calling 1-866-364-4266.

## B. VOTING INSTRUCTIONS.

Only the Holders of Claims in Classes 2(a)-(l), 3(a)-(l), 6(a)-(l) and 8(a)-(l) are entitled to vote to accept or reject the Plan, and they may do so by completing the Ballot and returning it in the envelope provided to the Balloting and Claims Agent by the Voting Deadline. Voting instructions are attached to each Ballot.

The Company, with the approval of the Bankruptcy Court, has engaged The Garden City Group, Inc. as the Balloting and Claims Agent to assist in the solicitation process. The Balloting and Claims Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process. The Balloting and Claims Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will File the Voting Report as soon as practicable before the Confirmation Hearing.

The deadline to vote on the Plan is **4:00 p.m. (Prevailing Eastern Time) on November _____, 2009.**

All Ballots must be properly executed, completed and delivered to the Balloting and Claims Agent, so as to actually be received on or before the Voting Deadline, by using the envelope provided, or by delivery as follows:

(A) If by first class mail:

The Garden City Group, Inc.
Attn: Building Materials Holding Corporation
P.O. Box 9393
Dublin, OH
43017-4293

(B) If by overnight mail or hand-delivery:

The Garden City Group, Inc.
Attn: Building Materials Holding Corporation
5151 Blazer Parkway, Suite A
Dublin, OH
43017

Ballots cast by facsimile, email, or other electronic transmission will not be counted unless approved in advance by the Debtors in writing.

If you have any questions on the procedures for voting on the Plan, please call the Balloting and Claims Agent at the following telephone number: 1-866-364-4266.

CREDITORS MUST VOTE ALL OF THEIR CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE APPLICABLE SUBPLAN AND MAY NOT SPLIT THEIR VOTE. ACCORDINGLY, A BALLOT THAT PARTIALLY REJECTS AND PARTIALLY ACCEPTS SUCH SUBPLAN SHALL NOT BE COUNTED.

BALLOTS THAT INDICATE BOTH ACCEPTANCE AND REJECTION OF A SUBPLAN SHALL NOT BE COUNTED AS VOTES TO ACCEPT OR REJECT SUCH SUBPLAN.

BALLOTS THAT FAIL TO INDICATE AN ACCEPTANCE OR REJECTION OF ANY SUBPLAN SHALL NOT BE COUNTED AS VOTES TO ACCEPT OR REJECT ANY OF THE SUBPLANS.

BALLOTS THAT INDICATE ANY ACCEPTANCE OR REJECTION OF ONE SUBPLAN APPLICABLE TO THE VOTING CREDITOR BUT FAIL TO INDICATE AN ACCEPTANCE OR REJECTION OF ANOTHER APPLICABLE SUBPLAN, AND WHICH ARE OTHERWISE PROPERLY EXECUTED AND RECEIVED PRIOR TO THE VOTING DEADLINE, SHALL BE COUNTED AS VOTES TO ACCEPT OR REJECT ALL OF THE SUBPLANS APPLICABLE TO THE VOTING CREDITOR.

BALLOTS THAT INDICATE AN ACCEPTANCE OR REJECTION OF ONE SUBPLAN APPLICABLE TO THE VOTING CREDITOR AND REJECTION OF ANOTHER SUBPLAN APPLICABLE TO THE VOTING CREDITOR SHALL BE COUNTED AS A VOTE TO ACCEPT THE SUBPLAN FOR WHICH SUCH CREDITOR VOTED TO ACCEPT AND A VOTE TO REJECT THE SUBPLAN FOR WHICH SUCH CREDITOR VOTED TO REJECT.

IF A CREDITOR IN CLASSES 6(A)-6(L) MAKES THE SMALL UNSECURED CLAIMS CLASS ELECTION ON ITS CLASS 6 BALLOT, SUCH ELECTION SHALL BE BINDING ON THE CREDITOR FOR ALL OF ITS CLAIMS AGAINST THE DEBTORS, SHALL CONSTITUTE AN ACCEPTANCE OF ALL OF THE SUBPLANS BY SUCH CREDITOR, AND ALL OF SUCH CREDITOR'S CLAIMS AGAINST THE DEBTORS SHALL BE DEEMED TO BE AND TREATED SOLELY AS CLAIMS IN CLASSES 8(A)-8(L) LIMITED FOR DISTRIBUTION PURPOSES, IN THE AGGREGATE, TO $5,000, AND THE CLASS 6 BALLOT SUBMITTED BY SUCH CREDITOR SHALL BE DEEMED TO BE A CLASS 8 BALLOT.

ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.

For all Holders of Claims in Classes 2(a)-(l), 3(a)-(l), 6(a)-(l) and 8(a)-(l):

By signing and returning a Ballot, each Holder of a Claim in Classes 2(a)-(l), 3(a)-(l), 6(a)-(l) and 8(a)-(l) will be certifying to the Bankruptcy Court and the Company that, among other things:

- the Holder has been provided with a copy of the Plan, Disclosure Statement and Disclosure Statement Approval Order;

- the solicitation of votes for the Plan is subject to all the terms and conditions set forth in the Disclosure Statement;

- the Holder has carefully read the Ballot and the accompanying instructions; and

- the vote reflected on the Ballot is binding on the Holder's successors, heirs and assigns including, without limitation, any transferee.

## C. VOTING TABULATION.

To ensure that a vote is counted, the Holder of a Claim should: (a) complete a Ballot; (b) indicate the Holder's decision either to accept or reject the Plan in the applicable boxes provided in the Ballot; and (c) sign and timely return the Ballot to the address set forth on the enclosed return envelope by the Voting Deadline.

The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim. Only Holders of Claims in the single voting Class shall be entitled to vote with regard to such Claims.

Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots to be sent to the Balloting and Claims Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided in the Solicitation Procedures, a Ballot will be deemed delivered only when the Balloting and Claims Agent actually receives the original executed Ballot. Delivery of a Ballot to the Balloting and Claims Agent by facsimile, e-mail or any other electronic means will not be accepted. No Ballot should be sent to the Company, the Company's agents (other than the Balloting and Claims Agent), or the Company's financial or legal advisors. The Company expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code requires the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Holders must vote all of their Claims within a particular Plan Class either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan in a single class will not be counted. Further, to the extent there are multiple Claims within the same Class, the Company will aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Neither the Company nor any other Person will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

The Balloting and Claims Agent will file the Voting Report with the Bankruptcy Court. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or electronic mail or damaged. The Voting Report also shall indicate the Company's intentions with regard to such Irregular Ballots.

## XVII. CONFIRMATION PROCEDURES

### A. CONFIRMATION HEARING

The Confirmation Hearing will commence on December _____, 2009 at _____ .m. (Prevailing Eastern Time), before The **Honorable Kevin J. Carey**, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Courtroom #5, Wilmington, DE 19801. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court, and will also be available on the internet at http://www.bmhcrestructuring.com. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

## B.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Company believes that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Claims and Interests deemed to reject the Plan.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- A least one Class of Impaired Claims against each Debtor has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Company or any successors thereto under the Plan.

- The Company has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Company will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in the Company's Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is closed.

### 1.  Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that

each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Company liquidated under chapter 7 of the Bankruptcy Code. This is commonly referred to as the "best interests" test. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Company's Chapter 11 Cases were converted to chapter 7 cases and the assets of the Company's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

To demonstrate compliance with the "best interests" test, Peter J. Solomon Company ("PJSC") prepared the Liquidation Analysis, attached hereto as Exhibit E.

To prepare the Liquidation Analysis, PJSC first estimated the range of proceeds that might be generated from a hypothetical chapter 7 liquidation of the Debtors' assets by a chapter 7 trustee charged with reducing to cash any and all of such assets in an orderly manner. The Liquidation Analysis assumes such liquidation commenced on September 30, 2009.

The gross amount of cash available from such hypothetical chapter 7 liquidation would be the sum of the cash held by the Debtors at the time of the commencement of the hypothetical chapter 7 liquidation plus the proceeds from the disposition of the Debtors' non-cash assets, reduced by the costs and expenses of the liquidation. Any net cash was allocated in the Liquidation Analysis to the creditors of the Debtors in strict compliance with the distribution priorities set forth in section 726 of the Bankruptcy Code.

PJSC then valued the recoveries to each impaired creditor class under the Plan and compared such recoveries to the recoveries that such creditors would receive in a hypothetical chapter 7 liquidation. The Liquidation Analysis was prepared separately for BMHC, BMC West, Illinois Framing, SelectBuild Construction, SelectBuild Northern California, C Construction, TWF Construction, H.N.R. Framing, SelectBuild Southern California, SelectBuild Nevada, SelectBuild Arizona, and SelectBuild Illinois. Then, the aggregate recovery of the various impaired creditor classes was summarized in a recovery comparison chart.

The Liquidation Analysis demonstrates that, in every instance, the amount that each creditor in an impaired class would receive under the Plan exceeds the amount that such creditor would receive in a hypothetical chapter 7 liquidation. For example, the Liquidation Analysis demonstrates that each Holder of the Debtors' Prepetition Credit Agreement Debt receives property with a value equal to 73.6% of its claims under the Plan, compared to a recovery that ranges from 22.5% to 31.7% in a hypothetical chapter 7 liquidation. Similarly, assuming the applicable classes vote to accept the Plan, each Holder of an Allowed General Unsecured Claim, whether such claims arise at BMHC or one of the other legal entities, receives cash with a value of 4.4% of its claims under the Plan, compared to a recovery of 0.0% in a hypothetical chapter 7 liquidation.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE DEBTORS' ASSETS. UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. IN ADDITION, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' ASSETS

WILL RESULT IN AN ACCURATE ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED WERE THE DEBTORS TO UNDERGO AN ACTUAL LIQUIDATION.

THE ACTUAL AMOUNT OF CLAIMS AGAINST THE DEBTORS' ESTATES COULD VARY SIGNIFICANTLY FROM THE ESTIMATE SET FORTH HEREIN, DEPENDING ON THE CLAIMS ASSERTED DURING THE PENDENCY OF THE DEBTORS' HYPOTHETICAL CHAPTER 7 CASES. ACCORDINGLY, THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE IN NATURE AND COULD VARY MATERIALLY FROM THE ESTIMATES PROVIDED HEREIN.

In estimating the gross amount of proceeds available under a hypothetical chapter 7 liquidation, PJSC estimated the cash proceeds that might be realized from the liquidation of the Debtors' assets based upon the book value of assets as of the July 31, 2009 closing balance sheet, or more recent financial information, where available. These values have not been subject to any review, compilation, or audit by any independent accounting firm. The Liquidation Analysis is subject to the qualifications and assumptions described above and in the schedules attached to Exhibit E.

2.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Company analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Company analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. The Company believes that with a significantly de-leveraged capital structure, the Reorganized Debtors will have sufficient cash flow and loan availability to pay and service their debt obligations and to fund operations. This is demonstrated by the Feasibility Analysis attached as Exhibit F, and the detailed Financial Projections ("Projections"), including an Income Statement, a Balance Sheet and a Cash Flow Statement that are attached to the Feasibility Analysis.

The Projections are based upon numerous assumptions that are an integral part of the Projections, including, without limitation, confirmation and consummation of the Plan in accordance with its terms; realization of the Debtors' operating strategy for the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, including environmental legislation or regulations or generally accepted accounting principles; general business and economic conditions; competition; adequate financing; absence of material contingent or unliquidated litigation, indemnity or other claims; other matters many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. The Projections were not prepared in accordance with the standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The projections have not been audited, reviewed, or compiled by the Debtors' independent public accountants. In addition although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only estimates that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Debtors or any other Person that the results set forth in the Projections will be achieved. Neither the Debtors' independent public accountants, nor any other independent accountants or financial advisors, have compiled, examined or performed any procedures with respect to the Projections nor have they expressed any opinion or any other form of assurance on such information or its achievability. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein

89

should not be regarded as a representation or warranty by the Debtors, the Reorganized Debtors, their advisors, or any other Person that the Projections can or will be achieved.

The Feasibility Analysis and Projections indicate that the Reorganized Debtors will have sufficient cash to pay all expenses to exit from chapter 11 and sufficient future cash flow to service their debt obligations and to fund operations. Under the Plan, the Reorganized Debtors will emerge from chapter 11 with $188.5 million of total debt and $60.3 million of unrestricted cash which when combined result in a net debt ("Net Debt") position of $128.2 million ($188.5 million of total debt less $60.3 million of unrestricted cash). Over the three year forecast period, the Reorganized Debtors will reduce their total debt position to $186.6 million and increase their unrestricted cash to $127.5 million or approximately $59.1 million of Net Debt. The reduction of Net Debt by December 2012 is achieved primarily through increases in cash flow from operations and from cash raised by selling excess real estate assets. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Debtors' management continues to actively monitor business activity levels and will make appropriate adjustments to the business plan where necessary or appropriate to meet business goals.

### 3. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the Company may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1(a)-(l), 4(a)-(l), 5(a)-(l), 7(a)-(l) and 9(b)-(l) are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

The Claims in Classes 2(a)-(l), 3(a)-(l), 6(a)-(l) and 8(a)-(l) are Impaired under the Plan. The voting Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Classes (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The members of Classes 9(a) and 10(a)-(l) will not receive a distribution under the Plan, are deemed to reject the Plan, and are not entitled to vote on the Plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, **provided** that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### a.  No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in it treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### b.  Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

*Secured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes, among other things, the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the Company or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the Company's property subject to the liens.

*Unsecured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Interests*: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Company will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 9(a) and 10(a)-(l).

The votes of Holders of Classes 9(a) and 10(a)-(l) are not being solicited because, under Article IV of the Plan, there will be no distribution to the Holders of such Classes.  Classes 9(a) and 10(a)-(l) are, therefore, conclusively deemed to have rejected the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Notwithstanding the deemed rejection by Classes 9(a) and 10(a)-(l) or any Class that votes to reject the Plan, the Company does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Company believes that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## XVIII. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS**

SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

## A. RISKS RELATED TO CONFIRMATION, EFFECTIVENESS AND IMPLEMENTATION

### 1. Parties in Interest May Object to the Company's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Company believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Company created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Company intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Company may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3. The Company May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Company were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

The Liquidation Analysis for the Debtors is attached as Exhibit E to the Disclosure Statement  Parties in interest in these Chapter 11 Cases may oppose Confirmation of the Plan by alleging that the liquidation value of one or more Debtors is higher than reflected on the Liquidation Analysis and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan. At the Confirmation hearing, the Bankruptcy Court may hear evidence regarding the views of the Company and opposing parties, if any, with respect to valuation of the Debtors.

Confirmation of the Plan is also subject to certain conditions as described in Article X of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Company, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to

the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted, or is deemed not to have accepted, the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Company believes that the Plan satisfies these requirements and the Company will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5. A Party in Interest May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, a party in interest may object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6. Risk of Non-Occurrence of the Effective Date

Although the Company believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur. The occurrence of the Effective Date is subject to the conditions precedent listed in the Plan and this Disclosure Statement, including execution of the Revolving Credit Agreement, the Exit Term Loan and the Term Loan Credit Agreement, and such conditions precedent may not occur.

### 7. Risk Related to IRS Claim

Shortly before the Company filed these Chapter 11 Cases, the Company received a tax refund from the Internal Revenue Service in the amount of approximately $57 million (the "Tax Refund"). This Tax Refund related to 2008 losses that were carried back to the 2006 and 2007 taxable years. The IRS has filed a proof of claim in the Chapter 11 Cases asserting, in summary, (1) a protective claim in the amount of the Tax Refund in the event an audit demonstrates that the Company was not entitled to all or a portion of the Tax Refund; and (2) a claim related to an ongoing audit of the Company related to 2005 to 2007 (the "Audit") in the amount of approximately $7 million. The revenue agent has issued a Revenue Agent Report concluding that the Tax Refund was appropriate and will not be challenged. However, under the Internal Revenue Code, such report is subject to the review of the Joint Committee on Taxation, which consists of ten members of Congress, five from the Senate Finance Committee and five from the House Ways and Means Committee. This review is expected to take approximately 60 to 75 days. Funding of the Exit Credit Facilities is conditioned on a satisfactory conclusion of the Tax Refund audit. Although the Company is confident that the Revenue Agent Report related to the Tax Refund will not be overturned, there can be no assurance of that fact.

### 8. Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

**B.      RISK FACTORS RELATED TO THE BUSINESS OF THE REORGANIZED DEBTORS.**

1.       **The Company's business is dependent on demand for and supply of single-family homes that are influenced by changes in the overall condition of the U.S. economy, including interest rates, consumer confidence, job formation, availability of credit and other important factors.**

The residential building products and construction services industry is highly dependent on demand for single-family homes, which is influenced by several factors. These factors include economic changes nationally and locally, mortgage and other interest rates, consumer confidence, job formation, demographic trends, tax incentives and availability of credit as well as other factors. The construction of new homes may experience decline due to excess unsold home inventory levels, lack of availability of credit for lenders, builders and homebuyers, lack of available and affordable land in attractive metropolitan areas, shortages of qualified tradespeople, shortages of materials and regulations that impose restrictive zoning and density requirements. Also, changes to housing patterns may occur, such as an increase in consumer demand for urban living rather than single-family suburban neighborhoods.

All of these factors could limit demand for home construction and may result in lower sales of the Company's building products and construction services as well as lower operating results due to the Company's inability to align our cost structure with these sales trends.

2.       **The Company's ability to maintain adequate liquidity, reduce operating costs and increase market share in an industry experiencing a 55% reduction in average annual housing starts may not be fully realized or may take longer to realize than expected.**

Excluding the boom years of 2006 through 2003, single-family housing starts for the U.S. as a whole averaged 1.1 million starts per year since 1990. For 2008, annualized single-family housing starts for the U.S. as a whole were 55% lower or 0.5 million starts. Housing starts have been negatively impacted by an excess inventory of unsold homes and home foreclosures as lending standards tightened and recent growing economic hardships of rising unemployment have sapped consumer confidence. These trends may not substantially improve for some time.

Single-family permits in the Company's markets declined 46% for 2008 and 31% for 2007. The decline was widespread across all the Company's markets for both building products and construction services. Lower sales from weakening buyer demand and increased competition for fewer contracts led to declines in the Company's margins, particularly for construction services. As of February 2009, single-family housing starts for the U.S. as a whole fell to an annualized rate below 0.4 million and single-family permits in the Company's markets fell to an annualized rate below 0.2 million. The Company expects market conditions to be challenging and may apply further pressure to its sales, margins and operating results.

3.       **The Company's liquidity is dependent on operating performance, an efficient cash conversion cycle and compliance with financial covenants.**

Liquidity is essential to the Company's business. The Company funds working capital requirements and necessary capital expenditures with cash flow from operations and seasonal borrowings under its credit facility. A substantial deterioration in operating performance as well as inefficient conversion of business activities to cash may adversely affect the Company's ability to obtain funding from operations or its credit facility.

The Company may not be able to meet near-term working capital and scheduled interest and debt payment requirements if cash flows are inadequate from the Company's suppressed operating activities or if the Company's access to the revolver portion of its credit facility is restricted due to lack of compliance with financial covenants or revolver borrowing base limitations.

If the Company's operating performance, particularly cash flows from operations, is inadequate, the Company could suffer unfavorable consequences, such as payment delays to its suppliers or failure to honor contractual commitments including financial obligations.

Changes in or perceptions of the Company's liquidity or the liquidity of its suppliers and customers may adversely affect its cash flows and compound other risks. The Company's suppliers of building products as well as customers of its building products and construction services may experience or perceive uncertain liquidity and cause changes in the Company's liquidity. For example, vendors may disrupt supply with changes in terms such as credit and quantity limitations, pricing or payment. Similarly, customers may disrupt demand with changes in purchasing habits.

Increases in interest rates and the credit risk premium assigned to the Company as well as changes in the amount of debt will increase the Company's interest expense. Higher interest expense may adversely impact the Company's financial position, results of operations or cash flows for operating needs.

4.    **An inability to implement and maintain cost structures that align with sales trends may have an adverse impact on the Company's operating results or the anticipated benefits of restructuring may not be fully realized or may take longer to realize than expected.**

When the Company experiences slower periods of homebuilding activity, it may experience inefficiencies in its cost structures. In response to the current challenging economic and industry conditions, the Company has implemented restructuring plans that include closure or consolidation of underperforming business units, reductions in the number of employees and consolidation of certain administrative functions. These actions are designed to align the Company's cost structures with anticipated sales. The Company's evaluation of and changes to expenses in response to declining sales may not be sufficient, timely or realized, leading to costs that are too high relative to sales and to lower returns on sales.

5.    **Loss of customers as well as changes in the business models of customers may have an adverse impact on the Company's operating results.**

The Company is exposed to the risk of loss arising from the failure or financial distress of customers. Although amounts due from the Company's customers are typically secured by liens on their construction projects, in the event a customer cannot meet its payment obligations to the Company, there is a risk that lender evaluations of customer creditworthiness may limit amounts paid to the Company or the value of their underlying project will not be sufficient to recover the amounts owed to the Company. Estimated credit losses are considered in the valuation of amounts due from the Company's customers, however the entire carrying amount is generally at risk.

While market and regulatory changes seek to reduce excess unsold home inventory and stabilize housing affordability, the Company may experience losses and changes in customers. Many homebuilders are experiencing business and financial challenges in the current housing environment. The Company's 5 largest customers represent 18% of consolidated sales. Additionally, diversification of the Company's sales to more products and services for multi-family and commercial projects may result in changes in its customer mix. The loss of one or more of the Company's significant customers or changes in customer mix may adversely affect the Company's financial condition, results of operations or cash flows.

As the business models of the Company's customers evolve, the Company's existing building products and construction service offerings may not meet the needs of certain homebuilders. Homebuilders may decide to no longer outsource construction services or may purchase construction services and building products from separate suppliers. If the Company does not timely assess shifts in customer expectations, preferences and demands, its financial condition, results of operations or cash flows may be adversely affected.

6.    **Due to the continuing downturn in the housing industry, the Company may incur additional impairment charges and costs to close or consolidate additional business units in underperforming markets.**

If weakness in the housing industry continues, all or a portion of remaining intangible assets for customer relationships as well as operating assets of underperforming business units may be impaired. The Company's ongoing evaluation of business operations places a priority on positive cash flow, efficient use of capital and higher

returns. As a result of these evaluations, the Company may incur additional costs to close or consolidate additional underperforming business units. These impairment charges and costs may adversely affect the Company's financial condition, results of operations or cash flows.

7.      **The Company's business is subject to intense competition.**

For 2008, annualized single-family housing starts for the U.S. as a whole were 55% lower or 0.5 million starts compared to an average of 1.1 million starts per year since 1990. Specifically, single-family building permits in the Company's markets declined 46% for 2008 and 31% for 2007. There are numerous competitors providing building materials and construction services for these lower housing starts. These competitive factors have led to pricing pressures and caused reductions in sales or margins as well as increases in operating costs. Loss of significant market share due to competition could result in the closure of facilities. Additionally, the availability of the Company's financial information as well as concerns about the Company's financial viability may be utilized against the Company by its competitors. Intense competition may adversely affect the Company's financial condition, results of operations or cash flows.

8.      **The Company's success is dependent upon the availability of and its ability to attract, train and retain qualified individuals.**

Competition for employees is especially intense in both building products distribution and construction services. Weak operating results may limit the Company's ability to offer competitive compensation and benefits and may result in shortages of qualified labor and key personnel and in turn, may limit the Company's ability to complete contracts as well as obtain additional contracts with builders. Also, as a result of the downturn in the homebuilding industry, many qualified individuals have and may continue to seek employment in other industries. Additional employment and eligibility requirements as well as enhanced and perceived enforcement from state and federal authorities could also limit the availability of qualified labor. The Company cannot guarantee that it will be successful in recruiting and retaining qualified employees in the future.

The Company's success is also dependent on its ability to profitably implement evolving employment legislation. For example, potential legislation easing union organizing activities and limiting arbitration options may significantly increase costs and may reduce or eliminate the Company's ability to provide goods or services in certain markets. Increases in health care and unemployment benefits, holidays and various job protections increase costs. Likewise, changes required to reasonably balance employment levels and profitability are difficult to obtain under binding arbitration provisions. There is no assurance the Company will be successful in balancing a changing sense of entitlement with shareholder value. Employment legislation may adversely affect the Company's financial condition, results of operations or cash flows.

9.      **The Company's operating results are affected by fluctuations in its costs and the availability of sourcing channels for commodity wood products, concrete, steel and other building products.**

Prices of commodity wood products, concrete, steel and other building products are historically volatile and are subject to fluctuations arising from changes in domestic and international supply and demand, labor costs, competition, market speculation, government regulations and periodic delays in delivery. Rapid and significant changes in product prices may affect sales as well as margins due to a limited ability to pass on short-term price changes. The Company does not use derivative financial instruments to hedge commodity price changes.

The Company may experience shortages of building products as a result of unexpected demand or production difficulties as well as transportation limitations. The Company has preferred suppliers for certain building products. The Company maintains an open dialogue with its suppliers to avoid supply disruptions. Suppliers may experience liquidity problems due to the decline in the homebuilding industry and tightened credit availability. Also, the Company's suppliers may have concerns about its financial viability and address their own liquidity needs by requesting faster payment of invoices or other assurances. If this were to happen, the Company's need for cash may intensify and it may be unable to make payments to our suppliers as they become due. Any disruption in the Company's sources of supply for key building products could negatively impact its financial condition, results of operations or cash flows.

10. **Weather conditions, including natural catastrophic events, may cause the Company's operating results to fluctuate each quarter.**

The Company's first and fourth quarters historically have been, and are expected to continue to be, adversely affected by weather conditions in some of its markets, causing decreases in operating results due to slower homebuilding activity. In addition, natural catastrophic events may cause the Company's operating results to fluctuate.

11. **The nature of the business exposes the Company to product liability and construction defect claims as well as other legal proceedings.**

The nature of the Company's business exposes it to product liability and construction defect claims as well as other legal proceedings.

The Company has been involved in product liability and construction defect claims relating to the products it distributes and manufactures and its various construction trades. The Company is also exposed to potential claims arising from the conduct of homebuilders and their subcontractors. The Company also operate a large fleet of trucks and other vehicles and therefore faces some risk of accidents. Although the Company believes it maintain adequate insurance, it may not be able to maintain such insurance on acceptable terms or such insurance may not provide adequate protection against potential liabilities.

The nature of the Company's business also exposes it to wage and hour claims. Accuracy of timekeeping methods may be difficult to defend and the extrapolation methods utilized may result in significant claims. Current or future claims may adversely affect the Company's financial condition, results of operations or cash flows.

12. **The Company may be adversely affected by disruptions in its information systems.**

The Company's operations are dependent upon information for decision-making and the related information systems. A substantial disruption in the Company's information systems for a prolonged period could delay the delivery of its products and services and adversely affect its ability to complete contracts and fulfill customer demands. Such delays, problems or costs may have an adverse effect on the Company's financial condition, results of operations or cash flows.

13. **Actual and perceived vulnerabilities as a result of widespread credit and liquidity concerns, terrorist activities and armed conflict may adversely impact consumer confidence and the Company's business.**

Instability in the economy and financial markets as a result of widespread credit and liquidity concerns, terrorism or war may impact consumer confidence and result in a decrease in homebuilding in the Company's markets. Terrorist attacks may also directly impact the Company's ability to maintain operations and services and may have an adverse effect on its business.

14. **Federal, state and other regulations could impose substantial costs and/or restrictions on our business.**

The Company is subject to various federal, state, local and other regulations, including among other things:

- work safety regulations promulgated by the Department of Labor's Occupational Safety and Health Administration,

- transportation regulations promulgated by the Department of Transportation,

- employment regulations promulgated by the Department of Homeland Security and the United States Equal Employment Opportunity Commission, as well as

DB02:8855143.1

068301.1001

- state and local zoning restrictions and building codes.

More burdensome regulatory requirements in these or other areas may increase the Company's costs and have an adverse effect on its financial condition, results of operations or cash flows.

15. **Numerous other matters of a local and regional scale, including those of a political, economic, business, competitive or regulatory nature may have an adverse impact on the Company's business.**

Many factors shape the homebuilding industry and the Company's business. In addition to the factors previously cited, there are other matters of a local and regional scale, including those of a political, economic, business, competitive or regulatory nature that may have an adverse effect on the Company's business.

## C. RISK FACTORS ASSOCIATED WITH FORWARD LOOKING STATEMENTS.

1. **Financial information is based on the Company's books and records and, unless otherwise stated, no audit was performed.**

**The financial information contained in this Disclosure Statement has not been audited unless otherwise stated.** In preparing this Disclosure Statement, the Company relied on financial data derived from its books and records that was available at the time of such preparation. Although the Company has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Company believes that such financial information fairly reflects the financial condition of the Company, the Company is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2. **Financial projections and other forward looking statements are not assured, are subject to inherent uncertainty due to the numerous assumptions upon which they are based and, as a result, actual results may vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Company's ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Company's ability to maintain market strength and receive vendor support by way of favorable purchasing terms.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will <u>not</u> be considered assurances or guarantees. While the Company believes that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

98

D.    **RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN.**

1.    **The Reorganized Debtors may not be able to achieve projected financial results or meet post-reorganization debt obligations and finance all operating expenses, working capital needs and capital expenditures.**

The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows that they have assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing their current customer offerings; (b) taking advantage of future opportunities; (c) growing their business; or (d) responding to competitive pressures. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors. If any such required capital is obtained in the form of equity, the equity interests of the holders of then-existing Reorganized BMHC Equity Interests could be diluted. While the Company's projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

2.    **The Reorganized BMHC Equity Interests are speculative.**

The Reorganized BMHC Equity Interests are not secured by collateral or any guarantees. If the Company's performance does not improve, the value of the Reorganized BMHC Equity Interests could be worthless and holders thereof will lose their investment.

3.    **The consideration being provided for the Funded Lender Claims and the L/C Lender Claims in the Plan does not reflect any independent valuation of such Claims.**

The Company has not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration being provided for Funded Lender Claims and the L/C Lender Claims in the Plan.

4.    **The Reorganized BMHC Equity Interests are a new issue of securities for which there is no prior market and the trading market for the Reorganized BMHC Equity Interests may be limited.**

The Reorganized BMHC Equity Interests will be a new security for which there currently is no, and on issuance there will not be any, established trading market. The Company does not intend to apply for listing of the Reorganized BMHC Equity Interests on any securities exchange or for quotation in any automated dealer quotation system. Trading of Reorganized BMHC Equity Interests may be further limited by securities law restrictions on transfer.

E.    **DISCLOSURE STATEMENT DISCLAIMER.**

1.    **Information Contained Herein Is for Soliciting Votes.**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.      **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his, her or its own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

3.      **No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Person (including, without limitation, the Company) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Company, the Reorganized Debtors, Holders of Allowed Claims or Interests or any other parties in interest.

4.      **Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement or Plan. The Debtors and/or the Reorganized Debtors, as the case may be, may seek to investigate, file and prosecute litigation claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such litigation claims or Objections to Claims.

5.      **Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Company or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Cause of Action of the Company or its Estate are specifically or generally identified herein.

6.      **Information Was Provided by the Company and Was Relied Upon by the Company's Professionals.**

Counsel to and other Professionals retained by the Company have relied upon information provided by the Company in connection with the preparation of this Disclosure Statement. Although counsel to and other Professionals retained by the Company have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

7.      **Potential Exists for Inaccuracies, and the Company Has No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Company has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Company nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Company may subsequently update the information in this Disclosure Statement, the Company has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

8.      **No Representations Outside this Disclosure Statement Are Authorized.**

No representations concerning or relating to the Company, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any

representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Company, the counsel to the Committee and the U.S. Trustee.

## F.    LIQUIDATION UNDER CHAPTER 7.

If no plan can be Confirmed, the Company's Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Company for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Company's liquidation analysis is set forth in Section XVII herein, "Confirmation Procedures" and the Liquidation Analysis attached hereto as Exhibit E.

## XIX.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to BMHC and each of its subsidiaries, all of which are Debtors under the Plan, and certain Holders of Claims against a Debtor. The following summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, rulings, and pronouncements of the U.S. Internal Revenue Service (the "IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. This discussion addresses only those Holders that hold Claims as capital assets within the meaning of Section 1221 of the Code. In addition, this summary does not address state, local, estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to a Debtor within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities, subchapter S corporations, persons who hold Claims, or who will hold the Term Notes, interests in the Exit Revolver, interests in the Exit Term Loan, and/or Reorganized BMHC Equity Interests as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark to market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class. Holders of Claims in more than a single Class should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim (or interest in the Exit Revolver or Exit Term Loan) that is for United States federal income tax purposes (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

A "non-U.S. Holder" means any Holder of a Claim (or interest in the Exit Revolver or Exit Term Loan) that is not a U.S. Holder.

The United States federal income tax consequences to a partner in an entity or arrangement treated as a partnership for United States federal income tax purposes that holds a Claim generally will depend on the status of the partner and the activities of the partnership. Partners in a partnership holding a Claim should consult their own tax advisors.

101

This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular Holder of a Claim. Each Holder of a Claim should seek advice from its own independent tax advisors concerning the United States federal, state, local, foreign income and other tax consequences of the Plan to them in light of its particular circumstances.

This discussion assumes that the various debt and other arrangements to which any Debtor is a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (AND ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (AND ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS.

As of December 31, 2008, BMHC had consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes in excess of $60 million, and it has incurred additional loss in 2009. However, as discussed below, the amount of BMHC's NOL carryforwards and current losses will likely be significantly reduced or even eliminated completely upon implementation of the Plan. In addition, the Debtors' subsequent utilization of any losses and NOL carryforwards remaining and possibly certain other tax attributes may be restricted as a result of and upon the implementation of the Plan.

### 1.  Cancellation of Debt Income and Reduction of Tax Attributes.

As a result of the Plan, the Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt income ("COD") upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of COD, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer, the amount of cash paid and the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange. The issue price of such new indebtedness issued to the creditor is determined under either Section 1273 or 1274 of the Tax Code. Generally, these provisions treat the fair market value of a publicly-traded debt instrument as its issue price and the stated principal amount of any other debt instrument as its issue price if its terms provide for adequate stated interest.

A debtor is not, however, required to include any amount of COD in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as a price for the exclusion of COD under the foregoing rule, Section 108 of the Tax Code requires the debtor to reduce (as of the first day of the taxable year following the year of the debt discharge) its tax attributes by the amount of COD which it excluded from gross income. As a general rule, tax attributes will be reduced in the following order: (a) NOLs, (b) most tax credits, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), (e) passive activity loss and credit carryovers and (f) foreign tax credits. A debtor with COD may elect first to reduce the basis of its depreciable assets under Section 108(b)(5) of the Tax Code, though it has not been determined whether the Debtors would make this election.

As a result of the consummation of the Plan, and in particular the exchange of certain Claims for a portion of the Term Notes and/or Reorganized BMHC Equity Interests, BMHC expects to realize substantial COD. The extent of such COD and resulting tax attribute reduction will depend significantly on the issue price of the Term Notes (determined in the manner described below) and the fair market value of the Reorganized BMHC Equity Interests. The issue price of the Term Notes and the fair market value of the Reorganized BMHC Equity Interests cannot be known with certainty until after the Effective Date. Thus, although it is expected that a reduction of tax attributes will be required, the exact amount of such reduction cannot be predicted with certainty. Indeed, it is likely that the amount of COD will exceed the amount of the NOLs thereby eliminating the NOLs and also reducing the Debtors' tax basis in their assets.

Any required reduction in tax attributes of a member of a consolidated group applies first to any tax attributes attributable to the debtor realizing the COD at issue. To the extent the debtor reduces its tax basis in the stock of another member of the consolidated group (which basis may not be reduced below zero), such other member is required to reduce its tax attributes by an equivalent amount.

### 2. Accrued Interest.

To the extent that there exists accrued but unpaid interest on the indebtedness owing to holders of Allowed Claims and to the extent that such accrued but unpaid interest has not been deducted previously by a Debtor, portions of payments made in consideration for the indebtedness underlying such Allowed Claims that are allocable to such accrued but unpaid interest should be deductible by such Debtor. Any such interest that is not paid will not be deductible by such Debtor and will not give rise to COD income.

To the extent that a Debtor has previously taken a deduction for accrued but unpaid interest, any amounts so deducted that are paid will not give rise to any tax consequences to such Debtor. If such amounts are not paid, they will give rise to COD income that would be excluded from gross income pursuant to the bankruptcy exclusion discussed above. As a result, the Debtor would be required to reduce its tax attributes to the extent of such interest previously deducted and not paid.

### 3. NOL Carryback.

Under current law, a corporation can generally carry back NOLs up to two years to offset taxable income in such years. There is a special exception, recently enacted, that allows certain eligible small businesses to carry back NOLs up to five years. The President's recently released Fiscal Year 2010 budget proposals have suggested that Congress make the lengthened NOL carryback period available to more taxpayers. If such legislation is passed, the Debtors may be able to carry back NOLs to offset income in prior years that would not otherwise be possible under the current two-year period. It is uncertain whether such legislation will be passed, and the availability to the Debtors of any benefit resulting from carrying back NOLs is therefore purely speculative.

### 4. Limitation on NOL Carryforwards and Other Tax Attributes.

Following the implementation of the Plan, the Debtors currently believe it is unlikely that they will have any NOL carryforwards. However, any NOLs that do remain, as well as any remaining tax credit carryforwards, built-in losses (to the extent recognized within the five-year period following the Effective Date or treated as recognized pursuant to the safe harbors provided by IRS Notice 2003-65), and, possibly, certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to limitation under Section 382 of the Tax Code as a result of an "ownership change" of the Debtors by reason of the transactions pursuant to the Plan. This discussion describes the limitation determined under Section 382 of the Tax Code in the case of an "ownership change" as the "Section 382 Limitation." The annual Section 382 Limitation on the use of Pre-Change Losses in any "post change year" is generally equal to the product of the fair market value of the loss corporation's outstanding stock immediately before the ownership change multiplied by the long term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate (4.16% for October 2009) is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in its assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe

harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by those shareholders at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation). A "5 percent shareholder" for this purpose includes, generally, an individual or entity that directly or indirectly owns 5% or more of a corporation's stock at any time during the testing period and one or more "public groups" of shareholders that individually own less than 5% of the value of the corporation's stock. Under applicable Treasury Regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated return that has consolidated NOLs is generally measured by changes in stock ownership of the parent corporation of the group. Also under applicable Treasury Regulations, stock of a lower-tier corporation is generally treated as owned proportionately by the shareholders of a higher-tier corporation, and, accordingly, an ownership change of BMHC will result in an ownership change of the other Debtors as well.

The issuance of the Reorganized BMHC Equity Interests, along with the cancellation of existing BMHC Equity Interests, under the Plan is expected to cause an ownership change to occur with respect to BMHC and, thus, the Debtors on the Effective Date. As a result, Section 382 of the Tax Code will apply to limit the Debtors' use of any remaining consolidated NOLs after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD. Similarly, the ability of the Debtors' consolidated group to use any remaining capital loss carryforwards and tax credits will also be limited.

5.        **Special Bankruptcy Exceptions.**

Section 382(l)(5) of the Tax Code provides a special rule applicable in the case of a bankruptcy reorganization (the "Section 382(l)(5) Rule"). If a corporation qualifies for the Section 382(l)(5) Rule, the annual Section 382 Limitation will not apply to the corporation's NOLs on account of an ownership change occurring as a result of the bankruptcy reorganization. The Section 382(l)(5) Rule does, however, require that the corporation's NOLs and credit carryovers be computed without taking into account the aggregate amount of all interest deductions during the three prior taxable years and the portion of the current taxable year ending on the date of the ownership change in respect of debt exchanged for the corporation's stock (such interest hereinafter called "Disqualified Interest"). The corporation will qualify under the Section 382(l)(5) Rule if the corporation's pre-bankruptcy shareholders and holders of certain debt (the "Qualifying Debt") own at least 50% of the stock of the corporation after the bankruptcy reorganization, and the corporation does not elect not to apply the Section 382(l)(5) Rule. Qualifying Debt is a claim which (i) was held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and has been owned, at all times, by the same creditor. Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business. For the purpose of determining whether a claim constitutes Qualifying Debt, special rules may in some cases apply to treat a subsequent transferee as the transferor creditor.

If the exchanges contemplated by the Plan qualify for tax treatment under the Section 382(l)(5) Rule and the Debtors do not elect out of the Section 382(l)(5) Rule, the Debtors' NOL carryover (if any) will be available for future use without any Section 382 Limitation (after reduction of the Debtors' NOLs by Disqualified Interest). However, under the Section 382(l)(5) Rule, if there is a second ownership change during the two-year period immediately following consummation of the Plan, the Section 382 Limitation after the second ownership change shall be zero. If the Debtors do qualify for tax treatment under the Section 382(l)(5) Rule, there is a substantial likelihood that the Debtors would elect out due to this risk.

If the exchanges do not qualify or the Debtors elect not to apply the Section 382(l)(5) Rule, the Debtors' use of any remaining NOLs to offset taxable income earned after an ownership change will be subject to the annual Section 382 Limitation. Since the Debtors are in bankruptcy, however, Section 382(l)(6) of the Tax Code will apply. Section 382(l)(6) of the Tax Code provides that, in the case of an ownership change resulting

from a bankruptcy proceeding of a debtor, the value of the debtor's stock for the purpose of computing the Section 382 Limitation will generally be calculated by reference to the net equity value of the debtor's stock taking into account the increase in the value of the corporation as a result of the surrender or cancellation of creditors' claims in the transaction (rather than the value without taking into account such increases, as is the case under the general rule for non-bankruptcy ownership changes). Accordingly, under this rule the Section 382 Limitation would generally reflect the increase in the value of a debtor's stock resulting from the conversion of debt to equity in the proceeding. Although it is difficult to predict what the net equity value of the Debtors will be immediately after the exchanges contemplated by the Plan, the Debtors' use of any Pre-Change Losses is expected to be substantially limited after those exchanges.

Application of Sections 382(l)(5) and 382(l)(6) of the Tax Code depend on whether the consummation of the Plan results in the elimination of the Debtors' consolidated NOL. If the Debtors retain any NOL carryforward after the consummation of the Plan, the special rules of Sections 382(l)(5) and 382(l)(6) of the Tax Code could then be applicable to the Debtors.

6.      **Alternative Minimum Tax.**

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular U. S. federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002 which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the Tax Code, immediately before the ownership change.

7.      **Certain Consequences of Section 5.5.2 of the Plan.**

The federal income tax consequences to the Debtors of the transactions described in section 5.5.2 of the Plan are unclear. If the steps outlined in that section are given independent significance, the transfer of the Reorganized Subsidiary Equity Interests to holders of Prepetition Funded Lender Claims would result in the termination of the Debtors' federal consolidated group and would result in income to members of the group from any excess loss accounts or deferred intercompany gains. In addition, the contribution of those interests by Claim holders would not allow the group to elect to file a federal consolidated income tax return for 5 years absent receiving a waiver of the 5-year rule from the Internal Revenue Service. If the steps in section 5.5.2 of the Plan are deemed to occur simultaneously pursuant to the Regulations under Section 1502 of the Tax Code or pursuant to the step transaction doctrine, those steps might be ignored for federal income tax purposes and if so the consolidated group would remain in existence.

B.      **U.S. HOLDERS.**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to U.S. Holders.

1.      **Certain U.S. Federal Income Tax Consequences to the Exit Revolver Lenders.**

The Exit Revolver Lenders will not be subject to U.S. federal income tax upon entering into the Exit Revolver.

The Exit Revolver will likely be treated as a contingent payment debt instrument ("CPDI"), based upon certain mandatory prepayments which are contingent upon net proceeds from certain asset sales, net proceeds from

any equity issued, and excess cash flow pursuant to a formula and based on audited financial statements. The Exit Revolver will be issued for money and will therefore be treated for U.S. federal income tax purposes under the "noncontingent bond method" described under the Treasury Regulations.

Under the noncontingent bond method, a holder of the Exit Revolver must account for interest for U.S. federal income tax purposes based on a "comparable yield" and the differences between actual payments on the instrument and the instrument's "projected payment schedule" as described below. The comparable yield will be determined by Reorganized BMHC and will take into account the yield at which Reorganized BMHC could issue a fixed rate debt instrument with no contingent payments, but with terms and conditions otherwise similar to those of the Exit Revolver. The comparable yield may be greater than or less than the stated interest with respect to the Exit Revolver.

Solely for the purpose of determining the amount of interest income that holders of the Exit Revolver are required to accrue on the instrument, Reorganized BMHC is required to construct a "projected payment schedule" that represents a series of payments the amount and timing of which would produce a yield to maturity on the instrument equal to the comparable yield used. Neither the comparable yield nor the projected payment schedule will constitute a representation by Reorganized BMHC regarding the actual amount that the Exit Revolver will pay.

Reorganized BMHC will be required to use the comparable yield and projected payment schedule established by Reorganized BMHC in determining interest accruals and adjustments in respect of the instrument, unless a holder timely discloses and justifies the use of a different comparable yield and projected payment schedule to the IRS.

A holder of the Exit Revolver, regardless of its method of accounting for U.S. federal income tax purposes, will be required to accrue interest income on the CPDI at the comparable yield, adjusted upward or downward to reflect the difference, if any, between the actual and the projected amount of any contingent payments on the instrument (as set forth below).

A holder of the Exit Revolver will be required to recognize interest income equal to the amount of any net positive adjustment, which will equal the excess of actual payments over projected payments, in respect of the Exit Revolver for a taxable year. A net negative adjustment, which will equal the excess of projected payments over actual payments, in respect of the Exit Revolver for a taxable year will first reduce the amount of interest in respect of the Exit Revolver that a holder would otherwise be required to include in income in the taxable year, and any excess will give rise to an ordinary loss to the extent that the amount of all previous interest inclusions under the instrument exceeds the total amount of the holder's net negative adjustments treated as ordinary loss on the instrument in prior taxable years. A net negative adjustment is not subject to the two percent floor limitation imposed on miscellaneous deductions. Any net negative adjustment in excess of the amounts described above will be carried forward to offset future interest income in respect of the Exit Revolver or to reduce the amount realized on a sale, exchange or retirement of the instrument.

Upon a sale, exchange or retirement of an interest in the Exit Revolver (including a delivery of property pursuant to the terms of the instrument), a holder will generally recognize taxable gain or loss equal to the difference between the amount realized on the sale, exchange or retirement and the holder's adjusted basis in the instrument. If Reorganized BMHC delivers property, other than cash, to a holder in retirement of the Exit Revolver, the amount realized will equal the fair market value of the property, determined at the time of retirement, plus the amount of cash, if any, received in lieu of property. A holder generally will treat any gain as interest income, and any loss as ordinary loss to the extent of the excess of previous interest inclusions in excess of the total net negative adjustments previously taken into account as ordinary losses, and the balance as capital loss. The deductibility of capital losses is subject to limitations. In addition, if a holder recognizes loss above certain thresholds, the holder may be required to file a disclosure statement with the IRS.

2.      **Certain U.S. Federal Income Tax Consequences to the Exit Term Lenders.**

The Exit Term Loan Lenders will not be subject to U.S. federal income tax upon entering into the Exit Term Loan.

Payments of stated interest on the Exit Term Loan will be taxable as ordinary interest income at the time they accrue or are received by a U.S. Holder in accordance with the U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The Exit Term Loan will be issued with original issue discount ("OID") for U.S. federal income tax purposes. The amount of OID on the Exit Term Loan will generally equal the excess of the principal amount of the Exit Term Loan over its issue price. The issue price of the Exit Term Loan will generally equal the amount paid by the Exit Term Loan Lenders for their interests in the Exit Term Loan.

A U.S. Holder of an interest in the Exit Term Loan generally must include in taxable income for any particular taxable year the daily portion of the OID described in the preceding paragraph that accrues on such interest for each day during the taxable year on which the U.S. Holder holds the interest, regardless of the U.S. Holder's usual method of accounting for U.S. federal income tax purposes. Thus, a U.S. Holder will generally be required to include OID in income in advance of the receipt of the cash to which such OID is attributable. The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the interest in the Exit Term Loan at the beginning of the accrual period multiplied by the yield to maturity of the Exit Term Loan less the amount of any stated interest allocable to such accrual period. OID allocable to a final accrual period is the difference between the amount payable at maturity (other than a payment of stated interest) and the adjusted issue price at the beginning of the final accrual period. The adjusted issue price of an interest in the Exit Term Loan at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the interest in all prior accrual periods, and decreased by the aggregate amount of payments of principal made during all prior accrual periods.

A U.S. Holder may elect to treat all interest on the Exit Term Loan as OID and calculate the amount includible in gross income under the constant yield method described above. The election is made for the taxable year in which the U.S. Holder acquired its interest in the Exit Term Loan and may not be revoked without the consent of the IRS.

Upon the sale, exchange, redemption or other taxable disposition of an interest in the Exit Term Loan, a U.S. Holder generally will recognize taxable gain or loss equal to the difference between (i) the sum of cash plus the fair market value of all other property received on such disposition (except to the extent such cash or property is attributable to accrued but unpaid stated interest, which will be treated as ordinary interest income to the extent not so previously taxed) and (ii) such Holder's adjusted tax basis in the Exit Term Loan. A U.S. Holder's adjusted tax basis in an interest in the Exit Term Loan will generally equal the cost of the interest to such Holder (increased by accrued OID and decreased by any previous payment of principal on the interest).

### 3. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Allowed Claims that are Paid Solely in Cash.

A Holder who receives solely Cash in exchange for its Allowed Claim pursuant to the Plan will generally recognize income, gain or loss for its U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of cash received in exchange for its Allowed Claim, and (ii) the Holder's adjusted tax basis in its Allowed Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Allowed Claim in such Holder's hands, whether the Allowed Claim constitutes a capital asset in the hands of the Holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Allowed Claim. To the extent that any amount received by a Holder of an Allowed Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a Holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss should be ordinary.

4. **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims that are Paid Using Consideration other than Solely Cash.**

Pursuant to the Plan, the following Holders of Allowed Claims will receive consideration other than solely cash in satisfaction of their claims, including but not limited to Term Notes and Reorganized BMHC Equity Interests: (a) Holders of Funded Lender Claims will receive Term Notes and their Pro Rata share of the Reorganized BMHC Equity Interests, and (b) to the extent an L/C Lender Claim is liquidated on or after the Petition Date, Holders of such Claims will receive Term Notes and Reorganized BMHC Equity Interests.

a. **In General**

The U.S. federal income tax consequences to Holders of Allowed Claims that are not paid solely in Cash under the Plan may vary depending upon, among other things: (i) the type of consideration received by the Holder in exchange for its Allowed Claim; (ii) the nature of the indebtedness owing to the Holder; (iii) whether the Holder has previously claimed a bad debt deduction in respect of such holder's Allowed Claim; and (iv) whether such Allowed Claim constitutes a "security" for purposes of the reorganization provisions of the Tax Code (as described below).

b. **Consequences to U.S. Holders of Funded Lender Claims and L/C Lender Claims against BMHC upon Exchange**

The federal income tax consequences of the receipt by Holders of Funded Lender Claims and L/C Lender Claims against BMHC of the Term Notes and shares of Reorganized BMHC Equity Interests and the Sale Cash Collateral Excess Proceeds Account Effective Date Amount will depend on whether the Funded Lender Claims against BMHC, L/C Lender Claims against BMHC, and the Term Notes are treated as "securities" (as described below) for tax purposes.

The Tax Code does not contain a definition for the term "securities" for purposes of the reorganization provisions. Whether the Funded Lender Claims against BMHC, L/C Lender Claims against BMHC, and the Term Notes constitute "securities" will depend on case law, which provides that the determination of whether an indebtedness or obligation constitutes a "security" depends upon the nature of the indebtedness or obligation. Important factors to be considered include, among other things, the length of time to maturity, the degree of continuing interest in the issuer, and the purpose of the borrowing. Generally, corporate debt instruments that mature within five years of issuance are not considered "securities" and corporate debt instruments that mature ten years or more from the time of issuance are considered "securities". Whether a debt instrument with a term of five or more, but less than ten, years is a security is unclear. Allowed Claims for accrued interest generally are not considered "securities". Holders of Funded Lender Claims and L/C Lender Claims against BMHC should consult their own tax advisors regarding whether such Claims, and the Term Notes received in exchange therefor, constitute "securities" for these purposes.

If the Funded Lender Claims and L/C Lender Claims against BMHC, as the case may be, are treated as "securities", the exchange of such Claims for Term Notes and shares of Reorganized BMHC Equity Interests and the Sale Cash Collateral Excess Proceeds Account Effective Date Amount should be treated as a recapitalization. Assuming the Term Notes are also treated as "securities", then a Holder of such Claims will recognize gain, but not loss, equal to the lesser of (i) the excess (if any) of (A) the issue price of the Term Notes, the fair market value of the Reorganized BMHC Equity Interests, and the Sale Cash Collateral Excess Proceeds Account Effective Date Amount received in the exchange over (B) such Holder's adjusted tax basis in the Funded Lender Claim or L/C Lender Claim against BMHC exchanged therefor, and (ii) the Sale Cash Collateral Excess Proceeds Account Effective Date Amount (plus the issue price of the Term Notes if the Term Notes are, in fact, not treated as "securities") received in the exchange. Any such gain should be capital in nature. In addition, a Holder will recognize income on account of any portion of the Term Notes, Reorganized BMHC Equity Interests, or Sale Cash Collateral Excess Proceeds Account Effective Date Amount that is treated as issued on account of accrued and unpaid interest that has not been included in income by the Holder. Except for the portion of any consideration that may be allocated to such interest and assuming the Term Notes constitute "securities," a Holder should obtain a tax basis in such Term Notes and Reorganized BMHC Equity Interests equal to the tax basis of the Funded Letter Claims or L/C Lender Claims against BMHC exchanged therefor and a Holder should have a holding period for the Term Notes and Reorganized

BMHC Equity Interests that includes the holding period for the Funded Letter Claims or L/C Lender Claims against BMHC exchanged therefor. If the Term Notes do not constitute "securities," then a Holder should obtain a tax basis in such Term Notes equal to their issue price and should have a holding period for the Term Notes that begins on the day following the Effective Date.

If the Funded Lender Claims or L/C Lender Claims against BMHC, as the case may be, are not treated as "securities," a Holder should be treated as exchanging its Funded Lender Claim or L/C Lender Claim against BMHC in a fully taxable exchange. In that case, the Holder should recognize gain or loss equal to the difference between (i) the issue price of the Term Notes, the fair market value of the Reorganized BMHC Equity Interests, and the Sale Cash Collateral Excess Proceeds Account Effective Date Amount received as of the Effective Date that is not allocable to accrued interest, and (ii) the Holder's tax basis in the Funded Letter Claim or L/C Lender Claim against BMHC surrendered by the Holder. Such gain or loss should be capital in nature and should be long-term capital gain or loss if the Funded Lender Claim or L/C Lender Claim against BMHC, as the case may be, was a capital asset and held for more than one year by the Holder. To the extent that a portion of the consideration is allocable to accrued interest, the Holder may recognize ordinary income. A Holder's holding period for the Term Notes and Reorganized BMHC Equity Interests should begin on the day following the Effective Date.

c.   **Consequences to U.S. Holders of Funded Lender Claims and L/C Lender Claims against Debtors other than BMHC upon Exchange**

A U.S. Holder of Funded Lender Claims and L/C Lender Claims against a Debtor other than BMHC who receives the Term Notes and a share of the Reorganized BMHC Equity Interests and the Sale Cash Collateral Excess Proceeds Account Effective Date Amount will recognize gain, but not loss, equal to the lesser of (i) the issue price of the Term Notes, the fair market value of the Reorganized BMHC Equity Interest, and the Sale Cash Collateral Excess Proceeds Account Effective Date Amount received in the exchange over (B) such Holder's adjusted tax basis in the Funded Lender Claim or L/C Lender Claim against a Debtor other than BMHC exchanged therefor, and (ii) the Sale Cash Collateral Excess Proceeds Account Effective Date Amount plus the issue price of the Term Notes received in the exchange. Any such gain should be capital in nature. In addition, a Holder will recognize income on account of any portion of the Term Notes, Reorganized BMHC Equity Interest, or Sale Cash Collateral Excess Proceeds Account Effective Date Amount that is treated as issued on account of accrued and unpaid interest that has not been included in income by the Holder. Except for the portion of any consideration that may be allocated to such interest, a Holder should obtain a tax basis in such Reorganized BMHC Equity Interest equal to the tax basis of the Funded Letter Claims or L/C Lender Claims against a Debtor other than BMHC exchanged therefor and a Holder should have a holding period for the Reorganized BMHC Equity Interest that includes the holding period for the Funded Letter Claims or L/C Lender Claims against a Debtor other than BMHC exchanged therefor. A holder should obtain a tax basis in the Term Notes equal to their issue price and should have a holding period for the Term Notes that begins on the day following the Effective Date.

d.   **Consequences to Ownership of Term Notes**

The Term Notes will likely be treated as a CPDI, because the Term Notes provide for certain mandatory prepayments as described above under "*Certain U.S. Federal Income Tax Consequences to the Exit Revolver Lenders.*" As the Term Notes will be issued for the Funded Lender Claims and L/C Lender Claims, which constitute non-publicly traded property, such Term Notes should be subject to the "bifurcation method" rather than the "noncontingent bond method", each as described under the Treasury Regulations. In general, if the bifurcation method applies to a debt instrument (the "overall debt instrument"), the debt is broken down into two pieces, each of which is subject to a different rule.

The contingent portion is includible in gross income by the holder and deductible by the issuer in their respective taxable years in which the payment is made. To determine the principal and interest component of each contingent payment, each contingent payment is discounted back to the issue date upon receipt using the Applicable Federal Rate as of the issue date. The discounted amount represents principal while the remainder is interest.

The noncontingent payments are treated as a separate debt instrument, the issue price of which is the issue price of the overall debt instrument, which equals the lesser of the instrument's noncontingent principal payments and the sum of the present values of the noncontingent payments. This separate instrument is taxed under the

109

general rules relating to instruments with original issue discount ("OID"), with certain exceptions. In general, OID will be equal to the excess of the stated redemption price at maturity of the notes over their issue price. A note's stated redemption price at maturity is generally defined as the sum of all payments provided by the note other than "qualified stated interest," except that under the bifurcation method none of the payments will constitute qualified stated interest. A holder will be required to include in gross income all OID as it accrues on a constant yield to maturity basis, before the receipt of cash payments attributable to this income. The amount of OID includible in gross income by a holder of a note for a taxable year will be the sum of the daily portions of OID with respect to the note for each day during that taxable year on which the holder holds the note. The daily portion is determined by allocating to each day in an "accrual period" a pro rata portion of the OID allocable to that accrual period. The OID allocable to any accrual period will equal the product of the adjusted issue price of the note as of the beginning of such period and the note's yield to maturity. The adjusted issue price of a note as of the beginning of any accrual period will equal its issue price, increased by previously accrued OID, and decreased by the amount of any payments made on the note. A holder's tax basis in a note will be increased by the amount of OID that is includible in the holder's gross income. A holder will not be required to recognize any additional income upon the receipt of any payment on the notes that is attributable to previously accrued OID, but will be required to reduce its tax basis in the notes by the amount of such payment.

Upon the sale, exchange or retirement of the Term Notes under the bifurcation method, the holder must allocate that amount received first to the noncontingent component in an amount up to the adjusted issue price of the noncontingent component. Any remaining amount then is allocated to the contingent component. The amount allocated to the noncontingent component is treated as realized from the sale or exchange of this component. Gain or loss would equal the excess of the amount realized in exchange therefor and the adjusted basis of the noncontingent component, which would generally equal the adjusted issue price. Such gain or loss should be capital in nature and should be long-term capital gain or loss if the Term Notes were capital assets and held for more than one year by the holder. The amount allocated to the contingent component is treated as a contingent payment made on the date of the sale, exchange or retirement of the CPDI, and is characterized as principal and interest under the general rules for the treatment of contingent payments.

5.  **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Interests in BMHC.**

Pursuant to the Plan, Holders of Interests in BMHC will have such Interests cancelled without any distribution. A Holder of Interests in BMHC will generally be entitled to a loss equal to the Holder's adjusted basis in such Interests. Such loss will generally be capital in nature. The deductibility of capital losses is subject to limitations.

6.  **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Other Secured Claims, L/C General Unsecured Claims, Intercompany Claims and Intercompany Interests.**

Pursuant to the Plan, Other Secured Claims, L/C General Unsecured Claims, Intercompany Claims and Intercompany Interests shall be reinstated. If any such Claim or Interest is reinstated, the Holder of such Claim or Interest should not recognize gain or loss except to the extent collateral securing such Claim is changed, and the change in collateral constitutes a "significant modification" of the Claim within the meaning of Regulations promulgated under Section 1001 of the Tax Code.

7.  **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Section 510(b) Claims.**

Pursuant to the Plan, each Section 510(b) Claim shall be cancelled without any distribution. A Holder may be entitled in the year of cancellation (or in an earlier year) to a bad debt deduction in some amount under Section 166(a) of the Tax Code to the extent of such Holder's tax basis in the Section 510(b) Claim. The rules governing the timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Section 510(b) Claims therefore are urged to consult their tax advisors with respect to their ability to take such a deduction.

8.    **Market Discount.**

If a Holder of an Allowed Claim purchased the underlying security or debt obligation at a price less than its issue price, the difference would constitute "market discount" for U.S. federal income tax purposes. Any gain recognized by a holder on the exchange of its Allowed Claim on the Effective Date should be treated as ordinary income to the extent of any market discount accrued on the underlying securities or debt obligation by the holder on or prior to the date of the exchange. Any additional accrued but unrecognized market discount should carry over to any "securities" (as described above) or debt obligation received in a tax-free exchange pursuant to the Plan, and should be allocated among such securities or debt obligation based upon their relative fair market values as of the Effective Date. Any gain recognized by such Holder on a subsequent disposition of such securities or debt obligation received under the Plan may be treated as ordinary income to the extent of such accrued but unrecognized market discount.

9.    **Certain U.S. Federal Income Tax Consequences of Ownership by U.S. Holders of Reorganized BMHC Equity Interests Issued Pursuant to the Plan.**

a.    **Distributions**

The gross amount of any distribution of Cash or property made to a holder with respect to the Reorganized BMHC Equity Interests generally will be includible in gross income by such holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of Reorganized BMHC as determined under U.S. federal income tax principles. Dividends received by corporations may qualify for a dividends-received-deduction if certain holding period and taxable income requirements are satisfied, but such corporate holders may be subject to "extraordinary dividend" provisions of the Tax Code. Dividends received by non-corporate holders in taxable years beginning before January 1, 2011 may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

A distribution in excess of Reorganized BMHC's current and accumulated earnings and profits will first be treated as a return of capital to the extent of the holder's adjusted basis in the Reorganized BMHC Equity Interests and will be applied against and reduce such basis. To the extent that such distribution exceeds the holder's adjusted basis in its Reorganized BMHC Equity Interest, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such holder's holding period in its Reorganized BMHC Equity Interests exceeds one year as of the date of the distribution. Long term capital gains may be eligible for reduced rates of taxation.

b.    **Sale or Exchange of Reorganized BMHC Equity Interests**

For U.S. federal income tax purposes, a holder generally will recognize capital gain or loss on the sale, exchange, or other taxable disposition of any of its Reorganized BMHC Equity Interests in an amount equal to the difference, if any, between the amount realized for the Reorganized BMHC Equity Interests and the holder's adjusted tax basis in such interests. Capital gains of non-corporate holders derived with respect to a sale, exchange, or other disposition of Reorganized BMHC Equity Interests held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

10.    **Backup Withholding Tax and Information Reporting Requirements.**

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate holders of the Reorganized BMHC Equity Interests or debt obligations of the Debtors regardless of whether such interests or debt obligations existed prior to the Plan or were issued pursuant to the Plan. Information reporting generally will apply to payments under the Plan and to payments of dividends on, interest on, and proceeds from the sale or redemption of the Reorganized BMHC Equity Interests or debt obligations made within the United States to a holder of the Reorganized BMHC Equity Interests or debt obligations. A payor will be required to withhold backup withholding tax from any payments made under the Plan, and payments of dividends on, interest on or the proceeds from the sale or redemption of, the Reorganized BMHC Equity Interests or debt obligations within the United States to a holder, other than an exempt recipient, if such holder fails to furnish its

111

correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements. The backup withholding tax rate is currently 28 percent.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## C.    NON-U.S. HOLDERS.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to non-U.S. Holders. This summary does not address all aspects of U.S. federal income taxes that may be relevant to non-U.S. Holders in light of their personal circumstances and does not deal with federal taxes other than the federal income tax or with foreign, state, local or other tax considerations. Special rules, not discussed here, may apply to certain non-U.S. Holders, including:

--U.S. expatriates;

--controlled foreign corporations;

--passive foreign investment companies; and

--corporations that accumulate earnings to avoid U.S. federal income tax.

Such non-U.S. Holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.

### 1.    Exchange and Subsequent Dispositions.

A non-U.S. Holder generally will not be subject to U.S. federal income tax on any gain or loss recognized in the Plan or in a subsequent disposition of interests in the Exit Revolver, Exit Term Loan, Term Notes or Reorganized BMHC Equity Interests received in the exchange, unless:

--the gain or loss is effectively connected with the conduct of a U.S. trade or business carried on by the holder (and, under the terms of an applicable income tax treaty, the gain is attributable to a U.S. permanent establishment),

--in the case of an individual holder, the holder is present in the United States for 183 days or more during the taxable year (or otherwise has a "tax home" in the United States) and certain other conditions are met, or

--BMHC or Reorganized BMHC, as the case may be, was or will be a United States real property holding corporation ("USRPHC") at any time within the shorter of the five-year period preceding such disposition or such holder's holding period.

### 2.    Interest on the Exit Revolver, Exit Term Loan and Term Notes.

Generally any interest paid to a non-U.S. Holder of the Exit Revolver, Exit Term Loan or Term Notes will not be subject to U.S. federal income tax if the interest qualifies as "portfolio interest." Interest on the Exit Revolver, Exit Term Loan and Term Notes generally will qualify as portfolio interest if:

--the non-U.S. Holder does not actually or constructively own 10% or more of the total voting power of any of the Reorganized Debtors' voting stock;

--such Holder is not a "controlled foreign corporation" with respect to which any of the Reorganized Debtors is a "related person" within the meaning of the Code;

--either the beneficial owner, under penalties of perjury, certifies that the beneficial owner is not a United States person and such certificate provides the beneficial owner's name and address, or a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and holds the Exit Revolver, Exit Term Loan or Term Notes certifies, under penalties of perjury, that such a statement has been received from the beneficial owner by it or by a financial institution between it and the beneficial owner; and

--the non-U.S. Holder is not a bank receiving interest on the extension of credit made pursuant to a loan agreement made in the ordinary course of its trade or business.

The gross amount of payments to a non-U.S. Holder of interest that does not qualify for the portfolio interest exemption will be subject to U.S. withholding tax at the rate of 30%, unless a U.S. income tax treaty applies to reduce or eliminate such withholding tax. To claim the benefit of a tax treaty, a non-U.S. Holder must provide a properly executed IRS Form W-8BEN (or such successor form as the IRS designates) prior to the payment of interest. The non-U.S. Holder must provide the form to the Reorganized Debtors or their paying agent, or in the case of a note held through a securities clearing organization, bank or other financial institution holding customers' securities in the ordinary course of its trade or business, to such organization, bank or other financial institution, which must in turn provide to the Reorganized Debtors or their paying agent a statement that it has received the form and furnish a copy thereof; provided, that a foreign financial institution will fulfill this requirement by filing IRS Form W-8IMY if it has entered into an agreement with the IRS to be treated as a qualified intermediary. These forms must be periodically updated. A non-U.S. Holder who is claiming the benefits of a treaty may be required in certain instances to obtain a U.S. taxpayer identification number and to provide certain documentary evidence issued by foreign governmental authorities to prove residence in the foreign country.

3.      **Dividends.**

Dividends paid to a non-U.S. Holder (to the extent paid out of our current or accumulated earnings and profits, as determined for U.S. federal income tax purposes) generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

If you wish to claim the benefit of an applicable treaty rate and to avoid backup withholding tax, as discussed below, for dividends, then you must (a) provide the withholding agent with a properly completed IRS Form W-8BEN (or other applicable form), and certify under penalties of perjury that you are not a U.S. person and are eligible for treaty benefits or (b) if our common stock is held through certain foreign intermediaries, satisfy the relevant certification requirements of applicable U.S. Treasury regulations. Special certification and other requirements apply to certain non-U.S. Holders other than corporations or individuals.

If you are eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty, then you may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

4.      **Withholding, Backup Withholding and Information Reporting.**

The Reorganized Debtors will be required to report annually to the IRS and to you the amount of interest and dividends paid to you and the amount of tax, if any, withheld with respect to such interest and dividends. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which you are resident.

In addition, you may be subject to information reporting requirements and backup withholding tax with respect to interest and dividends paid on, and the proceeds of disposition of, the Exit Revolver, Exit Term Loan, Term Notes and Reorganized BMHC Equity Interests unless, generally, you certify under penalties of perjury (usually on IRS Form W-8BEN) that you are not a U.S. person or you otherwise establish an exemption.

Any amounts withheld under the backup withholding tax rules may be allowed as a refund or a credit against your U.S. federal income tax liability, provided the required information is timely furnished by you to the IRS.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's circumstances and income tax situation. All Holders of Claims should consult with their tax advisors as to the particular tax consequences to them of the transaction contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws and of any change in applicable tax laws.**

## XX.   CONCLUSION AND RECOMMENDATION

The Company believes the Plan is in the best interest of all creditors and urge the Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Company's Balloting and Claims Agent no later than **4:00 p.m. (Prevailing Eastern Time) on November ____, 2009.**

Dated:   October 21, 2009

Wilmington, Delaware

BUILDING MATERIALS HOLDING CORPORATION,
FOR ITSELF AND FOR ALL OF ITS SUBSIDIARIES,
AS DEBTORS AND DEBTORS IN POSSESSION

By:   _____
Name:   Paul S. Street
Title:   Senior Vice President, Chief Administrative
         Officer, General Counsel and Corporate
         Secretary

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal, Esq.
Matthew Kelsey, Esq.
Aaron G. York, Esq.
200 Park Avenue
47th Floor
New York, New York 10166
Telephone:  (212) 351-4000
Facsimile : (212) 351-4053

and

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

_____
Sean Beach, Esq.
Donald J. Bowman, Jr., Esq.
Robert F. Poppiti, Jr., Esq.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Counsel for the Debtors and Debtors-in-Possession*

115